# EXHIBIT 1A
# ALL PROCESS AND
# PLEADINGS SERVED UPON
# DEFENDANT

Electronically Issued
8/21/2020 11:50 AM

1  **SEI**
   WRIGHT, FINLAY & ZAK, LLP
2  Darren T. Brenner, Esq.
3  Nevada Bar No. 8386
   Lindsay D. Robbins, Esq.
4  Nevada Bar No. 13474
   7785 W. Sahara Ave., Suite 200
5  Las Vegas, NV 89117
6  (702) 637-2345; Fax: (702) 946-1345
   lrobbins@wrightlegal.net
7  *Attorneys for Plaintiff, Deutsche Bank National Trust Company as Trustee for New Century*
8  *Home Equity Loan Trust, Series 2005-D, Asset Backed Pass-Through Certificates*

9                    **EIGHTH JUDICIAL DISTRICT COURT**

10                       **CLARK COUNTY, NEVADA**

11

12  DEUTSCHE BANK NATIONAL TRUST          Case No.: A-20-819973-C
    COMPANY AS TRUSTEE FOR NEW
13  CENTURY HOME EQUITY LOAN TRUST,       Dept. No.:
    SERIES 2005-D, ASSET BACKED PASS-
14  THROUGH CERTIFICATES,
15
                     Plaintiff,
16        vs.
17  WESTCOR LAND TITLE INSURANCE
    COMPANY; DOE INDIVIDUALS I through
18  X; and ROE CORPORATIONS XI through
    XX, inclusive,
19
20                   Defendants.

21

22                           **SUMMONS**

23  **NOTICE!  YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU
    WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS.**
24  **READ THE INFORMATION BELOW.**

25  **TO THE DEFENDANT:** A Civil Complaint has been filed by the Plaintiff against you for the
26  relief set forth in the Complaint.

27          **WESTCOR LAND TITLE INSURANCE COMPANY**

28

                              Page 1 of 2

1     1.     If you intend to defend this lawsuit, within 21 days after this Summons is served on you exclusive of the day of service, you must do the following:

2

3     a.     File with the Clerk of the Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

4

5     b.     Serve a copy of your response upon the attorney whose name and address is shown below.

6     2.     Unless you respond, your default will be entered upon application of the Plaintiff, and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

7

8

9     3.     If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

10

Issued at direction of:

11

12    WRIGHT, FINLAY & ZAK, LLP          CLERK OF COURT

                                         8/24/2020

13    */s/ Lindsay D. Robbins*

     Lindsay D. Robbins, Esq.               DEPUTY CLERK

14    Nevada Bar No. 13474                DATE:

     7785 W. Sahara Ave., Suite 200       County Courthouse

15    Las Vegas, NV 89117

     *Attorneys for Plaintiff, Deutsche Bank National*    Demond Palmer

16    *Trust Company as Trustee for New Century Home*

17    *Equity Loan Trust, Series 2005-D, Asset Backed*

     *Pass-Through Certificates*

18

19

20

21

22

23

24

25

26

27

28

## DISTRICT COURT CIVIL COVER SHEET

............... Clark ......... County, Nevada

Case No. ...................................
(Assigned by Clerk's Office)

**CASE NO: A-20-819973-C**
**Department 24**

### I. Party Information (provide both home and mailing addresses if different)

| Plaintiff(s) (name/address/phone): | Defendant(s) (name/address/phone): |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE | WESTCOR LAND TITLE INSURANCE COMPANY |
| FOR NEW CENTURY HOME EQUITY LOAN TRUST, SERIES | |
| 2005-D ASSET BACKED PASS-THROUGH CERTIFICATES | |
| | |
| Attorney (name/address/phone): | Attorney (name/address/phone): |
| Wright, Finlay & Zak, LLP c/o Lindsay D. Robbins, Esq. | |
| 7785 W. Sahara Ave., Ste. 200 | |
| Las Vegas, NV 89117 | |
| (702) 475-7964 | |

### II. Nature of Controversy (please select the one most applicable filing type below)

#### Civil Case Filing Types

| **Real Property** | | **Torts** | |
|---|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** | |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability | |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☐ Intentional Misconduct | |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort | |
| ☐ Judicial Foreclosure | **Malpractice** | ☑ Insurance Tort | |
| ☐ Other Title to Property | ☐ Medical/Dental | ☐ Other Tort | |
| **Other Real Property** | ☐ Legal | | |
| ☐ Condemnation/Eminent Domain | ☐ Accounting | | |
| ☐ Other Real Property | ☐ Other Malpractice | | |

| **Probate** | **Construction Defect & Contract** | **Judicial Review/Appeal** |
|---|---|---|
| **Probate** (select case type and estate value) | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Foreclosure Mediation Case |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Petition to Seal Records |
| ☐ Special Administration | **Contract Case** | ☐ Mental Competency |
| ☐ Set Aside | ☐ Uniform Commercial Code | **Nevada State Agency Appeal** |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Department of Motor Vehicle |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Worker's Compensation |
| **Estate Value** | ☐ Commercial Instrument | ☐ Other Nevada State Agency |
| ☐ Over $200,000 | ☐ Collection of Accounts | **Appeal Other** |
| ☐ Between $100,000 and $200,000 | ☐ Employment Contract | ☐ Appeal from Lower Court |
| ☐ Under $100,000 or Unknown | ☐ Other Contract | ☐ Other Judicial Review/Appeal |
| ☐ Under $2,500 | | |

| **Civil Writ** | | **Other Civil Filing** |
|---|---|---|
| **Civil Writ** | | **Other Civil Filing** |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment |
| ☐ Writ of Quo Warrant | | ☐ Other Civil Matters |

*Business Court filings should be filed using the Business Court civil coversheet.*

**August 21, 2020**
_____
Date

_____
Signature of initiating party or representative

*See other side for family-related case filings.*

Nevada AOC - Research Statistics Unit
Pursuant to NRS 3.275

Form PA 201
Rev 3.1

Electronically Filed
8/21/2020 11:42 AM
Steven D. Grierson
CLERK OF THE COURT

1

**COMP**
WRIGHT, FINLAY & ZAK, LLP
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Lindsay D. Robbins, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
(702) 637-2345; Fax: (702) 946-1345
lrobbins@wrightlegal.net
*Attorneys for Plaintiff, Deutsche Bank National Trust Company as Trustee for New Century Home Equity Loan Trust, Series 2005-D, Asset Backed Pass-Through Certificates*

CASE NO: A-20-819973-C
Department 24

**EIGHTH JUDICIAL DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR NEW CENTURY HOME EQUITY LOAN TRUST, SERIES 2005-D, ASSET BACKED PASS-THROUGH CERTIFICATES,<br><br>        Plaintiff,<br><br>vs.<br><br>WESTCOR LAND TITLE INSURANCE COMPANY; DOE INDIVIDUALS I through X; and ROE CORPORATIONS XI through XX, inclusive,<br><br>        Defendants. | Case No.:<br><br>Dept. No.:<br><br>**COMPLAINT**<br><br>**ARBITRATION EXEMPT: ACTION FOR DECLARATORY RELIEF** |

Plaintiff Deutsche Bank National Trust Company as Trustee for New Century Home Equity Loan Trust, Series 2005-D, Asset Backed Pass-Through Certificates ("Deutsche Bank"), by and through its attorneys of record, Darren T. Brenner, Esq. and Lindsay D. Robbins, Esq., of the law firm of Wright, Finlay & Zak, LLP, submits its Complaint against Westcor Title Insurance Company ("Westcor") for breach of its obligation to defend and indemnify Deutsche

Bank under a title insurance policy issued to insure a deed of trust on real property located in Nevada.

Title insurers, like Westcor, have known since the early 1990's that homeowners associations in some states, including Nevada, impose liens that can attain superpriority over senior mortgages and deeds of trust. They should. Title insurers are the experts on title, and lenders like Deutsche Bank rely upon and pay them handsomely for their expertise and protection.

Title insurers, like Westcor, have acknowledged the coverage that Deutsche Bank claims is due and owing in their manuals. These insurers themselves developed the trade usage describing the endorsements at issue in this case as providing coverage to an insured lender for losses caused by the enforcement of an association's superpriority lien.

Westcor's coverage position in this specific case is directly at odds with the trade usage they developed globally. This factual background must be considered when interpreting the title insurance contract drafted and issued by the insurers to Deutsche Bank's predecessor-in-interest.

### Parties, Jurisdiction and Venue

1.   Plaintiff Deutsche Bank is a national banking association as that term is defined in the National Bank Act. Deutsche Bank has its main office in New York, New York and doing business in Clark County, Nevada.

2.   Defendant Westcor is a California corporation with its principal place of business in Florida and doing business in Clark County, Nevada.

3.   Deutsche Bank does not know the true names, capacities or bases of liability of fictitious defendants sued as Does I through X and Roe Corporations XI through XX, inclusive

(collectively "fictitious Defendants").  Each fictitiously named defendant is in some way liable to Deutsche Bank.  Deutsche Bank will amend this Complaint to reflect the true names of said defendants when the same have been ascertained.

4.     This matter is exempt from Arbitration as Deutsche Bank has requested a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA's foreclosure sale.

5.   This Court has personal jurisdiction over Westcor because it has engaged in the business of issuing title insurance policies insuring deeds of trust on land located in the State of Nevada and therefore have sufficient contacts with the State to have availed themselves of the State's jurisdiction.

6.   Venue is appropriate in this Court because this judicial district is where a substantial part of the events giving rise to Deutsche Bank's claims took place, and it is the location of the property subject to the insured deed of trust that is at the core of this lawsuit.

### *Nature of Title Insurance*

7.   A title insurance policy is a contract through which the insurer is paid one sum in consideration for agreeing to indemnify the insured up to a specified amount against loss caused by encumbrances upon or defects in the title to real property in which the insured has an interest.

8.   Lenders such as Deutsche Bank often seek to obtain title insurance policies in connection with loans they advance that are secured by interests in real property.  The title insurance policy generally protects the lender against risks associated with loss of title or practical use of the property, subject to the policy's terms, exclusions, and conditions.

9.  As a title insurance underwriter, Westcor authorized certain entities and individuals in Nevada to issue title insurance policies on their behalf.  In this case, Westcor used non-party Nevada Title Company ("Nevada Title") to issue the subject policy.[1]

10. This lawsuit concerns the issuance of a title insurance policy in favor of "Home123 Corporation, its Successors and/or Assigns."[2]  Deutsche Bank is the insured entity under the policy.

11. Before 2014, Westcor issued to Deutsche Bank (or Deutsche Bank's predecessors-in-interest) a number of title insurance policies.

12. The large majority of insurance policies issued by Westcor and Westcor's issuing agents use standard forms promulgated by the American Land Title Association ("ALTA") and the California Land Title Association ("CLTA").

13. ALTA and CLTA are trade groups made up of representatives from the major title insurance underwriters and issuers, including Westcor.

14. These standard ALTA and CLTA forms are used by multiple title insurers, which publish guides concerning the coverage (and exceptions thereto) provided by the standard policy.  The standard ALTA policy form has been revised from time to time, including changes in 1992, 2006, and 2012.

15. There are a number of ALTA standardized endorsement forms that can be issued with the standard policy to modify the scope of coverage available.  Westcor has also used CLTA standardized endorsement forms from time to time.

16. Non-party Chicago Title Insurance Company, a title insurer that issues the same ALTA and CLTA standard form endorsements as Westcor, issued a 2013 Endorsement Manual states

---

[1] Nevada Title Company has since merged with First American Title Company.
[2] A true and correct copy of the Title Insurance Policy is attached as **Exhibit 1**. *See id*. at p. 6.

that "endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of" a title insurance policy.[3]

17. Additionally, Westcor's Underwriting Manual states that "[e]ndorsements to title policies serve to modify or amend the wording or language of title policies, thereby expanding . . . the coverage afforded under such title policies. This enables insurers to tailor coverage to meet specific transaction or customer needs."[4]

18. This is consistent with trade usage of the term "endorsement" among title insurers and their insureds. *See, e.g.*, Joyce D. Palomar, *Title Insurance Law* § 9:1 (2013-14 ed.) (explaining that endorsements serve two primary purposes: (1) "they may provide affirmative coverage for facts that exist in a transaction which standard title insurance policies have not traditionally addressed," or (2) they "may 'insure over' or modify the effect of preprinted policy exclusions or exceptions").

19. Lenders commonly request that title insurers issue ALTA Endorsement Form 9 ("Form 9"), or its CLTA equivalent, CLTA Endorsement Form 100 ("Form 100"). These "comprehensive" endorsements provide a range of guarantees to the insured relating to the existence of covenants, conditions, or restrictions affecting or governing the property which could cause damage to the insured lender's interest at the time the policy is issued or in the future.

20. Form 100 is the equivalent of Form 9.[5]

---

[3] A true and correct copy of Chicago Title's 2013 Endorsement Manual is attached as **Exhibit 2**.
[4] A true and correct copy of Westcor's Underwriting Manual is attached as **Exhibit 3**. *See id.* at 69.
[5] **Ex. 2** (Chicago's 2013 Endorsement Manual), at 3.

21. It is commonly understood between title insurers and their insureds that Form 100 "[p]rovides comprehensive coverage for [an] insured ALTA lender against loss by reason of present *or future* [covenants, conditions and restrictions] violations[.]"[6]

***Westcor Issued Policies Understood to Cover Nevada Superpriority Liens***

22. In 1982, the Uniform Law Commission promulgated the Uniform Common Interest Ownership Act ("UCIOA").  UCIOA provided a number of standardized terms governing the formation of common interest associations, including condominium associations and homeowners associations.

23. As relevant here, UCIOA provided that homeowners associations' covenants, conditions, and restrictions included a "superpriority" lien for unpaid assessments, which came into existence when the association was formed (i.e., when its declaration of covenants, conditions, and restrictions were recorded), and would take priority over a subsequently recorded mortgage or deed of trust even if no assessments were due at the time the mortgage or deed of trust was recorded.

24. In 1991, the Nevada Legislature adopted the 1982 version of UCIOA, codifying it in Chapter 116 of the Nevada Revised Statutes.

25. Chapter 116 includes NRS 116.3116, which, at the time of the events relevant to this suit, stated in relevant part:

> 1.   The association has a lien on a unit for any construction penalty that is imposed against the unit's owner pursuant to NRS 116.310305, any assessment levied against that unit or any fines imposed against the unit's owner from the time the construction penalty, assessment or fine becomes due. . . .
>
> 2.   A lien under this section is prior to all other liens and encumbrances on a unit except:
> . . .

---

[6] A true and correct copy of Fidelity's Endorsement Guide is attached as **Exhibit 4** (emphasis added). *See id.* at 1.

(b) A first security interest on the unit recorded before the date on which the assessment sought to be enforced became delinquent . . . ;

. . .

The lien is also prior to all security interests described in paragraph (b) to the extent of any charges incurred by the association on a unit pursuant to NRS 116.310312 and to the extent of the assessments for common expenses based on the periodic budget adopted by the association pursuant to NRS 116.3115 which would have become due in the absence of acceleration during the 9 months immediately preceding institution of an action to enforce the lien . . . .

. . .

4. Recording of the declaration constitutes record notice and perfection of the lien. No further recordation of any claim of lien for assessment under this section is required.

26. Under NRS 116.3116, from the time an association's covenants, conditions, and restrictions are recorded, the properties governed by the association are encumbered by a lien that secures all assessments.  Chapter 116 does not require that an association record a separate lien before the lien is foreclosed.

27. As part of its adoption of UCIOA, the Nevada Legislature also enacted NRS 116.1104:

Except as expressly provided in this chapter, [NRS 116's] provisions may not be varied by agreement, and rights conferred by it may not be waived. Except as otherwise provided in paragraph (b) of subsection 2 of NRS 116.12075, a declarant may not act under a power of attorney, or use any other device, to evade the limitations or prohibitions of this chapter or the declaration.

28. The Nevada Legislature also enacted NRS 116.1206(1):

Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.

29. Westcor and other title insurers were aware of Nevada's adoption of NRS 116, including its provision of a "superpriority" lien in a homeowners association's covenants, conditions, and restrictions.

30. Westcor and other title insurers believed they could be liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained an endorsement on Form 9 or its CLTA equivalent, Form 100.

31. In a bulletin dated December 12, 1991, non-party Stewart Title Guarantee Company ("Stewart Title") sent its issuing agents in eleven States (including Nevada) a bulletin indicating that Form 9 would provide coverage for losses caused by associations' superpriority liens. Stewart Title provided specific instructions to its agents to delete paragraph 2 of Form 9 before including either endorsement with a title insurance policy.[7]

32. In July 1993, Stewart Title issued a bulletin to its issuing agents in twelve States (including Nevada) indicating that "future assessments (usually six months) have priority over a prior mortgage," and that if the issuing agents were issuing Form 9 with their policies, they should add the following exception to Form 9: "The Policy and any endorsements to the Policy do not insure against loss because of condominium assessments not yet due and payable."[8]

33. Stewart Title's bulletins are available to the public on the Internet.  Westcor's bulletins and endorsement manuals are not.[9]

34. On information and belief, between 1991 and 2014, Westcor provided instructions to their issuing agents, including Nevada Title, to modify Form 9 or Form 100 before issuing any policy in Nevada for a property governed by a homeowners association.

35. On information and belief, between 1991 and the present, Westcor has published underwriting manuals indicating that Paragraph 1(a) of Form 9 and Form 100 provides coverage for losses due to "provision[s] [in recorded covenants, conditions and restrictions] permitting a

---

[7] A true and correct copy of Stewart Title Bulletin MU000003 is attached as **Exhibit 5**.
[8] A true and correct copy of Stewart Title Bulletin MU000008 is attached as **Exhibit 6**.
[9] While Westcor's 2017 Underwriting Manual is publicly available, the section concerning Endorsements has "been removed for extensive revision and re-write. *See* **Ex. 3** at 69.

home owners or civic association to levy an assessment, secured by a lien with priority over the insured deed of trust."

36. From 1991 until the present, Westcor has provided endorsement manuals for their issuing agents, including Nevada Title, explaining the scope of coverage provided by Form 9 and Form 100.

37. On information and belief, Westcor's endorsement manuals informed their issuing agents that Form 9 and Form 100 would provide coverage to an insured that suffered loss or damage due to an association's lien for assessments that became delinquent after the date of policy.

38. Westcor believed it was liable for an insured's losses caused by the enforcement of an association's superpriority lien if the policy at issue contained in Form 9/Form 100.

39. Contemporary trade usage describing the terms and scope of Form 9 and Form 100 indicates that those endorsements provide coverage for an insured lender in the event that covenants, conditions, and restrictions of record at the date of the policy allow an association's lien to take priority over the insured mortgage or deed of trust. *See, e.g.*, Barlow Burke, LAW OF TITLE INSURANCE § 10.05[B] (3d ed., 2002 Supp.) (in describing Form 9: "A second type of endorsement of interest to an insured lender is one covering the loss of lien priority because of the enforcement of a private covenant applicable to the title. … The priority of these covenants, restrictions, and conditions is particularly important to mortgage lenders with loan policies because their supporting documents, also recorded, typically include the power to compel the payment of amounts for the maintenance and repair of the common facilities in a large subdivision.  Often the exercise of these maintenance and repair functions is put in the hands of a subdivision homeowner's association.  It also typically holds a lien to compel the payment of

these amounts, and that lien also has priority over later recorded mortgage."); *id.* ("Future violations [of covenants, conditions, and restrictions] are also insured against, but only to the extent that the violations occur between the policy date and the acquisition of title in any foreclosure action, provided the violation causes the insured to be insecure or results in loss or damage to the title acquired by the insured in satisfaction of the secured debt, as where the insured takes a deed in lieu of foreclosure." (citing ALTA Form 9 ¶¶ 1(a), 2)).

40. Westcor represented to the public and to Deutsche Bank that Form 9 and Form 100 provided coverage against losses caused by an association's superpriority lien.

41. Despite having actual knowledge of the possibility that Deutsche Bank could lose its security interest in properties that were governed by homeowners associations, at no time did Westcor inform Deutsche Bank or its predecessors-in-interest of the danger of losing its security interests in such properties.

### *The Nevada Supreme Court Interprets NRS 116.3116*

42. In *SFR Investments Pool 1, LLC v. U.S. Bank, N.A.*, 130 Nev. 742 (2014), the Nevada Supreme Court confirmed that a portion of the lien included in a Nevada homeowners association's covenants, conditions, and restrictions has superpriority over a recorded first deed of trust.

43. The Court further held that NRS 116.1104 rendered inoperative clauses in associations' covenants, conditions, and restrictions that purported to allow senior deeds of trust to survive an association's foreclosure of the superpriority lien provided in its covenants, conditions, and restrictions.

44. *SFR Investments* confirmed that the proper foreclosure of an association's superpriority lien extinguishes a recorded senior deed of trust on the same property.

45. Following *SFR Investments*, Stewart Title issued a bulletin to its agents in Nevada indicating that "in lieu of issuing a[] [Form 9] for a lender's policy," its agents should "issue the ALTA 9.10."[10]

46. On information and belief, Westcor sent similar bulletins or documents to its agents, including Nevada Title, following *SFR Investments*, indicating their belief that Form 9 and Form 100 provided coverage for losses caused by superpriority liens.

47. In *K&P Homes v. Christiana Trust*, 133 Nev. 364 (2017), the Nevada Supreme Court held that *SFR Investments* "did not create new law or overrule existing precedent; rather, that decision declared what NRS 116.3116 has required since the statute's inception" in 1991.

48. Under controlling Nevada law, the covenants, conditions, and restrictions at issue here have provided the association with a lien that could attain priority over a senior deed of trust since 1991.

### Facts Specific to this Case

49. This action concerns real property located at 8213 Fawn Heather Court, Las Vegas, Nevada 89149 ("Property").

50. The Property is subject to the Declaration of Covenants, Conditions, and Restrictions and Grant and Reservation of Easements ("CC&Rs") for Timberlake Street and Landscape Maintenance Association ("HOA").[11]

51. The Recitals of the Original CC&Rs establishes that one of the CC&Rs' purposes is to establish "assessment obligation[s]" upon the properties governed by the HOA, stating:

---

[10] A true and correct copy of Stewart Title Bulletin NV2014002 is attached as **Exhibit 7**.

[11] A true and correct copy of the CC&Rs recorded in 1997 ("Original CC&Rs") are attached as **Exhibit 8**. A true and correct copy of the Restated CC&Rs recorded in 2002 ("Restated CC&Rs") is attached at **Exhibit 9**.

**NOW, THEREFORE,** Declarant hereby records this Declaration for the limited purpose of identifying and establishing each Owner's maintenance responsibilities, as well as the  assessment obligation for the Common Elements and the maintenance and repair thereof.

52. The Restated CC&Rs incorporate the Original CC&Rs by reference.[12]

53. Section 5.1 of the Restated CC&Rs establishes that the owners of properties governed by the HOA "covenant and agree to pay" assessments, stating:

> 5.1.   Personal Obligation of Assessments.  Each Owner by accepting title to a Lot or any interest therein, whether or not it shall be expressed in the deed or other instrument conveying title, shall be deemed to covenant and agree to pay to the Association. Annual Assessments and other amounts as required or provided for in this Declaration.

54. Section 5.1 of the CC&Rs further states:

> All such assessments, together with any and all late charges, fines, interest, attorneys' fees and other costs or expenses incurred by the Association in collecting unpaid amounts shall be a charge on the Lot, against which such assessment is made, enforceable and collectible as Annual or Special Assessments. Each such assessment, together with late charges, interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the person who was the Owner of the Lot at the time when the assessment fell due.

55. Thus, pursuant to the CC&Rs, an owner of property governed by the HOA covenants to pay assessments, and those assessments constitute a "charge on the Lot" secured by a continuing lien that has encumbered the property since the CC&Rs were recorded.

56. The Preamble of the Restated CC&Rs states that the CC&Rs were restated to "conform to the provisions of" NRS Chapter 116:

---

[12] **Ex. 9** (Restated CC&Rs), at para. A at 1.

C.     WHEREAS, in 1999, the Nevada Uniform Common Interest Ownership Act, Chapter 116 of the Nevada Revised Statutes (the "Act") was amended by Senate Bill 451;

D.     WHEREAS, the Editor's Note to NRS 116.31065 requires any post-January 1992 declarations of common-interest communities to conform to the provisions of the Act, as amended by Senate Bill 451.

E.     WHEREAS, the Association wishes to comply with the provisions of the Act by executing this Restated Declaration to conform the Original Declaration to the Act;

NOW THEREFORE, the Association hereby RESTATES the Original Declaration in its entirety in order to conform the Original Declaration to the Act.

57. Section 5.15 of the Restated CC&Rs further states that the HOA has a priority lien pursuant to NRS Chapter 116:

> 5.15.  Creation and Release of Lien. All sums assessed in accordance with the provisions of this Declaration shall constitute a lien on the respective Lot from the time such sums become due prior and superior to all other liens and encumbrances thereon except (a) liens and encumbrances recorded before recordation of this Declaration; (b) a first mortgage on the Lot recorded before the date on which the assessment sought to be enforced became delinquent, except the Association lien shall have priority for six (6) months Annual Assessments and related charges including late charges, interest, and attorneys' fees, pursuant to Section 116.3116.(2) of the Nevada Revised Statutes;

58. On August 26, 2005, Home123 Corporation ("Lender") provided a $400,000.00 loan to Michael R. LaPointe and Kimberly J. LaPointe ("Borrowers") to finance the purchase of the Property.[13]

59. By purchasing the Property, Borrowers covenanted to pay to the HOA annual assessments or charges.

60. On the same day, Borrowers executed a deed of trust ("Deed of Trust"), providing a security interest in the Property in Lender's favor.[14]

61. On November 23, 2009, the Deed of Trust was assigned to Deutsche Bank.[15]

---

[13] A true and correct copy of the recorded Deed of Trust is attached as **Exhibit 10**.
[14] *Id.*
[15] A true and correct copy of the recorded Assignment of Deed of Trust is attached as **Exhibit 11**.

62. On October 12, 2005, as part of the loan origination, Lender was named as the insured on a lender's title insurance policy, numbered 310-249418 ("Policy").[16]

63. The Policy obligates the Insurer to pay the costs, attorneys' fees, and expenses incurred in defense of the title or the lien of the Deed of Trust, as insured.[17]

64. The Policy includes a standard endorsement on Form 100.[18]

65. Pursuant to Form 100, the Insurer promised to insure Lender and its successors:

> against loss or damage which [Lender or its successors] shall sustain by reason of any of:
>
> 1.      The existence of any of the following:
>
> a.      Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;
>
> …
>
> 2(a).    Any future violations on the land of any covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest referred to in Schedule A by the insured, provided the violation results in: the invalidity, loss of priority, or unenforceability of the lien of the mortgage referred to in Schedule A, or result in impairment of loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

66. At the time it provided the Policy to Lender, Westcor was aware of the HOA's CC&Rs, the HOA's lien for unpaid assessments, and the fact that the lien could take priority over the Deed of Trust.

67. In or around 2011, Borrowers ceased making payments to the HOA for monthly assessments, in violation of their covenant under Section 5.1 of the CC&Rs.

---

[16] *See* **Ex. 1** (Title Policy).
[17] *Id.* at Form 1, at 3.
[18] *Id.* at Form 100, at 10.

68. On July 25, 2011, the HOA, through its agent Hampton and Hampton, P.C. ("H&H"), recorded a Notice of Delinquent Assessment Lien against the Property.[19]  The Notice states that it is being given pursuant to NRS Chapter 116 and the HOA's CC&Rs.[20]

69. On October 14, 2012, the law office of Miles Bauer Bergstrom and Winters ("MBBW"), on behalf of Deutsche Bank's predecessor, sent correspondence to H&H requesting a payoff statement for the superpriority portion of the HOA's lien under NRS 116.3116.

70. On October 25, 2011, H&H submitted a payoff statement indicating that the amount for nine months of assessments that obtained superpriority status under NRS 116.3116 was $378.00.

71. On November 6, 2011, MBBW submitted a check to H&H for $398.00, which was applied to the superpriority portion of the HOA's lien.

72. On April 8, 2013, without a new Notice of Delinquent Assessment being recorded, the HOA, through H&H recorded a Notice of Trustee's Sale.

73. On information and belief, the Notice of Trustee's Sale was not mailed or received by Deutsche Bank.

74. On May 23, 2013, the HOA sold the Property at foreclosure, conveying it to Underwood Partners LLC ("Buyer") in exchange for payment of $18,000.00.[21]  The Trustee's Deed states that the Property was conveyed to Buyer "pursuant to the powers conferred" by the Nevada Revised Statutes and the HOA's CC&Rs.[22]

---

[19] A true and correct copy of the Notice of Delinquent Assessment Lien is attached as **Exhibit 12**.
[20] *See id.*
[21] A true and correct copy of the Trustee's Deed Upon Sale is attached as **Exhibit 13**.
[22] *Id.*

75. On October 18, 2013, Buyer sold its interest in the Property to NV Eagles LLC ("NV Eagles").[23]

76. On March 21, 2016, NV Eagles, LLC filed a Complaint against Deutsche Bank in the Eighth Judicial District Court for the State of Nevada, County of Clark, Case No. A-16-733790-C, seeking a declaration that it owned the Property free and clear of the Deed of Trust.[24]   On August 31, 2016—*after* Deutsche Bank submitted its claim to Westcor—Deutsche Bank filed its Answer and Counterclaim, asserting that the Deed of Trust survived the HOA's foreclosure sale.[25] On February 1, 2018, the district court entered summary judgment in favor of NV Eagles. Deutsche Bank appealed to the Nevada Supreme Court as Case No. 75275 and the Court reversed and remanded in favor of Deutsche Bank on the basis of the pre-sale tender of the superpriority lien. ("Litigation").

77. Deutsche Bank has incurred significant attorneys' fees and costs defending its interest in the Property.

78. As of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust] c[ould] be cut off, subordinated, or otherwise impaired,"[26] including the payment covenant contained in Section 5.1 of the HOA's CC&Rs.

79. The HOA's foreclosure sale, conducted "pursuant to the powers conferred" by the HOA's CC&Rs, resulted in the purported extinguishment of the Deed of Trust.

80. Deutsche Bank has suffered losses or damages as a result of "future" (i.e., post-Date of Policy) "violation[s] on the land of" the HOA's CC&Rs – including the Borrowers' violation of

---

[23] A true and correct copy of the Grant, Bargain, Sale Deed is attached as **Exhibit 14**.
[24] A true and correct copy of the Complaint is attached as **Exhibit 15**.
[25] A true and correct copy of the Answer and Counterclaim is attached as **Exhibit 16**.
[26] *See* **Ex. 1** (Title Policy), at Form 100 at 10.

their covenant to pay assessments that the CC&Rs stated were a "charge on the Lot"[27] – which occurred prior to Deutsche Bank's acquisition of title to the Property and resulted in the invalidity, loss of priority, or unenforceability of the lien of the Deed of Trust.[28]

81. On April 28, 2016—shortly after NV Eagles filed its Compliant against Deutsche Bank and before Deutsche Bank filed its Answer and Counterclaim—Deutsche Bank submitted a claim under the Policy to Westcor.[29]  In its claim, Deutsche Bank identified Form 100 as providing coverage for losses caused by the HOA's foreclosure of its purportedly senior lien and requested that Westcor fulfill its obligations to defend Deutsche Bank in the Litigation and indemnify Deutsche Bank against losses.[30]

82. On August 22, 2016, Tiffany J. Riggs, Claims Counsel for Westcor, sent Deutsche Bank's counsel a letter indicating that Westcor was denying coverage under the Policy.[31]

83. Westcor contended that Form 100 did not provide coverage because "[t]he priority of the Lien is not established by the CC&Rs as they contain a mortgagee protection provision."[32]

84. The CC&Rs do not contain a mortgagee protection provision. Instead, Section 5.15 explicitly states that the HOA has a superpriority lien pursuant to NRS Chapter 116.[33]

85. Additionally, *SFR Investments* declared the mortgagee protection provisions contained in an HOA's CC&Rs *void ab initio*, meaning the provisions are treated as if they never existed.

86. *SFR Investments* "declared what NRS 116.3116 has required since the statute's inception" in 1991.  *See K&P Homes*, 133 Nev. at 368.  It "did not create new law."  *See id.*

---

[27] *See* **Ex. 9** (Restated CC&Rs), at 14, § 6.01.
[28] *See* **Ex. 1** (Title Policy), at 3, insuring provision Nos. 5-6.
[29] A true and correct copy of Deutsche Bank's claim to Westcor is attached as **Exhibit 17**.
[30] *Id.* at 2.
[31] A true and correct copy of Westcor's first denial letter is attached as **Exhibit 18**.
[32] *See id.*, at 2.
[33] *See* **Ex. 9** (Restated CC&Rs), at 18, § 5.15.

87. The Trustee's Deed stated the HOA's foreclosure sale was conducted "pursuant to the powers conferred" by the HOA's CC&Rs.[34]

88. In its denial, Westcor also contended the lien was created after the Date of Policy and therefore excluded under Exclusion 3(d) for "[d]efects, liens encumbrances . . . attaching or created subsequent to Date of Policy."[35]

89. Pursuant to NRS 116.3116, recording of the HOA's declaration constitutes record notice and perfection of the lien.

90. Additionally, the HOA's CC&Rs states that the HOA's lien is "created" pursuant to the declaration and that "[a]ll sums assessed in accordance with the provisions of [the] Declaration shall constitute a lien on the respective Lot . . ."[36]

91. In its denial, Westcor also contended that Deutsche Bank failed to comply with Condition 3 of the Policy because "the Insured was notified of the Lien in 2011 or in 2013 at the latest" and the claim was not received until 2016.[37]

92. Condition 3(ii) of the Policy requires that the insured notify Westcor once the insured obtains "knowledge" of an adverse claim to title.[38]

93. Knowledge is defined under the Policy as "actual knowledge, not constructive knowledge or notice which may be imputed to an insured by reason of the public records[.]"[39]

94. The Policy states that "failure to notify [Westcor] shall in no case prejudice the rights of any insured under [the] policy unless [Westcor] shall be prejudiced by the failure and then only to the extent of the prejudice."[40]

---

[34] *See* **Ex. 13** (Trustee's Deed).
[35] **Ex. 18** (Westcor's First Denial) at 2.
[36] **Ex. 9** (Restated CC&Rs) at 18, § 5.15.
[37] *Id.* at 2.
[38] **Ex. 1** (Title Policy) at 4.
[39] *Id.* at Paragraph 1(c).

95. Deutsche Bank and/or its predecessors did not have "actual knowledge" of a title defect to trigger notice under Condition 3.

96. Even if Deutsche Bank and/or its predecessor had actual knowledge, there was no prejudice to Westcor based on the tender and acceptance of the superpriority portion of the HOA's lien in advance of the foreclosure sale.

97. On June 13, 2017, Deutsche Bank's counsel sent a substantive 275 page letter to Westcor rebutting each of its coverage positions from its first denial and requesting that it reconsider its coverage determination.[41]

98. On July 17, 2017, Ms. Riggs sent Deutsche Bank's counsel a one (1) page letter stating that "nothing [] presented in [the] request for reconsideration constitutes new information" and that Westcor was again denying coverage under the Policy.[42]

## FIRST CAUSE OF ACTION
### (Declaratory Judgment – Westcor)

99. The allegations in Paragraphs 1 through 98 above are expressly incorporated by reference.

100.    This Court has the power and authority to declare Deutsche Bank's and Westcor's rights and legal relations in connection with the Policy.

101.    An actual controversy has arisen between Deutsche Bank and Westcor, as to whether the Policy provides coverage to Deutsche Bank for losses caused by the HOA's foreclosure of its purportedly senior lien.

102.    The Policy states that the Insurer insured Lender and its successors:

---

[40] *Id.*

[41] A true and correct copy of Deutsche Bank's counsel's letter to Westcor is attached as **Exhibit 19**.

[42] A true and correct copy of Westcor's second denial letter is attached as **Exhibit 20**.

against loss or damage which [Lender or its successors] shall sustain by reason of any of the following matters:

1.      The existence of any of the following:

a.      Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;

…

2(a).   Any future violations on the land of any covenants, conditions or restrictions occurring prior to the acquisition of title to the estate or interest referred to in Schedule A by the insured, provided the violation results in: the invalidity, loss of priority, or unenforceability of the lien of the mortgage referred to in Schedule A, or result in impairment of loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;

103.    Pursuant to Section 5.1 of the CC&Rs, which were of record on the Date of Policy, Borrowers covenanted to pay assessments, which constituted a "charge on the Lot" secured by a continuing lien that encumbered the Property.[43]

104.    Pursuant to Section 5.15 of the CC&Rs,[44] a portion of the HOA's lien encumbering the Property had priority over, and thus "subordinate[]," the Deed of Trust.

105.    The foreclosure of the superpriority portion of the HOA's lien imposed by the CC&Rs would "cut off" and "impair[]" the Deed of Trust.

106.    Thus, as of the Date of Policy, there existed "[c]ovenants, conditions, or restrictions under which the [Deed of Trust] c[ould] be cut off, subordinated, or otherwise impaired[.]"[45]

107.    After the Date of Policy, Borrowers violated their covenant to pay HOA assessments. Section 5.1 of the CC&Rs states that assessments shall be a charge on the land.[46]

---

[43] **Ex. 9** (Restated CC&Rs), at 13, § 5.1.
[44] *Id.* at 18, § 5.15.
[45] *See* **Ex. 1** (Title Policy), at 10, Para. 1(a) of Form 100.
[46] *See* **Ex. 9** (Restated CC&Rs), at 13, § 5.1.

108.     The Borrowers' post-Policy violation of their payment covenant thus constituted a "future violation[] on the land of [the HOA's] covenants, conditions or restrictions," which occurred "prior to the acquisition of title to the" Property by Deutsche Bank.[47]

109.      The Borrowers' delinquent assessments were secured by the continuing lien provided by the CC&Rs.

110.     The foreclosure of that lien purportedly "result[ed] in impairment and loss" of the Deed of Trust.[48]

111.     For these reasons, under Paragraphs 1(a) and 2(a) of Form 100, the Policy provides coverage for all losses and damages sustained by Deutsche Bank as a result of the HOA's foreclosure sale.

112.     Westcor nevertheless denied coverage based on Exclusion from Coverage 3(d), which "excluded from coverage" any "[d]efects, liens, encumbrances, adverse claims, or other matters … attaching or created subsequent to Date of Policy, and Condition 3.[49]

113.     When the Policy was issued, it was the intent of Lender and Westcor that Form 100 would provide coverage for losses or damages sustained as a result of the CC&Rs.

114.     Contemporary trade usage describing the terms and scope of Form 100 indicates the endorsement provides coverage for an insured lender for losses and damages sustained as a result of covenants, conditions, and restrictions.

115.     Schedule B Exception 3 and Exclusion 3(d) cannot be interpreted to remove coverage provided by Form 100.  *See Nat'l Union Fire Ins. Co. of the State of Pa., Inc. v. Reno's Exec. Air, Inc.*, 100 Nev. 360, 365 (1984) ("Clauses providing coverage are broadly

---

[47] *See* **Ex. 1** (Title Policy), at 10, Para. 2(a) of Form 100.
[48] *See id.*
[49] *See* **Ex. 18** (Westcor's First Denial Letter), at 2.

interpreted so as to afford the greatest possible coverage to the insured, [and] clauses excluding coverage are interpreted narrowly against the insurer.").

116.     In its denial, Westcor further contended that Form 100 did not provide coverage because the "priority of the Lien is not established by the CC&Rs as they contain a mortgage protection provision."[50]

117.     In fact, the CC&Rs *do not* contain a mortgage protection provision and instead, the CC&Rs provide the HOA with a priority lien pursuant to NRS 116.[51]

118.     Even if the CC&Rs had not expressly incorporated NRS 116.3116, they would have been "conformed" to incorporate NRS 116.3116 by operation of law.  *See* NRS 116.1206(1) ("Any provision contained in a declaration, bylaw or other governing document of a common-interest community that violates the provisions of this chapter shall be deemed to conform with those provisions by operation of law, and any such declaration, bylaw or other governing document is not required to be amended to conform to those provisions.").

119.     Moreover, Paragraph 2(a) of Form 100 expressly provides coverage for losses resulting from "future violations" of the HOA's CC&Rs, like the Borrowers' post-Policy violations of their payment covenant.[52]

120.     Deutsche Bank complied with all material obligations under the Policy, including Condition 3.

121.     Deutsche Bank is entitled to a declaration that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA's foreclosure sale.

---

[50] *See id.*

[51] **Ex. 9** (Restated CC&Rs) at 18, § 5.15.

[52] *See* **Ex. 1** (Title Policy), at 10, Para. 2(a) of Form 100.

122.     Deutsche Bank is also entitled to a declaration regarding which of the Defendants is the "Insurer" for purposes of providing coverage under the Policy.

123.     Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### SECOND CAUSE OF ACTION
**(Breach of Contract – Westcor)**

124.     The allegations in Paragraphs 1 through 98 above are expressly incorporated by reference.

125.     Deutsche Bank is the insured under the Policy.

126.     Deutsche Bank complied with all material obligations under the Policy, including Condition 3.

127.     Westcor issued the Policy to Lender, which provides coverage for any loss or damage sustained by Lender or its successors as a result of covenants, conditions, or restrictions under which the Deed of Trust could "be cut off, subordinated, or otherwise impaired," or "any future violations on the land of any covenants, conditions, or restrictions" which result in the impairment or loss of the Deed of Trust.

128.     The Policy gave rise to a duty to defend Deutsche Bank in any litigation arising from a challenge to the validity or priority of Deutsche Bank's Deed of Trust and to either cure the defects on title or indemnify Deutsche Bank for any losses it sustained as a result of the loss of priority or extinguishment of its Deed of Trust.

129.     As described above in Paragraph 77, Deutsche Bank has suffered an insured loss or damages under the Policy.

130.     Westcor breached the Policy by refusing to provide a defense to the Litigation, refusing to indemnify Deutsche Bank for its covered losses, and refusing to attempt to cure the covered title defect.

131.     These breaches of the Policy have proximately resulted in general and special damages to Deutsche Bank, including attorneys' fees and litigation expenses, which Deutsche Bank has incurred and will continue to incur.  Such damages and expenses should be paid by the Insurer under the Policy's terms.

132.     As a result of these breaches of the Policy, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## THIRD CAUSE OF ACTION
**(Bad Faith / Breach of the Covenant of Good Faith and Fair Dealing – Westcor)**

133.     The allegations in Paragraphs 1 through 98 above are expressly incorporated by reference.

134.     Westcor owed Deutsche Bank a duty to act in good faith and in a manner consistent with fair dealing in their considerations of Deutsche Bank's claim under the Policy, including a duty of candor and to avoid denials of claims without reasonable basis.

135.     Westcor knew that industry materials and expert commentators routinely described the "comprehensive" Form 9 and Form 100 endorsements as providing coverage for an insured that suffered a loss as a result of the enforcement of a superpriority lien provided for in an association's covenants, conditions, and restrictions at the time the policy was issued.

136.     Westcor knew that its own underwriting manuals, bulletins, and endorsement guides indicated that Form 9 and Form 100 provided coverage to an insured that suffered a loss as a result of the enforcement of a superpriority lien provided in an association's covenants, conditions, and restrictions at the time the policy was issued.

137.     In light of the foregoing, and on information and belief, Westcor underwrote the Policy with the belief that it would provide coverage if the Deed of Trust was impaired or extinguished by the enforcement of the HOA's lien.

138.     On information and belief, Westcor knew or had reason to know that Deutsche Bank purchased the Policy with the expectation that such coverage would be provided.

139.     On information and belief, Westcor knew or had reason to know that Deutsche Bank's expectation was reasonable in light of the trade usage and industry standards regarding Form 100.

140.     Westcor acted in bad faith and with malice, fraud, and/or oppression by allowing Deutsche Bank to obtain a title insurance policy that included an endorsement known and described as providing coverage against the enforcement of an association's superpriority lien, then denying coverage for losses arising from the HOA's enforcement of its superpriority lien despite internal documents, guidelines, and bulletins indicating that coverage was due.

141.     Westcor acted in bad faith by misrepresenting no coverage was available because the CC&Rs contained a mortgage savings clause.

142.     Westcor acted in bad faith by failing to reasonably address the contentions raised by Deutsche Bank in its correspondence with Westcor.

143.     Westcor breached its duties and acted in bad faith by denying Deutsche Bank's claim for coverage under the Policy.

144.     Westcor knew it claims decision was unreasonable and/or acted with a reckless disregard for the lack of a reasonable basis in denying Deutsche Bank's claim.

145.     Deutsche Bank has suffered damages as a result of Westcor's bad faith and breach of its duty of good faith and fair dealing.

146.     As a result of Westcor's bad faith, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

### FOURTH CAUSE OF ACTION
### (Deceptive Trade Practices (NRS 41.600 and NRS 598.0915) – Westcor)

147.     The allegations in Paragraphs 1 through 98 above are expressly incorporated by reference.

148.     Westcor received valuable consideration in exchange for providing the Policy to Deutsche Bank.

149.     Westcor and Nevada Title exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 9 and Form 100 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

150.     Westcor knew that public descriptions of Form 9 and Form 100 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

151.     Westcor and Nevada Title decided which endorsements should be issued with the Policy.

152.     Westcor and Nevada Title knew the Property was subject to the HOA's CC&Rs.

153.     The Policy Lender obtained from Westcor and Nevada Title contained endorsement language plainly intended to provide coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

154.     Lender and Deutsche Bank relied to its detriment upon Westcor's representations that Form 100 would provide such coverage by originating the mortgage loan in reliance on those representations.

155.    By representing that Form 100 provided such coverage at origination, then knowingly misrepresenting that Form 100 does not provide such coverage to deny Deutsche Bank's claim, Westcor engaged in consumer fraud as that term is defined in NRS 598.0915(5), (15) and NRS 41.600(2)(e) by misrepresenting the quality and characteristics of the Policy furnished to Lender and making false representations in the transaction.

156.    Deutsche Bank has suffered damages as a result of Westcor's consumer fraud, including the damages described above in Paragraph 77.

157.    As a result of Westcor's deceptive practices, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

## FIFTH CAUSE OF ACTION
### (Violation of NRS 686A.310 – Westcor)

158.    The allegations in Paragraphs 1 through 98 above are expressly incorporated by reference.

159.    Westcor and Nevada Title exchanged memoranda, bulletins, underwriting guides, and other communications indicating that Form 9 and Form 100 would provide coverage if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

160.    Westcor knew that public descriptions of Form 9 and Form 100 indicated that coverage would be available if an insured mortgage lien was impaired or otherwise affected by the enforcement of an association's superpriority lien.

161.    Westcor and Nevada Title represented to Lender that Form 100 provided coverage in the event that the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs.

162.     Lender and Deutsche Bank relied to its detriment upon Westcor's knowing misrepresentations regarding the characteristics and scope of coverage provided by the Policy with Form 100 by originating the mortgage loan in reliance on those misrepresentations.

163.     By representing that Form 100 provided coverage in the event the Deed of Trust lost priority or was otherwise impaired by operation of the HOA's CC&Rs, and then denying coverage for losses related to the HOA's foreclosure sale and misrepresenting that the CC&Rs contained a mortgage savings clause, Westcor breached NRS 686A.310(1)(a).

164.     In light of Westcor's knowledge that Form 100 provided coverage in the event a senior deed of trust was impaired by a Nevada association's superpriority lien, Westcor was required to adopt and implement reasonable claims handling procedures to provide such coverage.  Westcor failed to do so, and instead implemented claims handling procedures that called for the denial of claims under policies with an endorsement on Form 100 by insured lenders whose deeds of trust were impaired by Nevada association's liens, in violation of NRS 686A.310(1)(c).

165.     The Insurer's liability under the Policy for the extinguishment of the Deed of Trust was "reasonably clear," based upon Westcor's internal memoranda, bulletins, underwriting guides, and other communications.  By failing "to effectuate [a] prompt, fair, and equitable settlement[]" of Deutsche Bank's claim, Westcor violated NRS 686A.310(1)(e).

166.     By compelling Deutsche Bank "to institute litigation to recover amounts due under" the Policy, Westcor violated NRS 686A.310(1)(f).

167.     Upon information and belief, Westcor's internal documents and representations that Form 100 provided coverage if an insured lien was impaired or otherwise affected by the enforcement of an association's superpriority lien, establish that Westcor violated NRS

686A.310 as a result of its denial of coverage under the Policy for that exact scenario have been oppressive, willful, and malicious.

168.     As a result of Westcor's deceptive practices, Deutsche Bank was required to retain counsel to prosecute this action and is entitled to recover its corresponding attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, premises considered, Deutsche Bank requests that this Court grant judgment in its favor and against Westcor, and award Deutsche Bank:

A.     a declaration establishing (1) that the Policy provided coverage for all losses or damages, up to the Amount of Insurance, sustained by Deutsche Bank as a result of the HOA's foreclosure sale; and (2) of which Westcor is responsible for coverage under the Policy;

B.     compensatory damages;

C.     punitive damages;

D.     attorneys' fees;

E.     costs; and

F.     other relief deemed to be just.

DATED this 21st day of August, 2020.

WRIGHT, FINLAY & ZAK, LLP

*/s/ Lindsay D. Robbins*
Darren T. Brenner, Esq.
Nevada Bar No. 8386
Lindsay D. Robbins, Esq.
Nevada Bar No. 13474
7785 W. Sahara Ave., Suite 200
Las Vegas, NV 89117
*Attorneys for Plaintiff, Deutsche Bank National Trust Company as Trustee for New Century Home Equity Loan Trust, Series 2005-D, Asset Backed Pass-Through Certificates*

# EXHIBIT 1

# EXHIBIT 1

American Land Title Association
Loan Policy
With ALTA Endorsement
Form 1 (Street Assessment) (10-17-92)

# POLICY OF
# TITLE INSURANCE

*Issued by*

**Westcor**

Land Title Insurance Company

NEVADA REGIONAL HOME OFFICE:
2500 North Buffalo Drive
Suite 245
Las Vegas, NV 89128
Phone: (702) 253-5100

CALIFORNIA HOME OFFICE
189 Fulweiler Avenue
Auburn, California 95603



# Westcor
Land Title Insurance Company

## LOAN POLICY OF TITLE INSURANCE

### POLICY NUMBER
## 310- 249418

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, WESTCOR LAND TITLE INSURANCE COMPANY, a California corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;
2. Any defect in or lien or encumbrance on the title;
3. Unmarketability of the title;
4. Lack of a right of access to and from the land;
5. The invalidity or unenforceability of the lien of the insured mortgage upon the title;
6. The priority of any lien or encumbrance over the lien of the insured mortgage;
7. Lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material:
   (a) arising from an improvement or work related to the land which is contracted for or commenced prior to Date of Policy; or (b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to Date of Policy and which is financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance;
8. Any assessments for street improvements under construction or completed at Date of Policy not excepted in Schedule B which now have gained or hereafter may gain priority over the lien of the insured mortgage.
9. The invalidity or unenforceability of any assignment of the insured mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the insured mortgage in the named insured assignee free and clear of all liens.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of the title or the lien of the insured mortgage, as insured, but only to the extent provided in the Conditions and Stipulations.

IN WITNESS WHEREOF, Westcor Land Title Insurance Company has caused its corporate name and seal to be hereunto affixed by its duly authorized officer, the Policy to become valid when countersigned on Schedule A by an authorized officer or agent of the Company.

### WESTCOR LAND TITLE INSURANCE COMPANY

By _____
President

Attest _____
Vice President

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy. (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy; (c) resulting in no loss or damage to the insured claimant; (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material); or (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (a) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (b) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine of equitable subordination; or
   (c) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
   (i) to timely record the instrument of transfer; or
   (ii) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

# CONDITIONS AND STIPULATIONS

## 1. DEFINITION OF TERMS.

The following terms when used in this policy mean:

(a) "insured": the insured named in Schedule A. The term "insured" also includes

(i) the owner of the indebtedness secured by the insured mortgage and each successor in ownership of the indebtedness except a successor who is an obligor under the provisions of Section 12(c) of these Conditions and Stipulations (reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor insured, unless the successor acquired the indebtedness as a purchaser for value without knowledge of the asserted defect, lien, encumbrance, adverse claim or other matter insured against by this policy as affecting title to the estate or interest in the land);

(ii) any governmental agency or governmental instrumentality which is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage, or any part thereof, whether named as an insured herein or not;

(iii) the parties designated in Section 2(a) of these Conditions and Stipulations.

(b) "insured claimant": an insured claiming loss or damage.

(c) "knowledge" or "known": not constructive knowledge or notice which may be imputed to an insured by reason of the public records as defined in this policy or any other records which impart constructive notice of matters affecting the land.

(d) "land": the land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but nothing herein shall modify or limit the extent to which a right of access to and from the land is insured by this policy.

(e) "mortgage": mortgage, deed of trust, trust deed, or other security instrument.

(f) "public records": record established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge. With respect to Section 1 (a) (iv) of the Exclusions From Coverage, "public records" shall also include environmental protection liens filed in the records of the clerk of the United States district court for the district in which the land is located.

(g) "unmarketability of the title": an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A or the insured mortgage to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

## 2. CONTINUATION OF INSURANCE.

(a) After Acquisition of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of (i) an insured who acquires all or any part of the estate or interest in the land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the insured mortgage; (ii) a transferee of the estate or interest so acquired from an insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses the Company may have against any predecessor insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the insured mortgage.

(b) After Conveyance of Title. The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from the insured, or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the insured of either (i) an estate or interest in the land, or (ii) an indebtedness secured by a purchase money mortgage given to the insured.

(c) Amount of Insurance: The amount of insurance after the acquisition or after the conveyance shall in neither event exceed the least of:

(i) the Amount of Insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agency or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

## 3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.

The insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 4(a) below, (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if title to the estate or interest or the lien of the insured mortgage, as insured, is rejected as unmarketable. If prompt notice shall not be given to the Company, then as to the insured all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

## 4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE.

(a) Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the insured to object for reasonable cause) to represent the insured as to those stated causes of action and shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the insured in the defense of those causes of action which allege matters not insured against by this policy.

(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

(c) Whenever the Company shall have brought an action or interposed a defense as required or permitted by the provisions of this policy, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion to appeal from any adverse judgement or order.

(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

**Conditions and Stipulations Continued Inside Cover**

# CONDITIONS AND STIPULATIONS
## (Continued)

**5. PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulations, shall terminate any liability of the Company under this policy as to that claim.

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following options:

(a) To Pay or Tender Payment of Insurance or to Purchase the Indebtedness.

(i) to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by the Company , up to the time of payment or tender of payment and which the Company is obligated to pay.

(ii) to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred the insured claimant which were authorized by the Company up to the time of purchase and which the company is obligated to pay.

If the company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage , together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all the liability or obligations to the insured under this policy, other than to make the payment required 'in those paragraphs, shall terminate, including any liability or obligated to defend, prosecute, or continue any litigation, and the policy shall, be surrendered to the Company for cancellation.

(b) To Pay or Otherwise Settle with Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the time is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred  be the insured claimant which were authorized by the Company up to the time of purchase and which the company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs a(i) or (ii), all the liability or obligations to the insured under this policy for the loss or damage, other than the payment required to be made shall terminate, including any liability or obligated to defend, prosecute, or continue any litigation.

**7. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage  sustained or incurred by the insured claimant who has suffered or damaged by reason of matter insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations.

(ii) the amount of the unpaid principal indebtedness secured by the insured  mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced  under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

(iii)  the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against this policy.

(b) In the event the insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(b) The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8. LIMITATION OF LIABILITY.**

(a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or curves the lack of a right of access to or from land, or curves the lack of a right of access to or from the land, or curves the claim unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to the matter and shall not liable for any loss or damage caused thereby.

(b) In the event of any litigation, including litigation by the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of completion of any appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c) The Company shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company.

(d) The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expected to prevent deterioration of improvements; or (ii) construction loan advances made subsequent to Date of Policy, except construction of an improvement to the land which Date of Policy were secured by the insured mortgage and which the insured was and continue to be obligated to advance at the end after Date of Policy.

**9. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce the amount of the indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principle of the indebtedness, or any obligated secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10. LIABILITY NONCUMULATIVE.**

If the insured acquires title to the estate or interest in satisfaction of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the insured has agreed, assumed, or taken subject, or which is heareafter executed by an insured and which is a charge or Lien on the state or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11. PAYMENT OF LOSS.**

(a) No payment shall be made without producing this policy for endorsement of the payment unless the policy as been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b) When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12. SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a) The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the insured claimant shall transfer to the Company all fights and remedies against any person or property necessary in order to perfect this right of subrogation. The insured claimant shall permit the Company to sue, compromise or settle in the name of the insured claimant and to use the name of the insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the insured claimant, the Company shall be subrogated to all rights and remedies of the insured claimant after the insured claimant shall have recovered its principal, interest, and costs of collection.

(b) The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c) The Company's Rights Against Non-insured Obligators.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a) (ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligator will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

**13. ARBITRATION.**

Unless prohibited by applicable law, either the Company or the insured may demand arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. All arbitrable matters when the Amount of Insurance is $1,000,000 or less shall be arbitrated at the option of either the Company or the insured. All arbitrable matters when the Amount of Insurance is in excess of $1,000,000 shall be arbitrated only when agreed to by both the Company and the insured. Arbitration pursuant to this policy and under the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage  or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c) No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or a validating officer or authorized signatory of the Company.

**15. SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16. NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to  WESTCOR LAND TITLE INSURANCE COMPANY as follows:

| California Customers: | Customers From All Other States: |
|---|---|
| 189 Fulweiler Avenue | 2500 North Buffalo Drive, Suite 245 |
| Auburn, CA 95603 | Las Vegas, NV 89128 |
| Phone: (530) 885-8627 | Phone: (866) 528-4853 |
| Fax: (530) 885-7603 | Fax: (702) 251-3186 |

Valid Only If Face Page and Schedules A and B Are Attached

Order Number:  05-08-1365-SD                    Policy Number:  310-249418

# SCHEDULE A

                                          Order No.    05-08-1365-SD
                                          Premium:     $1,331.00

Amount of Insurance:  $400,000.00
Date of Policy:       September 1, 2005 at 2:09 P.M.

1.      Name of Insured:

Home123 Corporation, its Successors and/or Assigns.

2.      The estate or interest in the land described in this Schedule and which is encumbered by the insured mortgage is:

A FEE AS TO PARCEL I AND AN EASEMENT AS TO PARCEL II

3.      The estate or interest referred to herein is at Date of Policy vested in:

Michael R Lapointe and Kimberly J Lapointe, husband and wife, as joint tenants

4.      The mortgage, herein referred to as the insured mortgage, and the assignments thereof, if any are described as follows:

Deed of Trust to secure an indebtedness of $400,000.00:
Recorded:               September 1, 2005 in Book 20050901 Document No. 03890 of Official Records.
Dated:                  August 26, 2005
Trustor:                Michael R Lapointe and Kimberly J Lapointe, husband and wife, as joint tenants
Trustee:                Nevada Title Company Insurance
Beneficiary:            Home123 Corporation

5.      The land referred to in this policy is situated in the State of Nevada, County of Clark, and described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.

By: _____
        Sue Dudzinski
        Authorized Signature

Order Number: 05-08-1365-SD

## EXHIBIT "A"
## LEGAL DESCRIPTION

PARCEL I:

LOT TWO HUNDRED NINETY-ONE (291) IN BLOCK THREE (3) OF AMENDED MAP OF A
PORTION OF DEER SPRINGS RANCH - UNIT 2, AS SHOWN BY MAP THEREOF ON FILE IN BOOK
79, OF PLATS, PAGE 90, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY,
NEVADA.

PARCEL II:

AN EASEMENT FOR INGRESS, EGRESS AND USE IN AND TO THE PRIVATE DRIVES OF DEER
SPRINGS RANCH UNIT 2.

Order Number:  05-08-1365-SD                    Policy Number:  310-249418

## SCHEDULE B

## PART I

This policy does not insure against loss of damage by reason of the following:

1.  State and County Taxes for the fiscal period of 2005 to 2006, a lien now due and payable in the total amount of $3,243.89, and payable in the following installments and becomes delinquent if not paid as set forth below.

    First installment of $810.98 has been paid

    Second installment of $810.97 unpaid delinquent first Monday in October

    Third installment of $810.97 unpaid delinquent first Monday in January

    Fourth installment of $810.97 unpaid delinquent first Monday in March

    Parcel No.  125-21-312-044

2.  Any supplemental taxes which may become a lien on the subject property by reason of increased valuations due to land use or improvement, NRS 361.260, or otherwise.

3.  Any lease, grant, exception or reservation of minerals or rights thereto, and covenants, conditions, restrictions, lien rights of a homeowner's association, reservations and easements disclosed by a map or other document, if any, appearing as a matter of public record, but deleting therefrom any such matter based on race, color, religion, sex, handicap, familial status or national origin in violation of 42 U.S.C. 3604(a).

4.  Water rights, claims or title to water, whether or not shown by the public records.

Order Number: 05-08-1365-SD

## SCHEDULE B

## PART II

In addition to the matters set forth in Part I of this Schedule, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company insures that such matters are subordinate to the lien or charge of the insured mortgage upon said estate or interest:

NONE

Order Number: 05-08-1365-SD

# ENDORSEMENT
### Attached to Policy No. 310-249418
### Issued by
## Westcor Land Title Insurance Company

The Company hereby insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of:

1.  The existence of any of the following:
    (a) Covenants, conditions, or restrictions under which the lien of the mortgage referred to in Schedule A can be cut off, subordinated, or otherwise impaired;
    (b) Present violations on the land of any enforceable covenants, conditions, or restrictions;
    (c) Except as shown in Schedule B, there are no encroachments of buildings, structures or improvements located on the land onto adjoining lands, or any encroachments onto the land of buildings, structures or improvements located on adjoining lands.

2.  (a) Any future violations on the land of any covenants, conditions or restrictions occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, provided such violations result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the lien of the mortgage referred to in Schedule A, or result in impairment or loss of the title to the estate or interest referred to in Schedule A if the insured shall acquire such title in satisfaction of the indebtedness secured by the insured mortgage;
    (b) Unmarketability of the title to the estate or interest referred to in Schedule A by reason of any violations on said land, occurring prior to acquisition of title to the estate or interest referred to in Schedule A by the insured, of any covenants, conditions or restrictions.

3.  Damage to existing improvements, including lawns, shrubbery or trees
    (a) Which are located or encroach upon that portion of the land subject to any easement shown in Schedule B, which damage results from the exercise of the right to use or maintain such easement for the purposes for which the same was granted or reserved;
    (b) Resulting from the exercise of any right to use the surface of the land for the extraction or development of the minerals excepted from the description of the land or shown as a reservation in Schedule B.

4.  Any final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

Wherever in this endorsement any or all of the words, "covenants, conditions or restrictions" appear, they shall not be deemed to refer to or include the terms, covenants, conditions or restrictions contained in any lease.

For purposes of this endorsement, the words "covenants," "conditions" or "restrictions" shall not be deemed to refer to or include any covenants, conditions or restrictions relating to environmental protection, except to the extent that a notice of a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy and is not excepted in Schedule B. This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  September 1, 2005 at 2:09 P.M.

File No.: 05-08-1365-SD
**Westcor Land Title Insurance Company**

By:   Authorized Signature
CLTA Form 100 (Rev.6-14-96)
ALTA – Lender
Restrictions, Encroachments & Minerals

Order Number: 05-08-1365-SD

# ENDORSEMENT
## Attached to Policy No. 310-249418
## Issued by

# Westcor Land Title Insurance Company

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage which the insured shall sustain by reason of the failure of (i) a **Single Family Residence** known as:

## 8213 Fawn Heather Court Las Vegas NV

To be located on the land at  Date of Policy, or (ii) the map attached to this policy to correctly shown the location and dimensions of the land according to the public records.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

 Dated: September 1, 2005 at 2:09 P.M.

File No.: 05-08-1365-SD

**Westcor Land Title Insurance Company**

By:    Authorized Signature

**CLTA Form 116 (Rev. 6-14-96)**
**ALTA – Lender**
**Designation of Improvements, Address**

Order Number: 05-08-1365-SD

# ENDORSEMENT
## Attached to Policy No. 310-249418
## Issued by

## Westcor Land Title Insurance Company

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

(a) any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b) any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:
NONE

This endorsement, when countersigned below by an authorized signatory, is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  September 1, 2005 at 2:09 P.M.

File No.: 05-08-1365-SD

**Westcor Land Title Insurance Company**

By:    Authorized Signature

**CLTA Form 110.9 (3-13-87)**
**ALTA Endorsement Form 8.1 (3-27-87)**
**ENVIRONMENTAL PROTECTION LIEN**

Order Number: 05-08-1365-SD

# ENDORSEMENT
## Attached to Policy No. 310-249418
## Issued by

## Westcor Land Title Insurance Company

The Company hereby insures the insured against loss that the insured shall sustain by reason of

damage to existing improvements, including lawns, shrubbery or trees, resulting from the exercise of any right to use the surface of said land for the extraction or development of water excepted from the description of the land or shown as a reservation in Schedule B.

**This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.**

Dated:  September 1, 2005 at 2:09 P.M.

File No.: 05-08-1365-SD

**Westcor Land Title Insurance Company**

By:   Authorized Signature _____

**CLTA Form 103.5  (Rev. 9/10/93)**
**ALTA – Owner or Lender**
Water Rights, Surface Damage

Order Number: 05-08-1365-SD

# ENDORSEMENT
## Attached to Policy No. 310-249418
## Issued by

# Westcor Land Title Insurance Company

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by the reason of:

1. The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2. Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3 (d) of the Exclusions From Coverage. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Dated:  September 1, 2005 at 2:09 P.M.

File No. 05-08-1365-SD

**Westcor Land Title Insurance Company**

By:      Authorized Signature

**CLTA Form 111.5 (Rev. 3-13-87)**
**ALTA Form 6 (Variable Rate Mortgage)**
*Variable Rate*



# EXHIBIT 2

# EXHIBIT 2



# National Commercial Services
# ENDORSEMENT GUIDE



© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF



**ENDORSEMENTS**

Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions From Coverage, or excepted from coverage shown in Schedule B of the policy either by the regional general exceptions, if applicable, or by specific exceptions. A majority of the endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for loan policies. Some endorsements are not available in all circumstances.

The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by Chicago Title Insurance Company is subject to the terms and conditions of the policy to which they are attached. The following descriptions do not define the complete coverage of the endorsements, which can only be determined by reading the same. This list is provided as a convenience in located the endorsement which may fit a particular set of facts. This list does not include all endorsements that may be filed in California, but rather includes the standard ALTA endorsements.

**All information is provided as a courtesy and is deemed reliable but not guaranteed. Please contact your local Sales Executive to learn more. **

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF


## ALTA/CLTA ENDORSEMENT CONVERSION CHART AS OF 04-02-13

| ALTA | CLTA | Description | Adoption (Rev.) |
|------|------|-------------|-----------------|
| 1-06 | - | Street Assessments | 6-17-06 |
| 2-06 | 125-06 | Truth in Lending | 6-17-06 |
| 3-06 | 123.1-06 | Zoning – Unimproved Land | 6-17-06 |
| 3.1-06 | 123.2-06 | Zoning – Improved Land | (10-22-09) |
| 3.2-06 | 123.3-06 | Zoning – Land Under Development (OP or LP) | 04-02-12 (Tech. Correction 12-3-12) |
| 4-06 | 115.1-06 | Condominium | (02-03-10) |
| 4.1-06 | 115.3-06 | Condominium (for NV & HI not CA) | (10-16-08) |
| 5-06 | 115.2-06 | Planned Unit Development | (02-03-10) |
| 5.1-06 | 115.4-06 | Planned Unit Development (for NV & HI not CA) | (10-16-08) |
| 6-06 | 111.5-06 | Variable rate | (10-16-08) |
| 6.2-06 | 111.8-06 | Variable Rate - Negative Amortization | (10-16-08) |
| 7-06 | 116.5-06 | Manufactured Housing Unit | 6-17-06 |
| 7.1-06 | 116.5. 1-06 | Manufactured Housing Unit-Conversion; Loan | 6-17-06 |
| 7.2-06 | 116.5. 2-06 | Manufactured Housing Unit-Conversion; Owner's | 6-17-06 |
| 8.1-06 | 110.9-06 | Environmental Protection Lien | 6-17-06 |
| 8.2-06 | 110.9.1-06 | Commercial Environmental Protection Lien | 10-16-08 |
| 9-06 | 100.2-06 | Restrictions, Encroachments & Minerals-Loan | (04-02-12) |
| 9.1-06 | 100.9-06 | Covenants, Conditions and Restrictions (Owner's Policy - Unimproved Land) | (04-02-12) |
| 9.2-06 | 100.10-06 | Covenants, Conditions and Restrictions (Owner's Policy - Improved Land) | (04-02-12) |
| 9.3-06 | 100.2.1-06 | Covenants, Conditions and Restrictions-Loan | (04-02-12) |
| 9.4-06 | 100.2.2-06 | Restrictions, Encroachments, Minerals-Future Improvements re Minerals Extraction– OP-Unimproved Land | Withdrawn 04-02-12) |
| 9.5-06 | 100.2.3-06 | Restrictions, Encroachments, Minerals –Future Improvements re Minerals Extraction- OP– Improved Land | (Withdrawn 04-02-12) |
| **9.6-06** | **(100.2.6-06)** | **Private Rights - Loan** | **04-02-13** |
| 9.7-06 | (100.2.7-06) | Restrictions, Encroachments, Minerals – Land under Development-Loan | 04-02-12 |
| 9.8-06 | (100.2.8-06) | Covenants, Conditions and Restrictions-Land under Development-Owners | 04-02-12 (Tech. Correction 12-3-12) |
| **9.9-06** | **100.2.9-06** | **Private Rights – Owner's** | **(04-02-13)** |
| **9.10-06** | **100.2.10-06** | **Restrictions, Encroachments, Minerals – Current Violations - Loan** | **(04-02-13)** |
| 10-06 | 104.12-06 | Assignment of Mortgage | (02-03-10) |
| 10.1-06 | 104.13-06 | Assignment and Date Down | (02-03-10) |
| 11-06 | 110.11-06 | Mortgage Modification | 6-17-06 |
| 11.1-06 | 110.11.1-06 | Mortgage Modification with Subordination | 10-22-09 |
| **12-06** | **117-06** | **Aggregation - Loan** | **(04-02-12)** |
| **12.1-06** | **117.1-06** | **Aggregation – State Limits – Loan** | **04-02-13** |
| 13-06 | 119.5-06 | Leasehold – Owner's | 04-02-12 |
| 13.1-06 | 119.6-06 | Leasehold – Loan | 04-02-12 |
| 14-06 | 111.14-06 | Future Advance-Priority [Note: Version A gives ML Coverage: Version B Does Not] | (02-03-11) |
| 14.1-06 | 111.14.1-06 | Future Advance-Knowledge [See Note for ALTA 14] | (02-03-11) |
| 14.2-06 | 111.14.2-06 | Future Advance-Letter of Credit [See Note for ALTA 14] | (02-03-11) |
| 14.3-06 | 111.14.3 -06 | Future Advance-Reverse Mortgage [See Note for ALTA 14] | (02-03-11) (Tech. Correction 12-3-12) |
| 15-06 | 127-06 | Non-imputation-Full Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 15.1-06 | 127.1-06 | Non-imputation-Additional Insured [Owner's Policy Only] | 6-17-06 |
| 15.2-06 | 127.2-06 | Non-imputation-Partial Equity Transfer [Owner's Policy Only] | 6-17-06 |
| 16-06 | 128-06 | Mezzanine Financing [Owner's Policy Only] | 6-17-06 |
| 17-06 | 103.11-06 | Access and Entry | 6-17-06 |
| 17.1-06 | 103.12-06 | Indirect Access and Entry | 6-17-06 |
| 17.2-06 | 103.13-06 | Utility Access | 10-16-08 |
| 18-06 | 129-06 | Single Tax Parcel | 6-17-06 |
| 18.1-06 | 129.1-06 | Multiple Tax Parcels | 6-17-06 |
| 19-06 | 116.4.1-06 | Contiguity-Multiple Parcels | 6-17-06 |
| 19.1-06 | 116.4-06 | Contiguity-Single Parcel | 6-17-06 |
| 20-06 | 130-06 | First Loss-(Multiple Parcels) Transaction [Loan Policy Only] | 6-17-06 |
| 21-06 | 131-06 | Creditors' Rights (Decertification effective 03-08-10) | 6-17-06 |
| 22-06 | 116.01-06 | Location | 6-17-06 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

| 22.1-06 | 116.02-06 | Location & Map | 6-17-06 |
|---|---|---|---|
| 23-06 | 114.3-06 | Co-Insurance – Single Policy (01-01-08) | 10-16-08 |
| 24-06 | 133-06 | Doing Business | 10-16-08 |
| 25-06 | 116.1-06 | Same as Survey | 10-16-08 |
| 25.1-06 | 116.1.2-06 | Same as Portion of Survey | 10-16-08 |
| 26-06 | 116.8-06 | Subdivision | 10-16-08 |
| 27-06 | 132-06 | Usury | 10-16-08 |
| 28-06 | 103.1-06 | Easement – Damage or Enforced Removal | 02-03-10 |
| 28.1-06 | 103.14-06 | Encroachments-Boundaries and Easements | 04-02-12 |
| **28.2-06** | **103.15-06** | **Encroachments-Boundaries and Easements – Described Improvements** | **04-02-13** |
| 29-06 | 134-06 | Interest Rate SWAP-Direct Obligation | 02-03-10 |
| 29.1-06 | 134.1-06 | Interest Rate SWAP-Additional Interest | 02-03-10 |
| 29.2-06 | 134.2-06 | Interest Rate SWAP-Direct Obligation – Defined Amount | 08-01-11 |
| 29.3-06 | 134.3-06 | Interest Rate SWAP-Additional Interest – Defined Amount | 08-01-11 |
| 30-06 | 135-06 | Shared Appreciation Mortgage | 07-26-10 |
| 30.1-06 | 135.1-06 | Commercial Participation Interest | 08-01-12 |
| 31-06 | 136-06 | Severable Improvements | 02-03-11 |
| 32-06 | 137-06 | Construction Loan – Loss of Priority | 02-03-11 |
| **32.1-06** | **137.1-06** | **Construction Loan – Loss of Priority – Direct Payment** | **(04-02-13)** |
| **32.2-06** | **137.2-06** | **Construction Loan – Loss of Priority – Insured's Direct Payment** | **(04-02-13)** |
| 33-06 | 138-06 | Disbursement Endorsement | 02-03-11 |
| 34-06 | 139-06 | Identified Risk Coverage | 08-01-11 |
| 35-06 | 140-06 | Minerals and Other Subsurface Substances – Buildings-OP or LP | 04-02-12 |
| 35.1-06 | 140.1-06 | Minerals and Other Subsurface Substances-Described Improvements –OP or LP | 04-02-12 |
| 35.2-06 | 140.2-06 | Minerals and Other Subsurface Substances-Improvements- OP or LP_ | 04-02-12 |
| 35.3-06 | 140.3-06 | Minerals and Other Subsurface Substances-Land Under Development-OP or LP | 04-02-12 |
| 36-06 | 141-06 | Energy Project-Leasehold/Easement-OP | 04-02-12 |
| 36.1-06 | 141.1-06 | Energy Project-Leasehold/Easement-LP | 04-02-12 |
| 36.2-06 | 141.2-06 | Energy Project-Leasehold-OP | 04-02-12 |
| 36.3-06 | 141.3-06 | Energy Project-Leasehold-LP | 04-02-12 |
| 36.4-06 | 141.4-06 | Energy Project- CC and Rs- Land Under Development-OP | 04-02-12 |
| 36.5-06 | 141.5-06 | Energy Project- CC and Rs- Land Under Development-LP | 04-02-12 |
| 36.6-06 | 141.6-06 | Energy Project-Encroachments- LP or OP | 04-02-12 |
| **37-06** | **104.6-06** | **Assignment of Rents or Leases** | **12-03-12** |
| **39-06** | **142-06** | **Policy Authentication** | **04-02-13** |
| JR 1 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |
| JR 2 | | ALTA Res. Limited Cov.  Jr. Loan Policy | 08-01-12 |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**STREET ASSESSMENTS**
**ALTA ENDORSEMENT - FORM 1-06 (06-17-06)**

The repair and maintenance of public streets is either contracted for by a governmental body or done directly by government employees. The property owners adjoining the streets or in the generally benefited area are usually assessed the costs of the work on some basis. The governmental body is almost universally given a lien to secure the payment of this assessment.

This endorsement is concerned with the priority of that lien if the improvements are either in process or completed at the Date of Policy. If this lien is prior to the lien of the Insured Mortgage and the assessments are not paid by the borrower, the lender will have to pay them in order to stop a tax foreclosure. This endorsement covers the loss or damage which the lender may sustain by having to pay the assessments which have gained priority over the Insured Mortgage.

This endorsement is not filed in California.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the lack of priority of the lien of the Insured Mortgage over the lien of any assessments for street improvements under construction or completed at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Clause Optional]

DATED:

Chicago Title Insurance Company

BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 1-06
(Street Assessments) (6/17/06)
© American Land Title Association

**TRUTH-IN-LENDING**
**ALTA 2-06 (06-17-06)**

This endorsement is for loan policies only. It provides insurance against some losses the Insured may suffer if the borrower exercises a right of rescission under Regulation Z of the Federal Truth in Lending Act.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

any final judgment of a court of competent jurisdiction that either the lien of the Insured Mortgage has been terminated or the Title of an Insured, who has acquired all or any part of the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner, which discharges the lien of the Insured Mortgage, has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth-in-Lending Act and that the right or rights of rescission existed because neither the credit transaction evidenced by the Insured Mortgage nor the right of rescission was exempted or excepted by the provisions of Regulation Z (12 CFR 226).

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 2-06
(Truth in Lending) (6/17/06)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ZONING**
**ALTA 3-06 (06-17-06), 3.1-06 (10-22-09) and 3.2-06 (04-02-12)**

These forms are used to provide certain zoning coverage. They do not provide unlimited zoning insurance.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

a.      According to applicable zoning ordinances and amendments, the Land is not classified Zone *[FILL IN]*;

b.      The following use or uses are not allowed under that classification:

*[FILL IN]*

2.      There shall be no liability under this endorsement based on

a.      Lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses.  This paragraph 2.a. does not modify or limit the coverage provided in Covered Risk 5.

b.      The invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses.

c.      The refusal of any person to purchase, lease or lend money on the estate or interest covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 3-06
(Zoning – Unimproved Land) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The Company insures against loss or damage sustained by the Insured in the event that, at Date of Policy,

    a.    according to applicable zoning ordinances and amendments, the Land is not classified Zone FILL IN;

    b.    the following use or uses are not allowed under that classification: FILL IN

    c.    There shall be no liability under paragraph 1.b. if the use or uses are not allowed as the result of any lack of compliance with any conditions, restrictions, or requirements contained in the zoning ordinances and amendments, including but not limited to the failure to secure necessary consents or authorizations as a prerequisite to the use or uses. This paragraph 1.c. does not modify or limit the coverage provided in Covered Risk 5.

2.   The Company further insures against loss or damage sustained by the Insured by reason of a final decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing structure, as specified in paragraph 1.b. or requiring the removal or alteration of the structure, because, at Date of Policy, the zoning ordinances and amendments have been violated with respect to any of the following matters:

    a.    Area, width, or depth of the Land as a building site for the structure

    b.    Floor space area of the structure

    c.    Setback of the structure from the property lines of the Land

    d.    Height of the structure, or

    e.    Number of parking spaces.

3.   There shall be no liability under this endorsement based on:

    a.    the invalidity of the zoning ordinances and amendments until after a final decree of a court of competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

    b.    the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. For purposes of this endorsement:
   a. "Improvement" means a building, structure, road, walkway, driveway, curb, subsurface utility or  water well existing at Date of Policy or to be built or constructed according to the Plans that is or  will be located on the Land, but excluding crops, landscaping, lawns, shrubbery, or trees.

   b. "Plans" means those site and elevation plans made by [*name of architect or engineer*] dated_____, last revised_____, designated as [*name of project*] consisting of_____sheets.

2. The Company insures against loss or damage sustained by the Insured in the event that, at Date of  Policy
   a. according to applicable zoning ordinances and amendments, the Land is not classified Zone _____;

   b. the following use or uses are not allowed under that classification:

   c. There shall be no liability under paragraph 2.b. if the use or uses are not allowed as the result of  any lack of compliance with any condition, restriction, or requirement contained in the zoning  ordinances and amendments, including but not limited to the failure to secure necessary consents  or authorizations as a prerequisite to the use or uses.  This paragraph 2.c. does not modify or limit  the coverage provided in Covered Risk 5.

3. The Company further insures against loss or damage sustained by the Insured by reason of a final  decree of a court of competent jurisdiction either prohibiting the use of the Land, with any existing  Improvement, as specified in paragraph 2.b. or requiring the removal or alteration of the Improvement,  because of a violation of the zoning ordinances and amendments in effect at  Date of Policy with  respect to any of the following matters:
   a. Area, width, or depth of the Land as a building site for the Improvement

   b. Floor space area of the Improvement

   c. Setback of the Improvement from the property lines of the Land

   d. Height of the Improvement, or

   e. Number of parking spaces.

4. There shall be no liability under this endorsement based on:
   a. the invalidity of the zoning ordinances and amendments until after a final decree of a court of  competent jurisdiction adjudicating the invalidity, the effect of which is to prohibit the use or uses;

   b. the refusal of any person to purchase, lease or lend money on the Title covered by this policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and  provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of  Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of  this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of  the policy and of any prior endorsements.
[Witness Optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 3.1-06
(Zoning-Completed Structure) (rev. 10/22/09)
©American Land Title Association

**CONDOMINIUM**

**ALTA 4-06 (02-03-10) and 4.1-06 (10-16-08)**

These endorsements provide affirmative insurance to mortgage lenders loaning on the security of condominium units. There are seven matters selected for insurance in these endorsements.  The ALTA 4.1-06 differs from the ALTA 4-06 only in hat there is no insurance of priority over future assessments in paragraph 4 of the endorsement.  The ALTA 4.1-06 may be used with either an Owner's or Lender's Policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.    The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.    The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.    Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.    The priority of any lien for charges and assessments provided for in the condominium statutes and condominium documents at Date of Policy over the lien of any Insured Mortgage identified in Schedule A.

5.    The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.    Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.    The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 4-06
(Condominium) (Rev. 02/03/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.     The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2.     The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3.     Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants.  As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4.     Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5.     The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6.     Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7.     The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
         AUTHORIZED SIGNATORY

ALTA Endorsement Form 4.1-06
(Condominium) (Rev. 10/16/08)
©American Land Title Association

**PLANNED UNIT DEVELOPMENT**
**ALTA 5-06 (02-03-10) and 5.1-06 (10-16-08)**

These endorsements provide affirmative coverage for lenders loaning on the security of units in a Planned Unit Development, or PUD. Affirmative coverage is provided against loss caused by violation of restrictions or by the existence of certain kinds of restrictions. In addition, both cover loss from enforced removal of buildings by reason of encroachments and from failure of Title, as defined by the policies, caused by the exercise of any right of first refusal. The ALTA 5-06 insures against loss from lack of priority of the mortgage lien over the lien for homeowners' association assessments. The ALTA 5.1-06 differs in that there is no insurance of priority over future assessments in Paragraph 2 of the 5.1-06; instead it only covers unpaid assessments at date of policy.   The ALTA 5.1-06 may be used with either an Owner's or Lender's Policy.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition or restriction (a) relating to obligations of any type to perform maintenance, repair or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.      The priority of any lien for charges and assessments in favor of any association of homeowners which are provided for in any document at Date of Policy referred to in Schedule B over the lien of any Insured Mortgage identified in Schedule A.

3.      The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.      The failure of the Title by reason of a right of first refusal to purchase the Land which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 5-06
(Planned Unit Development) (Rev. 02/03/10)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.    Present violations of any restrictive covenants referred to in Schedule B that restrict the use of the Land or the forfeiture or reversion of Title by reason of any provision contained in the restrictive covenants. As used in this paragraph 1, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the Land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

2.    Any charges or assessments in favor of any association of homeowners, which are provided for in any document referred to in Schedule B, due and unpaid at Date of Policy.

3.    The enforced removal of any existing structure on the Land (other than a boundary wall or fence) because it encroaches onto adjoining land or onto any easements.

4.    The failure of the Title by reason of a right of first refusal to purchase the Land that was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 5.1-06
(Planned Unit Development) (Rev. 10/16/08)
©American Land Title Association

### VARIABLE RATE MORTGAGE
### ALTA 6-06 (10-16-08), and 6.2-06 (10-16-08)

These endorsements were created to insure the validity and priority of the mortgage liens securing loans with variable interest rates. The ALTA 6-06 is the basic variable interest rate endorsement. The ALTA 6.1 is not filed in California and is designed for use where lenders face regulatory requirements which must be followed in order to make such loans. The ALTA 6.2-06 was created to insure the validity and priority of mortgage liens as security for interest at variable rates and as security for additional principal created by the negative amortization of unpaid interest.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for changes in the rate of interest.

2.      Loss of priority of the lien of the Insured Mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

        1.      usury, or

        2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 6-06
(Variable Rate) (Rev. 10/16/08)
©American Land Title Association

**For use with 1992 policies or older**

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2. Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage by reason of the failure of the insured to comply with the following statutes or regulations concerning variable rate mortgages:

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement - Form 6.1
(Variable Rate Mortgage**)** (1/17/04)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage resulting from its provisions that provide for (a) interest on interest, (b) changes in the rate of interest, or (c) the addition of unpaid interest to the principal balance of the loan.

2.      Loss of priority of the lien of the Insured Mortgage as security for the principal balance of the loan, including any unpaid interest which was added to principal in accordance with the provisions of the Insured Mortgage, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which loss of priority is caused by (a) changes in the rate of interest, (b) interest on interest, or (c) increases in the unpaid principal balance of the loan resulting from the addition of unpaid interest.

"Changes in the rate of interest", as used in this endorsement shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the loan documents secured by the Insured Mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon:

        1.      usury, or

        2.      any consumer credit protection or truth in lending law.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 6.2-06
(Variable Rate, Negative Amortization) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

## MANUFACTURED HOUSING
### ALTA 7-06 (06-17-06), 7.1-06 (06-17-06) and 7.2-06 (06-17-06)

These endorsements clarify whether or not a manufactured housing unit ("MHU") located on the Land is covered by the insurance policy. The ALTA 7-06 adds the MHU to the definition of Land. In addition the ALTA 7.1-06 and the ALTA 7.2-06 insure against loss or damage if the MHU is not located on the subject premises, if there are UCC type liens filed against the MHU and if the MHU does not constitute real property under state law. The ALTA 7.1-06, which is the form to be used with a Loan Policy, also insures that the Insured Mortgage can be enforced in a single foreclosure action against both the MHU and the Land.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The term "Land" includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 7-06
(Manufactured Housing Unit) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.     The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.     Unless excepted in Schedule B, the Company insures against loss or damage sustained by the Insured if, at Date of Policy,

    (a)     A manufactured housing unit is not located on the land described in Schedule A.

    (b)     The manufactured housing unit located on the land is not real property under the law of the state where the Land described in Schedule A is located.

    (c)     The owner of the Land is not the owner of the manufactured housing unit.

    (d)     Any lien is attached to the manufactured housing unit as personal property, including

        (i)     a federal, state, or other governmental tax lien,

        (ii)     UCC security interest,

        (iii)     a motor vehicular lien,

        (iv)     other personal property lien.

    (e)     The lien of the Insured Mortgage is not enforceable against the Land.

    (f)     The lien of the Insured Mortgage is not enforceable in a single foreclosure procedure.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.1-06
(Manufactured Housing – Conversion; Loan) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.     The term "Land" as defined in this policy includes the manufactured housing unit located on the land described in Schedule A at Date of Policy.

2.     Unless excepted in Schedule B, the Company insures against loss or damage, sustained by the Insured if, at Date of Policy

    (a)     A manufactured housing unit is not located on the Land described in Schedule A.

    (b)     The manufactured housing unit located on the Land is not real property under the law of the state where the Land described in Schedule A is located.

    (c)     The Insured is not the owner of the manufactured housing unit.

    (d)     Any lien is attached to the manufactured housing unit as personal property, including

        (i)     a federal, state, or other governmental tax lien,

        (ii)     UCC security interest,

        (iii)     a motor vehicular lien,

        (iv)     other personal property lien.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 7.2-06
(Manufactured Housing – Conversion; Owners) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENVIRONMENTAL PROTECTION LIEN COMMERCIAL ENVIRONMENTAL LIEN**
**ALTA 8.1-06 (06-17-06) and 8.2-06 (10-16-08)**

These endorsements provide affirmative insurance that the lien of the Insured Mortgage has priority over unrecorded or unfiled environmental protection liens.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is used or is to be used primarily for residential purposes.

The Company insures against loss or damage sustained by the Insured by reason of lack of priority of the lien of the Insured Mortgage over

(a)     any environmental protection lien that, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or is filed in the records of the clerk of the United States district court for the district in which the Land is located, except as set forth in Schedule B; or

(b)     any environmental protection lien provided by any state statute in effect at Date of Policy, except environmental protection liens provided by the following state statutes:

FILL IN

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 8.1-06
(Environmental Protection Lien) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

      The Company insures against loss or damage sustained by the Insured by reason of an environmental protection lien that, at Date of Policy, is recorded in the Public Records or filed in the records of the clerk of the United States district court for the district in which the Land is located, unless the environmental protection lien is set forth as an exception in Schedule B.

      This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 8.2-06
(Commercial Environmental Lien) (10/16/08)
©American Land Title Association

**ALTA 9**
**SERIES 9**
**ALTA  9-06 to 9.10-06**
**[ALTA 9.4-06 AND 9.5-06 WITHDRAWN EFFECTIVE 4/2/2012]**

It is common for institutional lenders to require certain additional title insurance coverages for loans secured by first mortgages on improved real property when these mortgages are to be sold on the secondary market. The original ALTA Form 9 was designed to provide those coverages in a single, inclusive form. It afforded the lender various protections with respect to private property restrictions, building setback lines, encroachments and excepted minerals. Forms for use with owner's policies were subsequently adopted also.

In 2012 and 2013 ALTA completely revised all of the endorsements in the series, withdrawing the 9.4-06 and 9.5-06 and adding 5 new forms- the 9.6-06, 9.7-06,  9.8-06, 9.9-06 and 9.10-06.

# ALTA 9 Series Summary
**Actual Endorsement Availability Depends Upon Case by Case Title Insurer's Underwriting Analysis**

| | Coverage Requested | Loan Policy | Owners Policy |
|---|---|---|---|
| **A L T A 9 S E R I E S** | Restrictions, Encroachments, Minerals | **Use:** **ALTA 9-06[1]** for existing improvements, **ALTA 9.7-06[1]** for Land under Development, and **ALTA 9.10-06[1]** where a possibility of forfeiture exists but there is no current violation. | To get this coverage for: <u>vacant land</u> combine - ALTA **9.1-06[1]**, ALTA **28.1-06[2]** and ALTA **35.1-06**. <u>improved land</u> - combine ALTA **9.2-06[1]**, ALTA **28.1-06[2]** and ALTA **35.1-06**. |
| | Covenants, Conditions & Restrictions | **Use:** **ALTA 9.3-06[1]** (It has the same coverage as Section 3 of the ALTA 9-06, so the ALTA 9-06 is more inclusive with its encroachment and mineral coverages in Section 4). | **Use:** **ALTA 9.1-06[1]** for unimproved land, **ALTA 9.2-06[1]** available for improved Land, or **ALTA 9.8[2]** for Land Under Development |
| | Private Rights | **Use:** **ALTA 9.6-06** (A private charge or assessment, option, right of first refusal or right of prior approval). | **Use:** **ALTA 9.9-06 06** (An option, right of first refusal or right of prior approval). |

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

    a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b. "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

    a. A violation of a Covenant that:

        i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,
        ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or
        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

    b. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

    c. Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

    d. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4. The Company insures against loss or damage sustained by reason of:

    a. An encroachment of:

        i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

        ii. an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

    b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

    c. Damage to an Improvement located on the Land, at Date of Policy:

        i. that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

          ii.        resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.  any Covenant contained in an instrument creating a lease;

   b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c.  except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

   d.  contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

   e.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9-06
(Restrictions, Encroachments, Minerals-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For the purposes of this endorsement only, "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

3.      The Company insures against loss or damage sustained by the Insured by reason of:

   a.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation; or

   b.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   any Covenant contained in an instrument creating a lease;

   b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.   except as provided in Section 3.b, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
         AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.1-06
(Covenants, Conditions and Restrictions-Unimproved Land – Owner's Policy–) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2.  For the purposes of this endorsement only,
    a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
    b.  "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
3.  The Company insures against loss or damage sustained by the Insured by reason of:
    a.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
    b.  Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or
    c.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.
4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:
    a.  any Covenant contained in an instrument creating a lease;
    b.  any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or
    c.  except as provided in Section 3.c., any Covenant relating to environmental protection of any kind, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.2-06
(Covenants, Conditions and Restrictions – Improved Land -Owner's Policy (Rev. 4/1/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For the purposes of this endorsement only:

a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.   "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to the Land at Date of Policy that by law constitutes real property.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.   A violation of a Covenant that:

i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.   A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

c.   Enforced removal of an Improvement as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   any Covenant contained in an instrument creating a lease;

b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

c.   except as provided in Section 3.c, any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.3-06
(Covenants, Conditions and Restrictions-Loan Policy) (Rev. 4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

    a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

    b.    "Private Right" means (i) a private charge or assessment; (ii) an option to purchase; (iii) a right of first refusal; or (iv) a right of prior approval of a future purchaser or occupant.

3.   The Company insures against loss or damage sustained by the Insured under this Loan Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy (a) results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or (b) causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness.

4.       This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.   any Covenant contained in an instrument creating a lease;

    b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

    c.   any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

    d.   any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.6-06
(Private Rights-Loan Policy) (Rev. 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.     The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.     For purposes of this endorsement only:

a.     "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

b.     "Future Improvement" means a building, structure, road, walkway, driveway, curb, lawn, shrubbery or trees to be constructed on or affixed to the Land in the locations according to    the Plans and that by law will constitute real property.

c.     "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to  either the Land or adjoining land at Date of Policy that by law constitutes real property.

d.     "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
(*insert name of architect or engineer*)  dated_____, last revised _____, designated as (*insert name of project or project number*)  consisting of_____sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

a.     A violation of a Covenant that:

i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage,

ii.   results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

b.     A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

c.     Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the policy identifies the violation; or

d.     A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   The Company insures against loss or damage sustained by reason of:

a.     An encroachment of:

i.     an Improvement located on the Land at Date of Policy or a Future Improvement, onto adjoining land or onto that portion of the Land subject to an easement; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

      ii.      an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

      b.      Damage to an Improvement located on the Land at Date of Policy or a Future Improvement:

      i.      that encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

      ii.      resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.      This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

      a.      any Covenant contained in an instrument creating a lease;

      b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

      c.      except as provided in Section 3.d, any Covenant relating to environmental protection of     any kind or nature, including hazardous or toxic matters, conditions, or substance

      d.      contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; or

      e.      negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.7-06
(Restrictions, Encroachments, Minerals-Land Under Development-Loan Policy) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.      For purposes of this endorsement only:

   a.      "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.      "Future Improvement" means a building, structure, road, walkway, driveway, curb to be constructed on or affixed to the Land in the locations according to the Plans and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c.      "Improvement" means a building, structure located on the surface of the Land, road, walkway, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   d.      "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by (*insert name of architect or engineer*) dated_____, last revised _____, designated as (*insert name of project or project number*) consisting of ___sheets.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.      A violation of an enforceable Covenant by an Improvement on the Land at Date of Policy or by a Future Improvement, unless an exception in Schedule B of the policy identifies the violation;

   b.      Enforced removal of an Improvement located on the Land or of a Future Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records at Date of Policy, unless an exception in Schedule B of the   policy identifies the violation; or

   c.      A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred    to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.      any Covenant contained in an instrument creating a lease;

   b.      any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.      except as provided in Section 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


DATED:
Chicago Title Insurance Company
BY:_____
         AUTHORIZED SIGNATORY



ALTA Endorsement Form 9.8-06
(Covenants, Conditions and Restrictions-Land Under Development-Owners Policy) (4/2/12)
©American Land Title Association

*[includes technical correction of 12-3-12]*

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.    The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.    For purposes of this endorsement only:

   a.    "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.    "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3.    The Company insures against loss or damage sustained by the Insured under this Owner's Policy if enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy causes a loss of the Insured's Title.

4.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from: restriction:

   a.    any Covenant  contained in an instrument creating a lease;

   b.    any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c.    any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances; or

   d.    any Private Right in an instrument identified in Exception(s)_____in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.9-06
(Private Rights-Owner's Policy) ( 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For the purposes of this endorsement only:

   a.  "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.  "Improvement" means an improvement, including any lawn, shrubbery, or trees, affixed to either the Land or adjoining land at Date of Policy that by law constitutes real property.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

   a.  A violation at Date of Policy of a Covenant that:

        i. divests, subordinates, or extinguishes the lien of the Insured Mortgage,

        ii. results in the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage, or

        iii. causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of the Indebtedness;

   b.  A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   c.  Enforced removal of an Improvement located on the Land as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   d.  A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.  The Company insures against loss or damage sustained by reason of:

   a.  An encroachment of:

        i.  an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

        ii.  an Improvement located on adjoining land onto the Land at Date of Policy,

unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.;

   b.  A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c.  Damage to an Improvement located on the Land, at Date of Policy:

        i.  that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

the right to maintain the easement for the purpose for which it was granted or reserved; or

    ii.   resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

5.    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a. any Covenant contained in an instrument creating a lease;

b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

c. except as provided in Section 3.d, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

d. contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 9.10-06
(Restrictions, Encroachments, Minerals-Current Violations-Loan Policy) ( 4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ASSIGNMENT OF MORTGAGE**
**ALTA 10-06 (02-03-10) AND 10.1-06 (02-03-10)**

The ALTA 10-06 endorsement insures the effectiveness of the assignment of the Insured Mortgage and that there have been no releases or reconveyances placed of record other than as shown. The ALTA 10.1-06 provides the same coverage as the 10-06 and gives additional coverage over only certain matters occurring after the original Date of Policy and before the Date of Endorsement, which is a defined term within the endorsement.

The policy is modified by naming the assignee under the assignment as the Insured. The endorsement provides additional affirmative coverage against the ineffectiveness of the assignment and the effect of any full or partial releases or reconveyances recorded after the Date of Policy and before the Date of Endorsement. In addition, the ALTA 10.1-06 provides coverage for the matters described above. Both forms of endorsement are conditioned upon the proper delivery and endorsement of the underlying notes.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

    a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

    b.      Any modification, partial or full reconveyance, release, or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

    1.  the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

    2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 10-06
(Assignment) (Rev. 02/03/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The name of the Insured at Date of Endorsement and referred to in this endorsement as the "Assignee" is amended to read:

2.      The Company insures against loss or damage sustained by the Assignee by reason of:

   a.      The failure of the following assignment to vest title to the Insured Mortgage in the Assignee:

   b.      Any liens for taxes or assessments that are due and payable on Date of Endorsement, except:

   c.      Lack of priority of the lien of the Insured Mortgage over defects, liens, or encumbrances other than those shown in the policy or a prior endorsement, except:

   d.      Notices of federal tax liens or notices of pending bankruptcy proceedings affecting the Title and recorded subsequent to Date of Policy in the Public Records and on or prior to Date of Endorsement, except:

   e.      Any modification, partial or full reconveyance, release or discharge of the lien of the Insured Mortgage recorded on or prior to Date of Endorsement in the Public Records other than those shown in the policy or a prior endorsement, except:

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the assignment by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

   1. the assignment being deemed a fraudulent conveyance or fraudulent transfer; or

   2. the assignment being deemed a preferential transfer.

This endorsement shall be effective provided that, at Date of Endorsement, (1) the note or notes secured by the lien of the Insured Mortgage have been properly endorsed and delivered to the Assignee, or (2) if the note or notes are transferable records, the Assignee has "control" of the single authoritative copy of each "transferable record" as these terms are defined by applicable electronic transaction laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 10.1-06
(Assignment and Date Down) (Rev.02/03/10)
©American Land Title Association



© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**MORTGAGE MODIFICATION**
**ALTA 11-06 (6-07-06) & 11.1-06 (10-22-09)**

These endorsements were created to insure lenders that the modification of the Insured Mortgage evidenced by the document referred to within the endorsement does not impair the validity, enforceability or priority of the Insured Mortgage as of the Date of Endorsement, which is a defined term within the endorsements. In addition, the 11.1-06 insures against loss based upon a specific matter not being subordinate to the lien of the Insured Mortgage.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated ____ recorded ____ ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement _____

[Witness clause optional]

Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 11-06
(Mortgage Modification) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      The invalidity or unenforceability of the lien of the Insured Mortgage upon the Title at Date of Endorsement as a result of the agreement dated_____ , recorded_____, ("Modification"); and

2.      The lack of priority of the lien of the Insured Mortgage, at Date of Endorsement, over defects in or liens or encumbrances on the Title, except for those shown in the policy or any prior endorsement and except:      ADD EXCEPTIONS HERE

3.      The following matters not being subordinate to the lien of the Insured Mortgage: ADD SUBORDINATE MATTERS HERE

This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses, by reason of any claim that arises out of the transaction creating the Modification by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws that is based on:

1.      the Modification being deemed a fraudulent conveyance or fraudulent transfer; or

2.      the Modification being deemed a preferential transfer except where the preferential transfer results from the failure

        a.      to timely record the instrument of transfer; or

        b.      of such recordation to impart notice to a purchaser for value or to a judgment or lien creditor.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date of Endorsement_____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 11.1-06
(Mortgage Modification with Subordination) (10/22/09)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**AGGREGATION (TIE-IN)**
**ALTA 12-06 (04-02-13) and 12.1-06 (04-12-13)**

Mortgages covering many parcels in different recording districts or jurisdictions may each be recorded for the full amount of the secured indebtedness, or the allocated collateral value of each site, or a combination of full and allocated values.

The allocated amount is often used in states which impose a mortgage tax.   In any case, the lender views the transaction as one debt and wants insurance coverage for the total amount of the secured indebtedness.   Instead of combining all of the parcels into one large loan policy, the aggregation endorsement allows an insurer to issue a number of policies for lesser amounts but to tie the policies together so that the Insured can aggregate the coverage and take advantage of any increases in the value of a particular parcel should there be a loss.  Form 12-06 can be used for aggregating policies on sites all located in a single state or sites located in multiple states none of which have state statutory limitations on the amount which can be insured.  Form 12.1-06 is intended to be used for aggregating policies in multiple states one or more of which have state statutory limitations on the amount which can be insured.

This endorsement changes the provisions of Conditions 8(a)(i) of the  ALTA Loan Policy so that the Amount of Insurance available to cover a loss is the aggregate of the Amount of Insurance available under the policy to which this endorsement is attached plus the Amounts of Insurance available under the other policies identified in this endorsement.  Effective April 2, 2013 Form 12-06 was modified by adding new paragraphs which change the provisions of Sections 7(a)(i), 8(a), 8(b), 10 of the Conditions of the ALTA Loan Policy.  New Form 12.1-06 also contains the new paragraphs.  These new paragraphs clarify the effect of the endorsement on the options of the Company under the policy in the event of a claim and the extent of the Company's liability.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The following policies are issued in conjunction with one another:

| POLICY NUMBER: | STATE: | AMOUNT OF INSURANCE: |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

2.  The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3.  Subject to the limits in Section 4 of this endorsement, the Aggregate Amount of Insurance under these policies is $_____.

4.  Section 7(a)(i) of the Conditions of this policy is amended to read:

**7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a) to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

(i)  to pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

5.  Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

(i)   the Aggregate Amount of Insurance,

(ii)   the Indebtedness,

(iii)   the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

(iv)   if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b)   If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

**10.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a)   All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance by the amount of the payment.

(b)   However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(c)   The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy.   Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.   To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 12-06
(Aggregation-Loan) (rev. 4/2/13)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The following policies are issued in conjunction with one another:

| POLICY NUMBER: | STATE: | AMOUNT OF INSURANCE: |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

2. The amount of insurance available to cover the Company's liability for loss or damage under this policy at the time of payment of loss shall be the Aggregate Amount of Insurance defined in Section 3 of this endorsement.

3. The Aggregate Amount of Insurance under this policy is either:

   a. $\_; or

   b. If the Land is located in one of the states identified in this subsection, then the Aggregate Amount of Insurance is restricted to the amount shown below:

| STATE | AGGREGATE AMOUNT OF INSURANCE |
|---|---|
| | $ |
| | $ |

4. Section 7(a)(i) of the Conditions of this policy is amended to read:

   **7.  OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

   In case of a claim under this policy, the Company shall have the following additional options:

   (a)     to pay or tender payment of the lesser of the value of  the Title as insured or the Aggregate Amount of Insurance applicable under this policy at the date the claim was made by the Insured Claimant, or to purchase the Indebtedness.

   (i) To pay or tender payment of the lesser of the value of the Title as insured at the date the claim was made by the Insured Claimant, or the Aggregate Amount of Insurance applicable under this policy, together with any cost, attorneys' fees, and costs and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

5.   Section 8(a) and 8(b) of the Conditions of this policy are amended to read:

**8. DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

  (i)   the Aggregate Amount of Insurance for the State where the Land is located,

  (ii)  the Indebtedness,

  (iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

  (iv) if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured, the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as the date it is settled and paid.

6.   Section 10 of the Conditions of this policy is amended to read:

**10.  REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the applicable Aggregate Amount of Insurance by the amount of the payment.

(b) If this policy insures the Title to Land located in a state identified in Section 3 b. of this endorsement:

  (i)   all payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Aggregate Amount of Insurance  by the amount of the payment; but

  (ii)  a payment made for loss or damage on Land insured in one of the policies identified in Section 1 on Land located outside this state shall not reduce the Aggregate Amount of Insurance in Section 3.b. of this endorsement until the Aggregate Amount of Insurance in Section 3.a. is reduced below the  Aggregate Amount of Insurance in Section 3.b .

(c) However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Aggregate Amount of Insurance afforded under this endorsement except to the extent that the payments reduce the Indebtedness.

(d) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company under this policy, except as

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provided in Section 2 of these Conditions, but it will not reduce the Aggregate Amount of Insurance for the other policies identified in Section 1 of this endorsement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 12.1-06
(Aggregation- State Limits-Loan) (4/2/13)
© American Land Title Association

## LEASEHOLD-OWNER'S AND LEASEHOLD-LOAN
## ALTA 13-06 (04-02-12) AND 13.1-06 (04-02-12)

The ALTA Endorsement Forms 13-06 and 13.1-06 were created to be attached to the ALTA Owner's Policy and ALTA Loan Policy respectively. They were revised April 2, 2012. They are intended to be used either with policies covering only Leasehold Estates or for those that insure both Leasehold Estates and the ownership of improvements located on them.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement, the following terms shall mean:

    a.  "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.
    b.  "Lease": the lease described in Schedule A.
    c.  "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.
    d.  "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.
    e.  "Personal Property":  property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to it or to the Land.
    f.  "Remaining Lease Term": the portion of the Lease Term remaining after the Insured has been Evicted.
    g.  "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Insured's expense or in which the Insured has an interest greater than the right to possession during the Lease Term.

2.  Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Insured, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction.  The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

3.  Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy or Section 8(a)(ii) of the Conditions:

    a.  The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction .

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

b.  Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.  The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for leasehold reasonably equivalent to the Leasehold Estate.

g.  If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction.  Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

4.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 13-06
(Leasehold – Owners) (Rev. 4/2/12)
© American Land Title Association Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.
2.       As used in this endorsement, the following terms shall mean:

    a.    "Evicted" or "Eviction": (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of the Lease or (b) the lawful prevention of the use of the Land or the Tenant Leasehold Improvements for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    b.    "Lease": the lease described in Schedule A.

    c.    "Leasehold Estate": the right of possession granted in the Lease for the Lease Term.

    d.    "Lease Term": the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    e.    "Personal Property": property, in which and to the extent the Insured has rights, located on or affixed to the Land on or after Date of Policy that by law does not constitute real property because (i) of its character and manner of attachment to the Land and (ii) the property can be severed from the Land without causing material damage to the property or to the Land.

    f.    "Remaining Lease Term": the portion of the Lease Term remaining after the Tenant has been Evicted.

    g.    "Tenant": the tenant under the Lease and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

    h.    "Tenant Leasehold Improvements": Those improvements, in which and to the extent the Insured has rights, including landscaping, required or permitted to be built on the Land by the Lease that have been built at the Tenant's expense or in which the Tenant has an interest greater than the right to possession during the Lease Term.

3.       Valuation of Estate or Interest Insured:

If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction of the Tenant, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of the value for the Remaining Lease Term of the Leasehold Estate and any Tenant Leasehold Improvements existing on the date of the Eviction. The Insured Claimant shall have the right to have the Leasehold Estate and the Tenant Leasehold Improvements affected by a defect insured against by the policy valued either as a whole or separately. In either event, this determination of value shall take into account rent no longer required to be paid for the Remaining Lease Term.

4.       Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of this policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 2 of this endorsement, any other endorsement to the policy, or Section 8(a)(iii) of the Conditions:

    a.    The reasonable cost of (i) removing and relocating any Personal Property that the Insured has the right to remove and relocate, situated on the Land at the time

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

of Eviction,(ii) transportation of that Personal Property for the initial one hundred miles incurred in connection with the relocation,(iii) repairing the Personal Property damaged by reason of the removal and relocation, and (iv) restoring the Land to the extent damaged as a result of the removal and relocation of the Personal Property and required of the Insured solely because of the Eviction

b.     Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.     The amount of rent that, by the terms of the Lease, the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate and Tenant Leasehold Improvements from which the Insured has been Evicted.

d.     The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease permitted by the Lease and made by Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

e.     Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate or the Tenant Leasehold Improvements.

f.     The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.     If Tenant Leasehold Improvements are not substantially completed at the time of Eviction, the actual cost incurred by the Insured, less the salvage value, for the Tenant Leasehold Improvements up to the time of Eviction. Those costs include costs incurred to obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping.

5.    This endorsement does not insure against loss, damages, or costs of remediation (and the Company will not pay cost, attorneys' fees or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 13.1-06
(Leasehold – Loan) (Rev. 4/1/12)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**FUTURE ADVANCES ALTA ENDORSEMENT – FORMS 14-06 (02-03-11), 14.1-06 (02-03-11), 14.2-06 (02-03-11) and 14.3-06 (02-03-11 tech correction 12-03-12)**

These endorsements affirmatively insure the priority and enforceability of the lien of the Insured Mortgage with respect to future advances and repayments and re-advances of Indebtedness. In addition, they include coverage for the consequences of a variable rate, including possible negative amortization (or interest on interest), as discussed above in the ALTA 6-06 endorsement section. These endorsements also cover the effect on the priority and enforceability of the Insured Mortgage of the Indebtedness having been reduced to zero before being increased by subsequent advances ("zero-balance"), and state law requirements to secure these advances not having been met. Unique to the 14.3-06 (Reverse Mortgages) is additional coverage for failure of the Insured Mortgage to state a term or maximum dollar amount, and failure of the mortgagors to be at least 62 years old.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

    b.  Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

    b.  The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

    c.  The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

    d.  Any federal or state environmental protection lien; [or]

    e.  Usury, or any consumer credit protection or truth-in-lending law. *[; or*

    f.  *Any mechanic's or materialmen's lien.]*

5.  The Indebtedness includes Advances.

    This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 14-06
(Future Advance - Priority) (Rev. 2/3/11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

   a.   "Agreement," as used in this endorsement, shall mean the note or loan agreement, the repayment of Advances under which is secured by the Insured Mortgage.

   b.   "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

   c.   "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

   b.   The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

   c.   The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no Indebtedness owing during the term of the Insured Mortgage, or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances.

3.   The Company also insures against loss or damage sustained by the Insured by reason of:

   a.   The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the Indebtedness.

   b.   Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition of unpaid interest.

4.     This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) resulting from:

    a.     The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

    b.     The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

    c.     The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

    d.     Any federal or state environmental protection lien;

    e.     The lack of priority of any Advance made after the Insured has Knowledge of the existence of liens, encumbrances or other matters affecting the Land intervening between Date of Policy and the Advance, as to the intervening lien, encumbrance or other matter; [or]

    f.     Usury, or any consumer credit protection or truth-in-lending law. *[; or*

    g.     *Any mechanic's or materialmen's lien.]*

5.     The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.1-06
(Future Advance - Knowledge) (Rev. 2/3/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance for Advances added by Section 2 of this endorsement is subject to the exclusions in Section 3 of  this endorsement and the Exclusions from Coverage in the Policy, except Exclusion 3(d), the provisions of the  Conditions, and the exceptions contained in Schedule B.

  a. "Agreement," as used in this endorsement, shall mean the letter of credit and its reimbursement agreement, the repayment of Advances under which is secured by the Insured Mortgage.

  b. "Advance," as used in this endorsement, shall mean only an advance made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of  the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to  prevent deterioration of improvements, together with interest on those advances.

2. The Company insures against loss or damage sustained by the Insured by reason of:

  a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

  b. The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or  encumbrance on the Title.

  c. The invalidity or unenforceability or loss of priority of the lien of the Insured Mortgage as security for  the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage,  or (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the  Land is located to secure Advances.

3. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees  or expenses) resulting from:

  a. The lien of real estate taxes or assessments on the Title imposed by governmental authority arising  after Date of Policy; or

  b. Any federal or state environmental protection lien; or

  c. Limitations, if any, imposed under the Bankruptcy Code (11 U.S.C.) on the amount that may be  recovered from the mortgagor's estate. *[; or*

  d. *Any mechanic's or materialmen's lien.]*

4. The Indebtedness includes Advances.

  This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the  terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the  Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express  provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and  provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 14.2-06
(Future Advance – Letter of Credit) (Rev. 2/3/11)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance for Advances added by Sections 2 and 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions in the Policy, except Exclusion 3(d), the provisions of the Conditions, and the exceptions contained in Schedule B.

    a.  "Agreement," as used in this endorsement, shall mean the note or loan agreement, repayment of Advances under which is secured by the Insured Mortgage.

    b.  "Advance," as used in this endorsement, shall mean only an advance of principal made after the Date of Policy as provided in the Agreement, including expenses of foreclosure, amounts advanced pursuant to the Insured Mortgage to pay taxes and insurance, assure compliance with laws, or to protect the lien of the Insured Mortgage before the time of acquisition of the Title, and reasonable amounts expended to prevent deterioration of improvements, together with interest on those advances.

    c.  "Changes in the rate of interest," as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to a formula provided in the Insured Mortgage or the Agreement at Date of Policy.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Advance.

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Advance over any lien or encumbrance on the Title.

    c.  The invalidity or unenforceability or lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, Advances and unpaid interest resulting from (i) re-Advances and repayments of Indebtedness, (ii) earlier periods of no indebtedness owing during the term of the Insured Mortgage, (iii) the Insured Mortgage not complying with the requirements of state law of the state in which the Land is located to secure Advances, (iv) failure of the Insured Mortgage to state the term for Advances, or (v) failure of the Insured Mortgage to state the maximum amount secured by the Insured Mortgage.

    d.  The invalidity or unenforceability of the lien of the Insured Mortgage because of the failure of the mortgagors to be at least 62 years of age at Date of Policy.

3.  The Company also insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage resulting from any provisions of the Agreement that provide for (i) interest on interest, (ii) changes in the rate of interest, or (iii) the addition of unpaid interest to the principal portion of the Indebtedness.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

b.   Lack of priority of the lien of the Insured Mortgage as security for the Indebtedness, including any unpaid interest that was added to principal in accordance with any provisions of the Agreement, interest on interest, or interest as changed in accordance with the provisions of the Insured Mortgage, which lack of priority is caused by (i) changes in the rate of interest, (ii) interest on interest, or (iii) increases in the Indebtedness resulting from the addition   of unpaid interest.

"Interest," as used in this Paragraph 3, shall include lawful interest based on appreciated value.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

a.   The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for any Advance made after a Petition for Relief under the Bankruptcy Code (11 U.S.C.) has been filed by or on behalf of the mortgagor;

b.   The lien of real estate taxes or assessments on the Title imposed by governmental authority arising after Date of Policy;

c.   The lack of priority of the lien of the Insured Mortgage as security for any Advance to a federal tax lien, which Advance is made after the earlier of (i) actual knowledge of the Insured that a federal tax lien was filed against the mortgagor, or (ii) the expiration, after notice of a federal tax lien filed against the mortgagor, of any grace period for making disbursements with priority over the federal tax lien provided in the Internal Revenue Code (26 U.S.C.);

d.   Any federal or state environmental protection lien; [or]

e.   Usury, or any consumer credit protection or truth-in-lending law. *[; or*

f.   *Any mechanic's or materialmen's lien.]*

5.   The Indebtedness includes Advances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

*[BRACKETED MATERIAL OPTIONAL]*

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 14.3-06
(Future Advance – Reverse Mortgage) (Rev. 2/3/11)
© American Land Title Association                                    *[includes technical corrections of 12-3-12]*

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**NON-IMPUTATION**
**ALTA 15-06 (FULL-EQUITY TRANSFER) (06-17-06);**
**15.1-06 (ADDITIONAL INSURED) (06-17-06)**
**15.2-06 (PARTIAL EQUITY) (06-17-06)**

These ALTA forms give coverage over matters known to specified parties that would otherwise be excluded from coverage on the basis of imputed knowledge, but also over the consequences of the actions or inactions of those parties which affect the Title. Form 15-06 is to be used when the entire beneficial interest of the entity holding Title and named as the insured on Schedule A (e.g., partnership interest, corporate stock, membership interest of limited liability company) has been transferred for value. Form 15.1-06 is to be used when only a portion of the beneficial interest of the entity holding Title and named on Schedule A as the insured has been transferred and the incoming beneficial owner is identified on the form as an additional insured. Form 15.2-06 is to be used when the incoming beneficial owner requests to be the insured in its own policy, and its interest has been transferred for value.

Exclusions from Coverage 3(a) and (b) in the ALTA Owner's Policy and ALTA Loan Policy exclude from coverage matters created, suffered, assumed, or agreed to by the insured or known to the insured, but not to the Company, and not disclosed by the public records.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Insured by operation of law, provided_____acquired the Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15-06
(Nonimputation – Full Equity Transfer) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

For purposes of the coverage provided by this endorsement,_____ ("Additional Insured") is added as an Insured under the policy. By execution below, the Insured named in Schedule A acknowledges that any payment made under this endorsement shall reduce the Amount of Insurance as provided in Section 10 of the Conditions.

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the Additional Insured by operation of law, to the extent of the percentage interest in the Insured acquired by Additional Insured as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

_____
INSURED

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.1-06
(Nonimputation – Additional Insured) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b), or (e) to deny liability for loss or damage otherwise insured against under the terms of the policy solely by reason of the action or inaction or Knowledge, as of Date of Policy, of_____ whether or not imputed to the entity identified in paragraph 3 of Schedule A or to the Insured by operation of law, but only to the extent that the Insured acquired the Insured's interest in entity as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by the policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 15.2-06
(Nonimputation – Partial Equity Transfer) (6/17/06)
©American Land Title Association

## MEZZANINE FINANCING
### ALTA 16-06 (06-17-06)

This endorsement provides insurance to a lender whose loan is secured not by a lien against the land but rather by some form of security against the beneficial interest of the business entity that owns the Land. The security may be a pledge of  and security interest in  the stock in a corporation, partnership interest in a partnership, or membership interest in a limited liability company. The endorsement is made a part of an Owner's Policy rather than a Loan Policy, because the lender's personal property security interest is not being insured so no Loan Policy is issued to the lender. The endorsement assigns the rights under the policy of the Insured owner of the Land to the defined Mezzanine Lender. The endorsement provides that the Company will not assert as a defense matters known to the Insured owner, as long as they were not known to the Mezzanine Lender. It further provides that the Company will not deny liability on the basis that ownership interests in the Insured have been transferred to or acquired by the Mezzanine Lender.

Conditions paragraph 7 (b) is amended to provide that the Company can terminate its liability under the policy by paying the Mezzanine Lender rather than the Insured. Exclusions from Coverage Nos. 3 (a), (b), (c) or (e) are amended with respect to defects, liens, encumbrances, adverse claims or other matters which were not known to the Mezzanine Lender, or failure of the Mezzanine Lender to pay value.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The Mezzanine Lender is:_____and each successor in ownership of its loan ("Mezzanine Loan") reserving, however, all rights and defenses as to any successor that the Company would have had against the Mezzanine Lender, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, adverse claim, or other matter insured against by this policy as affecting Title.

2.   The Insured

   a.   assigns to the Mezzanine Lender the right to receive any amounts otherwise payable to the Insured under this policy, not to exceed the outstanding indebtedness under the Mezzanine Loan; and

   b.   agrees that no amendment of or endorsement to this policy can be made without the written consent of the Mezzanine Lender.

3.   The Company does not waive any defenses that it may have against the Insured, except as expressly stated in this endorsement.

4.   In the event of a loss under the policy, the Company agrees that it will not assert the provisions of Exclusions from Coverage 3(a), (b) or (e) to refuse payment to the Mezzanine Lender solely by reason of the action or inaction or Knowledge, as of Date of Policy, of the Insured, provided

   a.   the Mezzanine Lender had no actual Knowledge of the defect, lien, encumbrance or other matter creating or causing loss on Date of Policy.

   b.   this limitation on the application of Exclusions from Coverage 3(a), (b) and (e) shall

      i.   apply whether or not the Mezzanine Lender has acquired an interest (direct or indirect) in the Insured either on or after Date of Policy, and

      ii.   benefit the Mezzanine Lender only without benefiting any other individual or entity that holds an interest (direct or indirect) in the Insured or the Land.

5.   In the event of a loss under the Policy, the Company also agrees that it will not deny liability to the Mezzanine Lender on the ground that any or all of the ownership interests (direct or indirect) in the Insured have been transferred to or acquired by the Mezzanine Lender, either on or after the Date of Policy.

6.   The Mezzanine Lender acknowledges

   a.   that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which is a charge or

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

          lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy; and

    b.    that the Company shall have the right to insure mortgages or other conveyances of an interest in the Land, without the consent of the Mezzanine Lender.

7.    If the Insured, the Mezzanine Lender or others have conflicting claims to all or part of the loss payable under the Policy, the Company may interplead the amount of the loss into Court. The Insured and the Mezzanine Lender shall be jointly and severally liable for the Company's cost for the interpleader and subsequent proceedings, including attorneys' fees. The Company shall be entitled to payment of the sums for which the Insured and Mezzanine Lender are liable under the preceding sentence from the funds deposited into Court, and it may apply to the Court for their payment.

8.    Whenever the Company has settled a claim and paid the Mezzanine Lender pursuant to this endorsement, the Company shall be subrogated and entitled to all rights and remedies that the Mezzanine Lender may have against any person or property arising from the Mezzanine Loan. However, the Company agrees with the Mezzanine Lender that it shall only exercise these rights, or any right of the Company to indemnification, against the Insured, the Mezzanine Loan borrower, or any guarantors of the Mezzanine Loan after the Mezzanine Lender has recovered its principal, interest, and costs of collection.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

AGREED AND CONSENTED TO:

*(Name of Insured)*                      *(Name of Mezzanine Lender)*

By: _____    By: _____

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 16-06
(Mezzanine Financing) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ACCESS**
**ALTA 17-06 (Access & Entry) (06-17-06)**
**17.1-06 (Indirect Access & Entry) (06-17-06) and**
**17.2-06 (Utility Access) (10-16-08)**

These endorsements are designed to provide insurance against loss if the Land does not abut or have actual vehicular and pedestrian access to and from a specific open and publicly maintained street by way of existing curb cuts or entries. In addition, ALTA 17.1-06 provides the same coverage with respect to a specific easement insured in Schedule A which connects the Land to a specific public street. The ALTA 17.2-06 adopts a version of the generic "Utilities Facilities" endorsement which covers access to utility installations in a public street.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the Land does not abut and have both actual vehicular and pedestrian access to and from FILL IN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

ALTA Endorsement Form 17-06
(Access and Entry) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if, at Date of Policy (i) the easement identified as FILLIN in Schedule FILLIN (the "Easement") does not provide that portion of the Land identified as FILLIN in Schedule FILLIN both actual vehicular and pedestrian access to and from FILLIN (the "Street"), (ii) the Street is not physically open and publicly maintained, or (iii) the Insured has no right to use existing curb cuts or entries along that portion of the Street abutting the Easement.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
       AUTHORIZED SIGNATORY

ALTA Endorsement Form 17.1-06
(Indirect Access and Entry) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the lack of a right of access to the following utilities or services:  [CHECK ALL THAT APPLY]

☐ Water service             ☐ Natural gas service       ☐ Telephone service

☐ Electrical power service  ☐ Sanitary sewer            ☐ Storm water drainage

☐ _____        ☐ _____         ☐ _____

either over, under or upon rights-of-way or easements for the benefit of the Land because of:

    (1) a gap or gore between the boundaries of the Land and the rights-of-way or easements;

    (2)  a gap between the boundaries of the rights-of-way or easements; or

    (3)  a termination by a grantor, or its successor, of the rights-of-way or easements.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 17.2-06
(Utility Access)  (10/16/08)
©American Land Title Association

**TAX PARCEL**
**ALTA 18-06 (Single) (06-17-06)**
**18.1 (Multiple) [with tax sale protection] (06-17-06)**

These endorsements cover the tax parcel or tax identification numbers often included in the policy for informational. Form 18-06 insures against loss if the tax number shown does not include all the Land described in the policy or includes land not described in the policy. Form 18.1-06 is for use when there are multiple parcels and multiple numbers. In addition, Form 18.1-06 insures that any easement included as an insured parcel in Schedule A or C will not be wiped out by the subsequent foreclosure of taxes on the servient tenement.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the Land being taxed as part of a larger parcel of land or failing to constitute a separate tax parcel for real estate taxes.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 18-06
(Single Tax Parcel) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.      those portions of the Land identified below not being assessed for real estate taxes under the listed tax identification numbers or those tax identification numbers including any additional land:

   Parcel:                              PARCEL 1
   Tax Identification Number(s):        TAX ID 1


   Parcel:                              PARCEL 2
   Tax Identification Number(s):        TAX ID 2


   Parcel:                              PARCEL 3
   Tax Identification Number(s):        TAX ID 3

2.      the easements, if any, described in Schedule A being cut off or disturbed by the nonpayment of real estate taxes, assessments or other charges imposed on the servient estate by a governmental authority.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]




Chicago Title Insurance Company

BY:_____


ALTA Endorsement Form 18.1-06
(Multiple Tax Parcel) (6/17/06)
©American Land Title Association

**CONTIGUITY**

**ALTA 19-06 (MULTIPLE PARCELS) [within Land] AND (06-17-06)**
**FORM 19.1-06 (SINGLE PARCEL) [with property other than Land] (06-17-06)**

ALTA Form 19-06 is designed to provide insurance that (1) each parcel, in a policy which insures multiple parcels, is contiguous to at least one other parcel insured by the policy, or (2) if some parcels are not contiguous to at least one other parcel, that certain parcels are contiguous to certain other parcels. The ALTA Form 19.1-06 provides coverage that the Land in the policy is contiguous to some other specific parcel not insured in the policy.

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.    The failure [of the _____ boundary line of Parcel A] of the Land to be contiguous to [the_____ boundary line of Parcel B] **[for more than two parcels, continue as follows: "; of [the_____boundary line of Parcel B] of the Land to be contiguous to [the _____boundary line of Parcel C] and so on until all contiguous parcels described in the policy have been accounted for]**; or

2.    The presence of any gaps, strips, or gores separating any of the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19-06
(Contiguity – Multiple Parcels) (6/17/06)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of:

1.     The failure of the Land to be contiguous to **[describe the land that is contiguous to the Land by its legal description or by reference to a recorded instrument – e.g. ". . . that certain parcel of real property legally described in the deed recorded as Instrument No._____, records of County, State of_____]** along the _____ boundary line[s]; or

2.     The presence of any gaps, strips, or gores separating the contiguous boundary lines described above.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 19.1-06
(Contiguity – Single Parcel) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**FIRST LOSS**
**ALTA 20-06 (06-17-06)**

This endorsement is designed to alter the established criteria for determining when a loss is recognized under a loan policy. Loss is normally the difference between the value of the property with or without the defect, lien or encumbrance insured against. Under normal circumstances, a loss would be difficult to determine until the land was sold after foreclosure. If the sale was for an amount less than the debt, and the difference between the sales price and the indebtedness was caused by a matter covered by the policy, the lender could claim a loss. Consequently, an insured lender would normally be required to foreclose to prove this loss before being able to make a claim. This endorsement, to be issued only when there is more than one insured parcel, allows a loss to be recognized whenever a title defect materially impairs the value of a parcel securing the loan without requiring acceleration of the debt and foreclosure against any of the parcels securing the loan.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

This endorsement is effective only if the Collateral includes at least two parcels of real property.

1.      For the purposes of this endorsement

     a.      "Collateral" means all property, including the Land, given as security for the Indebtedness.

     b.      "Material Impairment Amount" means the amount by which any matter covered by the policy for which a claim is made diminishes the value of the Collateral below the Indebtedness.

2.      In the event of a claim resulting from a matter insured against by the policy, the Company agrees to pay that portion of the Material Impairment Amount that does not exceed the extent of liability imposed by Section 8 of the Conditions without requiring

     a.      maturity of the Indebtedness by acceleration or otherwise,

     b.      pursuit by the Insured of its remedies against the Collateral, or

     c.      pursuit by the Insured of its remedies under any guaranty, bond or other insurance policy.

3.      Nothing in this endorsement shall impair the Company's right of subrogation. However, the Company agrees that its right of subrogation shall be subordinate to the rights and remedies of the Insured. The Company's right of subrogation shall include the right to recover the amount paid to the Insured pursuant to Section 2 of this endorsement from any debtor or guarantor of the Indebtedness, after payment or other satisfaction of the remainder of the Indebtedness and other obligations secured by the lien of the Insured Mortgage. The Company shall have the right to recoup from the Insured Claimant any amount received by it in excess of the Indebtedness up to the amount of the payment under Section 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____ _____

ALTA Endorsement Form 20-06
(First Loss – Multiple Parcel Transactions) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CREDITORS' RIGHTS**

**ALTA ENDORSEMENT FORM 21-06**

**This endorsement was decertified by ALTA on 2/8/10 and is no longer available.**

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**LOCATION**
**ALTA 22-06**
**Form 22.1-06 (with map) (06-17-06)**

These endorsements insure against loss or damage if an improvement of the type identified in the endorsement having the address set forth in the endorsement is not located on the Land. In addition, the 22.1-06 insures that a copy of a recorded plat or map that may be attached as an exhibit to the endorsement accurately reflects the location and dimensions of the Land as shown in the public records.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of a FILL IN, known as FILL IN, to be located on the Land at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22-06
(Location) (6/17/06)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of (i) a FILL IN, known as FILL IN, to be located on the Land at Date of Policy, or (ii) the map, if any, attached to this policy to correctly show the location and dimensions of the Land according to the Public Records.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 22.1-06
(Location and Map) (6/17/06)
©American Land Title Association

**CO-INSURANCE-SINGLE POLICY**
**ALTA 23-06 (10-16-08)**

This endorsement was designed to facilitate the delivery of a single policy when co-insurance with other underwriters is involved with allocation of liability by endorsement from each co-insurer.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No.[*lead policy*]
Issued by
[*lead policy issuer*]**("Issuing Co-Insurer")**

CO-INSURANCE ENDORSEMENT

Attached to and made a part of Issuing Co-Insurer's Policy No. [*lead policy*] ("Co-Insurance Policy"). Each title insurance company executing this Co-Insurance Endorsement, other than the Issuing Co-Insurer, shall be referred to as "Co-Insurer." Issuing Co-Insurer and each Co-Insurer are collectively referred to as "Co-Insuring Companies".

1.  By issuing this endorsement to the Co-Insurance Policy, each of the Co-Insuring Companies adopts the Co-Insurance Policy's Covered Risks, Exclusions, Conditions, Schedules and endorsements, subject to the limitations of this endorsement.

| Co-Insuring Companies | Name and Address | Policy Number [File Number] | Amount of Insurance | Percentage of Liability |
|---|---|---|---|---|
| Issuing Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Co-Insurer | | | $ | |
| Aggregate Amount of Insurance | | | $ | |

2. Each of the Co-Insuring Companies shall be liable to the Insured only for its Percentage of Liability of: (a) the total of the loss or damage under the Co-Insurance Policy, in no event greater than its respective Amount of Insurance set forth in this endorsement; and (b) costs, attorneys' fees and expenses provided for in the Conditions.

3. Any notice of claim and any other notice or statement in writing required to be given under the Co-Insurance Policy must be given to each of the Co-Insuring Companies at its address set forth above.

4. Any endorsement to the Co-Insurance Policy issued after the date of this Co-Insurance Endorsement must be signed on behalf of each Co-Insuring Company by its authorized officer or agent.

5. This Co-Insurance Endorsement is effective as of the Date of Policy of the Co-Insurance Policy. This Co-Insurance Endorsement may be executed in counterparts.

This endorsement is issued as part of the Co-insurance Policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

_ALTA 23-06 Continued_

[Witness Optional]

DATED:
Issuing Co-Insurer:

[lead underwriter]

BY:_____ _____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

Co-Insurer:

[BLANK] Title Insurance Company

By: _____

[Additional Co-Insurer signatures may be added if needed.]

ALTA Endorsement Form 23-06
(Co-Insurance - Single Policy) (Rev. 10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**DOING BUSINESS**
**ALTA FORM 24-06 (10-16-08)**

This endorsement for a loan policy provides coverage to the lender concerning the consequences of the failure to comply with state "doing business" laws.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the invalidity or unenforceability of the lien of the Insured Mortgage on the ground that making the loan secured by the Insured Mortgage constituted a violation of the "doing business" laws of the State where the Land is located because of the failure of the Insured to qualify to do business under those laws.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 24-06
(Doing Business) (10/16/08)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SAME AS SURVEY & SAME AS PORTION OF SURVEY**
**ALTA 25-06 (10-16-08)**
**25.1-06 (10-16-08)**

These endorsements expand policy coverage by providing insurance in the event the survey identified in the endorsement is not the same land a described in Schedule A(or C) of the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified on the survey made by _____dated_____  _, and designated Job No._____.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 25-06
(Same as Survey) (10/16/08)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land as described in Schedule A to be the same as that identified as [Example:  Parcel A, B, C or Parcel 1, 2, 3] on the survey made by_____ dated _____, and designated Job No._____.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 25.1-06
(Same as Portion of Survey) (10/16/08)
©American Land Title Association

**SUBDIVISION**
**ALTA 26-06 (10-16-08)**

The ALTA Form 26-06 insures against loss based upon the Land described in Schedule A (or Schedule C) not constituting a legally created parcel pursuant to applicable state statutes or local governmental regulations.

This endorsement modifies exclusion 1(a)(iii) which excludes any law, ordinance, permit or governmental regulation which pertains to the subdivision of land.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured by reason of the failure of the Land to constitute a lawfully created parcel according to the subdivision statutes and local subdivision ordinances applicable to the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 26-06
(Subdivision) (10/16/08)
©American Land Title Association

**USURY ENDORSEMENT**
**ALTA 27-06 (10-16-08)**

This endorsement is for use with an ALTA loan policy. It provides insurance against loss the Insured may suffer if the Insured Mortgage is determined to be usurious under state statute.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured  by reason of the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness because the loan secured by the Insured Mortgage violates the usury law of the state where the Land is located.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company

BY:_____

ALTA Endorsement Form 27-06
(Usury) (10/16//08)
©American Land Title Association

**EASEMENT - DAMAGE OR ENFORCED REMOVAL ENCROACHMENTS - BOUNDARIES AND EASEMENTS**
**ALTA 28-06 (02-03-10)**
**ALTA 28.1-06 (04-02-12)**
**ALTA 28.2-06 (04-02-13)**

**ALTA Endorsement Form 28-06 (EASEMENT - DAMAGE OR ENFORCED REMOVAL)**

Endorsement Form 28.06 was developed to insure against loss caused by the encroachment of a building located on the Land onto or over an easement shown as an exception in Schedule B, as disclosed by a survey or inspection of the Land. The loss must be based on an exercise of the easement and is only for damage to an existing building or enforced removal or alteration.

**ALTA 28.1-06 (ENCROACHMENTS - BOUNDARIES AND EASEMENTS)**
**ALTA 28.2-06 (ENCROACHMENTS – BOUNDARIES AND EASEMENTS – DESCRIBED IMPROVEMENTS)**

Endorsement Forms 28.1-06 and 28.2-06 were developed to provide coverage with respect to certain boundary and easement encroachments. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06 and 9.10-06 (which additionally afford coverage as to violations of covenants, violations of setbacks, and damage to existing improvements because of development of minerals). The Form 28.2-06 specifically covers only the Improvements described at item 2 of the endorsement.

**The coverage in these Endorsements include:**

•        The loss occasioned by the existence of an encroachment by an Improvement onto a neighboring property or onto an easement area within the insured Land, other than as disclosed in Schedule B exceptions.

•        The loss occasioned by the existence of an encroachment by a neighboring Improvement onto the insured Land, other than as disclosed in Schedule B exceptions.
•        Enforced removal of an insured Improvement based upon the encroachment into the easement area or onto neighboring property.

These forms allow the exclusion of an encroachment raised as an exception in Schedule B from the enforced removal coverage by reference to the exception that describes it, if the title insurer elects not to include that encroachment within the coverage afforded by these endorsements.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The Company insures against loss or damage sustained by the Insured if the exercise of the granted or reserved rights to use or maintain the easement(s) referred to in Exception (s)_____ of Schedule B results in:

     (1)     damage to an existing building located on the Land, or

     (2)     enforced removal or alteration of an existing building located on the Land.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY

ALTA Endorsement Form 28-06
(Easement-Damage or Enforced Removal) (rev. 02/03/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means an existing building, located on either the Land or adjoining land at Date of Policy and that by law constitutes real property.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by the Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the encroachments listed as Exceptions _____of Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 28.1-06
(Encroachments-Boundaries and Easements) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this  endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in  Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement  on the Land or  adjoining land at Date of Policy , itemized below:

.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Improvement located on the Land onto adjoining land or onto that  portion of the Land subject to an easement, unless  an exception in Schedule B of the policy  identifies the encroachment;

   b. An encroachment of any Improvement located on adjoining land onto the Land at Date of Policy,   unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Improvement located on the Land as a result of an encroachment by  the Improvement onto any portion of the Land subject to any easement, in the event that the  owners of the easement shall, for the purpose of exercising the right of use or maintenance of  the easement, compel removal or relocation of the encroaching Improvement; or

   d. Enforced removal of any Improvement located on the Land that encroaches onto adjoining land.

4. Sections 3.c and 3.d. of this endorsement do not insure against loss or damage (and the Company  will not pay costs, attorneys' fees, or expenses) resulting from the following Exceptions, if any, listed  in Schedule B:

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
        AUTHORIZED SIGNATORY

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 28.2-06
(Encroachments-Boundaries and Easements-Described Improvements) (4/2/13)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SWAP ENDORSEMENT (INTEREST RATE EXCHANGE AGREEMENT SECURED BY INSURED MORTGAGE)**
**ALTA 29-06 (02-03-10)**
**ALTA 29.1-06 (02-03-10)**
**ALTA 29.2-06 (08-01-11)**
**ALTA 29.3-06 (08-01-11)**

Lenders occasionally request that the Loan Policy insure amounts which are described in an Interest Rate Exchange Agreement or Swap Agreement, the terms of which are contained in or referenced in the Insured Mortgage. Such agreements obligate the mortgagor for damages the lender may suffer under swap transactions it enters into on the borrower's behalf in order to achieve a favorable interest rate. If the borrower defaults on its loan, the lender becomes obligated itself under the swap loan for amounts known as breakage fees. This endorsement is designed to provide additional coverage for these amounts. These amounts are contingent and would accrue as an obligation of the borrower post-policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in Schedule B, and the Conditions. As used in this endorsement:

   a. The "Date of Endorsement" is_____; and

   b. "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between _____ and the Insured existing at Date of Endorsement and secured by the Insured Mortgage. The Swap Obligation is included as a part of the Indebtedness.

2. The Company insures against loss or damage sustained by the Insured by reason of the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of the Swap Obligation at Date of Endorsement.

3. This endorsement does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

   a. Rights or obligations set, created or confirmed after the Date of Endorsement under a master interest rate exchange agreement existing on or after Date of Endorsement;

   b. The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws;

   c. The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount of the Swap Obligation[; *or*]

   d. [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes were not paid; or* ]

   e. [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement - Form 29 - 06
(Interest Rate Swap –Direct Obligations**)** (2/3/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange               . agreement dated ___, between_____and the Insured existing at Date of Endorsement and secured by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the   loan documents secured by the Insured Mortgagee at Date of Endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,   unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or*]

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes   were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here].*

    This endorsement is issued as part of the policy. Except as it expressly states, it does not  (i)  modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date  of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous  endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements to it.

Dated:

By_____
         Authorized Signatory

ALTA Endorsement - Form 29.1 - 06

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

(Interest Rate Swap – Additional Interest) (2/3/10)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.      The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage  contained in Schedule B, and the Conditions. As used in this endorsement:

a.      The "Date of Endorsement" is_____; and

b.      "Swap Obligation" means a monetary obligation under the interest rate exchange agreement dated_____, between_____and the  Insured existing at Date of Endorsement and secured by the Insured Mortgage.  The Swap  Obligation is included as a part of the Indebtedness.

c. "Additional Amount of Insurance" is $\_\_\_\_that is in addition to the Amount of Insurance  stated in Schedule A and is Applicable only to loss or damage under this endorsement.

2.      The Company insures against loss or damage sustained by the Insured by reason of the  invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for the  repayment of the Swap Obligation at Date of Endorsement.

3       This endorsement does not insure against loss or damage, and the Company will not pay  costs,  attorneys' fees, or expenses that arise by reason of:

a.      Rights or obligations set, created or confirmed after the Date of Endorsement under a  master interest rate exchange agreement existing on or after Date of Endorsement;

b.      The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the  Swap Obligation, or a court order providing some other remedy, by the operation of       federal  bankruptcy, state insolvency, or similar creditors' rights laws;

c.      The calculation of the amount, if any, determined by a court of competent jurisdiction as  the amount of the Swap Obligation[; *or*]

d.      [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as  security for repayment of the Swap Obligation because all applicable mortgage recording  or  similar intangible taxes  were not paid; or* ]

e.      [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions  here*].

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or
(iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this  endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

Dated:

By_____
        Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement - Form 29 .2 - 06
(Interest Rate Swap –Direct Obligations-Defined Amount) (8/01/11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 3 of this endorsement, the Exclusions from Coverage in the Policy, the Exceptions from Coverage contained in  Schedule B, and the Conditions. As used in this endorsement:

    a.  The "Date of Endorsement" is_____; and

    b.  "Swap Obligation" means a monetary obligation under the interest rate exchange                          .
    agreement dated
    ____, between_____and the Insured existing at Date of Endorsement and secured
    by the  Insured Mortgage.

    c.  "Additional Interest" means the additional interest calculated pursuant to the formula provided in the  loan documents secured by the Insured Mortgagee at Date of Endorsement.

    d.  "Additional Amount of Insurance" is $___that is in addition to the Amount of Insurance stated in  Schedule A and is applicable  only to loss or damage under this endorsement.

2.  The Company insures against loss or damage sustained by the Insured by reason of the invalidity,   unenforceability or lack of priority of the lien of the Insured Mortgage as security for the repayment of  the Additional Interest at Date of Endorsement.

3.  This endorsement does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a.  Rights or obligations set, created or confirmed after the Date of Endorsement under a master  interest rate exchange agreement existing on or after Date of Endorsement;

    b.  The stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Swap  Obligation, or a court order providing some other remedy, by the operation of federal bankruptcy, state  insolvency, or similar creditors' rights laws;

    c.  The calculation of the amount, if any, determined by a court of competent jurisdiction as the amount  of the Additional Interest*[; or]*

    d.  [*The invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  repayment of the Swap Obligation because all applicable mortgage recording or similar intangible taxes  were not paid; or* ]

    e.  [*If Date of Endorsement is after Date of Policy, add any necessary additional exceptions here*].

    This endorsement is issued as part of the policy. Except as it expressly states, it does not (i)  modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date  of  Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous  endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements to it.

Dated:

By_____
       Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement - Form 29.3 - 06
(Interest Rate Swap – Additional Interest-Defined Amount) (8/01/11)
©American Land Title Association

**ONE TO FOUR FAMILY SHARED APPRECIATION MORTGAGE ENDORSEMENT**
**COMMERCIAL PARTICIPATION INTEREST**
**ALTA 30-06 (07-26-10)**
**ALTA 30.1-06 (08-01-12)**

These endorsements are designed to provide additional coverage to the lender when the loan documents provide that the lender will participate in the appreciation in value of the property or a share of the cash flow (as additional interest). The residential version (30-06) was developed for use with government programs that modified and reduced the outstanding debt of homeowners in the face of the downturn of the housing market. These programs allow the recapture of appreciation up to the amount of forgiveness of previously outstanding debt.  The commercial version (30.1-06) is for use only with commercial transactions and includes, in addition to the increase in the value of the property (appreciation), a share of the cash flow from the property and any increase in the equity of the borrower in the property.  These endorsements provide coverage in the event of an attack on the validity, priority or enforceability of the Insured Mortgage based upon the provisions regarding shared appreciation and participation.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

The insurance afforded by this endorsement is only effective if the Land is a one to four family residence.

For the purposes of this endorsement, "Shared Appreciation" shall mean increases in the Indebtedness  secured by the Insured Mortgage by reason of shared equity or appreciation in the value of the Land.

The Company insures against loss or damage sustained by the Insured by reason of:

    (a)  The invalidity or unenforceability of the lien of the Insured Mortgage as security for the  Indebtedness caused by the provisions for Shared Appreciation; or

    (b)  Loss of priority of the lien of the Insured Mortgage as security for the Indebtedness caused by  the provisions for Shared Appreciation.

Nothing contained in this endorsement shall be construed as insuring against loss or damage sustained or   incurred by reason of:

    (a)  usury;

    (b)  any consumer credit protection or truth in lending law;

    (c)  costs, expenses or attorney's fees required to obtain a determination, by judicial proceedings  or otherwise, of the amount of the Shared Appreciation;

    (d)  failure to comply with applicable laws and regulations regarding Shared Appreciation;

    (e)  the stay, rejection or avoidance of the lien of the Insured Mortgage as security for the Shared  Appreciation, or a court order providing some other remedy, by the operation of federal  bankruptcy, state insolvency or similar creditors' rights laws; or

    (f)  the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security  for the Indebtedness because all applicable mortgage recording or similar intangible taxes  were not paid.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

  Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 30-06
(One to Four Family Shared Appreciation Mortgage) (7/26/10)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. This endorsement is subject to the exclusions in Section 4 of this endorsement, the Exclusions  from Coverage in the policy, the Exceptions from Coverage contained in Schedule B, and the  Conditions.

2. As used in this endorsement,

    a. "Loan Documents" means those documents, as they exist at Date of Policy, creating the  Indebtedness.

    b. "Participation Interest" means those elements of interest, established and calculated pursuant to  the formula provided in the Loan Documents, that are payable or allocated to the Insured based  upon:

        i. the borrower's equity in the Title;
        ii. the increase in value of the Title; or
        iii. cash flow.

3. The policy insures as of Date of Policy against loss or damage sustained by the Insured by  reason of:

    a. The invalidity or unenforceability of the lien of the Insured Mortgage resulting from the provisions in  the Insured Mortgage or in the Loan Documents which provide for Participation Interest.

    b. Lack of priority of the lien of the Insured Mortgage at Date of Policy as security for (i) the unpaid  principal balance of the loan and (ii) the interest on the loan, including the Participation Interest, if  any, which lack of priority is caused by the provisions in the Loan Documents for payment or  allocation to the Insured of any Participation Interest.

4. The policy does not insure against loss or damage, and the Company will not pay costs,   attorneys' fees, or expenses that arise by reason of:

    a. usury; unconscionability; or any consumer credit protection or truth-in-lending law;
    b. disputes over the amount of Participation Interest;
    c. failure to comply with applicable laws and regulations regarding Participation Interest;
    d. the invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as security for  the Participation Interest because all applicable mortgage recording or similar intangible taxes were  not paid; or
    e. any statutory lien for services provided, labor performed, or materials or equipment furnished  arising after Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or  (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

By_____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

Authorized Signatory

ALTA Endorsement Form 30.1-06
(Commercial Participation Interest) (8/1/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**SEVERABLE IMPROVEMENTS**
**ALTA 31-06 (02-03-11)**

This endorsement adds, as a part of the calculation of the Insured's loss, the diminution in value of the Insured's interest in any defined Severable Improvement affixed to the Land, as well as the reasonable cost of removal or relocation of these. Severable Improvements are defined as property that by law does not constitute real property. Land is defined in the policy as land and improvements that by law constitute real property.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement, "Severable Improvement" means property affixed to the Land on or after Date of Policy that by law does not constitute real property because:

    a.  of its character and manner of attachment to the Land; and

    b.  it can be severed from the Land without causing material damage to it or to the Land.

2.  In the event of a loss by reason of a defect, lien, encumbrance, or other matter covered by this Policy ("Defect"), the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other endorsement to the Policy):

    a.  the diminution in value of the Insured's interest in any Severable Improvement resulting from the Defect, reduced by the salvage value of the Severable Improvement; and

    b.  the reasonable cost actually incurred by the Insured in connection with the removal or relocation of the Severable Improvement resulting from the Defect and the cost of transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the relocation.

3.  This endorsement relates solely to the calculation of the Insured's loss resulting from a claim based on a defect, lien, encumbrance or other matter otherwise insured against by the Policy. This Policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

    a.  the attachment, perfection or priority of any security interest in the Severable Improvement;

    b.  the vesting or ownership of title to or rights in any Severable Improvement;

    c.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

    d.  the determination of whether any specific property is real or personal in nature.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Dated:
Chicago Title Insurance Company
BY: _____
          AUTHORIZED  SIGNATORY

ALTA Endorsement Form 31-06
(Severable Improvements) (2-3-11)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CONSTRUCTION LOAN**
**ALTA 32-06 (Construction Loan – Loss of Priority) (02-03-11) ALTA 32.1-06 (Construction**
**Loan – Loss of Priority-Direct Payment) (04-02-13)**
**ALTA 32.2-06 (Construction Loan –Loss of Priority- Insured's Direct Payment) (04-02-13)**

These endorsements, together with the 33-06 (Disbursement) replace the ALTA Construction Loan Policy and the Construction Loan Policy Endorsements A through D which have been decertified and are no longer available.

These endorsements were developed to give limited coverage where priority has been lost. They only give coverage to the extent of work that the lender has paid for, with the ALTA 32-06 and the ALTA 32.1-06 further limited to liens filed by parties that have been identified on a draw request either paid by the Insured or the Company. They do not give coverage over other inchoate liens that can prime the construction mortgage. The 32-06 covers payment as disclosed by a draw request.

ALTA Endorsement 32.1-06 is designed for loan policies during construction in situations where the mortgage or deed of trust can never have priority over mechanic's liens or where the mortgage or deed of trust has lost priority to mechanic's liens (e.g., due to commencement of work prior to the recording of the mortgage or deed of trust). However, this endorsement may also be used for situations where the mortgage or deed of trust has priority over mechanic's liens.

Specifically, the ALTA 32.1-06 insures only to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval.  It does not insure against loss or damage by reason of any mechanic's lien arising from services, labor, material or equipment:

a Furnished after Date of Coverage; or
to the extent that a Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

The endorsement contemplates that the Company or its agent will be involved in the direct payment to specific mechanic's lien claimants – either by making the payment or by approving it.

The ALTA 32.2-06 covers a lien filed for payment of previously paid amounts by the title insurer or with the title insurer's consent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in  Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the  exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   a. "Date of Coverage" is_unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement  Endorsement issued at the discretion of the Company.

   b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage  for the purpose of financing in whole or in part the construction of improvements on the Land.

   c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided,  labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance  made on or before the Date of Coverage;

   b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before  the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in  Schedule B; and

   c. The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or  before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the  Public Records, but only to the extent that the charges for the services, labor, materials or equipment for which the  Mechanic's Lien is claimed were designated for payment in the documents supporting a Construction Loan Advance  disbursed by or on behalf of the Insured on or before Date of Coverage.

4 This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by  reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a. furnished after Date of Coverage; or
   b. not designated for payment in the documents supporting a Construction Loan Advance disbursed by or on behalf of the  Insured on or before Date of Coverage.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions  of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the  extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this  endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements.

Dated:
Chicago Title Insurance Company
BY: _____

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

AUTHORIZED  SIGNATORY

ALTA Endorsement Form 32-06
(Construction Loan-Loss of Priority) (2-3-11)
© American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to  the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the  provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this  endorsement and each subsequent Disbursement Endorsement:

   a. "Date of Coverage" is_____unless the Company sets a different Date of Coverage by  an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

   b. "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or  before Date of Coverage for the purpose of financing in whole or in part the construction of  improvements on the Land.

   c. "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from   services provided, labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. The invalidity or unenforceability of the lien of the Insured Mortgage as security for each  Construction Loan Advance made on or before the Date of Coverage;

   b. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan  Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title  recorded in the Public Records and not shown in Schedule B; and

   c. The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan  Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the  Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct  payment to the Mechanic's Lien claimant for the charges for the services, labor, materials or  equipment  for which the Mechanic's Lien is claimed  has been made by the Company or by the  Insured with the Company's written approval.

4. This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees  or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:
   a. furnished after Date of Coverage; or
   b. to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the  Insured with the Company's written approval.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
     AUTHORIZED SIGNATORY


ALTA Endorsement Form 32.1-06
(Construction Loan-Loss of Priority-Direct Payment) (rev. 4-2-13)
American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  Covered Risk 11(a) of this policy is deleted.

2.  The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in  Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the  exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

    a.  "Date of Coverage" is[ unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement  Endorsement issued at the discretion of the Company.

    b.  "Construction Loan Advance" shall mean an advance that constitutes Indebtedness made on or before Date of Coverage  for the purpose of financing in whole or in part the construction of improvements on the Land.

    c.  "Mechanic's Lien" shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided,  labor performed, or materials or equipment furnished.

3.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance  made on or before the Date of Coverage;

    b.  The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before  the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B;  and

    c.  The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or  before the Date of Coverage over any Mechanic's Lien, if notice of the Mechanic's Lien is not filed or recorded in the Public  Records, but only to the extent that a direct payment to the Mechanic's Lien claimant for the charges for the services, labor,  materials or equipment  for which the Mechanic's Lien is claimed  has been made by the Insured  or on the Insured's behalf on  or before Date of Coverage.

4   This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by  reason of any Mechanic's Lien arising from services, labor, material or equipment:
    a.  furnished after Date of Coverage; or
    b.  To the extent that the Mechanic's lien claimant was not directly paid by the Insured  or on the Insured's behalf.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions  of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the  extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this  endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior  endorsements.

[Witness clause optional]

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 32.2-06
(Construction Loan-Loss of Priority-Insured's Direct Payment) (rev. 4/2/13)
© American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**CONSTRUCTION LOAN DISBURSEMENT**
**ALTA 33-06 (02-03-11)**

This endorsement is used in conjunction with ALTA Forms 32-06, 32.1-06 or 32.2-06 when the Date of Coverage to be extended.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The Date of Coverage is amended to _____.

    [a.  The current disbursement is: $_____]

    [b.  The aggregate amount, including the current disbursement, recognized by the Company
        as disbursed by the Insured is: $_____]

2.  Schedule A is amended as follows:

3.  Schedule B is amended as follows:

    [Part I]

    [Part II]

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]
[Bracketed material optional]

DATED:

Chicago Title Insurance Company

BY:_____
      AUTHORIZED SIGNATORY

ALTA Endorsement Form 33-06
(Disbursement) (2-3-11)
© American Land Title Association

**IDENTIFIED RISK COVERAGE**

**ALTA 34-06 (08-01-11)**

This endorsement should be used whenever we decide to assume a specific risk or "Identified Risk" as defined therein. Sometime this is referred to as "insuring over", especially when we have raised that risk in a commitment or policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  As used in this endorsement "Identified Risk" means: [*insert description of the title defect, restriction encumbrance or other matter*] described in Exception _____of Schedule B.

2.  The Company insures against loss or damage sustained by the Insured by reason of:

    a.  A final order or decree enforcing the Identified Risk in favor of an adverse party; or

    b.  The release of a prospective purchaser or lessee of the Title or lender on the Title from the obligation to purchase, lease, or lend as a result of the Identified Risk, but only if

        i.  there is a contractual condition requiring the delivery of marketable title, and

        ii. neither the Company nor any other title insurance company is willing to insure over the Identified Risk with the same conditions as in this endorsement.

3.  The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of the Title by reason of the Identified Risk insured against by Paragraph 2 of this endorsement, but only to the extent provided in the Conditions.

4.  This endorsement does not obligate the Company to establish the Title free of the Identified Risk or to remove the Identified Risk, but if the Company does establish the Title free of the Identified Risk or removes it, Section 9(a) of the Conditions applies.

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements to it.

[Witness Optional]

DATED:

Chicago Title Insurance Company

BY:_____
    AUTHORIZED SIGNATORY

ALTA Endorsement Form 34-06
(Identified Risk Coverage) (8-1-11)
© American Land Title Association

**MINERALS AND OTHER
SUBSURFACE
SUBSTANCES
ALTA 35-06 thru 35.3-06
(04.02.12)**

These endorsement forms were developed to provide coverage to lenders with respect to the enforced removal or alteration of improvements resulting from the extraction or development of minerals or other subsurface substances. This coverage was previously included in the former ALTA 9 series. It is no longer contained within those endorsements other than the revised ALTA 9-06 and the new ALTA 9.7-06.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____

Issued by

Chicago Title Insurance

Company

1.  The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only, "Improvement" means a building on the Land at Date of Policy.

3.  The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4.  This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a.  contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b.  negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c.  the exercise of the rights described in (                    )]. *

        * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

DATED:

Chicago Title Insurance Company

BY:_____

AUTHORIZED SIGNATORY

ALTA Endorsement Form 35-06
(Minerals and other Subsurface Substances-Buildings) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means a building, structure located on the surface of the Land, and any paved road, walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

   b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

   c. the exercise of the rights described in (                    )]. *

   * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.


This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.


[Witness clause optional]

DATED:
Chicago Title Insurance Company
BY:_____
    AUTHORIZED SIGNATORY


ALTA Endorsement Form 35.1-06
(Minerals and other Subsurface Substances-Improvements) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only, "Improvement" means each improvement on the Land at Date of Policy itemized [on the exhibit attached to this endorsement] [below:]

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced removal or alteration of any Improvement resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances[; or

    c. the exercise of the rights described in (                )]. *

      * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
          Authorized Signatory

ALTA Endorsement Form 35.2-06
(Minerals and other Subsurface Substances-Described Improvements) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusion in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule  B, and the Conditions in the policy.

2. For purposes of this endorsement only:

    a. "Improvement" means a building, structure located on the surface of the Land, and any paved road,  walkway, parking area, driveway, or curb, affixed to the Land at Date of Policy and that by law  constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

    b. "Future Improvement" means a building, structure, and any paved road, walkway, parking area,  driveway, or curb to be constructed on or affixed to the Land in the locations according to the Plans  and that by law will constitute real property, but excluding any crops, landscaping, lawn, shrubbery,  or trees.

    c. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by  (*insert name of architect or engineer*)  dated_____, last revised__, designated as  (*insert  name of project or project number*)  consisting of_sheets.

3. The Company insures against loss or damage sustained by the Insured by reason of the enforced  removal or alteration of an Improvement or a Future Improvement, resulting from the future exercise of  any right existing at Date of Policy to use the surface of the Land for the extraction or development of  minerals or any other subsurface substances excepted from the description of the Land or excepted in  Schedule B.

4. This endorsement does not insure against loss or damage (and the Company will not pay costs,  attorneys' fees, or expenses) resulting from:

    a. contamination, explosion, fire, vibration, fracturing, earthquake or subsidence; [or]

    b. negligence by a person or an Entity exercising a right to extract or develop minerals or other  subsurface substances[; or

    c. the exercise of the rights described in (              )]. *

    * Instructional note:  identify the interest excepted from the description of the Land in Schedule A or   excepted in Schedule B that you intend to exclude from this coverage.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of  the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or
(iv) crease the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is  inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this   endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**


By: _____
          Authorized Signatory

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

ALTA Endorsement Form 35.3-06
(Minerals and other Subsurface Substances-Land Under Development) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENERGY PROJECT Series**

**ALTA 36.06 thru 36.6-06 (04-02-12)**

The ALTA 36 series of endorsement forms were developed to provide coverages to energy project owners and lenders which use a leasehold or easement rights structure. Examples of such projects would include solar or wind farms.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Easement" means each easement described in Schedule A.

    c.  "Easement Interest" means the right of use granted in the Easement for the Easement Term.

    d.  "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

    e.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    f.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

    g.  "Lease" means each lease described in Schedule A.

    h.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    i.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    j.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as  _(insert name of project or project number)_ consisting of____sheets.

    k.  "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

    l.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

    d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

    a. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

    b. The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i. the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii. the vesting or ownership of title to or rights in any Severable Improvement;

        iii. any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv. the determination of whether any specific property is real or personal in nature.

5. Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted, shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

    a. The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

    b. Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

    c. The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

    d. The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    e. Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Insured as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

    f. The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

    g. If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted. Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6. This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
           Authorized Signatory

ALTA Endorsement Form 36-06
(Energy Project –Leasehold/Easement-Owners) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Easement" means each easement described in Schedule A.

    c.  "Easement Interest" means the right of use granted in the Easement for the Easement Term.

    d.  "Easement Term" means the duration of the Easement Interest, as set forth in the Easement, including any renewal or extended term if a valid option to renew or extend is contained in the Easement.

    e.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    f.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession or use insured by this policy, contrary to the terms of any Lease or Easement or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease or the Easement, as applicable, in either case as a result of a matter covered by this policy.

    g.  "Lease" means each lease described in Schedule A.

    h.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    i.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    j.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

    k.  "Remaining Term" means the portion of the Easement Term or the Lease Term remaining after the Insured has been Evicted.

    l.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    m.  "Tenant" means the tenant under the Lease or a grantee under the Easement, as applicable, and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate or the Easement Interest for the Remaining Term, as applicable, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease or Easement as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate, the Easement Interest, and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

either event, this determination of value shall take into account any rent or use payments no longer required to be paid for the Remaining Term.

d.   The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.   Valuation of Severable Improvements:

a.   In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.   The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.   the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.   the determination of whether any specific property is real or personal in nature.

5.   Additional items of loss covered by this endorsement:

If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.   The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.   Rent, easement payments or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate or the Easement Interest, as applicable, may be obligated to pay to any person having paramount title to that of the lessor in the Lease or the grantor in the Easement, as applicable.

c.   The amount of rent, easement payments or damages that, by the terms of the Lease or the Easement, as applicable, the Insured must continue to pay to the lessor or grantor after Eviction with respect to the portion of the Leasehold Estate or Easement Interest, as applicable, from which the Insured has been Evicted.

d.   The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease, sublease or easement specifically permitted by the Lease or Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

e.   Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees or easement or subeasement grantees on account of the breach of any lease or sublease or easement or subeasement specifically permitted by the Lease or the Easement, as applicable, and made by the Tenant as lessor or grantor of all or part of the Leasehold Estate or Easement Interest, as applicable.

f.   The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate or a replacement easement reasonably equivalent to the Easement Interest, as applicable.

g.   If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.   This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]


Chicago Title Insurance Company


By: _____
          Authorized Signatory


ALTA Endorsement Form 36.1-06
(Energy Project –Leasehold/Easement-Loan) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

   b. "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c. "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

   d. "Lease" means each lease described in Schedule A.

   e. "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

   f. "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

   g. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of____sheets.

   h. "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

   i. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. Valuation of Title as an Integrated Project:

   a. If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Insured is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate for the Remaining Term, (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

   b. A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

   c. The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by this policy valued either as a whole or separately. In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

   d. The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4. Valuation of Severable Improvements:

   b. In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

    b.    The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

        i.    the attachment, perfection or priority of any security interest in any Severable Improvement;

        ii.    the vesting or ownership of title to or rights in any Severable Improvement;

        iii.    any defect in or lien or encumbrance on the title to any Severable Improvement; or

        iv.    the determination of whether any specific property is real or personal in nature.

5.    Additional items of loss covered by this endorsement:

If the Insured is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(ii) of the Conditions.

    a.    The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

    b.    Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate  may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

    c.    The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate from which the Insured has been Evicted.

    d.    The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

    e.    Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Insured as lessor of all or part of the Leasehold Estate.

    f.    The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

    g.    If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.    This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance

Company

By: _____
              Authorized Signatory

ALTA Endorsement Form 36.2-06
(Energy Project –Leasehold-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the exclusions in Section 6 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.  For purposes of this endorsement only:

    a.  "Constituent Parcel" means one of the parcels of Land described in Schedule A that together constitute one integrated project.

    b.  "Electricity Facility" means an electricity generating facility which may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

    c.  "Evicted" or "Eviction" means (a) the lawful deprivation, in whole or in part, of the right of possession insured by this policy, contrary to the terms of any Lease or (b) the lawful prevention of the use of the Land or any Electricity Facility or Severable Improvement for the purposes permitted by the Lease, in either case as a result of a matter covered by this policy.

    d.  "Lease" means each lease described in Schedule A.

    e.  "Leasehold Estate" means the right of possession granted in the Lease for the Lease Term.

    f.  "Lease Term" means the duration of the Leasehold Estate, as set forth in the Lease, including any renewal or extended term if a valid option to renew or extend is contained in the Lease.

    g.  "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated, last revised_____,designated as _(insert name of project or project number)_ consisting of_____sheets.

    h.  "Remaining Term" means the portion of the Lease Term remaining after the Insured has been Evicted.

    i.  "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

    j.  "Tenant" means the tenant under the Lease  and, after acquisition of all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy, the Insured Claimant.

3.  Valuation of Title as an Integrated Project:

    a.  If in computing loss or damage it becomes necessary to value the Title, or any portion of it, as the result of an Eviction, then, as to that portion of the Land from which the Tenant is Evicted, that value shall consist of (i) the value of (A) the Leasehold Estate  for the Remaining Term,  (B) any Electricity Facility existing on the date of the Eviction, and, if applicable, (ii) any reduction in value of another insured Lease as computed in Section 3(b) below.

    b.  A computation of loss or damage resulting from an Eviction affecting any Constituent Parcel shall include loss or damage to the integrated project caused by the covered matter affecting the Constituent Parcel from which the Insured is Evicted.

    c.  The Insured Claimant shall have the right to have the Leasehold Estate and any Electricity Facility affected by a defect insured against by the policy valued either as a whole or separately.  In either event, this determination of value shall take into account any rent no longer required to be paid for the Remaining Term.

    d.  The provisions of this Section 3 shall not diminish the Insured's rights under any other endorsement to the policy; however, the calculation of loss or damage pursuant to this endorsement shall not allow duplication of recovery for loss or damage calculated pursuant to Section 8 of the Conditions or any other endorsement to the policy.

4.  Valuation of Severable Improvements:

    c.  In the event of an Eviction, the calculation of the loss shall include (but not to the extent that these items of loss are included in the valuation of the Title determined pursuant to Section 8 of the Conditions or any other

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

provision of this or any other endorsement) the diminution in value of the Insured's interest in any Severable Improvement resulting from the Eviction, reduced by the salvage value of the Severable Improvement.

b.  The policy does not insure against loss or damage (and the Company will not pay any costs, attorneys' fees or expenses) relating to:

i.  the attachment, perfection or priority of any security interest in any Severable Improvement;

ii.  the vesting or ownership of title to or rights in any Severable Improvement;

iii.  any defect in or lien or encumbrance on the title to any Severable Improvement; or

iv.  the determination of whether any specific property is real or personal in nature.

5.  Additional items of loss covered by this endorsement:
If the Insured acquires all or any part of the Title in accordance with the provisions of Section 2 of the Conditions of the policy and thereafter is Evicted, the following items of loss, if applicable to that portion of the Land from which the Insured is Evicted shall be included, without duplication, in computing loss or damage incurred by the Insured, but not to the extent that the same are included in the valuation of the Title determined pursuant to Section 3 of this endorsement, the valuation of Severable Improvements pursuant to Section 4 of this endorsement, or Section 8(a)(iii) of the Conditions:

a.  The reasonable cost of: (i) disassembling, removing, relocating and reassembling any Severable Improvement that the Insured has the right to remove and relocate, situated on the Land at the time of Eviction, to the extent necessary to restore and make functional the integrated project; (ii) transportation of that Severable Improvement for the initial one hundred miles incurred in connection with the restoration or relocation; and (iii) restoring the Land to the extent damaged as a result of the disassembly, removal and relocation of the Severable Improvement and required of the Insured solely because of the Eviction.

b.  Rent or damages for use and occupancy of the Land prior to the Eviction that the Insured as owner of the Leasehold Estate may be obligated to pay to any person having paramount title to that of the lessor in the Lease.

c.  The amount of rent or damages that, by the terms of the Lease , the Insured must continue to pay to the lessor after Eviction with respect to the portion of the Leasehold Estate  from which the Insured has been Evicted.

d.  The fair market value, at the time of the Eviction, of the estate or interest of the Insured in any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

e.  Damages caused by the Eviction that the Insured is obligated to pay to lessees or sublessees on account of the breach of any lease or sublease specifically permitted by the Lease and made by the Tenant as lessor of all or part of the Leasehold Estate.

f.  The reasonable cost to obtain land use, zoning, building and occupancy permits, architectural and engineering services and environmental testing and reviews for a replacement leasehold reasonably equivalent to the Leasehold Estate.

g.  If any Electricity Facility is not substantially completed at the time of Eviction, the actual cost incurred by the Insured up to the time of Eviction, less the salvage value, for the Electricity Facility located on that portion of the Land from which the Insured is Evicted.  Those costs include costs incurred to construct and fabricate the Electricity Facility, obtain land use, zoning, building and occupancy permits, architectural and engineering services, construction management services, environmental testing and reviews, and landscaping, and cancellation fees related to the foregoing.

6.  This endorsement does not insure against loss, damage or costs of remediation (and the Company will not pay costs, attorneys' fees, or expenses) resulting from environmental damage or contamination.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]  DATED:
Chicago Title Insurance Company
BY:_____
AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.3-06
(Energy Project –Leasehold-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

   a.   "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b.   "Electricity Facility" means an electricity generating facility that may include one or more of the following:  a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by _(insert name of architect or engineer)_ dated_____, last revised_____, designated as _(insert name of project or project number)_ consisting of____sheets.

   d.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   i.   A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies  the violation;

   ii.  Enforced removal of any Electricity Facility or Severable Improvement as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

   iii. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   any Covenant contained in an instrument creating a lease or easement;

   b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

   c.   except as provided in Section 3.c., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]
DATED:
Chicago Title Insurance Company
BY:____
AUTHORIZED SIGNATORY

ALTA Endorsement Form 36.4-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Owners) (4/2/12)
©American Land Title Association

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.   The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   For purposes of this endorsement only:

   a.   "Covenant" means a covenant, condition, limitation or restriction in a document or  instrument in effect at Date of Policy.

   b.   "Electricity Facility" means an electricity generating facility that may include one or more  of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a  circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system,  communications or radio relay system, safety protection facility, road, and other building,   structure, fixture, machinery, equipment, appliance and item associated with or incidental   to the generation, conversion, storage, switching, metering, step-up, step-down,  inversion, transmission, conducting, wheeling, sale or other use or conveyance of  electricity, on the Land at Date of Policy or to be built or constructed on the Land in the  locations according to the Plans, that by law constitutes real property.

   c.   "Plans" means the survey, site and elevation plans or other depictions or drawings  prepared by
 (*insert name of architect or engineer*)  dated_____, last revised _____ ,designated as  (*insert name of project or project number*)  consisting of_____sheets.

   d.   "Severable Improvement" means property affixed to the Land at Date of Policy or to be  affixed to the Land in the locations according to the Plans, that would constitute an  Electricity Facility but for its characterization as personal property, and that by law does  not constitute real property because (a) of its character and manner of attachment to the  Land and (b) the property can be severed from the Land without causing material  damage to the property or to the Land.

3.   The Company insures against loss or damage sustained by the Insured by reason of:

   a.   A violation of a Covenant that:

      i.   divests, subordinates, or extinguishes the lien of the Insured Mortgage;

      ii.   results in the invalidity, unenforceability, or lack of priority of the lien of the Insured  Mortgage; or

      iii.   causes a loss of the Insured's Title acquired in satisfaction or partial satisfaction of  the Indebtedness.

     b.   A violation of an enforceable Covenant by any Electricity Facility or Severable Improvement, unless an exception in Schedule B of the policy identifies the violation;

     c.   Enforced removal of any Electricity Facility or Severable Improvement, as a result of a violation of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation; or

     d.   A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection, describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation.

4.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

     a.   any Covenant contained in an instrument creating a lease or easement;

     b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land; or

     c.   except as provided in Section 3.d., any Covenant pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
       Authorized Signatory

ALTA Endorsement Form 36.5-06
(Energy Project –Covenants, Conditions and Restrictions-Land Under Development-Loan) (4/2/12)
©American Land Title Association

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Section 4 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For purposes of this endorsement only:

   a. "Electricity Facility" means an electricity generating facility that may include one or more of the following: a substation; a transmission, distribution or collector line; an interconnection, inverter, transformer, generator, turbine, array, solar panel, or module; a circuit breaker, footing, tower, pole, cross-arm, guy line, anchor, wire, control system, communications or radio relay system, safety protection facility, road, and other building, structure, fixture, machinery, equipment, appliance and item associated with or incidental to the generation, conversion, storage, switching, metering, step-up, step-down, inversion, transmission, conducting, wheeling, sale or other use or conveyance of electricity, on the Land at Date of Policy or to be built or constructed on the Land in the locations according to the Plans, that by law constitutes real property.

   b. "Plans" means the survey, site and elevation plans or other depictions or drawings prepared by
   _(insert name of architect or engineer)_ dated_____, last revised _____, designated as
   _(insert name of project or project number)_ consisting of_____sheets.

   c. "Severable Improvement" means property affixed to the Land at Date of Policy or to be affixed to the Land in the locations according to the Plans, that would constitute an Electricity Facility but for its characterization as personal property, and that by law does not constitute real property because (a) of its character and manner of attachment to the Land and (b) the property can be severed from the Land without causing material damage to the property or to the Land.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. An encroachment of any Electricity Facility or Severable Improvement located on the Land onto adjoining land or onto that portion of the Land subject to an easement, unless an exception in Schedule B of the policy identifies the encroachment;

   b. An encroachment of an improvement located on adjoining land onto the Land at Date of Policy, unless an exception in Schedule B of the policy identifies the encroachment;

   c. Enforced removal of any Electricity Facility or Severable Improvement, as a result of an encroachment by the Electricity Facility or Severable Improvement onto any portion of the Land subject to any easement, in the event that the owners of the easement shall, for the purpose of exercising the right of use or maintenance of the easement, compel removal or relocation of the encroaching Electricity Facility or Severable Improvement; [or]

d.  Damage to any Electricity Facility or Severable Improvement that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved [; or]

[e.  The coverage of Sections 3.c. and 3.d. shall not apply to the encroachments listed in Exception(s)_____of Schedule B].

4    This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from contamination, explosion, fire, vibration, fracturing, earthquake or subsidence.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

**Chicago Title Insurance Company**

By: _____
        Authorized Signatory

ALTA Endorsement Form 36.6-06
(Energy Project –Encroachments) (4/2/12)
©American Land Title Association

**ASSIGNMENT OF RENTS OR LEASES**

**ALTA 37-06 (12-03-12)**

Lenders occasionally request that the loan policy insure certain recorded interests that are taken as additional security for the loan primarily secured by the Insured Mortgage. The most common additional security, other than a security interest under the Uniform Commercial Code, is an assignment of rents or leases.

This endorsement is issued to provide certain coverages with respect to a separate assignment of rents or leases shown in Schedule B, Part II of the policy. This endorsement provides insurance that the assignment of rents or leases is properly executed, and that the Public Records do not disclose any prior assignments of these same rents or leases.

These endorsements do not amend or modify any specific policy provisions, but add additional coverage to the terms of the policy.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1.  The insurance provided by this endorsement is subject to the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2.   The Company insures against loss or damage sustained by the Insured by reason of:

a.any defect in the execution of the [*Insert Title of Assignment of Rents or Leases Document*] referred to in paragraph_____[*of Part II*] of Schedule B; or

b.any assignment of the lessor's interest in any lease or leases or any assignment of rents affecting the Title and recorded in the Public Records at Date of Policy other than as set forth in any instrument referred to in Schedule B.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 37-06
(Assignment of Rents or Leases) (12/03/12)
©American Land Title Association

**MORTGAGE TAX**

**ALTA ENDORSEMENT - FORM 38-06**

This endorsement provides coverage to the insured lender if there is a deficiency in the recordation tax paid at the time the Insured Mortgage is recorded that is subsequently paid. The endorsement provides that, if the deficiency is paid, the Company will provide coverage against the invalidity or unenforceability of the Insured Mortgage or the lack of priority of the Insured Mortgage, from the failure to pay at the time of recording any portion of the recording tax. The Company does not provide coverage if the insured lender fails to pay the recordation tax deficiency.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

1. The insurance provided by this endorsement is subject to the exclusions in Sections 4 and 5 of this endorsement, the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2. For the purposes of this endorsement only, "Mortgage Tax" means a recordation, registration or related tax or charge required to be paid when the Insured Mortgage is recorded in the Public Records.
3. Upon payment of any deficiency in the Mortgage Tax, including interest and penalties, by the Insured, the Company insures against loss or damage sustained by the Insured by reason of:
   a. the invalidity or unenforceability of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax; or
   b. the lack of priority of the lien of the Insured Mortgage as security for the Indebtedness resulting from the failure to pay, at the time of recording, any portion of the Mortgage Tax.
4. The Company does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from the failure of the Insured to pay the Mortgage Tax deficiency, together with interest and penalties.

5. The Company is not liable for the payment of any portion of the Mortgage Tax, including interest or penalties

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 38-06
(Mortgage Tax) (12/3/12)
©American Land Title Association

**POLICY AUTHENTICATION**
**ALTA 39-06 (04-02-13)**

This endorsement provides coverage to the insured lender if a policy is issued electronically, or does not have a signature which may be required by the form of policy cover used. This endorsement for the insured lender modifies the cover and Conditions 14 (c) of the Policy which requires an authentication by an authorized person. This typically would be the signature of a licensed employee or agent.

© 2013 Chicago Title, a member of the Fidelity National Financial family of companies. | NYSE:FNF

**ENDORSEMENT**

Attached to Policy No._____
Issued by
Chicago Title Insurance
Company

When the policy is issued by the Company with a policy number and Date of Policy, the Company will not deny liability under the policy or any endorsements issued with the policy solely on the grounds that the policy or endorsements were issued electronically or lack signatures in accordance with the Conditions.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

[Witness clause optional]

Chicago Title Insurance Company
BY:_____

ALTA Endorsement Form 39-06
(Policy Authentication) (4/3/13)
©American Land Title Association

# EXHIBIT 3

# EXHIBIT 3

# UNDERWRITING MANUAL:

If any conflict exists between this Manual and the terms of your title insurance Issuing Agency Agreement with Westcor, the Issuing Agency Agreement will control.

For additional copies of this manual, please see the Westcor Land Title Insurance Company website (www.wltic.com) where you can download this information. Additional copies may be requested from your Regional Office or by contacting the Corporate Office in Maitland, Florida.



© Copyright, 2017, Westcor Land Title Insurance Company

WESTCOR 000637

# Acknowledgments

This volume was edited and co-written by Robert T. Edwards, Vice President & National Counsel of Westcor Title Insurance Company. Company Counsel and staff assisted as contributing authors and researchers.

# Disclaimer

Westcor is proud to make available this Underwriting Manual for your use. We sincerely believe that it will be a great help to you in your business. We trust that you will find it informative and easy to use.

Title insurance underwriting is an especially complex endeavor with thousands of factors affecting title transfers. No single volume could cover every contingency, and we don't pretend that this manual will, either. Consider this book to be a set of guidelines to help you through your workday, providing direction on many questions that may arise. If you have any doubt about a particular situation or how it applies to your jurisdiction, please call your regional underwriting counsel. Westcor counsel can provide you with an appropriate answer to your underwriting situation. It's a toll-free call and you'll get your answer right away.

**WESTCOR 000638**

# Table of Contents

Access ........................................................................................................................ 6

Acknowledgments ..................................................................................................... 7

Acreage ..................................................................................................................... 9

Adverse Possession ................................................................................................ 10

Affirmative Coverages ............................................................................................ 11

After-Acquired Title ................................................................................................ 13

Airspace ................................................................................................................... 14

Assignments ............................................................................................................ 16

Bankruptcy .............................................................................................................. 17

Beaches; Beach Rights ............................................................................................ 24

Bona Fide Purchasers ............................................................................................. 25

Boundaries, Disputed ............................................................................................. 26

Building Setback Lines ............................................................................................ 27

Canals ...................................................................................................................... 28

Capacity ................................................................................................................... 29

Cash Reporting ........................................................................................................ 30

Cemeteries .............................................................................................................. 33

Churches .................................................................................................................. 34

Condemnation (Eminent Domain) .......................................................................... 38

Condominiums ........................................................................................................ 39

Construction Loans ................................................................................................. 41

Contract (Agreement) for Deed .............................................................................. 44

Corporations ........................................................................................................... 46

Corporations, Foreign ............................................................................................. 47

Co-tenancies ........................................................................................................... 48

Creditor's Rights ...................................................................................................... 51

Deeds ....................................................................................................................... 52

Deeds in Lieu of Foreclosure .................................................................................. 56

Descriptions, Legal ................................................................................................. 58

Divorce ..................................................................................................................... 60

Drug Forfeitures ...................................................................................................... 61

Easements ............................................................................................................... 65

Encroachments ....................................................................................................... 68

Endorsements ......................................................................................................... 69

Environmental Liens ............................................................................................... 70

Execution of Instruments ....................................................................................... 71

**Extended Coverage** .......................................................................................... 72

**Federal Tax Liens** ............................................................................................ 73

**Filled-In Lands** ................................................................................................ 76

**FIRPTA** ........................................................................................................... 77

**Foreclosure** .................................................................................................... 78

**Gift Deeds** ...................................................................................................... 82

**Guardianship** .................................................................................................. 84

**Heirs At Law** ................................................................................................... 86

**Homestead** ..................................................................................................... 87

**Hospitals, Health Centers & Nursing Homes** ................................................... 88

**Improvements** ................................................................................................ 89

**Incompetence** ................................................................................................. 92

**Indian Lands** ................................................................................................... 93

**Inheritance** ..................................................................................................... 94

**Judgments** ...................................................................................................... 95

**Leasehold Estates** ........................................................................................... 97

**Liens** .............................................................................................................. 99

**Life Estates** .................................................................................................... 100

**Lis Pendens** .................................................................................................... 102

**Manufactured Housing** .................................................................................... 103

**Mechanics' and Materialmen's Liens** ................................................................ 104

**Minerals** ......................................................................................................... 107

**Minors** ............................................................................................................ 109

**Missing Persons** .............................................................................................. 111

**Mortgages** ...................................................................................................... 112

**Options to Purchase** ........................................................................................ 114

**Parties In Possession** ....................................................................................... 116

**Partnerships** ................................................................................................... 117

**Party Walls** ..................................................................................................... 118

**Planned Unit Development** ............................................................................... 119

**Powers of Attorney** ......................................................................................... 120

**Probate Proceedings** ....................................................................................... 122

**Purchase Money Mortgages** ............................................................................. 124

**Railroads** ........................................................................................................ 126

**Receivers** ........................................................................................................ 128

**Restrictions** .................................................................................................... 129

**Reversionary Clauses** ...................................................................................... 132

**Rights of Way** ................................................................................................. 133

WESTCOR 000640

**Riparian/Littoral Rights** ............................................................................................ **134**

**Severed Improvements** .............................................................................................. **136**

**Subordination Agreements** ....................................................................................... **138**

**Survey Matters** .......................................................................................................... **139**

**Synthetic Leases** ....................................................................................................... **144**

**Tax Titles** ................................................................................................................... **146**

**Taxes and Assessments** ........................................................................................... **148**

**Timeshare Estates** .................................................................................................... **149**

**Trusts** ......................................................................................................................... **151**

**UCC Financing Statements** ....................................................................................... **152**

**Vendor's Liens** ........................................................................................................... **154**

**Water Rights** .............................................................................................................. **155**

**Waterfront Property and Wetlands** ........................................................................... **156**

**Zoning** ........................................................................................................................ **161**

**Index** .......................................................................................................................... **162**

# Access

## Overview

Title policies include an insuring provision which covers the insured for loss resulting from a „*lack of a right of access to and from the land'*. Access directly affects the use and marketability of real property. Access to the insured land is always over some land other than the insured land. It may be provided by a dedicated street, a legally created easement or another specifically granted right. If a publicly dedicated street or highway abuts the insured land and the ability to cross between the two parcels is not restricted, then the insured land would have access. Access means the ability of the owner to get to the land.

The access provision in the commitment and policy relates to the existence of a *legal* right of access not *physical* access. A title insurance policy does not insure the physical usability, existence or characteristics of a means of access. Also, a policy does not insure a particular means of access. It merely insures that a valid, legal right of access exists as of the date of the policy. However, the type of physical access to the property must meet the standard of being reasonable. Access to a home with a garage would be the legal ability to walk or drive to the insured land. Access to the top floor unit of a condominium would probably mean only walking access and would not include the right to drive an automobile to the door of the condominium unit. Accordingly, each property must be reviewed to determine what would constitute *reasonable* access.

If the insured land abuts only private land, then access is restricted. Driveways and, in some cases, private roads do not necessarily constitute *legal* access. Such access rights must be evidenced by a written, recorded easement and access should not be insured unless the access is (shown) described in a written and recorded easement. A private easement should be considered a separate tract of property which abuts the subject property in an amount (width) sufficient to provide physical (vehicular, if appropriate) access from the insured land to a public roadway. Occasionally, a small gap or gore may separate a lot or parcel from a public roadway. In these instances it may be necessary for the municipality, county, or state to abandon title to that portion of property separating the insured parcel and the road.

Whenever access of the insured land to a public roadway is restricted, limited or does not exist, an exception to lack of access must be noted. The terms and conditions of any easement providing access must be shown as an exception on Schedule B.

## Underwriting Instructions

Title policies may be issued insuring access only when legal access is provided by a prior recorded easement or the property abuts a dedicated public roadway. Implied and/or prescriptive easement rights are not considered legal rights of access and should not be insured on an owner"s or loan policy. Please note that the policy does not insure convenient access or any particular right of access, but the access insured must still meet the standard of being reasonable. If coverage is sought for any particular right of access, see guidelines under **Easements** and **Endorsements**.

**Important Note:** The **ALTA Homeowners Policy (1998)** form includes a different insuring clause concerning access. That particular form insures the **existence** of a **useable** means of access. It does not insure just the existence of a legal right of access but also insures the existence and usability of the access right. This is a different and higher standard for insurance of access and requires additional underwriting analysis. The additional underwriting standards and guidelines for this policy form are discussed under **Homeowners Policy Form** in these Guidelines.

WESTCOR 000642

# Acknowledgments

## Overview

Laws and definitions regarding acknowledgments vary from state to state. However, there are several issues that are common to almost every jurisdiction. Generally, an acknowledgment refers to a form of certification made by a notary public, judicial officer, or other authorized individual which is attached to deeds, security instruments, leases and other real estate instruments, certifying that the maker or makers of such instruments appeared before the notary, judicial officer or other authorized individual and acknowledged that they signed the instrument freely and voluntarily (without compulsion, fear, or under duress), and for the purposes indicated in the instrument.

## Underwriting Instructions

Because laws and practices regarding acknowledgments vary from state to state, it is important that you familiarize yourself with, and comply with, statutory requirements.

Generally, Westcor agents must follow guidelines for acknowledgments:

1.  Notarize, witness, or attest signatures only when the signatory *personally appears before you, appears to be legally competent and states that the signature being acknowledged is authentic and voluntary.*

2.  Obtain proof positive that the person whose signature you are acknowledging is, in fact, who they say they are. They should be either *personally known* to the notary or *properly identified*. Westcor requires that its agents obtain valid, *current government issued picture identification* which includes the signatory's signature and physical description (e.g., a current driver's license).

3.  Require proof that the individual signing the document, (attorneys-in-fact, partner, trustee, etc.) has proper authority to execute in a representative capacity the document being acknowledged (i.e., through an acceptable power of attorney, partnership agreement, trust document, etc.). Remember that unless the document creating the powers of partners, trustees, corporate officers, etc., specifically provides for it, those fiduciary powers may generally not be delegated via a power of attorney.

4.  Confirm that all information in the acknowledgment section has been completed and conforms to the information contained in the body of the document (i.e., name, title, date, etc.).

5.  Make sure that strict compliance with statutory requirements for recordation has been met (i.e., correct number of witnesses have executed the document, acknowledgment form and verbiage, proper seals have been affixed, etc.), many states have specific, statutorily required language for acknowledgments as well as requirements for seal and commission expiration date. Also, some states appoint notaries for only certain counties. Failure to comply with those requirements may result in the document being void or voidable.

Generally, acknowledgments should contain the following information:

1.  Individual Acknowledgment

    a.  Name of individual

    b.  Personally appeared before them

    c.  Personally known or proved to be the person signing and acknowledging.

    2.   Attorney-in-Fact Acknowledgment

        a.  Name of Principal as contained in body of deed, by

        b.  Name of Attorney-in-Fact, as attorney-in-fact

    3.   Corporation Acknowledgment

        a.  Name of Officer

        b.  Capacity of Officer

        c.  Corporation Name

        d.  State of Incorporation

    4.   Partnership Acknowledgment

        a.  Name of Partner

        b.  Name of Partnership

    5.   REMEMBER: In some states (e.g., California), a generic statutory acknowledgment form MUST be used which makes no reference to the capacity of the signatory, and failure to use said form will disallow the filing/recording of the document. Also remember that regardless of the form of acknowledgment used, the proper capacity of the signatory MUST be noted in the signature area of the document.

If you have any questions regarding local practice or acknowledgment laws in your state, or if asked to accept an acknowledgment taken in a foreign jurisdiction, contact your local Westcor Counsel.

See also: **Corporations, Partnerships, Attorneys-in-Fact, Execution of Instruments**

# Acreage

## Overview

As a general rule, Westcor *does not* insure the actual amount of acreage to property and reference to the quantity of land should be avoided.

If acreage is to be insured, the acreage must be certified to Westcor in an acceptable current <u>survey</u>. Also, it is important to obtain an accurate legal description of the land including the section, township, and range in which it is located. In many cases, abbreviations may be used. For instance, the *"the Northwest quarter of the Northeast quarter of the South half of Section 7, Township 30 South, Range 26 East"* may be shown as the *"NW 1/4 of the NE 1/4 of the S 1/2, Sec. 7, T-30-S, R-26-E."*

In some cases, acreage descriptions may include a carved out portion of land that requires a more detailed metes and bounds description. It is necessary to verify that the property description begins and ends at the same point of beginning for proper closure of the parcel. An estimate of the amount of acreage may be included at the end of the metes and bounds description (e.g., *"containing 3.5 acres M.O.L."*) although the quantity of such acreage is not generally insurable.

When insuring acreage property that has been carved out of a larger portion of land, be sure to verify not only that the "new" legal description closes properly, but that it is completely contained within the larger parcel(s) of land from which it is carved, and that it is not affected by any overlapping conveyances.

## Underwriting Instructions

If you are asked to insure the *quantity* of acreage, contact Westcor underwriting counsel for express permission and prerequisites. A current, accurate survey of the land will always be required.

Always add the language "more or less" after the amount of acreage in any legal description when amounts are shown. And whenever any reference to the amount of acreage is mentioned in the description, the following exception should be taken:

> *"Any inaccuracy in statement made as to the quantity of land contained within the boundaries of the land described in Schedule „A"."*

As an alternative, the references to the amount of acreage should be deleted from the insured legal description.

Should a survey contain a reference as to the amount of acreage of the property and we are asked to remove the standard exception for survey matters, the following exception should be made in Schedule B of the policy:

> *"Any inaccuracy in any statement made on survey (<u>describe survey</u>) as to the quantity of land contained within the boundaries of the land described in Schedule „A"."*

See also: **Affirmative Coverages**, **Survey Matters**

# Adverse Possession

## Overview

Adverse possession is a basis for claiming title to property when a person or entity who is not the rightful owner of a specified parcel of land enters into possession of the land and maintains possession for the statutory period of time. Generally, cases have ruled that such possession must be open, notorious, hostile, and continuous for a statutory period of years.

Adverse possession may be made "*under color of title*" or *"without color of title."* When taken under color of title, the adverse possessor is in possession by virtue of a recorded document, a deed, tax deed (or even a void or forged deed), or will – that leads him to believe he has a legal right to the property. When taken without color of title, the adverse possessor has no such documentation by which to assert his supposed legal right to the property. In some states, adverse possession taken without color of title requires the adverse possessor to pay all taxes and matured installments of special improvement liens that attach to the property during the period of adverse possession. Some states provide for a shorter period of possession when there is color of title and payment of taxes.

Title by adverse possession is not considered marketable title and, therefore, the title must be confirmed by a proper court order prior to issuing title insurance on same.

## Underwriting Instructions

Westcor requires a judicial determination of adverse possessory interests (i.e., final non-appealable court order in favor of the present owner or proposed insured) in order to insure title in the name of a party who claims property by adverse possession. Absent a final court order, Westcor will not insure property owned or claimed by an adverse possessor.

WESTCOR 000646

# Affirmative Coverages

## Overview

*Affirmative Coverage* also referred to as "insuring over" or "insuring around", is a provision wherein a title insurer may add, extend or modify title insurance provisions or delete, diminish or qualify title exceptions to enhance title coverage provided by the policy.

**This may be accomplished by any of the following:**

- Providing Affirmative Language which may insure against loss or damage arising from the occurrence of a certain event

- The use of supplemental insuring provisions contained in endorsements

- By the deletion of some of the exclusions from coverage or exceptions contained in the policy

## Underwriting Instructions

**Affirmative Language: "Insuring Over/Around" Title Defects**

Most lenders require that Affirmative Coverages be given to general or specific exceptions as listed in Schedule B of the final policy insuring them for loss or damage which may result due to that matter. Rather than omitting the interest or encumbrance affecting title from the policy, the agent should list the matter as an exception to coverage in both the commitment and final policy, even though the Company may be provided with an indemnity letter from another party. The necessary affirmative coverage may then be given by attaching the appropriate endorsement to the policy. Another method for providing affirmative coverage is by inserting a note or additional language at the end of the exception in Schedule B to state the nature and extent of affirmative coverage. However, this method is not preferred and the Company discourages using this alternative method. The use of endorsements to provide supplementary or affirmative coverage is preferred.

Always check with the underwriting and/or legal department for approval before providing affirmative language other than those provided for in this manual. You must be extremely careful in the wording of affirmative coverages. Leaving out or including just one wrong word can expose the Company to a large degree of liability in the event of a claim.

- **Insuring Over an Actual Lien or Encumbrance:**
  Language should conform substantially to the following:

  *"The Company hereby insures the insured against loss or damage incurred, in an amount not exceeding the insurance amount of this policy, by reason of the enforcement of the lien identified as Item ___ of Schedule B, against the insured property as a lien encumbering or having priority over the estate or interest insured by this policy."*

- **Insuring Over an Encroachment:**
  Language should conform substantially to the following:

  *"The Company hereby insures against loss or damage which the insured shall sustain by reason of the entry of any court order or judgment which constitutes a final determination and requires the removal of the existing improvements because of the encroachment or encroachments thereof specifically set forth at exception number _____ in Schedule B."*

As outlined elsewhere in this manual, encroachments should *not* be insured over in an owner's policy without specific authorization from the Company.

See also: **Encroachments**, **Survey Matters**.

- **Insuring Over Matters of Record:**

  Generally, the Company does not authorize an Agent to insure over prior liens of record. Before insuring over any matter of record, contact the underwriting and legal department for written authorization. At a minimum, the Company will require a properly executed Indemnity Agreement from all parties involved; sufficient funds to be held in escrow (generally a minimum of 1½ times the amount of the liability) for a specified amount of time (pending completion of work, matter has been resolved, or until the statute of limitations has expired); and written authorization from the Company. You may <u>not</u> insure over pending litigation which may affect title to the insured property.

- **Unacceptable Affirmative Coverages:**

  *Caution!*

  The following examples of *unacceptable* affirmative language should never be used when "insuring over" matters:

  - The Company hereby insures against the *consequences* of any attack…

  - This policy hereby insures against *any* loss by reason of the aforementioned lien…

  - The Company hereby insures the insured against *all* loss or damage as a result of said violation…

  - The Company hereby insures against the forced removal or *attempted* forced removal…

  - This policy hereby insures against loss or damage arising out of any enforcement or *attempted* enforcement of the rights, if any.

**Endorsements**

Endorsements modify the existing policy language or extend additional coverage not otherwise provided by the policy. To obtain specific information regarding the definition and use of Westcor's most commonly used endorsements please refer to the Endorsements section of this manual or contact your local Westcor Agency Manager.

See also: **Endorsements**

**WESTCOR 000648**

# After-Acquired Title

## Overview

"After-acquired Title" is a legal doctrine recognized in many jurisdictions which provides that, when a grantor purports to convey or mortgage property to which he is not vested, any title subsequently obtained by that grantor automatically passes to his grantee by operation of law. The purpose of this doctrine is to give effect to the intent of the parties to a conveyance, or security instrument as evidenced by the documents they execute. After-acquired title applies when Joe, who has no interest in the land, conveys title to the land to Mary and then subsequently acquires title to the land from Fred, who originally held legal title to the land. At the time Joe acquires title, such title automatically passes to Mary.

This doctrine has been codified into a statutory provision in some states but originally it was an equitable doctrine to prevent unjust enrichment. As a general principle, warranty deeds and grant deeds are deemed to transfer after acquired title, but quitclaim deeds do not.

## Underwriting Instructions

While title obtained pursuant to the after-acquired title doctrine may be legally valid, the chain of title will not be entirely intact. Westcor agents should not rely on the doctrine without specific authorization of Westcor Counsel. The best rule of thumb is to obtain and record a confirmatory deed or mortgage.

# Airspace

## Overview

Title to estates or interests in land created above ground may themselves be the separate subjects of title insurance, provided that an accurate description with respect to horizontal and vertical planes are established such that the "cube of air" can be defined and located. This concept may be employed to separate a building from the land upon which it rests as a financing technique or a tax saving device. It is also used in large urban centers where it is necessary to divide and utilize available airspace in addition to the limited prime surface land to create multiple floored living arrangements without the use of condominium laws. It may also be used to define an area that may be restricted from construction which would obstruct the view or sunlight for an adjacent parcel of land. The airspace concept should not be confused with the separation of the ownership of land and buildings by agreement under the terms of certain sale-leaseback transactions. In those transactions, the building may not exist as a separate parcel of real estate unless it is separately defined and attached to other ownership interests in the land. Most forms of condominium ownership involve rights in airspace defined in the declaration of condominium and the condominium statutes of the relevant state. The concept of airspace addressed in this section applies to airspace rights other than those derived through a declaration of condominium.

## Underwriting Instructions

*Consult local underwriting counsel as the laws governing use of airspace varies from jurisdiction to jurisdiction.*

The basic requirements to insure airspace rights are:

1.  A determination must be made as to the record owner of the underlying land at the time of severance of the air parcel from the underlying land. This severance creates a new "chain" of title for the air parcel ownership. Look for a "covenants, conditions, and restrictions" document in the chain of title which may define ownership rights and obligations as to both the air parcel(s) and the underlying land. In the alternative, a ground lease may be required to provide supporting space for the separate air space ownership.

2.  The parcel of airspace must be located or defined by engineering and survey data (a legal description) sufficient to adequately define the insured parcel. At the very least, this must be a three-dimensional description which defines a floor elevation plane or datum and a ceiling elevation plane or datum with respect to the perimeter description of a horizontal surface. This three-dimensional description must be aligned with a surveyed tract of surface land. A surveyor or engineer should be able to identify the perimeters of the insured airspace with certainty in reference to a known surveyed tract of land which can be identified in the land records of the county in which the airspace (and surface land) is located.

3.  The airspace must have the benefit of a written and recorded easement or other appurtenant right in the referenced land surface to support any structure erected or to be erected within the airspace. This right may be set forth in a ground lease or "covenants, conditions and restrictions" document which may also include provisions for ingress and egress as stated below.

4.  The airspace must have a written easement for ingress and egress (if ingress and egress is required). This easement must also be recorded in the office of the recorder of deeds for the county in which the airspace and the referenced surface land is located. Please note that the "right of access to the insured land" is one of the insuring provisions of the policy. The easement for ingress and egress to airspace will probably be across private land (and may include other airspace). Consequently, an exception in Schedule B must be raised to modify the insuring provisions of the policy relating to access and to disclose the terms of the access easement.

WESTCOR 000650

WESTCOR

6.   The covenants, conditions  and restrictions for the use of the airspace must be identified in a recorded document referenced to the underlying land and must be raised by exception in Schedule B of the policy.

7.   Review that the airspace parcel created does not violate any "plat act" requirements according to local laws.

8.   If easements are to be insured, they will have to be added as an additional insured parcel.

9.   Contact your local underwriter counsel for requirements for waiver of the general exceptions to the policy related to survey pursuant to any request for "extended coverage". A survey may be required.

See also: **Condominiums**, **Easements**.

CAUTION:   Other than for condominiums, insuring airspace or rights in or to airspace constitutes an unusual and extra – hazardous risk that must be submitted to and approved by Westcor Counsel.

WESTCOR 000651

# Assignments

## Overview

A promissory note which is secured by a mortgage or deed of trust may be transferred or assigned by endorsement on the note and delivery to the assignee. The assignment of the obligation carries with it the rights of the assignor to the security for the promissory note. In Paragraph 8 of the ALTA Loan Policies, the validity and enforceability of any assignment of the insured mortgage or deed of trust shown in Schedule A, and also the failure of the assignment to vest title to the mortgage in the assignee free and clear of all liens, are automatically insured. This requires an agent to determine, among other things, that the document labeled "assignment" is in fact insurable. Furthermore, the second portion of the insuring provision which insures the assignee that the insured mortgage is "free and clear of all liens" makes it necessary to search not only the name of the mortgagor, but also the name of the mortgagee for possible prior assignments or liens which may have attached to the mortgagee"s interest in the mortgage. Although state law often does not require an assignment to be recorded in the real estate records, the records must be searched to verify that no prior assignment has been recorded. **As a prerequisite to issuing insurance to an assignee, a separate assignment of the note and security instruments must be recorded**. While most intervening matters filed between the effective date of the original mortgage and the date of recording of the subsequent assignment will generally be subordinate to the assignment, state law may vary. Agents must be concerned with the effects of changing the effective date of the policy upon the standard risks of survey matters, unrecorded mechanics liens, and parties in possession. For instance, you should not bring forward the effective date regarding matters of survey or mechanics liens if construction has occurred following recordation of the mortgage, unless you are certain that such matters could not affect the validity or enforceability of the assigned mortgage or gain priority over it.

An assignment should never be insured without insuring the underlying mortgage, because, in the event the underlying mortgage was not sufficient to create a proper lien, the assignment of that mortgage would be equally ineffective. In some cases, an assignee may wish to be insured in an amount equal to the existing loan balance rather than the original mortgage amount. This is acceptable, provided 1) you receive an estoppel letter from the assignor stipulating the existing loan balance and 2) notation is made in the loan policy that the amount insured is made upon the representation by the assignor that the loan balance has been reduced from the original mortgage amount of the existing balance.

## Underwriting Instructions

In the issuance of a loan policy insuring a mortgage or deed of trust which has been assigned, the assignment must be placed of record and the assignee named as the insured under Schedule A of the policy. The requirements are the same for the issuance of a policy insuring the original mortgage or deed of trust but, in addition, the note secured by the mortgage or deed of trust must be examined to determine that the chain of endorsements on the note from the original beneficiary to the proposed insured is unbroken and not in conflict with any assignments which may have been recorded. Furthermore, satisfactory evidence of the authority of the individual executing the assignment must be obtained. A search of the public records must be made to disclose prior assignment, partial releases, modifications or other matters that could affect the deed of trust.

If the assignee requests an endorsement to an existing loan policy, care must be taken to review the underwriting requirements for each specific endorsement. If the endorsement being requested includes a change of the effective date, extreme care must be taken to verify that no matters could affect other provisions of the policy, such as unfiled mechanic"s liens.

See also: **Deeds of Trust**, **Endorsements**, **Mortgages**.

WESTCOR 000652

# Bankruptcy

## Overview

Bankruptcy proceedings affect the ownership, conveyance and encumbrance of real property as well as the attachment, priority, and enforceability of mortgages, judgments, and liens. Contrary to popular belief, bankruptcy *does not automatically discharge the debtor of all debts, nor does it extinguish all judgments and liens filed against the debtor's property. While the debtor may be personally relieved from liability for properly scheduled pre-bankruptcy debts, pre-petition mortgages, judgments, and other liens continue to encumber the property of the debtor, unless properly invalidated in accordance with specific bankruptcy procedures.* (See also: **Judgments**, **Bankruptcy**.)

*Caution!*

Bankruptcy proceedings generally fall into one of two categories, prior party or current party:

- *Prior party* proceedings are those which occurred prior to the current title holder being vested.

  **Underwriting Instructions for Prior Party Proceedings:**
  When examining the file, you must determine that such prior conveyance did, in fact, convey marketable title. If certified copies of pertinent documents from the bankruptcy case file have been recorded in the local public records and you are able to determine that the title then conveyed was and is marketable, there is no requirement to make further inquiry as to the bankruptcy case.

- *Current party* proceedings typically involve the current owner or co-owner who, prior to conveying title to or mortgaging the subject property, voluntarily files a Petition for Bankruptcy.

  **Underwriting Instructions for Current Party Proceedings:**
  For current party proceedings, you must review the bankruptcy records and disclose the appropriate requirements/conditions on the title insurance commitment.

## Examination of Records

### Underwriting Instructions

If the property to be insured is located in a county where the local bankruptcy court is located, a search should be made of the *bankruptcy court records* to determine whether or not the subject property was, or is, involved in a bankruptcy. If the property is *not* located in the same county as the local bankruptcy court, no special search need be made *unless* there exists a notice of bankruptcy recorded in the *public records* of the county where the property is situated, or you believe, for some other reason, that a bankruptcy has occurred or is currently pending. Matters shown in local public records or other information that leads you to believe a bankruptcy proceeding may be pending place you under a duty to investigate further.

## Voluntary Petition or Entry of Order for Relief

By voluntarily filing a *Petition for Bankruptcy,* the debtor submits his property to bankruptcy administration. In the case of an involuntary proceeding, the debtor's creditors may ask the court for an *Order for Relief.* Under a voluntary petition, the court automatically acquires jurisdiction over the property of the debtor; however, it is not until the entry of an Order for Relief has been filed that the court is able to acquire jurisdiction with respect to involuntary proceedings.

## Scheduled Debts/Secured and Unsecured Creditors

At the time bankruptcy proceedings are commenced, *all* property (real and personal) of the debtor becomes part of the bankrupt estate. As noted below, certain property may be exempted from such proceedings or

may, during the course of the proceeding, be determined burdensome or of inconsequential value to the estate and may be abandoned (released back to the debtor) during the bankruptcy proceeding.

As part of the bankruptcy proceedings all debts of the debtor are to be listed in the bankruptcy records. Debts listed are thereafter referred to as *scheduled debts.* Those *not* listed are considered *unscheduled* debts.

### Underwriting Instructions

All property of the debtor should be considered unmarketable unless sold under court order or abandoned as part of the bankruptcy proceedings.

In addition, some debts – be they scheduled or unscheduled – are *secured debts* (i.e., mortgages, car loans, etc.) while other debts are *unsecured* (i.e., signature loans or unsecured lines of credit). Whether a debt is secured or unsecured determines whether the entities who extended the credit or made the loans to the debtor are *secured creditors* or *unsecured creditors.*

## Appointment of Trustee/Debtor-in-Possession

In Chapter 7 cases, a trustee is always appointed and the debtor may not act as debtor-in-possession. In Chapter 11, 12, and 13 cases, a trustee may be appointed or, if acceptable to both the court and creditors as evidenced by an approved plan under the applicable chapter, the debtor may remain in control of the estate as debtor-in-possession subject to the provisions of the plan.

## Exempt or Abandoned Property

Debtors may be able to claim certain property to be exempt from bankruptcy court jurisdiction under either federal or state exemption provisions. Once the debtor claims the property as exempt on the schedules, in the absence of timely objections, the property claimed as exempt is exempted. Fully exempted property may be sold by the debtor without further court order in a Chapter 7 or Chapter 11 case. In a Chapter 13 case, local rules may require court approval as well as approval of the trustee.

Property of the estate which was properly scheduled in the bankruptcy proceedings may be *abandoned* by the trustee if it can be shown that such property is burdensome or of inconsequential value to the estate. A court order approving the abandonment should be obtained and recorded in the land records.

Exceptions for liens on property as a result of an abandonment proceeding must be reflected since such proceeding *will not* eliminate liens which were properly perfected and attached to the property prior to commencement of the bankruptcy proceedings. Liens against abandoned property which were recorded at the time of the bankruptcy filing or which attached to the property or against the debtor/owner *after* bankruptcy must also be shown as exceptions to title, unless otherwise discharged.

With respect to insuring transactions involving property abandoned through bankruptcy, the order of abandonment must be recorded.  After the order of abandonment has been recorded, title to the abandoned property re-vests in the debtor who may then deal with the property outside of the bankruptcy.

## Order of Discharge: Dischargeable and Non-Dischargeable Debts

Not all debts are dischargeable in bankruptcy and the debtor remains personally liable for the payment of such non-discharged debts. Entry of the Discharge will typically *not* reveal which debts are being discharged and which are not. A perfected lien, arising from a debt which is properly scheduled and discharged in bankruptcy, will not attach to property acquired by debtor <u>subsequent</u> to the discharge, provided such property was not acquired by assets retained from the bankruptcy by the debtor. A perfected

WESTCOR 000654

lien, properly scheduled but *not* discharged in bankruptcy, remains a lien on all property acquired during or subsequent to bankruptcy. Liens perfected subsequent to the discharge *will attach* to all property retained by the debtor following the bankruptcy as well as property acquired by the debtor subsequent to the bankruptcy. In Chapter 7 (liquidation) cases, an inquiry must be made to determine whether such debts have been discharged or continue to be enforceable against the debtor and his subsequently acquired property. *Non-discharged liens must be shown as an exception to title.*

Under Chapter 7 cases, the filing of a Discharge will effectively forgive the personal liability of the debtor from all scheduled and dischargeable debts arising prior to the commencement of the case. This, however, only pertains to debts which were listed in the debtor″s schedule. Debts *not listed* in the debtor″s schedule (*unscheduled debts*) – including those which arose prior to the commencement of the case – would not be considered dischargeable.

The *effect* of a discharged debt upon entry of the Discharge is that it *becomes unenforceable against the debtor personally.* The discharge protects the debtor from any attempt at collection or recovery by creditors with respect to the discharged debt.

However, if the discharge was obtained a) through fraud then unknown by the requesting party; b) by failure of the debtor to report certain estate property; or c) by refusal of the debtor to obey lawful order or respond to material questions approved by the court – the Discharge may be *revoked.* Such request for revocation may be made within one year after the discharge was granted in the case of fraud, or within one year from the date of discharge or the date the case was closed, whichever is later, for other cited reasons.

Therefore, prior to insuring title, a review of the bankruptcy file should show that more than one year has elapsed since the date of discharge or the date the case was closed (whichever is later) and that no order revoking the discharge has been granted.

## Types of Bankruptcy; General Procedures

There are two basic types of bankruptcy proceedings: liquidation and reorganization. *Liquidation,* as its name suggests, liquidates the non-exempt assets of the debtor which are then used to pay off his creditors. *Reorganization,* on the other hand, economically rehabilitates the debtor by enabling him to recognize existing debts and structure new payout agreements with creditors. Chapters 1, 3, and 5 of The Code provide general information that applies to all bankruptcy cases and deal with procedural aspects of same. Chapters 7, 11, 12, and 13 are considered special chapters that affect only cases begun and administered under their provisions. A review of the Petition for Bankruptcy or case docket will disclose the applicable Chapter of a particular bankruptcy case. In some cases, proceedings begun under one Chapter may later be converted to another Chapter.

**Automatic Stays**

Upon filing a Petition for Bankruptcy, an *automatic* stay goes into effect, prohibiting any activity by the debtor, debtor″s creditors, or any other party from commencing any new action or continuing any existing action against property owned by the debtor (which, upon the original filing, became property of the estate). No conveyance, encumbrance, or action to enforce any existing encumbrance or lien may be taken against the estate property as long as the stay is in effect.

It is not uncommon to find that the debtor filed for bankruptcy subsequent to a creditor instigating foreclosure action against him. A foreclosure in progress at the time bankruptcy proceeding is commenced is *stayed;* meaning that no further action may be taken with respect to the foreclosure until the stay is lifted or the bankruptcy court authorizes such action by granting relief from the stay with respect to the subject property and pending foreclosure action.

From a title perspective, you may rely upon a *final order* of the bankruptcy court which grants relief from the automatic stay when insuring title involving foreclosures of mortgages or deeds of trust.

**Notice and Hearing**

The Bankruptcy Code requires that an opportunity for sufficient hearings, by interested parties, be provided for in bankruptcy proceedings. Throughout The Code is found the language, "*after notice and hearing*". While *notice* must be given to appropriate parties with respect to actions taken throughout the proceedings and an *opportunity for hearing* must exist with respect to same, this does not necessarily mean that there *will* be hearings held. Generally, hearings are held when responses are filed objecting to certain petitions or motions which may have been filed by interested parties. Therefore, if no responses are filed, a hearing will not be held.

**Appeals Process**

The Code provides that anyone wishing to *appeal* an order entered by the bankruptcy court must file such appeal within 10 days of final order. An order is considered final once it is entered on the bankruptcy court clerk's docket. The court may extend the appeal period for an additional 20 days, provided a motion to extend is received within the original 10-day period or, within 20 days of the date of final order if a showing of excusable neglect can be shown. From a title perspective, no judgment, order, or decree of a bankruptcy court is final until all appeals have been heard and/or the time for the appeals process has expired.

**Conversion**

In some cases, a bankruptcy case may be *converted* from one special Chapter to another. For instance, a Chapter 11 reorganization case or Chapter 13 repayment case may be converted to a Chapter 7 liquidation case in the event the reorganization or repayment plan fails. In the event of conversion, the date of the filing of the original Petition for Bankruptcy will be considered the date of commencement for the converted case.

**Dismissal**

Generally, the *dismissal* of a bankruptcy case by the court effectively revests title in the debtor of all property vested in him prior to the commencement of the case and reinstates any liens, transfers, proceedings, or other such matters which were in effect against the debtor prior to the commencement of bankruptcy.

## Special Chapters

**Chapter 7**

Chapter 7 governs liquidation or straight bankruptcy cases and is the most common of all bankruptcy proceedings. This type of proceeding is available to individuals, partnerships, and corporations with the exception of railroads, insurance companies, and certain savings institutions. *Filing of the petition* may be voluntary (by debtor) or involuntary (by creditors). The date of the voluntary filing of the petition by the debtor is considered the equivalent of the date of the entry of the *Order for Relief* in an involuntary proceeding initiated by creditors. This is when the court acquires jurisdiction over the debtor's property and may move to appoint a trustee. Title to *all* the debtor's assets is transferred to the bankruptcy estate, and the debtor no longer has the ability to deal with the assets outside of the bankruptcy proceeding.  Afterward *certain* assets may be exempted from sale or abandoned by the trustee under appropriate court order. Title to such exempt or abandoned property then revests in the debtor.

The debtor may *not* act as a debtor-in-possession under Chapter 7. The debtor's estate, consisting of both real and personal property – with the exception of exempt or abandoned property – is liquidated (sold off) and the cash is then used to satisfy creditor's claims.

WESTCOR 000656

## Underwriting Instructions

*From a title perspective,* the entry of a Discharge releases the debtor from personal liability for dischargeable debts and prohibits enforcement by creditors against the debtor for such debts. When insuring title to real property acquired by the debtor *after* the commencement of his bankruptcy case, no scheduled debts (i.e., those disclosed of record) should be ignored unless the examined bankruptcy file shows that the period for request for revocation has expired (see above) and no order revoking the discharge has been granted.

**Documents necessary to convey title in a Chapter 7 Bankruptcy:**
1.  Order of Abandonment, and
2.  Deed from debtor.
*or*
1.  Court Order approving sale and conveyance of the specific property, and
2.  Deed from bankruptcy trustee.

## Chapter 11

Chapter 11 provides for the planned restructuring of existing debts and is available to individuals, partnerships, corporations, and railroads. The proceeding is commenced by the filing of the petition by debtor (voluntary) or by his creditors (involuntary).

A Chapter 11 proceeding provides the debtor an opportunity to create a *debt-restructuring* plan that permits him to continue on with business as usual while providing the creditors sufficient repayment on existing debt obligations. Creditors affected by the plan have veto power over the plan. While court approval of the actual plan is not required, court approval *confirming* the plan is required.

Upon request by an interested party, the court has the authorization to appoint a trustee. If none is appointed, the debtor with an approved plan may continue to act as a debtor-in-possession and manage his business. In some cases, a trustee or receiver may be appointed to supervise management of the business by the debtor.

Generally, the Chapter 11 debtor has 120 days following the filing of the petition or entry of an Order for Relief in which to file his reorganization plan. If the plan is filed within that time, the debtor has an additional 60 days to obtain acceptance of the plan by all affected creditors. In the event the reorganization plan does not meet with the approval of creditors or, upon adoption, does not work out as planned, the Chapter 11 proceeding may be converted to a Chapter 7 liquidation plan. Debtors who file Chapter 11 voluntarily may convert to a Chapter 7 at any time. The court may convert a Chapter 11 case to a Chapter 7 case without the debtor″s consent, provided just cause is shown and such conversion is in the best interests of creditors, *unless* the debtor is a farmer or non-profit corporation. The latter cannot be converted without the debtor″s consent.

Once the plan is properly accepted by the appropriate (affected) creditors, the plan must be confirmed by the court. Prior to making such confirmation, the court must find that full disclosure of the debtor″s affairs was made and that the plan is fair, adequate, and suitable and that it meets the statutory requirements of 11 U.S.C. 1129(b). If the plan does comply it must be confirmed; if it does not, it must be denied. Once confirmation by the court is obtained, the plan becomes binding on the debtor, all creditors, all equity holders, and any entity acquiring property under the plan. *Revocation* of an Order of Confirmation may only be obtained if such confirmation was obtained by fraud and then, only upon request of an interested party made within 180 days from the date of entry of the confirmation order.

## Underwriting Instructions

Provided an examination of the case files shows that a) there has been no denial of the debtor″s authority to convey or transfer title to subject property by the plan or by court order; b) the conveyance or transfer of such title is specifically provided for in the plan; and c) the court order confirming the plan has become final and a certified copy of the same has been recorded in the public records in the county where the subject property is located, such conveyance or transfer may be insured. *In the event circumstances other*

*than those shown above arise, you should obtain Westcor counsel approval prior to insuring the transaction.*

**Documents necessary to convey title under Chapter 11:**
1. Court order confirming Chapter 11 plan, and
2. Deed from Debtor;

*or*

1. Deed from Debtor (or Trustee, if appointed) and order of bankruptcy court approving sale.

## Chapter 12

Chapter 12 is similar in nature to Chapter 11 with respect to the debtor submitting a plan for restructuring his debt. However, Chapter 12 applies only to family farmers with regular annual income. The proceeding is commenced only by the filing of a voluntary petition. Upon request by an interested party, the court has the authorization to appoint a trustee. If no trustee is appointed, the debtor may continue to act as a debtor-in-possession and manage his business under a confirmed plan.

## Chapter 13

Chapter 13 provides debt restructuring relief for individuals with regular income who want to pay their debts, have adequate income to pay such debts, and have a plan for payment of same that is acceptable to their creditors. There are monetary limits on secured and unsecured debts under this plan, so as to keep certain debtors (i.e., sole proprietors) from filing Chapter 13 when they should, in fact, file Chapter 11.

The proceeding may be commenced only by the filing of a voluntary petition, and the restructuring plan must be approved by the court. In some cases, an involuntary petition may be filed by creditors, however the case will not proceed until the debtor has consented to same.

A trustee will always be appointed, either by the court or via election by creditors. The trustee, therefore, has power over the property of the estate until an acceptable plan is confirmed. Estate property, under Chapter 13, consists of all property which would be within the jurisdiction of the courts under a Chapter 7 case *plus* all earnings acquired by the debtor after commencement of the case, up to the date the case is closed, dismissed, or converted to a Chapter 7 case.

**Note:** *A Chapter 13 case may be converted to a Chapter 7 case at any time, or may be dismissed by the court upon request by debtor.*

A Chapter 13 case requires the debtor to file a reorganization plan and obtain appropriate creditor approval. Generally, the plan may not extend beyond five years. *Secured creditors* (i.e., creditors with liens on estate property) must either accept or reject the plan and *cannot* be bound by a plan they have not consented to. *Unsecured creditors,* however, can be bound to the plan without consent provided such plan is confirmed by the court. In order for the court to confirm a Chapter 13 plan, the court must determine that the value of the estate property available to unsecured creditors is equal to or greater than that which would be available to them under a Chapter 7 case; that all secured creditors have accepted the plan, and that the debtor is able to comply with the plan. As with Chapter 11 cases, an Order of Confirmation may be revoked, after notice and hearing, if it is found to have been procured by fraud.

Once all payments due under the plan have been paid, the court may file an Order of Discharge which effectively relieves the debtor of all unsecured debts provided for in the plan or which were disallowed by the trustee except for debts owed to a spouse, former spouse, or child for alimony, support, or maintenance in connection with a separation or divorce agreement or property settlement agreement.

Within one year of discharge, an interested party may request *revocation of discharge* which, following due notice and hearing, may be granted by the court provided it was obtained by fraud or knowledge of the fraud came to the requesting party after the discharge was granted.

WESTCOR 000658

**Underwriting Instructions**

Provided an examination of the case file shows that a) there has been no denial of the debtor″s authority to convey or transfer title to subject property by the plan or by court order; b) the conveyance or transfer of such title is specifically provided for in the plan; and c) the court order confirming the plan has become final and a certified copy of same has been recorded in the public records in the county where the subject property is located, such conveyance or transfer may be insured. *In the event circumstances other than those shown above arise, you should obtain Westcor counsel approval prior to insuring the transaction.*

**Documents necessary to convey title under Chapter 13:**
1. Order confirming Chapter 13 (wage earner plan); and
2. Deed from Debtor.

## Invalidating Liens

As stated above liens attaching prior to the filing of the bankruptcy petition still encumber the debtor″s property after the debtor″s discharge of personal liability unless:

1. The agent verifies that there is notice in the bankruptcy file to the specific lien creditor of the debtors motion to discharge the lien, and either no objection has been entered, or after a hearing the bankruptcy overruled the objection, and;

2. The Bankruptcy Court entered an order avoiding the specific lien, or;
   a. The Bankruptcy Court″s order of sale states the property is to be sold free and clear of the specific lien, and;
   b. The Court″s order references the applicable bankruptcy code section being relied upon, and all applicable appeal periods have run.

All cases where liens are purported to be invalidated or discharged by bankruptcy must be referred to Regional Counsel for underwriting approval.

**Important:** *A discharge of a debtor in bankruptcy does not release a judgment lien against the debtor's property.* The discharge only acts to stop the collection of the debt against the debtor personally. *The discharge does not extinguish the judgment lien and therefore, continues to attach to real property.* The simplest way to remember this is:

*Caution!*

    *"A lien going into bankruptcy is a lien coming out of bankruptcy."*

A release of the judgment lien must be obtained and recorded or, an order of the bankruptcy court to sell free and clear of the lien must be obtained and reviewed by underwriting counsel.

**Important consideration in bankruptcy:** Many actions concerning real property in a bankruptcy must be approved or confirmed by an order of the bankruptcy court. All such orders are appealable and are not final until finally adjudicated or appealed or the appeal period has expired with no appeal filed. No title insurance may be issued based on a bankruptcy court order until after an appeal is no longer possible.

# Beaches; Beach Rights

## Overview

An exception to title should be made regarding the possible rights of the public to use that (dry sand) part of the subject property which lies between the abutting body of water and the natural line of vegetation, bluff, extreme high water mark, or other apparent boundary line separating the public use area from the upland private area. Many states follow the "*Public Trust Doctrine*" which permits the public access to beach areas for recreational and other related purposes. In those instances where the Public Trust doctrine is not applicable, there may exist a *prescriptive easement* across such areas as a result of constant or substantial public use. In many areas, title to tide lands has been a subject of considerable litigation.

## Underwriting Instructions

Any commitment or title policy insuring land abutting an ocean, gulf, or any beach front property or other areas that attract public use **must** contain the following exception:

> *"The right, title or interest, if any, of the public to use any part of the land which lies between the abutting body of water and any or all of the following: a) the natural line of vegetation; b) the most extreme high water line; c) the bulkhead line; d) any other line which has been or which hereafter may be legally established as relating to such public use."*

If a specific use of the land is disclosed, the following exception should be made:

> *"Any rights, interests or claims which may exist or arise by reason of the following facts disclosed by an inspection of said land:*
> *a.   The fact that a [road, path, etc.] extends over a portion of said land, and is used by the public for access to and from the adjoining body of water known as [name body of water]; or*
> *b.   The fact that portions of said land are used by the public for beach and recreational purposes."*

Because laws are so different from state to state, contact your local underwriter for guidance specific to your state. An agent must not rely entirely on prior title policies to determine exceptions for waterfront interests. An independent determination of the appropriate exceptions should be made in each instance.

See also: **Wetlands**, **Riparian/Littoral Rights**.

WESTCOR 000660

# Bona Fide Purchasers

## Overview

A *bona fide purchaser* (a.k.a. *bona fide purchaser for value and without notice*) is one who has paid full value for the property and has no knowledge of any outstanding interest held by third parties. In most states, a purchaser must meet these criteria in order to obtain full protection under the recording act. Generally, the purpose for these criteria is to prevent a seller from giving away part or all of his property to another so as to avoid demands of creditors who might otherwise obtain a lien against the property. A *bona fide purchaser* is essentially protected against any unrecorded equities or interests to which the title might have been subject had the seller/prior owner never conveyed title. Documents that are properly recorded according to state law impart constructive notice and defeat BFP status.

Of course, there are situations in which a person is *not* a purchaser for value. Two of the most common situations include obtaining title to property by *gift* deed or by inheritance or devise. With respect to gift deeds, you must be concerned with the possibility of liens for state and federal gift taxes and for unrecorded debts or interests created by the grantor and, therefore, an exception must be made for these liens and interests. If, however, it appears that the conveyance may involve fraud on the part of the grantor with respect to creditors or such conveyance may render the grantor insolvent, the transaction may not be insurable and you should contact Westcor counsel immediately.

## Consideration

Generally, all contracts must be supported by consideration in order to be legally binding. Consideration is the benefit(s) exchanged between parties to a contract. For example, if you buy a watch from a jeweler, the consideration you receive is the watch while the consideration the jeweler receives is your money. A contract for sale includes consideration from the buyer (money) and consideration from the seller (title to the property being conveyed).

Strictly speaking a deed is not a contract and, therefore, need not recite consideration in order to effect a conveyance of title. However, a failure to give consideration may have undesirable consequences for the purchasers, so it is customary to recite consideration in a deed. A deed need not set forth the exact consideration paid to be valid. A deed reflecting standard consideration language – e.g., "*$10 and other good and valuable consideration, the receipt and sufficiency of which being acknowledged*" – would be sufficient for conveyance purposes.

## Underwriting Instructions

For insuring purposes, there must be an established consideration which has been paid in order to establish that grantee is a bona fide purchaser (i.e., purchaser for value and without notice). A conveyance without consideration paid – such as a gift deed for love and affection – may be insured provided the transaction has been investigated and meets Westcor's requirements for insuring gift deeds. A subsequent conveyance to an arms-length bona fide purchaser for value and without notice would be insurable, since consideration was paid and the purchaser/grantee has no knowledge of any outstanding interest held by third parties with respect to the property. Most title insurance policies include an exclusion from coverage which negates liability if the insured is not a bona fide purchaser.

See also: **Gift Deeds**.

THE WESTCOR MANUAL

# Boundaries, Disputed

## Overview

Prior to insuring a transaction involving property which is part of a boundary line dispute between the subject property owner and adjacent property owner, it is mandatory that the property owners enter into a boundary line agreement which establishes the exact location of the dividing line between the respective properties and contains the requisite language to effectively quitclaim from and to each party those areas which are required to establish such boundary.

In the event either or both parties have mortgages or other liens encumbering their respective properties, it is also necessary that the lienholders consent to or join in the execution of the such boundary line agreement.

## Underwriting Instructions

In order to insure a transaction involving property without exception to a boundary line dispute, all parties with an interest in the disputed property must enter into a boundary line agreement which establishes the location of the dividing line between the properties. Each and every interested party must then quitclaim to each other the respective area within their boundaries; otherwise an exception for coverage must appear in Schedule B-I of the title policy conforming to the following:

> *"Rights and claims of parties along the _____ boundary of the insured property, the exact location of which is in dispute, and to which the Company does not insure the location of a title to property adjacent to said line."*

As mentioned above, existing lenders and/or lienholders must also ratify the transaction.

WESTCOR 000662

# Building Setback Lines

## Overview

Building setback lines appear on subdivision or lot plats or by zoning laws as areas that restrict the location of improvements *behind* or *within* certain boundaries. The most common building setback line is the *minimum building setback* line that designates the building setback from a street, right of way or side lot lines. The minimum building setback line (MBSL) is designed to insure conformity in the location of improvements within the development or subdivision. It is not uncommon for improvements to encroach upon minimum building setback lines to a small degree, especially on small, irregularly-shaped lots, corner lots, or lots developed on a cul-de-sac.

Another type of building setback line is the building envelope. The building envelope may be either a designated area of a subdivision in which construction may take place, thereby establishing a designated buffer zone around the perimeter of an entire subdivision or development in which improvements should not be located or a designated area of each lot in which construction may take place. Minor encroachments onto either the no-build buffer zone or out of a designated building site are more rarely seen than in minimum building setback line situations, but they do occur.

## Underwriting Instructions

### Existing Construction

It is the policy of our company to provide affirmative coverage under loan policies when minor encroachments are present. Minor encroachments are defined as encroachments of improvements over minimum building setback lines (MBSL) or the encroachment of improvements onto easements. *For reference purposes, such encroachments may be no more than a few inches over the MBSL requirements.*

Encroachments of fences and gravel drives onto easements or over boundary lines may be insured if they are less than 3 feet. Gross encroachments of improvements (*10% or more over the MBSL requirements*) such as concrete retaining walls, etc., should be treated on a case-by-case basis. Please contact Westcor's underwriting counsel for affirmative coverage involving more severe encroachment problems. You may proceed with the following affirmative coverage when warranted by the above criteria:

Describe the encroachment under Schedule B of the commitment or policy, then add the following:

> *This policy insures the insured against loss or damage the insured shall sustain in the event of a final order of a court of competent jurisdiction that compels removal of the encroachment described in this exception.* As an alternative, the same type of affirmative coverage may be provided (if underwriting requirements are satisfied) by attaching an endorsement to the policy which refers to the endorsement exception on Schedule B and uses the same basic affirmative insurance language mentioned above.

### New Construction

Westcor Title will not insure against loss by encroachments of new construction. It will be necessary to have the developer/builder/owner obtain a variance zoning board approval from the local planning commission, or other municipal authority, in order to proceed with title insurance. While a variance of zoning board approval will not change a recorded deed restriction, affirmative coverage may be considered on a case-by-case basis.

See also: **Survey Matters**, **Encroachments**.

# Canals

## Overview

Canals are man-made, artificial ditches that are generally created pursuant to an easement or in conjunction with condemnation of land for that purpose. When insuring property that abuts or is crossed by a canal, an exception should be made as to title to any portion of the land located within the boundaries of the canal. If the property is subject only to an easement for canal purposes, an exception should be made for such easement.

## Underwriting Instructions

When insuring property abutting or crossed by a canal, exception must be made as follows:

> *"Any and all rights of others in and to any portion of the land located within the boundaries of the [NAMED] canal and to so much of the land as is necessary for the use and maintenance of said canal."*

When insuring property which is subject to an easement for canal purposes, the following exception must be made:

> *"Easement for canal purposes over the [describe] as described in [INSTRUMENT] dated _____ recorded _____, in Book _____, Page _____, County of _____, State of _____."*

See also: **Wetlands**, **Littoral/Riparian Rights**.

WESTCOR 000664

# Capacity

## Overview

If there is no suggestion or proof to the contrary, you may assume that a *grantor* is of legal age and is mentally competent to convey title to real property. If the grantor is not of legal age, but is married, the act of marriage may remove the disability of minority and a deed executed by such married person would have the same effect as if the person were of legal age.  However, marriage <u>cannot</u> be relied upon to give validity to an incompetent grantor. A guardian or conservator must be appointed according to state law.

The fact that a *grantee* may not be of legal age or is mentally incompetent has no effect on the conveyance by grantor, in that it is not a requirement for a valid deed that the grantee must be of legal age.  An evaluation of representatives of an incompetent or minor must be made by reviewing the applicable trust document, order of appointment, letters or authority or power of attorney to determine that such individual has the authority (legal capacity) to execute the requisite deed or mortgage on behalf or a minor or incompetent person.

## Underwriting Instructions

See specific guidelines re: **Powers of Attorney**, **Minors**, **Guardianships**, **Corporations**, **Trusts**, or **Incompetence**.

# Cash Reporting

## Overview

Section 6050 [1] of the Internal Revenue Code (Title 26 USC) was added by the tax reform act of 1984. The IRS uses this information to track money laundering and other illegal activities.

Pursuant to the above, any title insurance agent, settlement agents, escrow company, or law firm providing closing and settlement services for the purchase and sale of real property receiving more than $10,000 in cash in a single transaction, or related transactions, must report the cash transaction to the Internal Revenue Service. The form provided for this purpose is IRS Form 8300, pictured below.

The definition of "cash" for reporting purposes includes coins and currency of the United States (and any other country). However, this definition may also include certain cashier's checks, bank drafts, traveler's checks, and money orders for amounts of less than $10,000 which total in aggregate, more than $10,000 that is received in an transaction in which the recipient knows that the instrument is being used in an attempt to avoid the reporting of the transaction.

Personal checks drawn on an individual's personal account for any amount are not considered to be cash. Cashier's checks, bank drafts, traveler's checks, or money orders in an amount of more than $10,000 are not considered to be cash. (The logic is that it is assumed the banking institution responsible for issuing the draft for more than $10,000 will be responsible for reporting the matter to the IRS.) Also, cashier's checks, bank drafts, etc., which constitute the proceeds of a bank loan in any amount, are not considered cash.

## Underwriting Instructions

Cash transactions must be reported on IRS Form 8300 if all of the following requirements are met:

1. The aggregate amount of cash received is over $10,000 (receipt of exactly $10,000 in cash is not reportable, but receipt of $10,001 is reportable).

    a. The reportable amount may be received either in one lump sum of cash (or cash equivalent) in excess of $10,000; or

    b. In installment payments that cause the total cash (or cash equivalent) received within one (1) year of the initial payment to total more than $10,000.

2. Received in the course of your trade or business;

3. Received from the same buyer (or the buyer's agent); and

4. Received in a single transaction or in two or more related transactions:

    a. Any transactions involving the same buyer (or an agent for this buyer) that occur within a 24-hour period are called "related transactions";

    b. If over $10,000 in cash is received from the same buyer in two or more transactions occurring within a 24-hour period, you must treat the transactions as one and report the cash payments on Form 8300.

Watch out for "structuring" or suspicious transactions. Should a purchaser come to closing with two cashier's checks from two different financial institutions – each one less than $10,000 – with a combined aggregate total of more than $10,000, the purchaser may be trying to avoid cash reporting requirements. If the closing agent accepts checks under these circumstances, the agent may be found guilty of assisting in the structuring of the sale transaction, and be criminally prosecuted.

WESTCOR 000666

*Sample of IRS Form 8300, Rev 2/92*

The IRS also requires the agent to report any transactions which appear to be suspicious or give signs of possible illegal activity even if no report would otherwise be required. Although no specific standards have been published by the IRS to define the obligation of a closing agent to uncover illegal activity, the agent should be careful to use common sense.

Apparent attempts to evade the cash reporting requirements should be avoided by filing Form 8300 to the IRS even if it is not otherwise required. Also, avoid counseling or advising customers of ways to circumvent the reporting requirements. Cash purchasers may still be advised to obtain a cashier's check or money order for closing purposes, but advice should not be given as to means of avoiding the cash reporting requirements. Form 8300 may be obtained from your local IRS office or call to order the form at 1-800-TAX-FORM (800-829-3676).

WESTCOR 000668

# Cemeteries

## Overview

In order for a tract of land used for cemetery purposes to be insurable, it must be properly dedicated for such purposes, with no prior restriction against such usage, and be permissible under applicable law.

Some lands, especially family-owned rural tracts, may contain private burial plots or family cemeteries, without having been officially "dedicated" for those purposes. Such lands may be insured but the portion containing burial plots cannot be insured without approval of Westcor counsel. An acceptable survey must be received showing the location of the burial plots or cemetery areas. Exceptions must be noted on Schedule B for rights or claims of parties in possession or any parties claiming any kinds of rights or ownership in the land by virtue of its use for burial plots or cemetery purposes. An exception must also be included to any rights or claims of easement or ingress and egress to or from burial plots (this exception must apply to the portion of the land being insured).

Individual burial plots are not insurable.

## Underwriting Instructions

Provided the agent submits the Company"s Policy Authorization Request (for unusual risks), the agent may be given specific authorization to insure an entire cemetery on a case-by-case basis. Never issue title insurance on property platted for or used as burial plots unless specifically authorized by Westcor underwriting counsel.

If a deed, survey or inspection discloses the existence of burial plots or cemeteries, or their existence is otherwise made known to the agent, their exact location must be identified and excluded from coverage in the commitment and final title policy as follows:

> *"This policy hereby excludes from coverage that portion of the land situated within the area of the [CEMETERY, BURIAL PLOT, ETC.] as further described in that certain [SURVEY, INSPECTION, DEED, ETC.] dated _____, by _____; recorded in Book _____, Page _____."*

In addition, exceptions for claimed rights of ownership and easement and rights of ingress and egress to the cemetery or burial plot must show in the commitment and final policy and may conform as follows:

> *"Rights or claims of easement to or from and ingress and egress in and to the [CEMETERY, BURIAL PLOT, ETC.] located on said land as described in that certain [SURVEY, INSPECTION, DEED, ETC.] dated _____, by _____; recorded in Book _____, Page _____."*

and,

> *"Rights or claims of parties in actual or constructive possession or any parties claiming an kinds of rights or interests in the land by virtue of its use for burial plots or cemetery purposes."*

# Churches

## Overview

When one party to a transaction is a church, care must be taken to determine exactly who or what the entity is that holds title and that proper authority exists for the transaction to take place. Church transactions often present challenging questions as to the structure of the church-entity and who is authorized to sign on its behalf. Issues of authority are especially sensitive in church transaction. Personal, emotional, and legal issues must be carefully addressed before insuring a transaction involving a church.

If the church is incorporated, it should be treated like any other corporate party. Difficulty and uncertainty arise when the church is an unincorporated association of some type, because few jurisdictions recognize these as separate legal entities.

## Underwriting Instructions

In order to be considered marketable, title to church property should be vested either in the trustees of the church (unincorporated churches), a corporation (incorporated churches), or in a bishop or other applicable church official (corporation sole churches). Proper documentation showing the church organization and entity status must be provided.

Some considerations to be addressed in dealing with churches include:

Most unincorporated religious organizations are either Ecclesiastical or Congregational in structure.

### Ecclesiastical Structure

When title is held by a religious organization that is subordinate to a general church organization which includes one or more levels of superior governing bodies, the controlling organization will have adopted a written constitution or similar enactment which addresses the ownership, mortgaging and disposition of property. The constitution should be reviewed to learn what is necessary to comply with the governing agreements, as well as any other applicable document of operation which governs the conveyance of real property.

Although the title may be vested in the Trustees, the trust is regarded as a passive trust. Any action of the trustees must be supported by an authorizing resolution of the church membership acting in accordance with its by-laws or controlling rules.

If title is held in the name of a bishop in his official capacity for the benefit of the church, the only resolution or affidavit necessary should be an affidavit that the individual signing in the capacity of Bishop is in fact the person holding that office at the time.

### Congregational Structure

When the property is held by a religious organization which is wholly independent of other church governing bodies, the Trustees are usually authorized to act upon the majority vote of the members present at a duly called meeting. A copy of the congregation's by-laws or other regulations for meetings and conveyance of title should be reviewed for procedures. A copy of a duly passed congregational resolution authorizing the transaction should be obtained.

### Unincorporated Churches

Title into an unincorporated church (e.g., *Prayerful Presbyterian Church*), itself, is not considered valid since it is not a legal entity and therefore, cannot acquire or transfer title to real property. Therefore, when insuring a conveyance into an unincorporated church, title must vest in the trustees or other specifically designated representatives of the church, although it is not necessary to list the actual names of such

WESTCOR 000670

trustees or representatives. For example, title vested in the *Trustees of the Prayerful Presbyterian Church* would be considered acceptable.

When insuring either a conveyance out of an unincorporated church or an encumbrance of church-owned real property, the deed or mortgage must be executed by all the then current church trustees. It is necessary to obtain a certificate stating the names of the current trustees of the church from the pastor, secretary, or other church-authorized administrative person, and a resolution of the governing body of the church attesting to the authority of that person to act.

Generally speaking, the above holds true for all unincorporated church transactions involving real property with the possible exception of a Methodist Church. A conveyance of Methodist church-owned property requires a certified copy of the resolution of the Quarterly Conference of the church which sets forth approval of the sale, sales price, and empowerment of the trustees to execute and deliver the required documents and accept the proceeds from the sale. A certificate, signed by the clerk or secretary of the Quarterly Conference – stating that due notice of the Quarterly Conference was given by announcement from the pulpit at a regular church service at least 10 days prior to the meeting – should accompany such resolution.

In addition to the resolution and clerk″s certificate, the pastor and district superintendent of the church must execute the deed – along with the named trustees – so as to evidence their assent to such sale at the agreed-upon price and terms (see guidelines at the end of this chapter for some specific denominations).

## Incorporated Churches

When insuring a transaction involving the conveyance or encumbrance of church-owned property by an incorporated church, it is necessary to obtain evidence of corporate existence (i.e., certificate of incorporation) from the state of incorporation and to obtain and review a certified copy of the articles of incorporation and bylaws. If the appropriate powers to convey and/or encumber church property by the appropriate officials are not set forth within the articles of incorporation or bylaws, it will be necessary to require a specific corporate resolution authorizing the conveyance or encumbrance, along with the designation of the church officials empowered to execute the requisite transfer/loan instruments and, if necessary, a clerk″s certificate identifying the officials so named.

## Corporations Sole

A corporation sole consists of only one person and his successors, such as a Catholic bishop of a diocese. Therefore, a bishop would effectively take, convey, and/or encumber title in his name as bishop of the named diocese, along with his successors and assigns, as a corporation sole.

CAVEAT: Litigation has resulted over church ownership of real property in many jurisdictions. These cases raise issues of ownership between individual congregations and governing church bodies as well as issues of authority to act by the individuals purporting to represent the church. Also, lawsuits by minority or dissenting interests in the church challenging transactions by the church are not unprecedented. Utmost care must be exercised to verify legal structure, ownership, governing authorities, status of title, and properly documented and certified authority when dealing with church transactions. Your review of the title must comply with your state law.

## Information and Guidelines for Certain Denominations and Specific Religious Organizations

(*Note*: This list is not exhaustive or exclusive. This is information that is known or has been discovered. Information concerning other religious organizations will be added from time to time.)

### Assembly of God

Assembly of God churches are usually unincorporated congregations associated with a District Council of Assemblies of God. Title to local church property is under the control of the congregation acting through

designated Trustees. In the event of a congregation's demise, title to congregational property reverts to the incorporated District Council.

### Baptist

Baptist churches are congregational in structure. Trustees hold title to the property and act on resolutions of the congregation. The resolution should name the Trustees and authorize them to undertake the proposed transaction.

### Christian Church

Christian churches are congregational. The church acts through Trustees upon resolutions adopted by the congregation at properly called congregational meetings.

### Christian Science

Local congregations exercise independent control over their property. Most congregations are not incorporated but are organized through a "Board of Directors". Land title transactions occur through congregational resolution authorizing the Board to act.

### Church of Christ

Churches of Christ are congregational in structure. Land title transactions are conducted through a Board of Trustees authorized to act by congregational resolution.

### Church of Jesus Christ of Latter Day Saints

The Church of Jesus Christ of Latter Day Saints operates as a Utah Corporation. "Sole" Authority to hold and convey property is in one person who is the corporation. As such, he executes all instruments on behalf of the corporation. The presiding Bishop as the "Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints" may acquire, hold, donate, or otherwise convey property without approval of the members. Instruments are executed in the name of the corporation, signed by the person representing the corporation in the official capacity designated in the Articles of Incorporation or by authorized agents designated in a certificate filed by the corporation in the office of the Secretary of State. The acknowledgment will be made in the State of Utah, County of Salt Lake.

### Church of the Nazarene

The Church of the Nazarene is an ecclesiastical organization consisting of a Superintendency, a General Assembly, and District Assemblies. Local congregations may incorporate and may hold title in the corporate name. When title is held by Trustees, it may be transferred by the Trustees acting upon instruction of the majority vote of the congregation at an annual meeting or a specially called meeting, with written approval of the District Superintendent. If a debt is incurred, the additional approval of the District Board of Church Extension is necessary.

### Episcopal

Episcopal Churches are ecclesiastical in structure, with local congregations governed by an "Episcopal Church Council" of the diocese in their location. This Council is a non-profit corporation. Real property conveyances originate with a resolution of the local congregation authorizing the "Vestry" to take the proposed action. The Vestry then conducts a meeting and authorizes the Senior Warden and Junior Warden of the Vestry to execute the necessary documents. Both the Congregational and Vestry actions should be supported by authorizing resolutions. Mortgages of local church property should be joined by the diocese, by act of the President of the Board of Trustees.

### Jehovah's Witnesses

Local congregations have independent control of their property. Title is held by Trustees, or a Board of Directors, if incorporated. Title is conveyed upon the vote of the local congregation, which instructs the Directors or Trustees to act.

WESTCOR 000672

### Jewish
All Jewish congregations, whether Orthodox, Conservative, or Reform, are congregational in structure. Land titles are held through the means of Trustees. The Trustees conduct transactions upon instruction by congregational resolutions.

### Lutheran
Although ecclesiastical in structure with a District and Supervising Synod, title to property is held by Trustees named by the local congregation. The Trustees act by resolutions of the congregation or a Board of Directors if incorporated. Higher governing body approval is not required.

### Methodist, Free
The Free Methodist Church is a distinct and separate religious organization from the better-known United Methodist Church. It has an ecclesiastical structure that includes a District Superintendent and a National Board of Directors. Title is held in the congregation"s name (if incorporated) or through a Board of Trustees. Sale of the property must be upon a vote by the Board of Trustees and must reflect the consent of the District Superintendent and the Board of Directors of the Free Methodist Church of North America.

### Methodist, United
The United Methodist Church is an ecclesiastical church, with local congregations governed through a "quarterly conference". If the congregation is incorporated, title to its real property is held in its corporate name. If the congregation is not incorporated, title is held by Trustees for the benefit of the congregation. A conveyance by the church must be preceded by a notice of the proposed action to the congregation and a resolution passed by the quarterly conference authorizing the action. The resolution must direct that the documentation be executed by specified officers of the Board of Trustees (or Board of Directors, if incorporated). The written consent of the local church pastor and of the District Superintendent must be affixed to the conveyance documents.

### Pentecostal
The Pentecostal Church of God of America is a single religious corporation. It has an Executive Board that is authorized by the church"s constitution to act on behalf of the church without further authorization from local congregations.

### Presbyterian Church of America
For purposes of land titles, the Presbyterian Church is congregational. If incorporated, the church holds title in the corporate name. The officers of the corporation acting under authority of the  Board of Directors, which constitutes the governing body of the church and must authorize any conveyance or transfer of church property, may sign transfer documents. The resolution or certificate of authority issued by the Board of Directors should be placed of record concurrently with the deed or other transfer document.

# Condemnation (Eminent Domain)

## Overview

Condemnation or eminent domain proceedings can occur through the power of the government to take private property for public use without the owner's consent. The 1992 ALTA title policies exclude from coverage any loss arising from *"rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.* The 2006 ALTA title policies exclude from coverage any loss arising from *"Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8."*

Where condemnation or eminent domain proceedings are pending – i.e., for purposes of creating or widening roads or streets – an exception should be made for such proceedings, provided notice of such proceedings is recorded in the public records or you have actual knowledge of same.

Where there exists a prior taking, an examination of the public records should disclose either:

1.  An *Order of Taking* granting possession to the government provided the requisite deposit of the estimated value of the property being taken has been paid within the statutory period, at which time a *Receipt of Deposit* will be recorded and title will vest in the government; or

2.  A *Final Judgment* condemning the property, based upon the filing of a petition for eminent domain in the circuit court records of the appropriate county, such judgment setting forth the statutory period in which the government must make deposit in an amount equal to the determined compensation for the taking as set forth in said judgment; or

3.  Such other form of notice recorded or filed in the public records as is permitted by your state's law.

The estates and rights in the land may be taken by "Easement" or "Fee Simple". If the decree recites that an easement is taken, title shall be shown subject to such easement. If the decree recites "Fee Simple", and the proceedings are otherwise normal, such portion shall be excepted from the description of the land to be insured.

## Underwriting Instructions

If Notice of legal proceedings exercising the powers of eminent domain are recorded in the public records or are otherwise known to the agent, an exception to that notice must be taken as follows:

> *"Condemnation or Eminent Domain Proceedings in the ___ feet of said land condemned for ___ purposes, by (final decree entered/pending) in the County Superior Court, Case No.___. (Type the description of the land and the use for which it was taken.)*

The proceedings for the interest condemned must be thoroughly examined by the issuing agent and determined whether statutorily valid. If you are not familiar with the rules and regulations regarding condemnation in your area, contact your underwriting department for further instruction.

WESTCOR 000674

# Condominiums

## Overview

Generally, a condominium is an estate in real property ownership representing a combination of a separate or exclusive ownership in the condominium *unit* and the undivided ownership interest in common with others in the *common elements.*

Generally, the condominium *unit* is made up of the airspace as enclosed by the floor, walls and ceiling and is owned exclusively by the unit owner. The *common elements* are the interests owned by all unit holders in the land, foundations, walls, floors, ceilings, halls, heating and utility systems, recreational facilities and the real property on which the unit sits. These common elements may be *general,* such as the swimming pool or hallways, or *limited* and its use restricted to specific owners (e.g. parking spaces or patios attached to the individual unit). The laws of most states provide that ownership of an airspace unit cannot be separated or partitioned from the percentage ownership in the common elements assigned to that unit. The estates in condominiums are generally held as *Fee,* wherein title is vested fee simple to the unit owner with an undivided interest as tenants in common with other unit holders to the common area, or *leasehold,* wherein the individual unit owner has the exclusive right to possession of the unit and an undivided right of possession to the general common elements. The interests created by a condominium project must conform to all statutory requirements creating condominium estates for that particular state.

A condominium is typically created by a *condominium declaration* and *condominium map.*

The *condominium declaration* must be statutorily created by the developer of the project to conform to that state″s Condominium laws and should specify whether ownership will vest fee simple or leasehold, the designation of limited common elements, a statement of the rights and obligations of the unit owners, and a legal description of the property.

The *condominium map* identifies the location of each unit and its general and limited common elements. The map must provide a three-dimension drawing showing the boundaries of each airspace unit-length, width, and height.

The *condominium owner's association* is generally a non-profit corporation made up of unit owners whose responsibilities typically include the maintenance of the project, grounds, and common areas, as well as the assessment and collection of association dues, which are collected for that purpose. Under the declaration, the association may be given special rights or interests such as the right of first refusal to purchase any unit being sold or transferred, or an easement for maintenance of the individual unit.

The declaration will usually provide that a first mortgage held by an institutional lender has priority over condominium assessments, but only as to those fees assessed after the mortgage. Should the unit owner not pay this portion of the assessments, the declaration or statutory law will generally provide that the association may secure payment for assessments by recording a lien against the owner″s individual unit in the county records. In some jurisdictions, the association may *not* be required to file a lien in the county records for unpaid assessments and statutorily, non-payment of assessments will automatically constitute a lien on the unit. Should the association choose to pursue the collection of this lien, they may initiate foreclosure proceedings. Therefore, when insuring condominiums, it is essential that the agent obtain verification that all assessments have been brought current and there are no interests (such as rights of first refusal) adverse to our insured.

At some point in the out-sale process the developer will relinquish control of the condominium project to the association, or this may occur automatically by statute. After this point, the ability of the developer to correct errors in the map or other documents is minimized or eliminated and the association itself will be considered the authorized party. Questions in this regard must be directed to Westcor Counsel.

## Underwriting Instructions

In order to insure the condominium units, all condominium documents must be read by the title examiner. The examiner should review all condominium documents and deeds for the following:

1. The interests created must comply with all state laws and requirements creating condominium estates.

2. Compliance with State Law providing that the unit and common elements may be assessed individually for tax purposes. (All taxes for years prior to the creation of the condominium must be paid in full).

3. The restrictions must be reviewed for any forfeiture or reversionary provisions. If such provisions are contained in the instrument, they must specifically state that they are subordinate to the insured mortgage (reversionary clauses should be set out word-for-word as exceptions on Schedule B of the commitment or policy). See also: **Restrictions**.

4. Review the state condominium law to verify that the insured mortgage is not statutorily subordinate to condominium assessment liens. (Some states allow six months or more of post-mortgage assessments to take priority by statute. In such cases, exceptions should be taken to the effect of such statute by specific reference.)

5. Certification by the condominium association stating that all assessments are current and paid. (Any unpaid assessments or liens must be paid and released or excepted to in the commitment and final policy.)

6. No recorded instrument contains a right of refusal. (If such right does exist, an exception must be made in the commitment and final policy. This exception may not be deleted unless the agent obtains a waiver of these rights, in recordable form, from all parties involved.)

7. When reviewing title to condominiums, all underlying mortgages affecting the entire project or individual units should be fully or partially released or exception made in the commitment or policy.

Every condominium commitment and policy must contain the following exceptions:

> *"Limitations and conditions imposed by the condominium law of _____as set out in [STATUTORY CITATION]"; and*

> *"Terms, provisions, covenants, conditions, easements, rights, options, and liens established by and contained in the [DECLARATION OF CONDOMINIUM] of [CONDOMINIUM PROJECT], of record in [RECORDING INFORMATION]."*

New condominium projects may not be insured without prior authorization by Westcor Counsel.

WESTCOR 000676

# Construction Loans

## Overview

A construction loan provides the financing to build or complete a house, structure, project, development or other improvements to land. In most instances, construction loan proceeds are disbursed in successive draws and such draws are usually staggered throughout the process of constructing the improvements. It is customary in most markets for the lender to control the draws, and to require lien waivers from laborers or suppliers when they are paid. The lender has the duty to monitor the project to ensure that the level of completion of the improvements is commensurate with the amount of construction funds disbursed. In certain markets, title companies, escrow companies, or attorneys may disburse construction loan funds using similar disbursements/ payment/waiver procedures. It is the title agent's responsibility to reduce the underwriter's exposure to mechanics" and materialmen's liens. Therefore, it is necessary for the agent to be familiar with relevant state law as they relate to mechanics" liens and their potential for priority over an insured mortgage.

In some jurisdictions, please be aware that insuring against unfiled mechanics" liens during construction or within the lien-filing period after construction is considered to be unusual and high-risk underwriting. Any Westcor agent must obtain specific, written approval from the company's local underwriting counsel before providing such coverage or disbursing a construction loan. Recording a construction loan mortgage or deed of trust prior to the commencement of construction or the delivery of materials to be used in construction is adequate to establish the priority of the lien of such mortgage in some states. However, the unique requirements of a state's statutory framework along with case law developments require that title agents be knowledgeable about the specifics of the mechanics" lien law of their state.

It is acceptable, when insuring a construction loan, to issue the standard ALTA Loan Policy provided Schedule B, Part 1 contains a *pending disbursements clause* which limits liability to the amount actually disbursed up to the face amount of the policy as shown on Schedule A. (See discussion below.)

Prior to the release of each draw, the lender may want an endorsement bringing the title to date and insuring that there are no intervening mechanics" or materialmen's liens or other matters outstanding which could adversely affect the lien priority of the mortgage.

### Contemplated Improvements Clause (Owner's Policy)

Many times a closing will involve the purchase of an unimproved lot in anticipation of constructing a home on the lot.  In some situations, construction financing will occur simultaneously with the purchase of a lot. The title agent may be asked to issue a simultaneous owner's and loan policy. It is usually requested that the owner's policy be issued in the amount of the lot purchase price and the lender's policy in the amount of the construction loan, resulting in an owner's policy with an effective amount less than that of the loan policy.

It is preferable in this situation to advise the lot purchaser to acquire title insurance coverage not only in an amount adequate to cover the value of the unimproved lot, but also to cover the value of the anticipated improvements. Without this full coverage, the insured could potentially suffer a title loss in excess of coverage amount.

When asked to issue an owner's policy in the amount of the purchase price paid for the land and existing improvements plus the cost of construction of pending improvements, a *Contemplated Improvements Clause* must be inserted in the owner's policy which limits the initial liability of the insurer to the amount actually paid for the land and existing improvements, with an increase in liability as the pending improvements are constructed and paid for, up to the maximum amount stated in the policy.

The premium charged will be based on the total amount of the policy – i.e., the amount paid for the land and existing improvements plus the total anticipated cost of all improvements.

**Pending Disbursement Clause (Lender's Policy)**

Typically, a request is made to issue a loan policy in the full amount of the loan and, through successive draws, be updated through the date of each draw with the insured amount increasing by the amount disbursed on the loan until all work is completed and the final draw paid, at which time the insured amount of the policy reaches the full amount of the loan and the Amount of Insurance stated in the policy.

A loan policy given to insure a construction loan will be issued for the loan amount prior to the full disbursement of loan proceeds.  Liability of the policy must be limited to the amount of the loan actually disbursed but allowed to increase as additional disbursements are made. This may be accomplished by inserting a *pending disbursement clause*, which may vary from state to state. Such clause limits the amount of liability of the insurer to the amount of funds actually disbursed up to the full amount of the policy.

## Underwriting Instructions

The priority of the lien created by recording is especially important in construction loan situations. If it is necessary to determine that no improvements have commenced in order to insure priority in your jurisdiction, the following requirements must be met:

1. Owner/Builder Affidavit stating that no work has commenced and no delivery of materials has been made that would create a lien prior to our insured"s mortgage.

2. Satisfactory indemnification to the company for any losses arising from mechanics"s liens.  **Note:** *This indemnity must be based on receipt and analysis of current financial statements provided by the owner and contractor, and approval of the financial statements and indemnity agreements by Westcor underwriting counsel.*

3. Completion and submission of Westcor"s Request for Policy Authorization for Unusual Risks.

4. Verification/Evidence of non-commencement of construction must be obtained by agent and retained in the agent"s file. Such evidence may consist of photographs that are dated and certified.

5. Surveyor"s report disclosing that no commencement has begun, nor have materials been delivered to the site.

6. Recording of the construction loan mortgage concurrently with the inspection in no. 4.

**Note:** *Items 3 and 4 must bear a date which coincides with date of recording. Westcor requires that concrete evidence of non-commencement of construction is retained in your file.*

**Note:** *Please be aware that in states in which no legal priority can be obtained for construction lenders, additional requirements are necessary and Westcor agents must consult the company's local underwriting counsel for approval.*

**Contemplated Improvements Clause (Owner's Policy)**

The following clauses (or similar promulgated clauses) should be included in Owner"s Policies where the policy amount exceeds the actual consideration and improvements are contemplated on the property in question:

1. *"Liability hereunder at the date hereof is limited to [amount of actual consideration]. Liability shall increase as contemplated improvements are made so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time such loss occurs. Any expenditures made for improvements subsequent to the date of this policy will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or printed provision of this policy."*

**WESTCOR 000678**

2.  *"Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed or to be placed upon the subject of land."*

Please be advised that the title commitment should contain a statement that the above items will appear on the final title policy.

**Pending Disbursement Clauses (Loan Policy)**

If coverage is requested in a liability amount that includes contemplated improvements, the following clause (or similar promulgated clauses) must be inserted on Schedule B of loan commitments and loan policies when insuring a construction loan:

*"Pending disbursement of the full proceeds of the loan secured by the mortgage described herein, the Company insures only to the extent of the amount actually disbursed but increases as each disbursement is made in good faith and without knowledge of any defects in, or objections to the title, up to the face amount of the policy. Notwithstanding anything contained in this policy to the contrary, this policy does not guarantee the completion of the improvements, nor the sufficiency of funds for the completion thereof."*

# Contract (Agreement) for Deed

## Overview

A contract for Deed (also known as Contract for Sale, Agreement for Deed or Land Installment Contract) is a hybrid form of deed/mortgage that results in a transfer of title from vendor (seller) to vendee (buyer) upon payment in full of all monies due under the Contract or Agreement.

An ALTA Owner's Policy may be issued to insure the equitable interest of a contract purchaser (a.k.a., contract vendee). There are two basic ways in which such a policy may be issued. The first is to insure the contract purchaser/vendee under the contract seller/vendor's interest. This requires showing the name of the purchaser/vendee as the named insured while, at the same time, showing the insured interest (i.e., fee simple) vested in the seller/vendor. In addition, an exception for the contract for deed between the parties must be made on Schedule B of the policy, along with an exception as to the interest of the fee simple title holder.

An alternative method is to insure the contract purchaser/vendee's (equitable) interest, which entails showing the names of the purchaser/vendee as the named insured and reflecting the estate or interest in the land as being the "*rights of the contract purchaser/vendee*" with such estate or interest shown as being vested in such "*contract purchaser*" or "*contract vendee." Insuring the contract purchaser/vendee's (equitable) interest should be limited to those jurisdictions where priority is given (by statute or case law) to contract purchasers/vendees against other bona fide purchasers or creditors when the contract for deed is recorded.*

In some states, judgments and state tax liens against a contract seller/vendor recorded *subsequent* to the contract itself will not attach to the vendee's interest, but the seller/vendor's interest in the contract may be subject to levy on execution pursuant to a money judgment. Judgments against the seller recorded prior to the time of the contract must be cleared of record or listed as an exception to title. It is important to note that judgments, federal tax liens, or other liens against a *contract purchaser/vendee* must be cleared or shown as exceptions. For insuring purposes, it is best to treat contract purchasers/vendees the same as fee owners.

Most states recognize the doctrine of Equitable Conversion. This doctrine effectively "converts" or considers the interest of the contract purchaser into legal title or ownership and the interest of the contract seller into that of a mortgagee. This is the basis for claims of creditors of the purchasers to attach to the property but not such claims against the seller.

## Underwriting Instructions

The agent must first determine that equitable interest estates have priority in their area. If not, the property may not be insured without specific instructions from Westcor's underwriting counsel.

1.  Review the contract to ensure that:
    a.  All parties to the transaction are specified;
    b.  All parties have properly executed the contract in written form;
    c.  The terms and consideration of payment have been detailed within the body of the instrument;
    d.  The sales price is an adequate consideration;
    e.  The contract contains the legal description of the property and meets all statutory requirements.

2.  To insure the purchaser/vendee under the contract seller/vendor's interest:
    a.  List the name of the contract purchaser/vendee on Schedule A of the policy under "Name of Insured", referencing only their names and not marital status or other vesting information.
    b.  List the estate or interest as insured as "Fee Simple".

WESTCOR 000680

    c.   List the title as vested in the name of the contract seller/vendor as contained in the last deed of record.

    d.   Exceptions as shown below.

3.   To insure the vendee"s interest only:

    a.   List the name of the contract purchaser/vendee on Schedule A of the policy under "Name of Insured", referencing only their names and not their marital status or other vesting information.

    b.   The estate vested should conform to the following language:

> "___ as to the rights created by that certain [TYPE OF INSTRUMENT including description of sellers, purchasers, date, and recording information.]

    c.   Under the Estate or Interest, list the following:

> "The interest of [CONTRACT PURCHASER(S) VENDEE(S)], under that certain [TYPE OF INSTRUMENT] referred to in Schedule A, and the effect of any failure to comply with such terms, covenants and provisions."

    d.   Exceptions as shown below.

Some buyers and/or sellers may object to recording the actual contract for deed and making the terms of the sale public. At the very least and only where permitted by state law, a memorandum or notice of contract must be filed in order to insure the transaction. Generally, unrecorded contracts are uninsurable.

The following exceptions must be included under Schedule B-1 of the policy:

> "Those terms, conditions and provisions under that certain [TYPE OF INSTRUMENT] referred to in Schedule A, and the effect of any failure to comply with such terms, covenants and provisions."

> "Subject to the rights, title and interest of the fee simple title holder, pursuant to the [TYPE OF INSTRUMENT] referred to in Schedule A."

If the contract seller(s)/vendor(s) are in possession of the property under an unrecorded contract, and the property is not being transferred, and the contract purchaser/vendee(s) are obtaining financing, the following requirement should be made in the lender"s title commitment.

> "NOTE: It has been brought to our attention that {CONTRACT SELLER(S)/VENDOR(S) are in possession of the subject property by virtue of a certain {TYPE OF INSTRUMENT], joinder of said {CONTRACT SELLER(S)/VENDOR(S)] on the mortgage, or a written subordination of their rights to the lien of the insured mortgage is required."

If insuring a different sale or a mortgage made by the seller/vendor, before a contract for sale or agreement for deed may be ignored, the purchaser/vendee must properly release his interest, or the contract seller/vendor must foreclose, or a court order quieting title must be obtained and approved by WESTCOR Counsel.

See also: **Vendor's Lien**.

# Corporations

## Overview

When insuring a transaction involving a corporation as purchaser, seller, or borrower it must be determined that the corporation legally exists and is in good standing. This information may be acquired through the Department of the Secretary of State in the state of incorporation. For new corporations acquiring title to real property on or about the date of incorporation, it is necessary to verify that incorporation occurred prior to the conveyance – for if incorporation has not occurred, the conveyance would be void due to lack of a proper grantee (legal entity).

In addition, the articles of incorporation and bylaws should be reviewed and it should be verified that the bylaws do not prohibit the specified type of transaction (i.e., conveyance or encumbrance). It is also necessary to obtain a certified copy of the corporate resolution authorizing the sale or mortgage.

Specific state laws should be reviewed as to which corporate officers may execute deeds and mortgages/deeds of trust (i.e., CEO, President, and Vice President). If someone other than a statutorily approved corporate officer is signing, such person must be approved by the corporation through its resolution. Where the corporate seal is required, a handwritten, typed, or imprinted scroll or seal is acceptable, depending on applicable state law.

### Disposition of Substantially All Corporate Property and Assets

Prior to insuring a transaction which involves the disposition of all or substantially all of the corporation″s real property, a certified copy of a corporate resolution of the Board of Directors should be obtained. Such resolution should certify that those executing the deed have been authorized to sell such corporate-owned property by affirmative vote given at a meeting of stockholders or by written consent of such stockholders of record, who hold a majority of the stock, and are entitled to vote on such matters.

### Dissolved Corporations

With respect to conveyances of real property from dissolved corporations, please refer to specific state law or contact underwriting counsel for further guidance. Conveyances by foreign dissolved corporations will usually be governed by the laws of the state in which the property is located.

## Underwriting Instructions

In order to address concerns, the following items are generally required in order to approve title from or a mortgage made by a corporation:

1. Verification from Secretary of State in the state of incorporation that the corporation is a legal entity in good standing. If a corporation currently has title to the property, verify the date of incorporation and check the date against that of the deed by which title was conveyed to the corporation.

2. A certified copy of a resolution of the Board of Directors authorizing the transaction.

3. Evidence that the corporation legally exists and that there are no liens for unpaid corporate or franchise taxes.

4. In the case of a nonprofit corporation, evidence that the transaction meets any special requirements under state statute for nonprofit corporations.

See also: **Deeds**.

WESTCOR 000682

# Corporations, Foreign

## Overview

Prior to insuring a transaction involving a foreign corporation (i.e., a corporation formed in a state other than the state where the subject property is located), the corporation should obtain a Certificate of Authority from the subject-property state which allows it to transact business in that state. Generally, such Certificate of Authority is adequate to prove corporate existence. If the foreign corporation does not have a Certificate of Authority to transact business in the state where the subject property is located, verification of its status must be verified through the Department of State or equivalent office in the state of incorporation. The requirement or a certificate of authority for a foreign corporation varies according to state law. Check with your Westcor Underwriting counsel for the requirements in your state. Basically, the above holds true for corporations incorporated in foreign countries (a.k.a., "alien" corporations). If the corporation does not have a Certificate of Authority to transact business in the state where the subject property is located, verification of corporate status must be obtained from the place of incorporation and a copy of such verification must be recorded in the official records of the county in which the subject property is located. In addition, a certified copy of the articles of incorporation, charter, and /or bylaws must also be recorded as proof that the corporation has the authority to engage in the proposed transaction and that those executing documents on behalf of the corporation are authorized to do so. If document are in a foreign language, an English translation must be made and filed of record.

Generally speaking, once a foreign corporation obtains a Certificate of Authority to transact business in a specific state, it will hold the same power and will be ruled under the same regulations as domestic corporations in such state with respect to real property transactions. However, a dissolved foreign corporation in the process of selling its real property in another state will fall under the laws of the state in which the property is located with respect to disposition of such property.

## Underwriting Instructions

In titles involving alien corporations, state statutes must be consulted in order to determine that the transaction is proper. Some states limit the amount of acreage or type of property (e.g., agricultural) that an alien corporation may own.

See also: **Corporations**.

# Co-tenancies

## Tenants In Common

### Overview

Generally, a tenancy in common is the most common form of co-ownership and is the tenancy of default when no other co-tenancy is established or when a joint tenancy with right of survivorship or a Tenancy by the Entirety is severed. Tenants in common may own equal or unequal shares in the property, and may acquire an interest in the property at the same or different times, from the same or different grantors, through the same or different instruments. Each may dispose of the interest in any manner desired. In the event of death of a tenant in common, the co-tenancy interest becomes a part of the estate.

### Underwriting Instructions

Because laws are different from state to state, contact your local underwriter for guidance specific to your state. Generally, unless specifically requested, no designation of co-tenancy should be made in Schedule A of any policy.

**Insuring less than the entire undivided interest**

Where fee simple title is vested in undivided interests and you are requested to insure the undivided interest of fewer than all the co-owners, the following exception should be taken in both the commitment and Schedule B-1 of the title policy:

> *"Rights and claims of co-tenants and co-owners of the insured estate and rights of anyone claiming under them, including but not limited to rights and claims for partition, improvements, reimbursement, contribution, creditors claims, and any and all agreements between co-tenants or co-owners, recorded or unrecorded."*

## Joint Tenants

### Overview

In order to create a joint tenancy, four unities (possession, interest, time, and title – the PITT group) must exist unless excused by state statute.

| | |
|---|---|
| **Possession** | All Joint Tenants individually have equal rights to possession. |
| **Interest** | All Joint Tenants have an equal ownership interest in the land. |
| **Title** | All Joint Tenants must have equal title, i.e., fee simple. |
| **Time** | All Joint Tenants must have the land conveyed to them by the same instrument at the same time by the same grantor. |

A deed, from an owner to himself and another with wording verifying his intent to create a joint tenancy with right of survivorship, should be considered to have created survivorship rights. However, deeds with wording limited to *joint tenants* or *as joint tenants and not as tenants in common* may not suffice to establish survivorship rights in some jurisdictions. The language necessary to create a joint tenancy is dependent on and controlled by state law.

Provided survivorship rights have been established, in the event one party dies, his or her portion of the title, as a joint tenant, will pass to the surviving joint tenant(s), free of any claims of any heirs or devises under a will (or creditors, depending on state law) of the deceased.

WESTCOR 000684

A joint tenancy interest may be severed voluntarily by all joint tenants or by a conveyance of the interest of any one joint tenant, or involuntarily by an execution sale of any interest subject thereto. A levy and sale or bankruptcy sale against one joint tenant will operate to sever that joint tenancy interest. Such interest may be sold without the other joint tenant(s) being made a party to the action. At the time of levy and sale the joint tenancy will be severed and the new purchaser will become a *tenant in common* with the other co-owner(s).

Joint tenancy applies to individuals only and cannot apply to entities such as partnerships, corporations, etc., which may have life spans other than natural persons.

### Underwriting Instructions

Because laws are different from state to state, contact your local underwriter for guidance specific to your state. Generally, unless specifically requested, no designation of co-tenancy should be made in Schedule A of any policy.

In most states the right of survivorship of a joint tenant operates independently of the probate estate of the deceased joint tenant. Upon death of a joint tenant the surviving joint tenant(s) take title by operation of law. The death of a joint tenant must usually be shown by recording a death certificate.

Often borrowers may ask the title company to advise them on how they should hold title, particularly when planning their estates. Westcor agents should be careful not to advise borrowers on this legal matter.

## Tenants By the Entirety

### Overview

Historically, property jointly held by husband and wife as tenants by the entirety has not been subject to liens filed against only one spouse, provided the couple was married at the time of acquisition of the property and remained married to each other, continuously and uninterruptedly, throughout the date of the current conveyance or encumbrance. Tenancy by the entirety must meet all requirements (unities) of joint tenancy in addition to the fact that both parties must be married to each other. This special exempt status as to creditors of one spouse may be limited to the marital homestead property of the "innocent" spouse in some states. If, however, the couple divorces, such entirety estate would automatically convert to a tenancy in common and would remain so, even if the couple remarried each other. The only way in which an estate by the entireties could be re-established is if the now-remarried couple executes a deed to themselves as tenants by the entirety.

Tenancy by the Entirety includes the right of survivorship. Upon the death of either spouse, the property automatically passes to the surviving spouse.

Tenancy by the Entirety is not recognized in all states. Where it is recognized, typically, a conveyance having two people as "husband and wife" as grantee will automatically create a tenancy by the Entirety. In other states marital rights, homestead rights or statutory community property rights may apply.

It is the opinion of the Internal Revenue Service regarding federal tax liens that separate but identical liens filed against a husband and wife individually will attach as a lien to jointly-held property including property held as an estate by the entirety. Therefore, such liens must be made an exception to title unless satisfied and released or subordinated as to the lien of the current/new mortgage. In the latter case, the lien would still be reflected as an exception to title on the owner's and loan policies; however, it would be reflected as a subordinated interest on Schedule B, Part II of such loan policy. The Supreme Court of the United States has determined that federal tax law supercedes state law concerning tenancy by the Entirety and a federal tax lien against only one spouse/tenant will pierce the entireties shelter and attach to the property (U.S. v. Craft).

THE WESTCOR MANUAL

## Underwriting Instructions

Because laws are different from state to state, contact your local underwriter for guidance specific to your state. Generally, unless specifically requested, no designation of co-tenancy should be made in Schedule A of any policy.

In some areas, recent litigation has affected the protection previously afforded under tenants by the entirety against liens filed against only one spouse. Therefore, in those jurisdictions where title is held by the entireties and a judgment has been filed against one spouse, Westcor has taken the position that satisfactory payment and release or subordination of any and all judgments and/or Federal Tax Liens filed against either one or both of the tenants by the entireties must be a requirement in the title commitment or made an exception in both the owner and loan policies.

Joinder of spouse is mandatory when mortgaging or conveying property held by the entireties. Upon the death of a tenant by the entirety, the agent should obtain, review, and record, if necessary:

1. A continuous marriage affidavit, if applicable;

2. A certified copy of the death certificate;

# Community Property Overview

Community property overview is created by statute in a small number of states. Although the laws vary as to what rights and interests spouses have as a result, the basic tenet of community property is that all property acquired during the marriage is owned by both spouses. In community property states, spousal ownership rights are automatically created unless a clear statement of "as sole and separate property" is expressed.

## Underwriting Instructions

Because laws vary from state to state, contact your local Westcor underwriter for guidance specific to your state.

See also: **Federal Tax Liens**, **Judgments**.

# Creditor's Rights

## Overview

Fraudulent conveyances or preferential transfers of real property – especially those occurring immediately prior to or during a debtor″s insolvency – are areas of concern for bankruptcy and state courts. Transactions that increase the debt (loan-to-value) ratio by lowering the assets of a debtor, thereby leading to potential insolvency of the debtor, can create creditor″s rights problems.

In general, the Bankruptcy Code views any transactions occurring within 90 days prior to the filing of the petition for bankruptcy as a preferential transaction (i.e., an action that gives one creditor favorable treatment at the expense of other creditors), and Section 547 of the Code makes it easier to set aside such alleged preferential transfers. The Code strives to balance the equities of legitimate transfers with those which are fraudulent, intentional attempts to hide assets of the bankrupt estate. Therefore, all transfers, including those which are legitimate, are open to potential problems.

With respect to insuring a transaction involving a *deed in lieu of foreclosure,* it is recommended that an *estoppel affidavit* be obtained from the grantor/debtor that speaks to potential creditor″s rights problems. Such affidavit should state that the conveyance was intended to be an absolute conveyance given freely and voluntarily without coercion nor under duress; that the deed was not given as a preference against any other creditors of the affiant/grantor; that no other persons or entities held an interest in the property at time of conveyance; that the affiant/grantor is solvent and no other creditor″s rights would be prejudiced by the conveyance; and that the affiant/grantor is not under obligation of any other mortgage whereby a lien exists or has been created against the subject property.

## Underwriting Instructions

Should your lender request that the creditors rights exclusion [ALTA Loan Policy (Exclusion #7) be deleted from an ALTA policy, such deletion must be in the form of an endorsement, rather than through affirmative insurance stated in the policy. In order to provide such an endorsement to a loan policy, it is necessary to determine that the transaction is supported by adequate consideration. In situations where you are considering removal of the exclusion by endorsement, you must contact Westcor underwriting counsel for authorization.

- Property is conveyed or mortgaged without apparent consideration when there are lawsuits pending against the seller

- Property is conveyed from debtor to self and spouse as tenants by the entirely just prior to a judgment or lawsuit being filed against the seller

- Several lawsuits/judgments are pending against the debtor and the debtor executes a promissory note securing a previous debt

- There is a leveraged buyout situation.

Should you suspect that a transfer or mortgage of property is being made for the purpose of defrauding a creditor, consult Westcor underwriting counsel immediately.

WESTCOR 000687

# Deeds

## Overview

A deed is a *written* instrument, voluntarily executed, which creates an absolute and irrevocable grant, transfer or conveyance of real property or an interest therein.

## Corporation

Prior to insuring a conveyance of real property by deed from a corporation, it is necessary to verify that the corporation legally exists and is in good standing; that the corporate bylaws and/or corporate resolution authorizes the conveyance of corporate-owned real property; and that the persons executing the deed on behalf of the corporation have been authorized to do so.

The deed should reflect the name of the corporation as it appears on the certificate/articles of incorporation, as well as the state of incorporation – e.g., ABC Corporation, a Tennessee corporation – in the body of the instrument as well as above the signature of the officer(s) signing on behalf of the corporation. In addition, the title(s) of the officer(s) executing the instrument should be noted in the signature areas as well as the acknowledgment section and, if required, the corporate seal should be properly affixed.

State laws governing the proper execution of corporate deeds should be reviewed and followed. The CEO, President, and Vice-President are typically recognized, statutorily, as those authorized to execute deeds, mortgages, and other instruments. If a corporate officer – other than those recognized by statute – executes the deed on behalf of the corporation, a certified copy of the corporate resolution authorizing such person (by name and/or title) must be obtained and reviewed prior to insuring the transaction.

Generally, a corporate deed executed under corporate conveyancing statutes will require the signature of the authorized officer of the corporation as well as affixation of the corporate seal, which may be by seal imprint or handwritten or typed scroll or seal. Some states may also require attestation by the secretary of the corporation. Alternately, some states may authorize execution of corporate deeds under general conveyancing statutes, which negates the need for corporate seal and attestation by the corporate secretary but may necessitate attestation by (two) witnesses.

**Note:** Since any corporation operates and conducts business under the supervision and direction of the corporation's Board of Directors, any conveyance or transfer of corporate property must be authorized and supported by express action of the Board of Directors. Any such conveyance should be authorized by a written resolution of the Board of Directors which specifically authorizes the corporate action and authorizes the individuals or officers of the corporation to execute the document for and on behalf of the corporation.  Unless required by state law or directed by underwriting counsel, it is not necessary to record the corporate resolution.  The resolution should be kept in the agent's file.

See also: **Corporations**.

## Partnership

### Deeds from General Partnerships

Deeds conveying property owned in the name of a general partnership must be executed in the name of the partnership in accordance with statutory requirements. Prior to insuring title to such conveyances a copy of the partnership agreement should be reviewed or a supporting affidavit in recordable form should be obtained reflecting the name of the partnership and setting forth the names of all partners currently existing and stating that:

1.  The partnership is currently in existence under a valid partnership agreement;

2.  The partner or partners executing the deed are authorized to do so under the partnership agreement or that all partners have consented to the conveyance;

3.  Any corporate general partners have not been dissolved. This is also true if the general partners are either a partnership, a limited partnership, or a limited liability company.

### Deeds from Limited Partnerships

Deeds from limited partnerships must be executed in the name of the limited partnership in accordance with statutory requirements. Prior to insuring title to such conveyance it will be necessary to verify, through the Department of State, that the partnership is in good standing and has remained in good standing since it took title to the property being conveyed. In addition, a copy of the partnership agreement or a supporting affidavit in recordable form should be obtained which establishes that the general partner executing the deed is authorized to convey real property held by the limited partnership and that the limited partnership agreement has not been amended, modified, or revoked. Only a general partner may execute a deed on behalf of a limited partnership. Limited partners may not execute such instruments. The general partner executing the deed on behalf of the limited partnership cannot have been nor currently be a debtor in a bankruptcy proceeding, because a partnership may not be bound by a conveyance executed by a bankrupt partner. Additionally, item 3 in the *Deeds from General Partnerships* section applies to this section.

### Deeds from Limited Liability Companies

Deeds from Limited Liability Companies ("LLC") must be executed in the name of the LLC (which must contain the words *limited liability company* or the abbreviated *"LLC"*) as follows:

1.  If the LLC operates through officers appointed or elected pursuant to the terms of its operating agreement, such instruments must be executed by at least two elected or appointed officers in the manner provided for in the operating agreement. Such officers should consist of (a) a chairperson, president, or a vice president, and (b) any secretary, assistant secretary, or chief financial officer.

2.  If the LLC operates through a manager or managers in accordance with the terms of its operating agreement, such deeds should be executed by at least two managers. However, if the LLC operates through a single manager, only his signature should be subscribed in the deed.

3.  If the LLC operates through its members and has not elected or appointed officers/managers pursuant to an operating agreement, such deeds must be executed by members holding a majority of the economic interest of the LLC.

4.  Since LLC"s are recent entities created by the individual states, some states may authorize execution of LLC deeds under general conveyancing statutes.

In order to insure title from an LLC, it is necessary to obtain the following items:

1.  A copy of the filed articles of organization in order to ascertain:
    a.  The LLC"s legal formation and its effective date;
    b.  Member or Manager Management;
    c.  Limitations that may affect the transaction or the acts of the persons executing the deed.

2.  A current list of the names of the members at the time the deed was executed. This requirement is made in order to check the general index for probate or bankruptcy matters that may cause a dissolution of the LLC.

3.  A copy of the LLC"s operating agreement, if one has been adopted together with all amendments to such agreement. Additionally, a certificate that the operating agreement is a true and correct copy of the agreement now in effect.

4. A copy of the certificate of registration, a copy of the articles of organization certified by authorities of the state of origin if it is a foreign LLC, and verification from the state of origin that the LLC is in good standing.

# General Warranty

A general warranty deed provides the most comprehensive guarantee of title protection for the purchaser of real property, due to the covenants, or warranties, given by the seller/grantor. A general warranty deed includes a covenant of *full warranty or warranty forever*, which guarantees that the grantor will *"warrant and forever defend"* the right and title to the real property being conveyed unto the grantee against the claims of all persons whomsoever.

Item 2 of the conditions and stipulations section of the ALTA owner's policy states that the *"coverage of this policy shall continue in force as of Date of Policy in favor of the insured…so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest."*

General warranty deeds (and all other deeds) must be executed and acknowledged in accordance with applicable state laws.

It should be noted that some of the states in the Western United States have adopted the *Grant Deed* or a statutory form of *Bargain and Sale Deed* which is used in lieu of the General Warranty Deed. The warranties contained in these deeds are prescribed by the statutes of such states.

# Special Warranty

Special warranty deeds differ from general warranty deeds in that they limit the seller/grantor's liability in warranting title to the purchaser/grantee to only those acts which the seller/grantor has personally done that might cloud or encumber the title to the land being conveyed. Developers and builders often prefer to issue a special warranty deed, rather than a general warranty deed, so as to limit the extent of their potential liability to those matters they are directly responsible for. This type of deed may also be used for conveying a tax title, in which case it will be referred to as a tax deed.

# Quitclaim

Quitclaim deeds are often used to clear clouds on the title. In lieu of the granting and conveyancing language found in general warranty deeds, a quitclaim deed will reflect the party of the first part's intent to *remise, release,* and *quitclaim* any interest or title he or she may have unto the party of the second part. Since the party of the first part typically holds no apparent legal right, title, or interest in the property being insured, it would be inappropriate for such person to "grant" or "convey" an established interest or, further, to warrant and defend title to the property. A quitclaim deed does not purport to convey any established interest but merely remises, releases and quitclaims any such interest or title the party of the first part might have.

See also: **Deed in Lieu**.

**Underwriting Instructions**

In order for a deed to be valid and enforceable:

1. The grantor must have been competent at the time of its execution.

**WESTCOR 000690**

2. The grantee must be adequately identified.

3. The deed must contain granting or conveyancing language.

4. The deed must describe the property to a reasonable certainty.

5. The deed must be properly executed by grantor and spouse, as applicable.

6. The deed must have delivery and acceptance to and by the grantee.

Each state has statutory formalities that must be observed in conveyances of land lying within its borders. These typically include one or more of the following: proper execution (individual, corporate, etc.); witnesses; and acknowledgment by a notary or other authorized individual. In addition, a deed must be recorded in the real property records of the county in which the land lies before the interest of the grantee can be insured.

**Caution:** Beware of possibility of fraud.

As is also discussed in the section on Gift Deeds of this Manual, caution must be exercised when examining title when the chain of title includes deeds, especially quit claim deeds, which appear to stand alone with no new loan transaction showing of record concurrently or just a "stand-alone" deed transferring title. If such a deed, of any type or nature, appears questions should be asked about the reasons for the deed, verification of authenticity and confirmation of the signatures on the deed and if they were voluntary.

Experience has shown that sometimes "stand-alone" deeds are shortly (within a few days or weeks) followed by a new loan on the same property. The "stand-alone" deed is subsequently found to be a forgery. Deeds between or among family members (individuals with the same last name), deeds conveying property from one spouse to the other, gift deeds, deeds which show no (or nominal) consideration, and deeds with no acknowledgment (or defective acknowledgment) should be investigated for authenticity. Also handwritten documents which suggest the parties hurriedly completed a form document should be investigated.

These conditions will not always confirm wrong-doing, and there may be no problem discovered in many instances. However, experience has shown that these can be indicators ("red-flags") of wrong-doing, and the bad transactions can be discovered and good or valid transaction may be confirmed by asking questions of the parties involved (especially the grantors in such deeds) to verify authenticity.

Although not the exclusive method for perpetrating frauds, quit claim deeds are more likely to be used in fraudulent schemes. Any time a quit claim deed is the type of document used to vest title in the current seller or mortgagor, questions should be asked to verify authenticity. Vesting title by a quit claim deed is more common in some jurisdictions, but in other states, quit claim deeds are used only as curative instruments. Local practices may govern your scrutiny of quit claim deeds.

# Deeds in Lieu of Foreclosure

## Overview

Many borrowers, when faced with foreclosure proceedings by their mortgage lenders, elect to execute and deliver a *deed in lieu of foreclosure*, in full or partial satisfaction of the secured obligation. Only those deeds in lieu which are voluntarily executed and deemed to be an absolute conveyance by mortgagor to mortgagee, with all mortgagor"s rights thereby terminated, may be insured. The deed in lieu should contain language stipulating that it is a deed of *absolute conveyance of title in consideration for the cancellation of the debt secured by the [referenced] mortgage and is not intended to be a mortgage or some type of security instrument."*

In addition, an *estoppel affidavit* should be obtained from the grantor(s), and the lenders, if possible, for the purpose of addressing any potential creditor"s rights problems. Such affidavit should state that the conveyance is intended to be an absolute conveyance and is not given with conditions or sale agreement for repurchase or lease, and does not act as security for a debt and is freely and voluntarily given without coercion nor under duress; and in consideration for cancellation of the debtedness and released the mortgage that the deed is not being given as a preference against any other creditors of the affiant/grantor; that no other persons or entities hold an interest in the property at time of conveyance; that the affiant/grantor is solvent and no other creditor"s rights will be prejudiced by the conveyance; and that the affiant/grantor is not under obligation of any other mortgage whereby a lien exists or has been created against the subject property.

Since deeds in lieu do not extinguish liens and encumbrances recorded *after* the mortgage, such matters filed of record against the property or the mortgagor as of the date the deed in lieu is recorded must be excepted in the title policy. In some cases, the mortgagee may attempt to preserve the lien priority of its mortgage by stipulating in the language set forth above that the consideration is intended to be a release of only the personal liability of the grantor (borrower) and that the fee simple title being conveyed will not merge with the lien, so that the lien may be preserved in favor of the mortgagee. The mortgage will then remain as an exception to title on the new owner"s policy issued in favor of the mortgagee.

### Deed in Lieu in Chain of Title

A subsequent conveyance of real property – that includes a deed in lieu appearing of record in the chain of title which does not contain language the same or similar to that shown above – may be acceptable provided the statutory period for expiration of the lien of such mortgage has expired or the mortgage has been satisfied of record. If the statutory period has not expired or a satisfaction has not been recorded, a corrective deed may be required.

If, however, the mortgagee/grantee under the deed in lieu, subsequently conveys title to a third party by warranty deed, the necessity for the former mortgagee to also record a satisfaction of mortgage may be moot, in that conveying under general warranty essentially warrants full title and the then-mortgagee-grantee/now-grantor can no longer claim that title was subject to such mortgage. Consult applicable state laws conserving the effect of such a warranty of title. It is always the preferred practice to require a release or satisfaction of the mortgage to property clear the record and avoid any possibility of a future problem.

## Underwriting Instructions

1. A conveyance by deed in lieu of foreclosure can never be insured without prior authorization by Westcor underwriting counsel.

2. Unless otherwise instructed by Westcor underwriting counsel, the following exception must appear on any commitment or policy insuring a deed in lieu of foreclosure:

WESTCOR 000692

> *"Any invalidity of or avoidance of the transfer of the title to the insured property pursuant to the provisions of the Bankruptcy Code (11 U.S.C.) or similar creditor's rights or state insolvency laws."*

This exception must appear in any policy issued within one (1) year after the recordation date of the deed to the mortgagee/grantee and thereafter if a petition in bankruptcy was filed by or against the mortgagor/grantor or mortgagee/grantee within the one-year period.

*[Upon specific approval from Westcor underwriting counsel, a policy may be issued to a lender or bona fide purchaser after 90 days but within the one-year period without exception to the above if the following can be determined:*

   a.  *The amount of the indebtedness is not less than seventy percent (70%) or equivalent of the fair market value of the property;*

   b.  *The mortgagee/grantee is not a relative, partner, affiliate, or other "insider" as defined under 11 USCA Sec. 101 of the Bankruptcy Code;*

   c.  *Mortgagee/Grantee or purchaser is without knowledge of the violability of the mortgagor's transfer, such as insolvency of mortgagor/grantor, within 90 days of recordation date of the deed to mortgagee;*

   d.  *No petition for bankruptcy has been filed against the mortgagor/grantor or mortgagee/grantee within 90 days of recordation date of the deed to the mortgagee.]*

3.  In addition to the above creditor's rights exception, the following requirement must be met:

   a.  The conveyance must be an absolute deed in lieu of foreclosure reciting full satisfaction and discharge of the indebtedness.

   The deed in lieu should contain language similar to the following:

   > *"This deed is given as an absolute conveyance of the title in consideration of the cancellation of the debt in the amount of [AMOUNT OF INDEBTEDNESS] as secured by that mortgage dated _____ in the original amount of $_____, in favor of [LENDER NAME] and recorded on _____ in Book _____, Page _____, said Recorder's Office and a release satisfaction of said mortgager and is not intended to be an additional security."*

   b.  It must be determined that the current value of the property is not substantially in excess of the balance due under the mortgage (which should not be less than 70% of the fair market value of the property).

   c.  Possession of the property must be surrendered by the mortgagor/grantor.

   d.  An affidavit signed by and between the parties and their principals must be obtained attesting to the fact that there are no recorded or unrecorded side agreements as to the property (such as an option to repurchase) or any proceeds there from.

See also: **Deeds**, **Quit Claim**.

# Descriptions, Legal

## Overview

Legal descriptions come in many different forms: lot/block, unit/phase, sectional, metes and bounds, reference to a recorded plat, and other types. The legal description to property is considered to be sufficient if the property can be identified and located by a surveyor.

The type of legal description most common in or around metropolitan areas will be by reference to a recorded plat. Lots – or in the case of condominiums – units, will typically be described as lot or unit number, block or phase number, subdivision name and plat recording reference. References should be made to all of these items. A recorded survey may serve as an insurable legal description provided it is certified by a licensed surveyor and there are provisions for this type of description in your jurisdiction.

With respect to metes and bounds descriptions, if the current legal description *differs* from the description contained in the prior recorded document, the difference may stem from the fact that the lands to be insured have been carved out of a larger parcel of land (current parcel is smaller than prior parcel) or that more than one parcel has been combined either as contiguous parcels or with new legal descriptions encompassing the combined smaller parcels. Also, through time and with advancing technology, surveying equipment and methods have become more accurate. The accuracy of the equipment and the surveyors may vary, giving different results, which must be reconciled before the land can be insured. It is important to make sure the entire property has been searched in the public records.

When dealing with metes and bounds descriptions, one should be able to trace from the point of beginning through all calls and end at the point of beginning without lifting pen from paper; if a break occurs, the legal description should be re-verified by a surveyor or engineer. If the parcel does not close, running the description in reverse may help to locate the problem.

As to all legals – metes and bounds, lot/block, unit/phase – the legal description set forth in the contract, loan closing instructions, title commitment, deed, mortgage, other applicable documents, and final title policies should be the same. Any discrepancies in the description should be corrected and applicable documents should be amended and initialed, as needed, to bring them into conformity.

## Underwriting Instructions

**Platted Property:**

When insuring platted property, it is essential that the reference be made to the appropriate book and page number where the plat of property being insured is recorded. Such plat may have been recorded in a deed book or plat book. A policy should not be issued for platted property unless the plat has been properly filed of record. Unfiled plats result in insufficient legal description and are, therefore, not insurable.

**Metes and Bounds:**

Except as noted above, the legal description of the current transaction should match that shown on the prior deed of record and, as applicable, the prior owner's and/or loan policies. If a new, non-matching metes and bounds description has been proposed by a surveyor, most likely a new survey will be required. You should contact Westcor for further instruction.

WESTCOR 000694

**Discrepancies:**

If you should determine that there are discrepancies between the survey and legal descriptions as contained in the prior or current deed of record, it may be necessary to obtain quitclaim deeds or boundary line agreements in order to make the property insurable. Keep in mind that prior lenders and other lien holders must enter into such conveyances or agreements in order to eliminate their right to foreclosure and extinguish the rights granted.

# Divorce

## Overview

In most divorce cases the parties involved usually settle their differences by some form of Property Settlement Agreement. When an agreement is reached, the parties may execute deeds dividing their property or may divide same by formal agreement. Alternately, the property may be divided by judgment.

When a Property Settlement Agreement (PSA) is used by the parties to settle property rights, they normally list all of their property and then prepare a list of property that each is to receive. Following the list of property that one party is to receive, the other party may use granting or conveyancing language such as "does hereby grant, bargain and convey" such property to the receiving spouse. In such a case, the agreement itself will divest title and a deed is not necessary. The agreement, upon final hearing, will normally be incorporated into the judgment.

In cases where parties do not enter into a PSA, the division of marital property may be accomplished by judgment. In this event the judgment will set out or list the property that each party is to receive and will follow with wording as follows: "…It is *therefore ordered adjudged and decreed* by the Court that title to such property is hereby vested in…".  If title is vested and divested in this manner, it is not necessary that the parties execute deeds.

In some cases the parties may enter into a PSA and schedule the property that each is to receive with a provision that each party will execute all necessary instruments to carry out the Agreement. In such cases, the Agreement will not be effective until the instruments are properly executed. Divorce decrees, property settlement agreements, and all other types of partitions must be of record in the county clerk″s office to constitute a judgment wherein one of the parties – most likely the plaintiff – will receive an equitable right to the property which may affect the title in numerous ways. Title should be examined carefully.

## Underwriting Instructions

Be certain that any conveyances, as a result of divorce, are properly executed and recorded in the county records. Contact Westcor underwriting counsel for approval in cases of unusual or extraordinary circumstances.

WESTCOR 000696

# Drug Forfeitures

## Overview

Drug-related forfeitures of real property are usually accomplished under one of three federal statutes:

1.  The Controlled Substances Act (21 U.S.C. 881)

2.  RICO (18 U.S.C. 1963)

3.  The Criminal Forfeiture provisions of the Drug Abuse Prevention and Control Chapter (21 U.S.C. 853)

Because it is not necessarily tied to a criminal prosecution, forfeiture under the Controlled Substances Act is considered a civil forfeiture. The other two federal statutes provide for criminal forfeiture because a criminal conviction is a prerequisite to the forfeiture of the property.

In addition, many states have enacted legislation providing for forfeiture of such property. State laws vary widely as to their effect on real property. For this reason, only a general treatment of issues that may arise under state law is possible within the confines of this manual. Questions about the statutes of specific states and their application should be directed to Westcor underwriting counsel.

### Relation Back

One of the principal variations among statutes is when the forfeiture takes effect. Federal law and the laws of some states provide that the date of the forfeiture relates back to the date of the illegal act. Others give effect to the forfeiture upon seizure of the property. Still others provide that forfeiture is effective upon the filing of notice in the public records. The implications of these distinctions are enormous. If the relation back principle is recognized, the government can more easily reach property in the hands of third parties and thereby prevent criminal defendants from avoiding forfeiture by transferring assets.

### Bona Fide Purchasers

Generally, the power of the government to reach property in the hands of third parties is tempered by protection for "bona fide purchasers" or "innocent owners". States vary as to the degree of protection provided, depending on what type of knowledge, if any, the third party may have had that the property was associated with a drug crime. Some states use an objective standard of knowledge and they protect third parties who, given the circumstances, had no reason to suspect that the property was connected with illicit activity. Other states use a subjective standard and protect third parties with no actual knowledge that the property was tainted. The federal civil forfeiture law appears to require actual knowledge, and the federal courts generally apply that standard. Nevertheless, the U.S. Supreme Court has not specifically addressed this issue.

### Record Notice

Federal law mandates compliance with the notice requirements of the state in which the property is located. If state law requires the recording of a lis pendens or other similar document giving notice of an action affecting real property, then the federal government must file a lis pendens in a forfeiture action in order to protect the priority of any interest it may obtain in the property. However, federal law contains no independent notice requirements, so if a state does not require the recording of a lis pendens, then the government need not record one.

### Due Process

Unless the government is seeking forfeiture of property in the hands of third parties, the government's heavy burden of proof and the relatively stringent safeguards afforded the criminally accused generally satisfy constitutional due process requirements for deprivation of property. Civil forfeitures, on the other

hand, do not require proof beyond a reasonable doubt or compliance with the protections given criminal defendants. Frequently, the government can seize personal property without an opportunity for the owner to be heard.

Real property is more difficult for the government to seize, because there is no danger of it being commingled with other property or moved to another jurisdiction. Consequently, notice and the opportunity to be heard are nearly always required for the seizure of real property.

## Underwriting Instructions

Because of the *relation back* principle outlined above, there is no foolproof method of eliminating claims for losses from forfeitures. However, certain fact situations should cause an agent concern.

### Suspicious Parties in the Chain of Title

As noted under **Cash Reporting**, watch out for suspicious transactions or signs of possible illegal activity. Many title claims may occur – not where we are insuring a forfeiture, but where we suspect one may occur – because of a forfeiture of the property as proceeds of drug-related or other illegal transactions. Never issue a final policy without consulting Westcor underwriting counsel where:

*Caution!*

- A party to the transaction brings a large amount of cash to closing, which may indicate drug activity.

- There are current criminal proceedings filed against a party to the transaction. In certain instances, this could indicate the proceeds may be drug-related.

- You have personal knowledge or are otherwise notified that a participant in the closing transaction may be a drug dealer.

Be extremely careful in how you handle any suspicious events. Never allege that the property may be subject to forfeiture or accuse anyone of illegal activity. Contact Westcor underwriting counsel for guidance should you suspect a transaction may be drug-related.

See also: **Cash Reporting**.

On a case-by-case basis, Westcor may insure a transfer of property from the United Sates after forfeiture pursuant to 21 U.S.C. 881, 21 U.S.C. 853, or 18 U.S.C. 1963 under the following circumstances:

### Civil Forfeiture under 21 U.S.C. 881

Before insuring real property under Civil Forfeiture 21 U.S.C. 881, the following documentation must be obtained and reviewed:

1. **Order for the Warrant of Arrest of the Real Property**
   This document must be hand-signed by a judge or magistrate and filed of record in the local real property records.

2. **Copy of the Complaint**
   This document must specifically request the forfeiture of the property as well as the alleged basis under which the forfeiture is being conducted.

3. **Proof of Personal Service**
   All owners and/or lienholders of the property (including spouses with marital or community property rights) who are not executing deeds or releases must be given notice by personal service. Generally, this is accomplished via the process and return receipt. Evidence of the personal service must be filed of record in the local real property records. Any transactions where personal service

WESTCOR 000698

does not occur on all the above must be approved in writing by Westcor counsel before a commitment or policy may be issued.

**4. Proof of Notice of Publication**
Notice of the forfeiture must be published in the federal district where the land is located. If the proceeding takes place in a district other than where the property is located, notice must be published in both districts.

**5. Order Authorizing Forfeiture**
This order must adequately describe and specifically authorize the forfeiture of the real property. This document must be filed of record in the local real property records.

**6. Final Letter from United States Attorney's Office**
This letter from the U.S. Attorney (or other acceptable party) must state that the order is final and non-appealable (generally, 90 days after the entry of the order if no motion is filed).

In addition to the above, the following requirements must also be met to the satisfaction of the company:

1. The forfeiture must occur in the federal district where the land is located or in the district where criminal prosecution of the owner is occurring.

2. If an owner of the property is subject to criminal prosecution, that prosecution must be final and no longer subject to appeal.

3. Verification by inquiry or inspection that no one is in possession of the land (except through the United States).

4. The proposed insured must execute an affidavit/acknowledgment attesting that they have been advised the forfeiture is involved in the chain of title.

5. If the sales price of the property exceeds $100,000, you must call Westcor counsel and/or submit Westcor"s Authorization Request (for unusual risks) for written authorization before issuing a commitment or policy.

## Criminal Forfeitures Under 21 U.S.C. 853 and 18 U.S.C. 1963

Before insuring real property under Civil Forfeiture 21 U.S.C. 853 and 18 U.S.C. 1963, the following documentation must be obtained and reviewed:

**1. Certified Copies of the Indictment**
You must review the indictment to verify that it requests the forfeiture of the property by an acceptable legal description. Certified copies of the indictment must be recorded in the local county recorder"s office.

**2. Certified Copies of the Court Order**
Review to verify that it authorizes forfeiture and seizure of the property. Copies should be filed of record.

**3. Proof of Personal Service**
All owners and/or lienholders of the property (including spouses with marital or community property rights) who are not executing deeds or releases must be given notice by personal service. Generally, this is accomplished via the process and return receipt. Evidence of the personal service must be filed of record in the local real estate records. Any transaction where personal service does not occur on all the above must be approved in writing by Westcor counsel before a commitment or policy may be issued.

**4. Proof of Notice of Publication**
Notice of the forfeiture must be published in the local newspaper.

    5.   **Motion for Final Order of Forfeiture**
       The United States must file the motion and a subsequent final order of forfeiture must be entered by the court.

    6.   **Final Order of Forfeiture**
       This order, entered by the court, must adequately describe and specifically authorize the forfeiture of the real property. The order must be final and non-appealable (as verified by the U.S. Department of Justice or other acceptable party). Certified copies of the Final Order must be recorded in the county recorder's office.

In addition to the above, the following requirements must also be met to the satisfaction of the company:

1. The United States must convey the subject property by virtue of a warranty deed warranting the validity of the forfeiture.

2. The proposed insured must execute an affidavit/acknowledgment attesting that they have been advised the forfeiture is involved in the chain of title.

3. The defendant/owner must be convicted of a criminal offense and the conviction must be final and non-appealable. This may be verified through the United States Department of Justice or other knowledgeable party.

4. Obtain verification (preferably by inspection) that no one is in possession of the land (except through the United States).

5. If the sales price of the property exceeds $100,000, you must call Westcor underwriting counsel and/or submit Westcor's Authorization Request (for unusual risks) for written authorization before issuing a commitment or final policy.

**Forfeitures Under State Law**

Many states provide for forfeiture of real estate for criminal acts, such as racketeering. Before insuring property where state forfeiture appears back in the chain of title, call Westcor underwriting counsel. Among other matters, we will need to consider whether there has been personal service on all owners and/or lienholders, the type and finality of the forfeiture, specific state laws regarding the forfeiture of real property, and the authority of the state or authority to convey.

**Important Note:** *Due to the nature of forfeiture remedies, constitutional protections, difficulty in determining and showing of record satisfaction of all statutory requirements, and the likelihood of challenge to title deriving from a forfeiture proceeding, Westcor is very cautious when asked to insure property which has been subject to a federal or state forfeiture. Approval by Westcor underwriting counsel is absolutely required before such property may be insured.*

# Easements

## Overview

An easement is a limited right to use the land of another. Easements may be either a benefit or burden to the proposed insured property. All easements, although conferring a benefit, nearly always create an obligation on the benefited party, terms of which should be set out as an exception. An easement may also simultaneously be a benefit and a burden such as a reciprocal easement agreement in a shopping center. If an easement is a burden to the insured property then an exception must be raised for the easement in Schedule B. If an easement is a benefit to the insured property then it may be appropriate to consider the easement as an additional insured parcel in Schedule A. Your local underwriting counsel of Westcor should be consulted for title insurance issues relating to easements.

An easement may be *appurtenant*, that is, one which benefits a specific property and runs with the dominant or benefited land. Or, an easement may be *in gross,* which benefits a specific individual and does not benefit any particular land. Easements are assignable and subject to sale and conveyance just like any other interest in land. Easements *in gross* are rarely insurable, and easements that are not conveyed in a written document are not insurable.

Easements may be created by deed or other recorded instrument. However, as easements are a right and interest in land, in most jurisdictions, there must be a conveyance of the easement in order to create it. The mere recitation or drawing of an easement on a plat may not be sufficient to create an easement. If a recorded plat of the subject property shows an easement that affects the property, an exception should be raised even if no further documentation is found for the easement.

Easements may be created by necessity as when a landowner owning two adjacent parcels, one with access to a public thoroughfare and one without, conveys the landlocked parcel without an express easement or right of way. In most jurisdictions the parcel with the access to the public thoroughfare will be charged with an easement benefiting the otherwise landlocked parcel. An easement by necessity is not insurable without an order of a court of competent jurisdiction granting such an easement.

Easements may be by prescription. This is a method of creating an easement similar to establishing title by adverse possession. If one has used a portion of a property continuously for the required time period, openly and notoriously, without the permission or objection of the landowner, the land may be charged with an easement by prescription. Unexplained paths, driveways, or other features on or crossing the land that do not appear to be of exclusive benefit to the land itself may benefit others using the land. One reviewing a survey must be wary for such features. A prescriptive easement is not insurable without an order of a court of competent jurisdiction granting such an easement.

## Underwriting Instructions

Easements which are appurtenant are those which are granted to an owner of a specific property to be used and enjoyed in conjunction with the use and enjoyment of the benefited and typically adjoining property. The property which enjoys the benefit of an easement is referred to as the dominant estate. An appurtenant easement attaches to and is incidental to the use of the dominant estate. An appurtenant easement runs with the land and will be automatically conveyed along with the dominant estate which it benefits. In most jurisdictions this is so even if a subsequent deed in the chain of title which describes and conveys the dominant estate fails to describe the appurtenant easement. The ownership of the easement belongs to the person that owns the dominant estate, unless it is specifically severed from the dominant estate by a recorded instrument.

### Rights of Way

A right of way is an easement for the purpose of passing over the land of another for a particular and expressly stated purpose. A right of way is sometimes used to describe a strip of land over which an

easement passes. It may also be appurtenant to the use of a parcel of land. The term "right of way" is frequently used interchangeably with "easement". The two terms are mostly synonymous except that "right of way" is typically used to identify a particular kind of easement or purpose for an easement.

A right of way may be an alley, sidewalk, road, street, railroad, power line, sewer line, water line, or even a shared driveway. When the insured parcel contains any of these or any right of way, those should be excepted under the policy as well as the rights of others to use the right of way.

### Licenses

A license is a grant of the personal right to use the land for a limited purpose, which is revocable. Typically a license expires upon the death of the licensee. A license is typically not assignable as it is a personal right. A license is not an insurable interest in land but will certainly be a burden on the land until revoked or terminated. A license will not mature to an easement because its existence acknowledges the owner's rights in and authority over the land.

## Underwriting Instructions

### Insuring Easements

Prior to insuring an appurtenant easement, or any easement, a proper legal description of the easement must be obtained. There must be a recorded instrument that describes the easement as well as the purpose of the easement. There must be a valid conveyance of that easement to the current owner and to the proposed insured. Legal descriptions for the property to be insured as well as for the appurtenant easement must appear on Schedule A of the title policy, if the easement is to be insured. The parcel burdened by the easement must also be searched to determine that the easement was properly created and that all who had an interest in the servient parcel joined in the conveyance of the easement when it was originally established, including mortgagees.

Easements in gross will usually not be insured. Consult your local underwriting counsel for guidance.

### Easements Burdening the Subject Property

When insuring the title to property which is subject to an easement or right of way, the rights of all persons entitled to use the easement must be excepted from the policy coverage under Schedule B. All easements should be listed as exceptions, with appropriate recording information as well as the type and, if known, the location of the easement.

The following are suggested ways to set out easements:

> *"Easement for a power line running through subject property, as shown by instrument dated _____, _____ recorded in the _____ office for _____County, in _____ Book _____, Page _____."*

> *"Easement of _____ feet for [DESCRIBE PURPOSE OF EASEMENT] according to plat of said [ADDITION OR SUBDIVISION] recorded in Plat Book _____, Page _____, _____ County records."*

> *"Easement over the _____ feet for [DESCRIBE PURPOSE OF EASEMENT] according to [DEED OR INSTRUMENT] recorded in Deed Book _____, Page ____, _____ County records."*

> *"Easement granted to _____ over the _____ feet of said lot according to [DEED OR INSTRUMENT] recorded in Deed Book ____, Page ____, _____ County records."*

> *"Easement for driveway purposes over the _____, for the use and benefit of the adjoining property according to [DEED, INSTRUMENT OR AGREEMENT] recorded in Deed Book ____, Page ____, _____ County records."*

The following are suggested ways to set out exceptions for rights of way:

> *"Rights of the public in and over that portion of [sidewalk, alley, etc.] affecting subject property."*

WESTCOR 000702

WESTCOR

*"Right of way running over the Southwest portion of subject property as shown by survey of John Doe, dated _____, _____."*

*"Right of way of [NAME OF ROAD OR STREET] over that portion of above property embraced therein."*

See also: **Access**, **Survey Matters**.

# Encroachments

## Overview

Encroachments are described as the projection or overlapping of certain improvements either from or onto the property to be insured in relation to property boundary lines, easements, minimum building set-back lines, or restricted areas without legal authority. For insuring purposes, encroachments must be dealt with by listing the items as exceptions from coverage. The Company will, however, in some circumstances, agree to provide affirmative coverage to lenders in situations where the risk of loss to the mortgagee is considered negligible.

## Underwriting Instructions

It is the policy of our company to provide affirmative coverage under lender's title policies when minor encroachments are present. Minor encroachments are defined as encroachments of improvements over minimum building setback lines (less than a few inches) or similar encroachment of improvements onto easements. Encroachments of fences and gravel drives onto easement or over boundary lines may be insured if they are less than 3 feet. Gross encroachments of improvements (more than a few inches over the minimum building setback line requirements or onto easements by concrete retaining walls, etc.) should be treated on a case-by-case basis. Please contact the underwriting department for affirmative coverage involving the more severe encroachment problems.

When warranted by the above criteria, the following affirmative coverage may be afforded:

[Describe the encroachment under Schedule B of the commitment or policy, then add the following:]

*"However, this policy affirmatively insures the insured against loss as a result of the enforcement of a decree of a final judgment from a court of competent jurisdiction ordering the removal of said encroachment."*

Similar coverage can be provided by an endorsement which includes substantially the same language and refers to a specific Schedule B exception.

See also: **Survey Matters**, **Restrictions**, **Boundaries**, **Affirmative Coverage**.

WESTCOR 000704

# Endorsements

## Overview

Endorsements to title policies serve to modify or amend the wording or language of the title policies, thereby expanding – or sometimes limiting – the coverage afforded under such title policies. This enables insurers to tailor coverage to meet specific transaction or customer needs. Affirmative coverage is best added to a policy by virtue of endorsements rather than by additions to Schedule B. In some states, however, affirmative coverage within Schedule B is not permitted and coverage must be given through endorsement to policy.


NOTE:  Endorsements have been removed for extensive revision and re-write.

WESTCOR 000705

# Environmental Liens

## Overview

The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. (known as "CERCLA" or the "Superfund" Act, as amended and supplemented by the Superfund Amendments and Reauthorization Act of 1986 (SARA), P.L. 99-499, provides for the filing of environmental protection liens for the cost of cleaning up hazardous materials on real property. Although the CERCLA lien arises at the time that cleanup is commenced, the lien is subordinate to all liens which have been perfected under state law prior to the recordation of a Notice of Lien in the appropriate public records. Many states have passed legislation which requires the lien be recorded in the same public records in which the state requires real property documents to be recorded. Much of this legislation is similar to the Uniform Federal Lien Registration Act, which applies to all federal liens including CERCLA liens. In the absence of such state legislation, however, the lien may be filed with the clerk of the U.S. District Court having jurisdiction where the land is located, and the priority of the lien is established upon such filing. Agents and examiners must be familiar with the laws of the applicable state and, if necessary, search the records of the U.S. District Court to determine if a CERCLA lien has been filed. If uncertainty exists relating to the individual state"s law relating to recording requirements, contact your local state or regional counsel to determine the records required to be examined.

Many states have passed similar environmental legislation modeled after CERCLA. However, several states have laws that provide for a "super-lien" which establishes the priority of the environmental protection lien to be superior to all other liens and encumbrances. Contact your local state or regional counsel if you are unsure of the filing requirements for state environmental liens and whether or not super-lien priority applies in your state.

## Underwriting Instructions

Should your search disclose a state or federal environmental protection lien, or if a potential problem of hazardous waste is otherwise made known to you, an exception to the matter must be shown under Schedule B of the commitment and final policy as follows:

> *Notice and lien concerning violation of laws, ordinances, or governmental regulations relating to environmental protection recorded (date) in recording info.*

**Note:** *Every ALTA title insurance policy form used since 1984 includes an exclusion from coverage for environmental liens. This general exclusion provides that the policy does not protect against environmental liens. However, if an environmental lien is recorded against land being insured, we recommend that a special exception to the lien should be noted on Schedule B of the policy.*

See also: **Endorsements**, **Environmental Protection Lien (ALTA 8.1**

WESTCOR 000706

# Execution of Instruments

## Overview

When insuring conveyances or encumbrances of real property, it is essential to verify that the person or persons executing the instruments are authorized to do so.

Generally, those executing instruments must be of legal age and be mentally competent. Deeds and mortgages from those holding title to real property should be executed in the same manner as they hold title (i.e., John Harbinger Doe will sign as his name appears of record and not as John H. Doe or John Doe). In „homestead" states, the spouse of the person conveying title or encumbering real property will normally be required to join in the execution of the deed or mortgage, even though he or she may not hold an interest or be in record title of the property.

When insuring conveyances or encumbrances involving corporations, limited liability companies, partnerships, or the statutory entities capable of holding and conveying title, one must verify that the entity exists and is in good standing and, if not provided for via statute, a corporate resolution or partnership agreement, as applicable, should be obtained authorizing the person or persons who will be executing the documents to do so on behalf of the corporation or partnership. Typically, the CEO, President, or Vice President will be recognized, by statute, as being authorized to sign deeds and mortgages on behalf of their corporations. The rules described under Deeds section for limited liability companies are applicable to the execution of other instruments executed on behalf of such limited liability companies. As in all entities created by law, the powers for a limited liability company to act must comply with the terms of its articles of organization and its operating agreement. With respect to general or limited partnerships, execution by all general partners would be preferable; however, execution by any one general partner will suffice with proper supporting documentation giving this authority.

Deeds and mortgages executed in the name of a trust should be signed by the trustee, while those executed under power of attorney should be signed by the appointed attorney-in-fact. Conveyances and encumbrances made in accordance with a will should be executed by the personal representative of the estate.

In all cases, documents should be reviewed to determine who is authorized to sign – i.e., corporate resolution, partnership agreement, articles of organization and operating agreement of a limited liability company, trust documents, power of attorney, wills, probate records.

## Underwriting Instructions

Westcor requires that you obtain proof positive (valid, government issue picture identification which includes signature) that persons executing instruments are, in fact, who they say they are. Also, documentary proof that persons signing documents on behalf of others (such as attorneys-in-fact, trustees, partners, etc.) have the authority to execute same on behalf of such others, absolutely must be obtained for each transaction.

Although Westcor does not endorse mail-away closings, in certain instances it may be necessary. To help eliminate problems and lessen the possibility for error or fraud, contact a local attorney or Westcor agent in the area to close the transaction for you. Obtain the telephone number of the notary acknowledging the instrument and verify the signatures with him or her by telephone. Also, request that the notary return photocopies of the signatories driver"s license to you so that you may compare the signatures on the license against those on the documents.

See also: **Acknowledgments**, **Deeds**, *Westcor Escrow and Settlement Procedures Manual*.

# Extended Coverage

## Deletion of Printed Exceptions (Extended Coverage)

### Rights or claims of parties in possession not shown by the public records (Owner's Policy)

This exception may be deleted routinely from owner's policies on owner-occupied residential property if the proposed insured so requests. It can be deleted from rural or farm property upon presentation of a recent survey. This survey must not show the potential for boundary line disputes or other evidence of potential adverse possessors. It can also be deleted from commercial property or residential investment property with an affidavit from the seller that there are no tenants holding unrecorded leases.

### Easements, or claims of easements, not shown by the public record

This exception can be removed routinely from and owner's policy if the property is located in a platted subdivision. For other properties, a survey is required to remove this exception.

### Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey or inspection of the premises

When insuring title to a *mortgagee only* on 1-4 Family Residential properties up to $1 million in a platted subdivision, a survey is no longer required to give coverage for survey matters when utilizing an ALTA Loan Policy or Short Form Policy. *This change does not apply to owner's policies, construction loan policies, new construction, acreage tracts, commercial loans, or residential properties for more than four families.* Exceptions must still be made for recorded easements and any unrecorded easements you may discover from an old survey, a prior policy or other reliable source. (The above does not apply to Florida.)

When insuring property not within a platted subdivision, wherein the lender requires title insurance be given without exception to survey matters, but is not requiring that a new survey be ordered, Westcor will accept prior surveys issued to the current owner within ten (10) years provided the property is a refinance only of residential property and an affidavit has been obtained from the current owner stating that there have been no improvements to the insured property since the date of that prior survey. The survey cannot be used to delete the survey exception when issuing a policy on a resale.

See also: **Survey Matters**.

### Any lien or right to a lien, for services, labor, or material hereto or hereafter furnished, imposed by law and not shown by the public records

Most loan policies will require that this exception be deleted; however, the agent must be careful in doing so. Different rules will apply for different situations. These situations will include: 1) when the property is unimproved or has been improved for some time; 2) when construction on the property is imminent; and 3) when construction has recently been completed. For specific Underwriting Instructions in deleting this exception, see also **Mechanics' Liens.**

WESTCOR 000708

# Federal Tax Liens

## Overview

A federal tax lien is a statutory lien provided for by Internal Revenue Code § 6321 which arises upon the non-payment of taxes owed to the Internal Revenue Service. The lien arises on the date of assessment and attaches to all of the taxpayer's property. However, a federal tax lien does not establish its priority relative to other perfected liens or interests until a Notice of Federal Tax Lien is filed in either (a) the public records designated by the laws of the State in which the property is located or (b) the clerk of the U. S. district court for the judicial district in which the property is located whenever the state has not by law designated one office in which all federal liens are required to be filed. Federal tax liens do not have any super-priority over previously recorded liens or interests. Federal tax liens are considered enforceable against homestead property, even in states such as Florida and Texas.

## Duration of Federal Tax Liens

A federal tax lien is valid for 10 years and 30 days from the date of assessment, unless prior to expiration of this period of limitations, the lien is properly re-filed within the time allowed by law. The date of assessment is disclosed in Column (d) of the Notice of Federal Tax Lien, and the last day for re-filing is shown in Column (e). Prior to November 5, 1990, a federal tax lien was valid for 6 years unless re-filed within 6 years and 30 days from the date of assessment. If re-filed, the duration of the lien was extended an additional 6 years. Under the Federal Omnibus Reconciliation Act of 1990, which went into effect on November 5, 1990, the duration of federal tax liens was extended from 6 years to 10 years, and the re-filing period was extended from 6 years and 30 days to 10 years and 30 days from the date of assessment. Therefore, a title search that extends back 10 years and 30 days from the current date should pick up all effective federal tax liens.

Care should be taken, however, in relying completely upon the statute of limitations. Circumstances such as the taxpayer's suit in Tax Court or bankruptcy may toll the running of the enforcement period. Also, the taxpayer may have entered into a waiver agreement with the Internal Revenue Service which extends the time of payment, and thus the enforceability of the lien. If you have actual notice of such a waiver agreement or other circumstance which may extend the IRS's ability to enforce the lien, then you should not rely on the statute of limitations alone, but rather require a Release of Lien from the Internal Revenue Service.

## Release, Discharge, Nonattachment, or Subordination of Federal Tax Liens

The IRS will usually employ one of four methods to free property from a federal tax lien:

1. Issuance of a Release of Federal Tax Lien (IRS form 668[z]) which indicates a complete satisfaction of the entire debt secured by the lien. To obtain this release, the taxpayer must pay off the tax debt in whole, or negotiate an amount acceptable to the IRS in satisfaction of the lien. Although less frequent, a Release of Federal Tax Lien may also be obtained upon submitting proof to the IRS that the statute of limitations has expired so that the lien is unenforceable or upon the IRS acceptance of a bond to secure payment of the debt.

2. Issuance of a Certificate of Discharge of Property from Federal Tax Lien (IRS Publication 783). In this case, the IRS agrees to release the lien as it applies to specified property only, and the lien will remain valid against all other property owned by the taxpayer. The IRS most commonly uses this procedure in cases where the taxpayer is selling the property at full value to a third party, and either all of the net proceeds of the sale (after normal sales costs and commissions) are paid to the IRS or the taxpayer has no equity in the property after taking into account the liens which are senior to the Internal Revenue Service's lien. The application for a Certificate of Discharge from Federal Tax Lien (Publication 783) must be filed with the Collection Division's Special Procedures Staff. The application must include an estimate of the fair market value and usually a written appraisal by a disinterested appraiser together with any other information requested by the

IRS. Additional information usually includes a copy of the anticipated settlement statement prior to the settlement, which must be approved by the IRS. *Unapproved alterations may result in a refusal by the IRS to issue the Certificate of Discharge*.

3. Issuance of a Certificate of Nonattachment (Publication 1024) is normally used in a situation in which the party involved in the transaction is not the same person identified in a recorded tax lien, but has a similar name.

4. Issuance of a Certificate of Subordination of the federal tax lien (IRS Publication 784). The request must show that the amount realizable on the tax lien will ultimately be increased and collection facilitated as a result of the subordination. This method is most often used when dealing with a refinance of a borrower with a federal tax lien against them.

**Foreclosure of Prior Liens**

When a federal tax lien has been recorded subsequent to a lien or mortgage being foreclosed, the federal tax lien will not be extinguished by the foreclosure unless certain steps are taken. If a judicial foreclosure procedure is being utilized to foreclose the prior lien, the United States must be joined as a party. If the senior lien is being foreclosed pursuant to a non-judicial procedure, proper notice must be given to the district office of the Internal Revenue Service by certified mail at least 25 days prior to the sale date. The agent should obtain satisfactory evidence that the proper procedure was followed and that the notice requirements were satisfied. If not, the federal tax lien is not extinguished, and remains an encumbrance upon title.

**United States' Right of Redemption**

Once the property subject to a federal tax lien has been foreclosed by a senior lienholder, the United States has 120 days from the date of the foreclosure sale, or the period allowable for redemption under local law, whichever is longer, to redeem the foreclosed property. The United States may, upon application (Form 487), release their right of redemption. Therefore, unless the United States has specifically waived its right of redemption, an exception must be made for possible right of redemption on any commitment or policy issued within the United States" redemption period.

**Tenancy by the Entirety**

Whether a federal tax lien attaches to the interest held by either the husband or the wife in property held in tenancy by the entirety depends upon the law of the state where the land is located. Contact your local state or regional counsel to determine the effect of a federal tax lien on property held in tenancy by the entirety. A recent (2003) decision of the United States Supreme Court ruled that the federal law concerning tax liens will supercede state law protection of tenants by the Entirety.  Be sure to consult your Westcor underwriting counsel to determine the effects of this case on your state law.

**Underwriting Instructions**

**Liens Against Current or Prior Owners**

When insuring a refinance in most jurisdictions, if a federal tax lien against the current or former owner has attached to the property, the federal tax lien will retain priority over the new lender's interest. Therefore, such liens must be listed as exceptions on the commitment and policies, the lien must be paid and the lien released, or otherwise subordinated to the lien being insured.

In some states, however, the priority of the new lender's lien will relate back and take the priority of the deed of trust or mortgage securing the debt being satisfied. This relation back to the priority of the lien being paid off is based on the principle of "equitable subrogation". In such states the federal tax lien will be subordinate to the lien being insured. Therefore, the federal tax lien should be shown on Schedule B, Part 2 of a loan policy as a subordinate matter. Equitable subrogation may or may not be recognized in your state. Agents" questions regarding the law in their state should be addressed to local state or regional counsel.

When insuring a sale in which a federal tax lien against the current or former owner has attached to the property, such lien must be removed from the property by release, discharge, or subordination. Otherwise, the lien must be shown as an exception on the owner's title policy.

## Liens against Purchasers

The Internal Revenue Service recognizes the common law "purchase money doctrine". They have taken the position that the lien of a mortgage in which *all* the proceeds are used to acquire title to a parcel of property is superior to the lien created by a previously recorded tax lien against the purchaser (Revenue Ruling 68-57). Therefore, if the federal tax lien is against the purchaser of the property, no exception need be taken on the purchase money lender's policy. (In the State of Louisiana, however, the foregoing does not apply. Federal tax liens against the purchasers in that state will take priority over the purchase money mortgage. For this reason, it is mandatory that the purchasers' names be searched for federal tax and other liens which must be either paid or listed as exception.) If secondary financing is being insured, the purchase money doctrine will not protect the secondary lender, and an exception for the federal tax lien must be taken. In addition, exception for the federal tax lien against the purchaser must be made on any owner's title policy since the lien will attach immediately upon the purchaser's acquisition of an interest in the property.

## Insuring During the United States' Right of Redemption

Unless the United States has released their right of redemption, an exception on any commitment or policy issued during the United States' redemption period must be made as follows:

> *"Rights of the United States to redeem subject property within the period of ('120 days" or 'insert the period of time permitted junior lienors to redeem under local law') from the date of the foreclosure sale of the deed of trust or mortgage recorded in Book _____ at Page _____. Said sale having taken place on _____".*

See also: **Foreclosures, Tenancy by the Entirety**.

# Filled-In Lands

## Overview

With respect to insuring filled-in land, it is important to ascertain whether the addition of land was natural (accretion) or artificial (filled). A natural extension of land created by the gradual and imperceptible depositing of materials onto the existing land is known as *accretion*. In short – due to the motion of water – sand, sediment, and other materials wash up on land and remain there. Over a long period of time, the addition of such materials creates an extension of the land. In some jurisdictions, title to accreted lands may belong to the owner of the property who is sometimes referred to as the *upland owner*. Filled-in land, however, is neither gradual nor imperceptible. The fill may have been done by the owner of the property or others, such as the Army Corps of Engineers. Depending upon specific state law, the title to filled-in lands may remain with the state or, alternatively, if the state has no ongoing interest in same, may have been conveyed by the state to a prior or current upland owner.

A third type of additional land is artificially exposed land. Such exposure, of formerly submerged lands, most often occurs through drainage and reclamation activities normally performed by or on behalf of the state. As with filled-in land, the title may remain with the state, or if the state has no ongoing interest in same, may have been conveyed by the state to a prior or current upland owner.

Since filled-in or artificially created lands may remain the property of the state, prior to insuring same a conveyance from the state of such lands must be recorded, conveying title to same in the name of a prior or the current upland owner. If such conveyance is not forthcoming, an exception to the policy must be made excluding possible adverse ownership claims by the state from coverage as to those portions of land that comprise sovereignty lands not previously conveyed by the state or legally excluded from prior state conveyances of other types of lands.

## Underwriting Instructions

Generally, Westcor does not insure accretion. In some states accreted lands may be considered the property of the upland owner and are, therefore, insurable. More commonly, title to accreted land (and filled land as well) must be determined by court order in a quiet title lawsuit.

Since title to filled-in lands is subject to the ownership of the state and the regulatory rights of the federal government, an exception for these rights must be listed in the commitment and policy as follows:

> *"The property described herein being artificially filled-in land on formerly navigable waters, this policy is subject to any adverse claim by the State of _____ and/or the United States Government by reason of sovereignty and/or riparian rights, if any."*

See also: **Wetlands**.

WESTCOR 000712

# FIRPTA

## Overview

The Foreign Investment Real Property Tax Act (FIRPTA) requires the transferee (buyer) to deduct and withhold a tax equal to 10% of the amount realized when a foreign person disposes of a United States real property interest. The withholding obligation also applies to certain partnerships, corporations which are not domiciled in the U.S., and the fiduciary of certain trusts and estates. The "amount realized" includes cash paid or to be paid, the outstanding amount of any liability assumed by the transferee, the fair market value of other property transferred or to be transferred, and the amount of any liability assumed by the transferee or to which the U.S. real property interest is subject immediately before and after the transfer. The tax must be deducted from transferor"s proceeds, IRS forms 8288 and 8288A must be completed, the withheld tax must be paid, and the forms must be sent to the IRS by the 20th day following the date of transfer.

There are two special exemptions under the regulations. If the transferor provides the transferee with an affidavit stating, under penalties of perjury, that the seller is not a foreign person and by providing the seller"s U.S. taxpayer identification number, then withholding is not required and no personal liability of the transferee for the tax exists. The other exemption applies if (a) the transferee is acquiring a residence, (b) the transferee actually uses the property as his or her new residence, and (c) the sales price is $300,000 or less. An affidavit should be obtained from the transferee stating his or her intent to reside at the premises.

Foreign transferors who do not already meet the exemptions under the Act may apply to the IRS for a withholding certificate *prior to the transfer*. Withholding can be reduced or even eliminated when the IRS issues such a certificate. In this case, the transferee must still withhold the tax, but need not file the forms to remit the tax to the IRS until the 20th day after the IRS" final determination regarding the application. The regulations require that the IRS act with respect to any such application within 90 days of receipt. The certificate may be relied upon unless it is known to be false. These certificates may be issued if the transferor is exempt from the tax, an agreement has been made for payment of the tax, or the transaction produces no taxable gain or an amount of gain which justifies reduced withholding.

## Underwriting Instructions

FIRPTA states that the transferor"s or the transferee"s agent may be liable for withholding under certain instances. Generally, a title agent acting in a fiduciary capacity only as an agent on behalf of Westcor is not considered an agent for the transferor or the transferee and is therefore not responsible for reporting under FIRPTA. However, if the Westcor agent is also acting in a separate capacity on behalf of the transferor or transferee (e.g., real estate agent or attorney), the agent may be obligated to comply with FIRPTA. Any amounts withheld must be reported to the IRS within 20 days from the date of the transfer, using IRS Forms 8288 and 8288A.

# Foreclosure

## Overview

When a lien creditor, in order to satisfy the debt owed to it, resorts to a sale of the liened property through the foreclosure process, the property rights of the debtor and junior lien creditors are intended to be extinguished. In order to insure the title subsequent to such a sale, the title insurer must be satisfied that 1) all statutory and contractual requirements of the foreclosure process were complied with, thereby eliminating any possibility that the sale will be overturned, and 2) there are not outstanding Rights of Redemption.

Foreclosures can be divided into two classes. *Non-Judicial* foreclosure, allowed in many states, requires little or no involvement by any court, and is usually the quickest and most inexpensive choice for mortgagees (including Beneficiaries under deeds of trust). The process of *Judicial* foreclosure (through a court) is used either because non-judicial foreclosure is not permitted under state law or there are additional issues that need to be resolved by a court. The foreclosure process is governed by state statutes and the terms of the lien instrument. The particular requirements of the state″s foreclosure statutes must be followed.

**Non-Judicial Foreclosure**

The following is a general list of items that potentially must be confirmed in states where, in practice, the title examiner reviews the elements of the non-judicial foreclosure process.

- Mortgage instrument contains a Power of Sale provision.

- Substitution of Trustee has been properly recorded (where necessary or appropriate).

- Notice of Sale has been given to appropriate parties, including the United States (if it holds a junior lien), and properly posted, in accord with mortgage and statutes. Some states require recordation of a Notice of Default, and then the lapse of a period of time before a Notice of Sale can be given.

- Advertisement in proper publication has occurred, in accord with mortgage and statute.

- Proper time periods between the events constituting the foreclosure process were respected, in accord with mortgage and statute.

- In some states, a Memorandum or Certificate of Sale has been filed.

- Proof of compliance with the Soldiers″ and Sailors″ Civil Relief Act (or appropriate waiver in Security Instrument).

- Proper "Trustee″s Deed" (or similar instrument).

- Compliance with other statutory requirements.

- Satisfaction of all rights of redemption and expiration of all applicable redemption periods.

**Non-Judicial Foreclosure on Deceased Debtors**

Probate records must be checked prior to foreclosure for debtors who may be deceased. If a debtor is deceased, the probate code must be followed prior to foreclosure. Notice to a deceased debtor in most states is not sufficient to allow a non-judicial foreclosure sale to be insurable.

WESTCOR 000714

**Non-Judicial Condominium Foreclosure Sales**

In most states, by law or custom, all condominium units have homeowners" associations (HOA) and those HOA"s have assessments. Generally, these assessments will be subordinated to purchase money liens. As a basic principle, in most states HOA"s can foreclose a lien only through a judicial process. Non-judicial foreclosures are typically reserved only for mortgages and deeds of trust according to statute. However, if you are insuring an HOA"s non-judicial foreclosure, you must check the redemption rights of the owner of the unit and/or the subordination agreements between the condominium homeowner association and the lender per the recorded documents to determine 1) whether there is a redemption right; or 2) that the HOA lien is subordinate to the other liens. Also, it is absolutely necessary to fully comply with all statutory and due process of law requirements before any such insurance is provided.

See also: **Condominiums**.

**Judicial Foreclosure**

In the judicial foreclosure process, the creditor sues the debtor for repayment or other satisfaction of the debt, and this results in a judgment being entered against the debtor. In this way, judicial foreclosures are similar to any other sale to enforce a money judgment. The court decrees that the property shall be sold to satisfy the judgment, and the resulting sale by the proper government official terminates the interest of the debtor. If the proceeds of the sale are not sufficient to satisfy the debt, the creditor can, in some jurisdictions, proceed to obtain a *deficiency judgment,* a personal money judgment against the debtor in the unsatisfied amount.

In order to insure title derived from judicial sales, the insurer must be satisfied that all applicable procedural requirements have been met. The process includes: naming all of the necessary debtors and junior lien creditors as defendants (including the United States, if it holds a junior lien); proper notice and service of process on all necessary parties; compliance with Servicemembers Civil Relief Act; reinstatement period (in which the debtor may reinstate the debt by making up all defaulted payments plus costs); trial; judgment; notice of sale; sale; *Redemption* period (not applicable in some jurisdictions); "Sheriff"s Deed" or similar instrument conveying title to purchaser.

In some jurisdictions, the failure to name a junior lien creditor as a defendant results in that lien not being extinguished by the foreclosure sale.

**Servicemembers Civil Relief Act of 2003**

This Federal statute provides protection to people in military service from loss of certain interests in property during the period which they are involved in a military conflict, and can preclude foreclosure. In all foreclosure situations, the title insurer must be satisfied that 1) where a debtor is in the military, that the Act was fully complied with throughout the foreclosure process, or 2) none of the debtors were in the military. As confirmation that none of the debtors were in the military, an affidavit from the foreclosing entity, or sufficient language in the Trustee"s Deed to this effect, is usually sufficient.

# Extinguishment of Federal Tax Lien

**Non-Judicial Foreclosure:**

If the United States holds a junior tax lien which was filed more than 30 days prior to the date of a non-judicial foreclosure sale, the foreclosure will not divest the property of the tax lien unless proper notice of the foreclosure sale has been sent to the District Director of the IRS at lease 25 days prior to the foreclosure sale. (If the federal tax lien was filed less than 30 days prior to the actual foreclosure sale date, no notice is required for the tax lien to be extinguished.) If no notice is given to the IRS, then the property will remain subject to the tax lien, even after the foreclosure sale. However, even in the absence of the proper prior notice, the IRS has the ability to extinguish its lien by executing a proper Consent to Sale. It should be

noted that even if the lien of the IRS is properly noticed and extinguished, the IRS has 120 days in order to redeem the property under its lien.

When relying on notice to extinguish and IRS Lien, the agent must obtain evidence of personal service of notice of the foreclosure to the Director of the Internal Revenue Service in the form of certified mail return receipt.

**Judicial Foreclosure:**

Generally, a junior United States tax lien will be discharged upon judicial foreclosure of a prior lien only if the United States is made a party to the proceeding. However, if the federal tax lien has not been filed at the time of recording of a lis pendens of the judicial proceeding, the resulting judgment of foreclosure will discharge the United States" lien even though the United States was not named in the suit.

# Rights of Redemption

A Right of Redemption is an ability, within a statutorily specified time period following the foreclosure sale, to take title away from the foreclosure purchaser by reimbursing his purchase price, plus interest. If a right of redemption exists, an exception must be included in Schedule B. In many states title does not vest until the redemption period has lapsed. Therefore, title may not be marketable.

Rights of Redemption are held in various jurisdictions by the foreclosed-out borrower and junior lien creditors, and in other jurisdictions they have been entirely abolished. In some jurisdictions, these rights can be waived, but in many places, any attempt to waive a right of redemption is invalid.

In any foreclosures divesting a junior United States lien arising under the Internal Revenue laws, the United States holds a Right of Redemption of either 120 days from the date of sale or the time permitted for redemption under local law, whichever is longer. As stated previously, proof of personal service of notice of the foreclosure to the Director of the IRS is required. If the junior United States lien arises under a law other than the Internal Revenue code, the Redemption period is one year from the date of sale. The United States can specifically waive its redemption rights by executing a proper form. Any questions as to waiver of Rights of Redemption should be directed to company counsel.

# Bankruptcy

When a party files a petition in Bankruptcy, an Automatic Stay of all collection activity against that debtor is instituted. Any action in the foreclosure process occurring after the filing of the petition and before an order of Relief from the Automatic Stay has been granted is void. Title insurers must examine bankruptcy situations very carefully to verify that the foreclosing creditor obtained this Relief from Stay before proceeding.

## Underwriting Instructions

The underwriting requirements for foreclosed property vary from state to state, depending mainly upon the extent to which state courts allow the overturning of foreclosure sales in the case of failure to meet statutory/contractual requirements. If you are not aware of the acceptable practice for your jurisdiction, please contact your Westcor underwriting counsel for guidance.

> *When relying on notice to extinguish and IRS Lien, the agent must obtain evidence of personal service of notice of the foreclosure to the Director of the Internal Revenue Service in the form of certified mail return receipt.*

If the United States holds a Right of Redemption, include the following exception:

> *The right, if any, of the United States to redeem said land with ("120 days" if foreclosure was a non-judicial sale pursuant to a mortgage or deed of trust; otherwise, insert the period of time permitted*

WESTCOR 000716

WESTCOR

*junior lienors to redeem under local law) from the date of sale held on _____ as provided for in 26 U.S.C. 7425.*

If another party holds a Right of Redemption, include the following exception:

*The right, if any, of _____ to redeem said land within _____ days from the date of sale held on as provided for in _____.*

# Gift Deeds

## Overview

A gift deed appearing in a chain of title – reflected by consideration shown as "love and affection" or other indications of a gift such as similarity in names of parties or transfer by quitclaim deed –will, in most states, be considered valid. However, all conveyances for no consideration or inadequate consideration raise questions as to fraud and forgery.

## Underwriting Instructions

Generally, Westcor does NOT authorize its agents to insure gift deeds. Any request to insure the grantee of a gift deed must be approved by underwriting counsel.

The following matters will be considered by underwriting counsel in determinant insurability. When insuring property conveyed by gift deed, it is extremely important to investigate the circumstances under which the deed was given. What are the circumstances under which the transaction came about? Be aware of unusual circumstances or answers to your inquiries. Independent verification of the intent of the grantor should be established whenever possible. In any questionable situation, contact Westcor legal counsel before issuing the Company"s commitment or policy.

Also, run the grantor(s) name for judgments. Were there liens filed shortly before or after the deed was conveyed? Is there pending litigation, or are you otherwise aware of possible litigation against the grantors? If so, the property may have been conveyed to avoid the creditors and the deed might possibly be set aside as a fraudulent transfer. Exceptions for judgments against the grantor, as well as liens which have been recorded prior to the proposed insured deed or mortgage, must be made.

In addition, an exception should be made regarding possible liens for federal and/or state gift taxes as follows:

> *"Any lien for federal or state gift tax payable by reason of the transfer from „A" to „B"."*

In situations where an owner"s policy is requested on property where the title is acquired by a gift deed, the policy must be written in the amount of the fair market value of the property as established by an acceptable appraisal or other valuation means.

If the seller/mortgagor under the current transaction obtained title via a gift deed, it is recommended that the grantor/donor of such gift deed execute an affidavit, acceptable to Westcor, acknowledging that he or she was (and remains) competent at and since the date the gift was made; that the gift was voluntary; that the grantor/donor was solvent at the time of transfer and was not made insolvent there from; and specifically, that the grantor/donor did not make such conveyance in order to defraud or hinder any of the grantor/donor"s creditors.

Finally, the following exception needs to be raised if a gift deed appears in the chain of title and any judgments appear against the grantor:

> *The conveyance from _____ to _____, date __/__/____, recorded __/__/____, in Liber/Reel/Book _____ at page _____, appears to have been made for no (or inadequate) consideration. The following judgment(s) appears against the grantor. The judgment(s) must be disposed of or the circumstances explained to the satisfaction of the Company because of the possibility that the conveyance may be set aside as a fraudulent conveyance to defraud creditors.*

**Note:** *Gift deeds or deeds supported by nominal or no consideration, particularly among family members have been shown frequently to be fraudulent. A typical scenario included a gift deed to a family member and, shortly thereafter (but not part of the same transaction), a mortgage loan secured by the property is taken out by the grantee of the deed. No loan payments are ever made by the borrower and when the lender*

**WESTCOR 000718**

*institutes foreclosure, the true owners of the property maintain that the gift deed was a forgery and the property was never conveyed. Although not always the case, loans of this nature are frequently made by "hard money lenders" who charge high fees and interest rates because of the high risk of the loan. Extra precautions should be taken as outlined above when insuring a gift deed or a loan to the grantee of a gift deed.*

See also: **Bona Fide Purchaser/Consideration**, **Creditor's Rights**, **Quitclaim Deed**.

# Guardianship

## Overview

As a preliminary note, states which have enacted the Uniform Probate Code or some version of that Code (UPC) refer to the position here identified as "guardian" according to the UPC terminology, considered a court-appointed officer called "conservator". Under the UPC, "guardian" refers to a position which applies only to the person of a ward or "protected person" whether a minor or incompetent. In UPC states guardians have no authority to affect real property of the ward without court approval. The UPC designates conservators as the court-appointed official with broad powers with respect to the real property of the ward. Conservators must be appointed by a court. This appointment is evidenced by the issuance of a document called "letters". The discussion which follows concerning "guardians" will generally apply to conservators in UPC states.

Guardianship and Conservatorship are governed by state law. These laws may vary and you must determine the specific requirements of laws in your state. Consult with your Westcor underwriting counsel for specific instructions.

An understanding of the various types of guardianship, the requirements of appointment, and the requisite duties of guardians is important in the examination of title. For instance, a person may be a guardian of *person* or *property* or both. *Natural guardians* are considered to be the mother and father, jointly, of their own children or adopted children, during minority. All instruments executed by a natural guardian are considered to be binding on the ward. With respect to guardianship of incompetents, there must exist a petition for judicial inquiry, a certificate of an authorized physician, a court hearing before an examining committee, and a finding or adjudication by the court stating the nature and extent of the incompetency. When a person is adjudicated mentally or physically incompetent, a guardian of the person shall be appointed and a guardian of the *property* may also be appointed, or the named guardian may act as both. Formal guardianship of a minor is similar in nature to the requirements above with respect to the filing of a petition; a court hearing; and as adjudicated, the appointment of guardian(s) of the minor of his person, his property, or both.

Title examiners should note the references made to *guardianship of person* and *guardianship of property*. For purposes of insuring title, we are concerned with *guardianship of property*. Court orders, with respect to sale, encumbrance, or lease of real property of the ward, are of great importance, regardless of whether the ward is a minor or incompetent.

Generally, the powers of guardian – upon court approval – include the power to sell, mortgage, lease, or otherwise encumber said real property. However, in most states, such sale must be authorized or confirmed by the court. Title examination should include review of the certified petition for sale setting forth the reasons for said sale; an adequate description of the property; the price and terms of sale, mortgage or other contract; and whether the sale is private or public; as well as the subsequent terms and conditions of the court orders approving said sale, mortgage, or lease.

With respect to entireties property, all legal or equitable interests in real and personal property owned by an incompetent for whom a guardian of property has been appointed may be sold, transferred, conveyed, or mortgaged if the spouse who is not incompetent joins in the sale, transfer, conveyance, or mortgage of the property. When both spouses are incompetent, the sale, transfer, conveyance, or mortgage must be made by the guardian(s) of each spouse. In many states, guardians are prohibited from purchasing property or borrowing money from his or her ward unless the property is sold at public sale, and then only if the guardian is a spouse, parent, child, brother, or sister of the ward or a cotenant of the ward in the property to be sold.

WESTCOR 000720

**Underwriting Instructions**

When insuring any transaction where a guardian of a minor or incompetent is mortgaging or conveying property, the commitment must contain the following requirement:

> *"Certified Copy of 1) Petition and Order Appointing ____, Guardian; and 2) Specific Court Order authorizing the (sale/mortgage/lease/etc.) of the real property described herein must be obtained from a court of competent jurisdiction and filed in the appropriate county records."*

The Certified Petition and Order must contain the following:

1. Reasons for the sale/mortgage/lease

2. Adequate legal description of the property

3. Price and terms of sale/mortgage/lease

4. Whether the sale is private or public

5. Subsequent terms and conditions of the court order approving said sale/mortgage/lease.

Unless this requirement is met to the satisfaction of the title agent, exception to the matter must be made in the title policy.

In UPC states, the appointed official for dealing with the property of a minor or incompetent is termed "conservator". In those states a guardian is usually appointed only to care for the person of a ward and does not have the statutory authority to take any actions affecting the property of the ward. Under the UPC, a conservator is appointed by a court which issues "Letter of Conservatorship". When issued, the Letters authorize the conservator to take all actions concerning the property of the ward without further court order or approval. To show the authority of the conservator to act, the Letters should be recorded in the land records of the county where the property is located.

See also: **Capacity**, **Incompetence**, **Minors**.

# Heirs At Law

## Overview

When a person dies intestate (without a will), all real property passes by intestate succession to the decedent″s heirs at law. To establish marketable title, a judicial determination naming the heirs at law must be obtained. While this proceeding is time consuming, the Company is afforded protection from an omitted heir when it relies on a final judgment determining heirship. When a deed from the heirs at law appears in the chain of title, it should be supported by a recorded Decree of Heirship or Decree of Distribution identifying the same heirs who signed the deed. Under limited circumstances an affidavit may be acceptable to the company to show that those named as grantors were, in fact, *all* the heirs of the decedent. Westcor underwriting counsel must approve acceptance of an heirship affidavit. If no judicial determination of heirship or approved affidavit from grantor/heirs is obtained, an exception to title as to the rights of possible undisclosed heirs must be made.

NOTE:  Notwithstanding local practices and customs which include acceptance of affidavits of heirship in lieu of a judicial heirship determination, only on very rare, exceptional occasions will Westcor underwriting counsel approve acceptance of an affidavit of heirship.  Such affidavits may **not** be relied upon to vest title in a current seller or borrower.  Judicial determination of heirship by a final, non-appealable court order of competent jurisdiction is always required to vest title unless expressly waived by Westcor underwriting counsel.

## Underwriting Instructions

1.  Obtain judicial determination of decedent″s heirs at law.

2.  When relying on a prior deed back in the chain of title from the heirs at law, with express approval of Westcor underwriting counsel you may obtain an affidavit from a disinterested party, (e.g., a priest or neighbor) certifying to Westcor Title Insurance Company that the named grantors were all heirs of the decedent.

3.  If no judicial determination is made or no affidavit acceptable to the Company is provided and approved, the following exception must appear on the commitment and policy:

    *"Rights of possible undisclosed heirs of_____, deceased."*

See also: **Probate**.

WESTCOR 000722

# Homestead

## Overview

Homestead laws vary greatly from state to state. Homestead rights in most states are an *exemption* from the claims of creditors, not an encumbrance on title. However, the homestead right or exemption requires special treatment to satisfy the law, and the homestead right must be treated as though it constitutes a kind of encumbrance which must be waived or released to validate a transaction. Basically, the purpose of a homestead exemption is to protect the family home, but the protection takes many forms. In some states, the homestead is protected against forced sale by certain creditors. In many states, a surviving spouse is allowed to use the homestead free from the claims of creditors. Some states protect spouses by requiring that both spouses join in the conveyance or encumbrance of the homestead, even if title is vested in just one of the spouses. A homestead exemption is allowed in some jurisdictions for purposes of ad valorem taxes, with a percentage of the appraised value of the homestead exempted from the taxes.

Generally, homestead rights are created by state constitutions, state statutes, the federal bankruptcy laws, and federal legislation. The applicable law must be studied to determine what constitutes the homestead, what protection is afforded, and what limitations, exclusions, and requirements affect the homestead rights.

Federal tax liens *do* attach against homestead property, in all states.

## Underwriting Instructions

- Federal tax liens must be released or listed on Schedule B as exceptions to title.

- Because homestead laws are so different from state to state, contact your local underwriter for guidelines specific to your state.

See also: **Bankruptcy**, **Federal Tax Liens**, **Probate**.

# Hospitals, Health Centers & Nursing Homes

## Overview

The federal government, through the provisions of numerous Federal Statutes, such as Title 42, USC – and the *Hill-Burton Act*, 42 USC Section 291 to be specific – may make grants to assist in the construction or modernization of public or other nonprofit hospitals and medical facilities. Such funds may generally be recovered by the government by the original applicant or his or her assigns/transferees should it be determined that the initial owner or subsequent transferee violate the initial conditions under which the funds were given. Such circumstances include the following:

- ▪ Facilities are not used for purposes as provided for under the act/statute(s) authorizing the funds

- ▪ The owner does not qualify for federal funding

- ▪ Facilities are used for religious worship.

The right to recover federal funds is not required to be secured by a lien on the property, nor is notice of the right to recovery required to be reflected in the chain of title to the real property. Therefore, when insuring a transaction for a nursing home or hospital, inquiry must be made to ascertain if federal funds were used in the construction or improvements of the facilities. If determined that federal funds were used, an exception must be made as to the rights of the United States to recover any federal funds advanced as provided under such Act.

More information on Hill-Burton facilities, including a list of Hill Burton obligated facilities, is on the Health Resources and Services Administration web site here:

http://www.hrsa.gov/gethealthcare/affordable/hillburton/compliance.html

## Underwriting Instructions

Should you determine that a public/quasi-public, nonprofit medical/health facility being insured is associated with a federal act or statute providing for the recovery of federal funds, the following exception must be taken in the commitment and final policy:

> *"Any right of the U.S. to recover funds from the owners or subsequent transferee of said property, or any portion thereof, by reason of the advance of federal funds, including, but not limited to those authorized under _____."*

This exception may not be deleted without prior written authorization from Westcor underwriting counsel.

WESTCOR 000724

# Improvements

## Overview

An improvement is a valuable addition made to property. It is more than mere replacement or repair and is intended to enhance the beauty, value and utility of the property. Buildings or houses are improvements, as are streets, sewers, sidewalks, utilities, etc.

An improvement becomes part of the land and the owner of the land will in most cases also be the owner of the improvements located upon the land. The standard form American Land Title Association policies define "land" as: "*the land described in Schedule A, and affixed improvements that by law constitute real property.*"

Like any other interest of right in land, improvements may also be severed from the land by a conveyance of the improvements. Unless the improvement or house which is being conveyed is to be removed from the property, such a conveyance will always be in conjunction with a lease for the use of the land that supports the improvements. The lease will typically be a 99 year lease and most likely will contain provisions renewing the lease.

After the ownership in the improvements has been severed from ownership of the land on which the improvements are located, the improvements may be freely conveyed without conveying an ownership interest in the land. The leasehold interest in the land will normally be assigned to the purchaser along with the subsequent conveyances of the improvements.

## Improvements and Fixtures

A fixture is a former chattel, or personal property, which retains its separate identity and is connected to real property in such a way that it becomes part of the real property. One may think of a furnace or boiler and the related pipes and duct work in a house as an example of a fixture. When purchasing a home, the heating system would be included as part of the home, i.e., as part of the improvements to the real property. Fixtures do not qualify for separate insurance coverage under a title policy.

Fixtures may be the subject of separate liens, in the form of financing statements filed in conformity with the Uniform Commercial Code (UCC). One will see these quite often in a commercial transaction where the fixtures may have been financed separately from the balance of the improvements. If a lender asks for affirmative coverage over the affects of any filed financing statements, a search of the appropriate records must be performed at the state as well as local county level to discover any financing statements. These statements should be indexed against the name of the debtor named in the financing statement, and the UCC requires that the statement also describe the property where the goods are held. This may not be a legal description and may be an address.

Although a financing statement secured against a fixture would not attach to the real property, it will still be a lien on the collateral listed since this collateral (as a fixture) becomes part of the real property, the financing statement must be terminated before a new lender or new owner is insured. Under the UCC in most states, security interests in goods which become fixtures have priority over subsequently recorded real estate interests. If the security interest in goods is a purchase money security interest, it arises before the goods become fixtures and, therefore, is a SENIOR lien as to those fixtures and is PRIOR to a previously recorded mortgage.

In no event should there ever be any affirmative statement in a policy or commitment that a chattel has or has not become affixed to the insured property or they have or have not become fixtures.

**Insuring Improvements Only**

Insuring title to the improvements in one party and title to the land upon which they are affixed in another party is often referred to as a "severed improvement", "split fee", or "constructive severance" transaction.

As indicated earlier, the party owning the improvements also must have a properly created and documented leasehold estate in the land. (See also: **Leasehold Estates**.)

It is important to determine whether the severed improvements are real or personal property. Provided the improvements have, or will continue to be, permanently affixed to the land, and the estates or interests have been properly created, separately described land and improvements are capable of title insurance coverage for both owners and lenders if there is a concurrent recorded leasehold interest in the land held by the owner of the improvements.

Depending upon the instruments creating the interest, the policy will show title vested in fee simple to the severed improvements and in leasehold as to the land. Before insuring such an interest the documents creating the severed improvements must be carefully reviewed to determine if a fee absolute or qualified interest is created in the improvements. A qualified ownership is generally created in a lease transaction where the conditions of ownership are limited by its terms, and upon the happening of a certain event, such as the expiration of the lease, the estate will revert back to the lessor. If the interest in the improvements is qualified, Schedule A of the policy should reflect that the ownership in the improvements is vested in a qualified fee.

A mobile home would not qualify for insurance coverage as a severed improvement because of its readily movable nature. A mobile home would remain personal property unless it was permanently affixed to the property when it would then become an improvement to the real property and non severable. You may never separately insure mobile homes; the policy must only describe the land upon which the mobile home sits.

See also: **Manufactured Housing and Endorsements**, **ALTA 7**.

## Underwriting Instructions

### Fixtures

The laws dealing with fixtures and improvements may vary greatly from state to state, so you should consult with your local underwriting counsel when faced with these issues. When dealing with fixture financing statements, they must usually be recorded in both the appropriated state and local offices where chattel records are filed. Those same records must be searched to discover fixture financing statements.

The following exceptions and requirements may be used when dealing with fixture financing statements:

### Requirements:

*Termination of financing statement No. _____ showing _____ as debtor and _____ as secured party filed on _____ in the office of _____.*

*Termination of financing statement showing _____ as debtor and _____ as secured party filed as instrument/book _____, page _____, on _____, among the land records of _____ County, State.*

### Exceptions:

*Financing statement No. _____ showing _____ as debtor and _____ as secured party filed _____ in the office of _____.*

*Financing statement showing _____ as debtor and _____ as secured party filed _____ as instrument/book no. _____, page _____, among the land records of _____ County, State.*

WESTCOR 000726

**Severed Improvements**

To determine whether severed improvements are real or personal property, the agent must thoroughly review the instruments creating the interest for the intention of the parties involved. Documentation must not only properly describe the improvements, title to which is being or has been constructively severed from that of the land, but must also provide clear language assuring that the building and improvements are and shall remain real property. The agent must also obtain written verification that it is the intention of the parties that the improvements are not to be physically removed from the land to which they are affixed and there are no agreements to the contrary. In addition, there must be a lease agreement between the owner of the land and the owner of the improvements.

If title to a severed improvement is not insurable as an absolute or unqualified fee estate as outlined in the overview above, the leasehold estate in the underlying land may be insured and described under Schedule A as a leasehold estate if there is a recorded lease or memorandum of lease. (See also: **Leasehold Estates**.)

The agent should also make an exception for any easements for access, maintenance, use, and support of such buildings and improvements which, although not necessarily constructed, may be implied by the separate estate or interests created by the severance. An exception must also be taken for the terms and conditions of the agreement by which title to the improvements was severed from the land.

Easement created by express grant or reservation:

> *"Easement for the access, maintenance, use and support (QUOTE VERBATIM FROM INSTRUMENT CREATING THE EASEMENT) of the buildings and improvements situated on and excepted from the land described herein, as (GRANTED TO/RESERVED BY) _____ in deed recorded _____."*

**Easement Created by Implication:**

> *"Such easements or other rights for the access, maintenance and support of buildings and improvements situated on and excepted from the land described herein, as maybe implied from the severance of the title to buildings and improvements (GRANTED TO/EXCEPTED BY) _____ in document recorded _____ as _____."*

**Lease Exception:**

> *"Terms and conditions of the lease by which the insured occupies the land described in Schedule A including the obligation to make payments under the lease."*

**Severance Exception:**

> *"Terms and conditions of the (name the agreement using the exact language) severing title to the improvements from the title to the land dated _____, recorded _____ as instrument/book _____, page _____, in _____ County, State."*

All severed improvement transactions must be submitted to Westcor Underwriting counsel along with the Company's Policy Authorization Request (for unusual underwriting risks).

See also: **Leaseholds**, **Leasehold Estates**, **Easements**, **Fixtures**.

# Incompetence

## Overview

In order to be considered valid, the grantor of a deed or mortgagor of property must be of age and legally competent. The age of majority (or legal capability) varies by state. Traditionally, age 21 has been considered majority. Many states continue to adhere to their law. Some states have lowered majorities to 18 years. Likewise, a guardian or conservator must be appointed for any sale or other transfer of property for someone who has not reached the age of legal majority. Individuals who have not reached the age of majority (considered minors) or have been adjudicated by court order to be legally incompetent are considered to be under a legal disability thereby necessitating the court appointment of a guardian or conservator for any real property transaction involving such a person. Please note that having a physical handicap does not necessarily render a person incompetent. Court orders, with respect to sale encumbrance, or lease of real property of a minor or incompetent are necessary either for appointment of the conservator or court approval of transaction by a guardian.

Generally, the powers of guardian - upon court approval - include the power to sell, mortgage, lease, or otherwise encumber said real property. However, in most states, such sale must be authorized or confirmed by the court. Title examination should include review of the certified petition for sale setting forth the reasons for said sale, mortgage or other contract; and whether the sale is private or public as well as the subsequent terms and conditions of the court orders approving said sale, mortgage, or lease.

In states which have adopted the Uniform Probate Code, appointment of a conservator for a minor or incompetent person requires court involvement. The letters of conservatory must be examined for restrictions and must be recorded.

WESTCOR 000728

# Indian Lands

## Overview

Because of the various state and federal regulations, and judicial decisions interpreting treaties and regulating Indian affairs, title to land now or formerly owned of occupied by an individual Indian, Indian tribe, or other Indian entity creates an extraordinary amount of risk and requires an extensive amount of research, review and specific knowledge of the subject before it may be insured. Guidelines for insurability will vary from state to state.

Risks generally revolve around the failure to treat Indian titles carefully according to the particular federal laws which apply to Indian land titles. Title 25 United States Code and federal regulations specifically address Indian matters and require strict adherence. In many states, the Company considers Indian lands uninsurable. However, upon specific approval from Westcor, the Company may agree to insure these lands subject to specific Indian claims and any other applicable limitations. The agent must be alert to instances where Indian land or former Indian lands were later acquired by non-Indians or any instance where an Indian was involuntarily divested of the land to non-Indian purchasers. Before insuring Indian land titles, the Company requires that the agent submit a Policy Authorization Request for Unusual Underwriting Risks to Westcor Underwriting counsel for written authorization.

## Underwriting Instructions

Prior to the issuance of any commitment or title policy insuring title to land now or formerly owned or occupied by an individual Indian, Indian tribe, or other Indian entity, the agent will need to provide the following information to the Company:

1. A Title Status Report as provided by the Bureau of Indian Affairs (BIA). A Title Status Plat must also be obtained from the BIA.

2. The agent must determine that there is proper judicial authority for the lender to conduct foreclosure proceedings should the mortgagee need to foreclose on the Indian land in the future.

3. Should the agent determine that the state court does not have jurisdiction to conduct judicial foreclosure and non-judicial foreclosure remedy is unavailable, title insurance may not be issued.

4. The agent must consider the competency and/or authority of Indian entities and tribes to enter into specific transactions.

5. Verify that there is consent to transfer the property issued by the Department of the Interior, Bureau of Indian Affairs (BIA) of record.

6. The full name of the tribe or organization.

7. A full copy of the charter or constitution, all amendments, and current bylaws and resolution.

8. Proof that the property was properly divested from the Indian entity.

9. Other off-record matters such as treaties or executive orders controlling or limiting the use and/or transfer of the land.

# Inheritance

## Overview

When insuring a conveyance by inheritance or devise, the agent must determine that the estate has been settled with all taxes and debts paid, and that potential demands of prior unrecorded creditors or other debt obligations of the deceased grantor have been disposed of through probate proceedings or other relevant statutory authority. However, where the estate has not been settled, the Company will not usually issue a policy unless there is a sale by order of the court in which the liens of legatees and debts are transferred to the proceeds of the sale and are no longer liens on the real estate. The time for appeals must also have expired. When a commitment is requested while an estate is in the course of administration, an exception must be made for claims or demands against the decedent's estate, or inheritance taxes, discovery and probate of will, and any unrecorded deeds or interests created by the deceased or his estate.

It should be noted that, in an inheritance situation, the person or persons inheriting title to real property are not considered bona fide purchasers *for value* due to the fact that they did not pay any value for such property.

Title vested in heirs at law or devises under a will, even with a court order establishing such interests, does not create marketable title. Such title continues to be subject to appeals, claims of creditors of the estate, spousal interest, and state and federal taxes, and cannot be insured until all claims and appeal periods have expired, tax waivers are received, and the estate has been cleared without possibility of reopening.

## Underwriting Instructions

1. Verify that the owner of the property is in fact, deceased by virtue of a certified copy of the death certificate.

2. Verify that the federal estate and state inheritance taxes have been paid, or that no such taxes were due.

3. Obtain judicial determination heirship.

See also: **Heirship at Law**, **Probate**.

# Judgments

## Overview

### Creation of Judgment Liens

The creation of a judgment lien varies from state to state. In some areas a judgment is a lien as soon as it is entered in the court"s own records. In others, a judgment does not become a lien against real property until a certified copy of the judgment has been recorded in the public land records of the county in which the property is located. Where there exist multiple properties of the debtor which are located in two or more counties or parishes, copies of the judgment must be recorded in all applicable counties in order for a lien to be placed against all such properties.

### Entireties Property

Historically, a judgment lien against one spouse did not attach to property owned by husband and wife as tenants by the entirety, while a judgment against both spouses did attach. In community property states, however, title to community property is usually subject to judgment liens against either or both of the spouses. Due to recent litigation affecting the protection previously afforded under tenants by the entirety, Westcor requires that when insuring a transaction involving a judgment lien against one spouse, the judgment lien must be paid in full or subordinated, or an exception must be made in both the commitment and final policy.

See also: **Co-tenancies**.

### Bona Fide Purchasers

While an *uncertified* or improperly recorded judgment may not legally create a lien against real property it may, in the case of a transaction involving anyone other than a bona fide purchaser for value and without notice (i.e., an arms length transaction), adversely affect the rights of the purchaser – especially if the conveyance was made for fraudulent purposes to the detriment of the debtor"s creditors.

### Statute of Limitations

The statute of limitations regarding judgments should be reviewed for your state as to various types of judgment liens. Some states require that judgment liens be re-filed within specified periods of time until the total life of the judgment lien has expired; and, if not properly re-filed, such lien will cease to attach.

Statutes of Limitation can be tolled for certain events. Therefore, should the lienholder be an individual rather than an institution, contact Westcor for specific approval before relying on the expiration of a lien under the statute of limitation.

### Federal Tax Liens

It is the opinion of the Internal Revenue Service – regarding federal tax liens – that separate but identical liens filed against a husband and wife individually will attach as a lien to jointly-held property including property held as an estate by the entirety. Therefore, such liens must be made an exception to title unless satisfied and released, substituted against other property, or subordinated as to the lien of the current/new mortgage. In the latter case, the lien would still be reflected as an exception to title on the owner"s and loan policies; however, it would be reflected as a subordinated interest on Schedule B, Part II of such loan policy.

Federal tax liens will attach to all real property owned by the debtor/taxpayer including homestead property. Effective November 5, 1990, the validity of Federal Tax Liens has been extended from 6 years, 30 days to 10 years and 30 days after the date of the assessment (column (d) in the notice of lien) of the tax unless re-filed. A certified judgment on the other hand, in favor of the U.S. Government, will remain in force 20 years from entry, and may be extended for an additional 20 years.

See also: **Federal Tax Liens**.

**Purchase Money Mortgages**

State law will dictate priority of purchase money mortgages over judgment liens (Louisiana, for example, does not provide purchase money mortgages priority over judgments.) In most jurisdictions, however, true purchase money mortgages generally take priority over judgment liens correctly filed against the purchasers/borrowers of the insured property. These judgments should be disclosed to the lender (or seller if they are taking back a purchase money mortgage) in the title commitment and listed as a subordinate matter under Schedule B-II of the title policy. If you have any questions regarding the priority of judgment liens over purchase money mortgages for your area, contact your Westcor underwriting counsel.

**Bankruptcy**

**Important:** A discharge of debtor in bankruptcy does not release a judgment lien against the debtor's property. The discharge only acts to stop the collection of the debt against the debtor personally. The discharge does not extinguish the judgment lien and therefore, continues to attach to real property. The simplest way to remember this is:

> *"A lien going into bankruptcy is a lien coming out of bankruptcy."*

A release of the judgment lien must be obtained and recorded, or an order of the bankruptcy court to sell free and clear of the lien must be obtained and reviewed by underwriting counsel.

See also: **Bankruptcy**.

**Underwriting Instructions**

A thorough search of the appropriate records must be made to ascertain all judgments and similar liens which affect the property to be insured. Any adverse matters found must be satisfied or subordinated to the insured mortgage or shown as exceptions in both the commitment and title policy as follows:

> *A Judgment dated _____, against _____, defendant, in favor of _____, plaintiff, in the original amount of _____, recorded _____, records of _____ County/Parish, State of _____.*

WESTCOR 000732

# Leasehold Estates

## Overview

A leasehold estate is created by a lease agreement and exists for a designated period of time. A lease is an agreement (written or unwritten) by which the owner of the land (the landlord or lessor under the lease) transfers to another party (the tenant or lessee under the lease) the right to the exclusive possession and use of the land for a definite period of time. A leasehold estate is referred to as a possessory estate because the owner of the leasehold estate does not own the land.

Leasehold interests should be insured using ALTA leasehold policy forms, designed for this specific purpose. Item 1(h) of the Conditions and Stipulations of the 1992 ALTA leasehold policy defines leasehold estate as *"the right of possession for the term or terms described in **Schedule A** hereof subject to any provisions contained in the lease which limit the right of possession."* Schedule A, Item 2 describes the estate or interest being insured as being a leasehold estate created by specifically described lease documents, while Item 3 describes the leasehold term. Items have also been added to the Conditions and Stipulations of leasehold policies, describing the method of valuation of the estate or interest being insured and the miscellaneous items of loss in the event the insured is evicted (Items 13 and 14 of the leasehold loan policy and Items 14 and 15 of the leasehold owner"s policy). If insuring using a different policy form, an exception must be made, in Schedule B, as to the terms and conditions of the lease.

States that do not use the 1992 ALTA Leasehold Policy may have specific forms or endorsements that must be used. Check with local underwriting counsel for requirements.

Generally, a leasehold estate can be encumbered, and a Leasehold Loan policy can be issued insuring the mortgage covering the leasehold estate. See the Underwriting Instructions below and check with local underwriter counsel for specific requirements or forms that must be used.

Generally, unless prohibited by the terms of the lease agreement, a lessee may assign its interest in the lease to a third party or sublease a portion of leasehold estate to a third party. See the Underwriting Instructions below and check with local underwriter counsel for specific requirements or forms that must be used.

NOTE:  In 2002, ALTA promulgated Leasehold Endorsements to be used with the standard 1992 owners and loan policies to insure leasehold estates.  These endorsements were subsequently revised for use with the ALTA 2006 policies.  Westcor has implemented the use of these endorsements and the leasehold policy forms have been phased out.

## Underwriting Instructions

The following are general guidelines. Consult with local underwriting counsel for state-specific requirements.

Review the lease agreement. It should contain the following items:

1. Names of all parties involved and execution by all lessors and all lessees (and acknowledgements if required by state law);

2. An insurable legal description of the property;

3. A grant of the leasehold estate, usually accomplished by words such as "lease", "demise", "let", or "rent";

4. A commencement date that is certain (e.g., a term that commences "when construction is completed" is *not* a date that is certain);

5.  A certain term that is a specific date on which the lease begins and a specific date on which it ends;

6.  Time and manner of payment (i.e., the consideration for the lease).

The lease or a memorandum of lease must be recorded in the appropriate real property records. If a memorandum of lease is recorded, the laws of most states require that the memorandum must include at least the information mentioned above in items 1-6. This constitutes the minimum information a Memorandum of Lease must include to impart record notice of the lease.

Title to the land must be examined to make certain that the lessor had fee simple title to the land at the time of the execution of the lease.

All outstanding exceptions to fee title must be shown as exceptions to the leasehold estate.

To insure a mortgage covering a leasehold estate:

- Verify that the lease agreement does not contain any provisions that would prohibit the mortgaging of the leasehold estate;

- Obtain the written consent of the lessor, if the lessor's consent is required by the lease agreement;

- Obtain written verification from the lessor that the lease is in full force and effect and that neither lessor nor lessee is in default under the lease (sometimes referred to as an Estoppel Certificate) ;

- Search judgment and other general lien indexes, and except to any liens filed against the lessee, unless state law prevents such liens from attaching to a leasehold estate; and

- Record the mortgage.

To insure a leasehold estate obtained by an assignment of lease or a sublease:

- Verify that the lease agreement does not contain any provision that would prohibit the assignment or sublease;

- Obtain the written consent of the lessor, if the lessor's consent is required by the lease agreement;

- Obtain written verification from the lessor and lessee that the lease is in full force and effect and that neither lessor nor lessee is in default under the lease; (sometimes referred to as an Estoppel Certificate)

- Record the assignment of lease or the sublease; and

- Except to the terms and conditions of the Assignment of Lease or the Sublease.

WESTCOR 000734

# Liens

## Overview

A lien is a claim or encumbrance on property which constitutes security for the payment of a debt, obligation, or duty. It may be created voluntarily by the owner of the property or involuntarily by actions or proceedings at law. Generally, a court judgment becomes a lien against real property once an Abstract, Transcript, or certified copy of the judgment is recorded in the county where the property is located. However, in some states the lien may be created by entry of the judgment in the court. The laws and rules as to what constitutes a lien, how it is created, its duration, and where it can be searched for and discovered are all determined by applicable state law and may vary from state to state. The duration of a lien and the effect it has on real property depends, in part, upon the type of lien and the statutory provisions creating it. When insuring title to property encumbered by a lien, such lien must either be satisfied and released of record or subordinated to the interest being insured; otherwise it must be shown as an exception to title.

## Underwriting Instructions

For specific underwriting assistance, see guidelines under **Assignments**, **Environmental Liens**, **Federal Tax Liens**, **FIRPTA**, **Judgments**, **Mechanic's and Materialmen's Liens**, MERS, **Mortgages**, **Subordination Agreements**, **UCC**, **Vendor's Lien**, etc., as such topics may apply.

# Life Estates

<u>Overview</u>

A life estate is an ownership estate in real property that exists only for the lifetime of its owner or the lifetime of a designated third party (sometimes called a life estate per autre vie). A life estate can also be identified as an "estate for years". It is still measured by the physical life of the life estate owner. Life estates can only be measured by the life of a natural person.

A life tenant is the owner of a life estate. (Although the words "life tenant" are used to describe the owner of a life estate, a life estate is an ownership interest, not a lease.)

A reversion is that portion of a fee estate that continues in the grantor after the grantor has conveyed a life estate. For example, when A conveys a life estate to B, the portion of the fee estate remaining in A is a reversion. When B″'s life estate ends, the right to ownership and possession will revert to A. In this example, A is both grantor and a reversioner.

A remainder is a fee estate created in a third party (other than the grantor) that does not become an ownership interest until the life estate is terminated. It is a future possessory interest that vests immediately upon its granting. For example, when A conveys a life estate to B, with the remainder to C, the fee estate conveyed to C is a remainder. When B″'s life estate ends, the right to possession and ownership becomes vested in C. C is a remainderman.

A life estate can be created by deed, will, trust agreement, or by operation of law (for example, under the homestead, dower, and courtesy laws of some states, a surviving spouse may receive a life estate in the real property of the deceased spouse).

A life estate that extends beyond a current living generation may violate the Rule Against Perpetuities.

Specific state law must be reviewed to determine the benefits, limitations, obligations, and duties pertaining to life estates, remainders, and reversions.

A life estate can be granted to a third party, or it can be retained by a grantor. For example, A can convey a life estate to B, or A can convey the property to B, reserving a life estate for A.

A life estate terminates upon the death of the person identified in the conveyancing document as the measuring life. For example, if A conveys to B for the life of B, the life estate is terminated when B dies. Likewise, if A conveys to B for the life of C, the life estate is terminated when C dies. A life estate may also be terminated upon the occurrence of an event triggering termination under the document that created the life estate. A statutory life estate may be terminated as provided by the applicable state statute. When the life estate is terminated, title is vested in the owner of the reversion interest or the remainderman.

A life tenant may sell, mortgage, lease, or otherwise dispose of her or his life estate interest, unless prohibited or restricted by the document creating the life estate. However, whatever interest the life tenant transfers is still subject to the life estate limitations. The life estate interest still terminates upon the death of the life tenant or other measuring life.

A reversioner and a remainderman may transfer and encumber her or his interest (reversion or remainder) in the same manner as a present interest, subject to the life estate. However, remember the reversion or remainder interest is future by nature and is subject to the life estate.

<u>Underwriting Instructions</u>

Call for local underwriter approval before insuring a transaction involving a life estate, remainder, or reversion. The following are general guidelines. The requirements in your state may be different.

WESTCOR 000736

- To insure a life estate, the estate to be insured on Schedule A should be described as "A *life estate created by [describe document creating life estate]"*.

- When insuring a life estate, note a Schedule B exception to *"all rights, title, and interest of [insert names of all reversioners and remaindermen], their successors or assigns, as to the [reversion or remainder] interest created by [describe document creating the reversion or remainder]"*.

- If the document creating the life estate includes any conditions or restrictions, note a Schedule B exception to *"terms and conditions set forth in [describe document creating life estate]"*.

- To insure the interest held by a reversioner or a remainderman, the estate to be insured on Schedule A should be described as *"fee simple"* or *"remainder in fee simple"*.

- When insuring the interest held by a reversioner or a remainderman, note a Schedule B exception to *"all rights, title, and interest of [insert names of all life tenants], as to the life estate created by [describe document creating the life estate]"*.

- If both the life tenant and reversioner or remainderman are to be insured, show the name of the insureds as *"[name of life tenant] and [name of reversioner or remainderman], as their interests may appear"*.

- If both the life tenant and reversioner or remainderman are to be insured, show title vested in *"[name of life tenant], as to a life estate, and [name of reversioner or remainderman], as to a [reversion or remainder]"*.

- All liens, voluntary and involuntary, created by or against the life tenant and the reversioners or the remaindermen must be released, re-conveyed, or satisfied, or they must be or listed on Schedule B as exceptions to title.

- Some documents creating life estates give to the life tenant the power to convey or encumber the fee estate. Obtain local underwriter approval before relying on such powers to insure without the joinder of the reversioners or the remaindermen.

- If a life estate has terminated, require evidence of the death of the life tenant, or, if applicable, the person whose life was used to measure the term of the life estate. This evidence of death must be an official document (such as a properly certified Certificate of Death issued by the governmental entity of the state responsible for such certifications) and recorded in the land records. A simple affidavit or sworn statement that the life tenant has died is *not* sufficient.

# Lis Pendens

## Overview

A lis pendens, also known in some jurisdictions as "Notice of Pendency of Action" or "Notice of Commencement of Action", is a legal document which serves to provide constructive notice pursuant to state law that a legal action (lawsuit) has been commenced in which an interest in certain real property is being claimed or asserted in the action. The literal translation of lis pendens is "a pending suit".

A lis pendens is not a lien on property, but rather a notice that a possible interest is being claimed in certain real property. The filing or recordation of a lis pendens in the public records establishes constructive notice from the date of recording to subsequent purchasers, encumbrances, creditors, and other third parties that a lawsuit is pending that involves an interest in the subject real property or may affect title to the subject property. The recording of a lis pendens establishes the priority of the claim of interest in the land. When there is a lis pendens of record, anyone acquiring an interest in the subject property is subject to and will be bound by the outcome of the pending lawsuit.

A lis pendens must contain certain statutorily required information including the parties to the action and the specific description of the property involved. Agents should not pass on or determine the validity of a recorded lis pendens based upon a technical deficiency in the notice.

## Underwriting Instructions

When insuring real property against which a lis pendens has been filed, the agent must obtain and record a release of lis pendens, determine that the lis pendens is no longer effective by operation of law, or make exception in policies as follows:

> *"A Lis Pendens dated _____, filed by _____, Plaintiff, recorded _____, in Book _____, Page _____, records of _____ County/Parish, State of _____, and any claims or rights that may be evidenced by, or judgments or orders rendered pursuant to, the Lis Pendens or lawsuit."*

WESTCOR 000738

# Manufactured Housing

## Overview

The ALTA form 7, Manufactured Housing Endorsement, is issued as affirmative coverage that the manufactured housing unit situated on the insured land is included in the policy definition of "land." The individual prefab pieces delivered to the site are considered personal property until they are erected into a finished unit and attached to the land, at which time they convert to real property and, therefore, become part of the land as defined in the terms of the ALTA policies.

Caution must be exercised to be sure that the manufactured units are permanently attached to the land and all ownership and liens applicable to the units as personal property have been terminated. Title certificates must be surrendered and purged, UCC liens (both separately filed with the Secretary of State and in the land records and noted on the Certificate of Title) must be fully paid and released, and all sales and personal property taxes paid and terminated. The units must be transferred to be taxed with the land as real property.

## Underwriting Instructions

See also: **Endorsements**, **ALTA 7-Manufactured Housing Endorsement**.

# Mechanics' and Materialmen's Liens

## Overview

Items 7(a) and (b) of the ALTA loan policy jacket insure against loss of damage sustained or incurred by the insured by reason of "*lack of priority of the lien of the insured mortgage over any statutory lien for services, labor or material a) arising from an improvement or work related to the land which is contracted for or commenced prior to the date of policy; or b) arising from an improvement or work related to the land which is contracted for or commenced subsequent to the date of policy and which is financed in whole or in part by the proceeds of the indebtedness secured by the insured mortgage which at date of policy the insured has advanced or is obligated to advance.*"

With respect to mechanics" (labor/service providers) and materialmen"s (suppliers of materials) liens, Schedule B of all title policies should contain an exception for:

> "any lien or right to lien for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records,"

and such exception should not be deleted unless it can be verified that:

- No work has been performed on the property whatsoever.

- The statutory period of time for filing a lien has elapsed since the last work was performed.

- That pending construction will not commence until the insured mortgage has been recorded.

In cases of recently completed work where the statutory lien period has not expired, applicable releases, satisfactions or lien waivers must be obtained from all applicable parties including contractors, subcontractors, labor/service providers, and suppliers of materials. Also, proper and satisfactory indemnity agreements for unrecorded liens must be obtained.

In some states, mechanics" liens and materialmen"s liens will, upon recording, revert back for priority purposes to the date of commencement of work on the project or filing of a notice of commencement; therefore, it is essential that the insured mortgage be recorded prior to such notice and that construction does not commence until such notice is recorded in accordance with statutory provisions. As a consequence of the "relation back" aspect of mechanics" liens, it is essential to comply with state law concerning priority when providing coverage against mechanic's liens. If a policy will be issued without exception to unrecorded mechanics" liens, consult your Westcor underwriting counsel for any special requirements which must be made to avoid potential losses from mechanics" liens.

## Underwriting Instructions

The procedures for removing the mechanics" liens exception are outlined below, but these procedures must not just be followed by rote. The agent must apply common sense to each transaction before removing the exception.

Different rules apply for different situations, such as:

- When the property is unimproved or has been improved for some time.

- When construction on the property is imminent.

- When construction has recently been completed.

- When construction has begun before recording.

- Owner's policies.

**Property Unimproved or Improved for Some Time**

If no work has been performed within the period for liens to be filed after work has been performed, then in most instances a lien cannot arise which has priority over the insured mortgage. In order to remove the exception for unfiled liens, the Company will accept, in most instances, an affidavit and indemnity agreement from the seller and/or borrower that no work has recently been performed on the property. Such affidavits are obviously self-serving, and the indemnity actually may have little value, so the agent must exercise good judgment in determining when not to rely on such affidavits. If any questions arise, please contact Westcor underwriting counsel.

**Property Unimproved But Construction Imminent**

In most jurisdictions, the relative priority of the mortgage with labor or materialmen's liens is determined by the time of recording of the mortgage in relation to the commencement of work on the property. Therefore, in most instances, recording the mortgage before work commences will assure priority. In most instances, the lien exception can be removed upon the execution by the seller/borrower/contractor of Affidavit of Non-Commencement of Construction. The agent must also perform a physical inspection of the property to verify no work has commenced prior to recording the mortgage. The agent should be alert for any set of facts which might indicate that construction has in fact begun before recording of the mortgage, and special care must be taken to record the mortgage as soon as possible after the closing. For commercial construction projects, the Company requires that pictures of the unimproved construction site be taken immediately before the recording of the mortgage. Westcor underwriting counsel should be called if there are any questions. Be aware that "commencement of work" on the property is defined differently in various states. In some states "commencement of work" for mechanics' liens priority may mean the start of planning, architectural drawings, soil testing, or other off-site work. In these states, priority of a mortgage or ownership interest may be legally impossible to obtain against mechanics' liens which may be recorded in the future.

**Construction Recently Completed**

The most dangerous of these situations regarding unfiled lien coverage is when construction has recently been completed and the time for filing liens has not yet passed. This situation is more dangerous in that, unlike the other two, the knowledge that work or construction has been performed is certain; the only question is whether all those who are owed money have been paid. Affidavits and Indemnity Agreements in these circumstances are even more self-serving.

The Company will, however, allow the non-record mechanics' lien exception to be removed from loan policies when construction has just been completed. Within this category, there are two situations with separate rules. In instances where the owner of the property has recently completed remodeling existing improvements and is either refinancing or selling, the Company will rely on a standard lien affidavit, discussed previously. In instances where a contractor or individual is selling a new house, please call Westcor underwriting counsel for guidelines to be followed in the agent's particular region. Upon authorization from Westcor, a Contractor's/Owner's Affidavit may be acceptable. In some cases, provision of mechanics' liens coverage during or soon after construction is completed may require more extensive investigation, review of lien waivers or releases, evaluation of financial states of owners, contractors, or other indemnitors, or other procedures to control risk. Consult your Westcor underwriting counsel for instructions concerning this coverage.

**Construction Begun Before Recording**

Insurance against the risk of unfiled liens where construction began before recordation of the mortgage is outside the usual scope of title insurance protection. The Company will *rarely* entertain the risk of labor or materialmen's liens during construction, in the absence of surety bonds naming the Company as co-obligee. If such approval is to be obtained, it will be given only in reliance upon financially responsible indemnitors, for which evidence of financial stability must be submitted, and upon satisfactory independent evaluation as to the sufficiency of funds available for completion of the project. In addition, control of disbursements,

waivers, and other protective devices may be a condition of affording any coverage. Such insurance cannot be given without approval from Westcor underwriting counsel.

**Special Rules for Owner's Policies**

The mechanics'' liens exception should not be removed from owner''s policies, unless specifically requested by the insured, and then only with underwriter approval. The exception should *never* be removed to benefit an owner whose failure to pay laborers or suppliers may result in liens arising against the property.

WESTCOR 000742

# Minerals

## Overview

A fee simple estate in land includes title to both the surface estate and the mineral estate. The mineral estate (either the entire estate or lesser interests or rights in the mineral estate) can be severed from the remainder of the land. The severance of minerals can be accomplished in several ways, such as an exception or reservation in a deed, a deed of the surface only, a deed of minerals or mineral rights, a mineral lease, or a mortgage of the mineral estate only. Minerals can be conveyed, encumbered, and leased, just like any other interest in land.

Generally, the owner of the mineral estate has the right to use the surface, including the right of ingress and egress, for purposes of exploration, drilling, mining, and otherwise extracting the minerals.

An exception on Schedule B must be made for every document containing a grant, a reservation, or a lease of a mineral right or interest (unless only the surface estate is being insured, as discussed below). In most states, once a mineral interest is shown as an exception to title, it is not necessary to show subsequent transfers of such interest.

If only the surface estate is being insured, an exception for *all* minerals, as set forth in the Underwriting Instructions, should be made. When a complete exclusion has been made as to all minerals, it is not necessary to also list specific exceptions to mineral reservations, grants, or leases.

Mineral leases may have either a fixed term or an indefinite term. When the term is indefinite, it is typically a short fixed period followed by a period that continues so long as minerals are produced. If a fixed-term lease has expired by its terms, it need not be excepted to. It is much more difficult to determine if an indefinite-term lease has expired because production has ceased. Because of the risk involved in such a determination, require either a written release of the lease, executed by the lessee, or a judicial determination that the lease has terminated. In some states, an Affidavit of Nonproduction from the landowner and two disinterested parties may be used to prove up that the lease has terminated.

In some jurisdictions, affirmative coverage is available to insure the owner or lender of the surface estate against loss or damage caused by drilling or mining operations by the owner of the mineral estate. In most jurisdictions, the affirmative coverage is provided by way of a mineral endorsement. The Underwriting Instructions below must be complied with before giving any type of affirmative coverage.

Because of the extraordinary risk involved in insuring a mineral estate separate and apart from the ownership of the land, Westcor will not insure just a mineral estate (or any other mineral interest or right).

## Underwriting Instructions

If a policy excepts to all minerals or specifically excepts to the documents affecting the minerals, it should also contain the following exception on Schedule B:

> *"The right to use the surface estate for ingress and egress and any other right or privilege incident to the ownership of the mineral estate."*

Affirmative coverage may be available to insure against loss or damage caused by the use of the surface. Typically, it will be available if there is a recorded waiver of surface rights or if the subject property is located in a city that has an ordinance that completely prohibits drilling or mining. Consult local underwriting counsel for state-specific requirements.

If all minerals are excluded from coverage,

- In Schedule A, the estate or interest to be insured should be "fee simple – surface estate only," and

- In Schedule B, the following exception should be placed:

> *"There is expressly excluded from coverage hereunder and the company does not insure title to oil, gas, and other minerals of every kind and character, in , on, and under the property herein described."*

Unless all minerals are excluded from coverage (as discussed above), a specific exception should be made in Schedule B for every document containing a grant, reservation, or lease of a mineral right or interest. At the end of each exception, the following language should be added:

> *"Title to said interest has not been investigated subsequent to the date of said instrument."*

To remove a mineral lease as an exception, require one of the following:

- A fixed term that has expired, without renewal;

- A release of the lease, executed by the lessee;

- A judicial determination that the lease has terminated; or

- If the lease has a term that continues so long as there is production, an Affidavit of Nonproduction executed by the landowner and two disinterested parties (*if* allowed by local underwriting practices).

Westcor does *not* insure severed mineral interests or rights. Westcor does *not* insure against loss or damage resulting from mine or drilling subsidence.

See also: **ALTA Endorsement Form 9**, **Endorsements**, **Mineral Rights**.

# Minors

## Overview

Although uncommon, a deed conveying property to a child would not be considered invalid simply because the child is a minor; however, such minor child would not be able to convey or encumber title to the property until he is of legal age. A conservator or guardian of such minor child – with a proper court appointment – may be able to convey, encumber, or otherwise affect the use of the property on behalf of the minor child, usually with court approval, provided applicable laws such as those noted below are followed.

*Natural guardians* are considered to be the mother and father, jointly, of their own children or adopted children, during minority. Instruments executed by a natural guardian are, however, considered to be binding on the ward only for personal property. Statutory provisions limiting the value of property owned by the minor which can be conveyed by a natural guardian without court approval may exist in some states. As a general principle, natural guardians must obtain court appointment and approval to transfer or otherwise affect real property of a minor. Formal guardianship of a minor generally requires the filing of a petition; a court hearing; and adjudication and the appointment of guardian(s) of the minor or his person.

In states which have adopted the Uniform Probate Code, a conservator must be court appointed to convey or transfer real property owned by a minor. (This is true even if the natural parents of the minor seek to convey the minor"s property.)

Generally the powers of guardian – upon court approval – include the power to sell, mortgage, lease, or otherwise encumber said real property. However, in most states, such sale must be authorized or confirmed by the court. Title examination should include review of the certified petition for sale setting forth the reasons for said sale; an adequate description of the property; the price and terms of sale, mortgage or other contract; and whether the sale is private or public, as well as the subsequent terms and conditions of the court orders approving said sale, mortgage, or lease.

In Uniform Probate Code states, a conservator must be appointed to sell or convey any real property of a minor. Such appointment is evidenced by a document called "Letters". The Letters must be recorded and usually no further court approval or confirmation is required. Letters must be carefully examined for any restrictions on authority.

## Underwriting Instructions

When insuring any transaction where a guardian of a minor or incompetent is mortgaging or conveying property, the commitment must contain the following requirement (similar requirement for Uniform Probate Code conservators):

> *"Certified Copy of (1) Petition and Order Appointing _____, Guardian; and (2) Specific Court Order authorizing the (sale/mortgage/lease) of the real property described herein must be obtained from a court of competent jurisdiction and filed in the appropriate county records."*

The Petition for *Order of Sale* should contain the following items:

1. The reasons for the sale or mortgage;

2. An adequate description of the property;

3. The price and terms of the sale, mortgage, or other contract;

4. Whether the sale is private or public; AND

THE WESTCOR MANUAL

    5.    The subsequent terms and conditions of the court orders approving the sale or mortgage.

Unless this requirement is met to the satisfaction of the title agent, exception to the matter must be made in the title policy.

See also: **Guardianships**, **Incompetence**, **Capacity**.

WESTCOR 000746

# Missing Persons

## Overview

Statutory provisions exist in most states to deal with persons who have been missing for an unreasonable period of time (e.g., 90 days or more). Generally, the court may appoint a trustee to manage and control the estate of the missing person during his period of absence. Similarly, a person who remains missing for the requisite statutory period may be deemed deceased and his estate may subsequently be administrated. In the absence of a quiet title action, or the proper statutory procedure establishing of record the death of the missing person and the probate of his estate, transactions insuring property owned by missing persons should not be insured without express underwriter approval.

## Underwriting Instructions

When insuring transactions where a party is missing, Westcor requires a court appointed trustee and order to mortgage or sell the property as outlined above. Contact your local Westcor counsel for state specific statutory provisions and additional instructions.

# Mortgages

## Overview

A mortgage is an interest in land created by a written agreement to provide security for the performance of a duty or payment of a debt. In a "mortgage or title" state, the mortgage operates as a conveyance of the legal title to the property to the mortgagee. In a "lien" state, the mortgage is a pledge of the title to the property but is not regarded as an actual conveyance of the title. There are a variety of mortgage options available to borrowers, as shown below. From an insuring standpoint, the mortgage creates a lien on the real property which must be satisfied of record at the time the loan is paid in full. If a mortgage is not properly satisfied of record, statutory provisions exist which limit the duration of the lien from the specified date of maturity (e.g., five years) or, if no maturity date exists, from the inception of the mortgage (e.g., 20 years). Duration of mortgages is determined by state statute.

A lender making a loan to finance the purchase of real property will generally want a loan policy showing that the lender"s lien is in first position or has superior priority. Any prior or intervening liens must, therefore, be satisfied and released or subordinated to the lien of such mortgage. Intervening or prior liens not released or subordinated must be shown as exceptions to title.

**Adjustable Rate**

An adjustable rate mortgage (called an ARM) has a lower initial interest rate that is subsequently adjusted to a set index at incremental periods during the term of the mortgage.

**Balloon**

A balloon mortgage involves periodic payments which cumulatively are less than the amount necessary to fully amortize the principal amount borrowed, resulting in a balloon payment at time of maturity to pay the loan in full. To be a "true" balloon mortgage, such final payment must be at least twice the amount of any one periodic payment.

**Construction**

A construction mortgage is usually a short-term mortgage which may or may not be converted to a permanent mortgage. Generally, construction loan proceeds are paid out in "draws" and a pending disbursements clause must appear in the loan policy, which serves to limit the liability of the insurer to the amount actually disbursed.

**Deed of Trust**

A deed of trust is used in lieu of a mortgage in "lien" states. A mortgage is a two-party document (grantor [borrower] and lender). A deed of trust is a three-party document (grantor [borrower], trustee, and lender [beneficiary]). Although the language of a Deed of Trust purports to convey the title to the named Trustee, it is usually not regarded as a conveyance in effect. The deed of trust creates a lien on property to secure payment of an indebtedness or obligation. However, the named trustee does have the power to convey the property in a foreclosure.

The terms "mortgage" and "deed of trust" are commonly used interchangeably. Both documents are used to secure the payment of an obligation or indebtedness, and both function in much the same way although, as mentioned above, they are different kinds of documents. Whether a mortgage or deed of trust is issued is a function of state law and local practice. Most deeds of trust can be foreclosed in a non-judicial notice proceeding. Depending on state law, mortgages usually must be foreclosed by filing a foreclosure law suit in a court with jurisdiction. However, the laws of some states allow mortgages to be non-judicially foreclosed with proper notice.

**Note:** For purposes of this article, the same principles stated about mortgages are intended to also apply to deeds of trust.

WESTCOR 000748

**Purchase Money**

While, technically, any mortgage taken to finance the purchase of real property is a purchase money mortgage, some states consider only seller take-back mortgages – where the seller holds financing for the buyers – to be purchase money mortgages.

**Variable Rate**

A variable rate mortgage is one that ties the interest rate to some specified index of market interest rates and therefore causes the interest rate and mortgagor″s monthly payment amount to fluctuate.

## Underwriting Instructions

**Balloon Mortgages**

In order to give certain coverages or endorsements for a balloon mortgage, the trust deed/mortgage and rider must include a Conditional Right to Refinance.

**Purchase Money Mortgages**

To establish priority, verify that all proceeds are being used for the purchase of the home – no funds from the lender are going to pay off credit cards or other debts.

# Options to Purchase

## Overview

An option to purchase is a contractual right or interest granted by the owner of property to someone who wants to purchase the property at a future time. The option to purchase gives the proposed purchaser the right to purchase the property in the future according to certain specified terms at a certain time in the future or upon occurrence of specified future events.

There are two basic forms of options to purchase:

- A stand-alone document which grants an option to purchase to a person holding a less than fee simple interest in the property or a person with no interest in the property.

- A lease-option, whereby the lessee has an option to purchase the leased property under the terms of the lease.

The laws of some states consider an option to purchase as being a personal contract right (personal property) rather than an interest in real property and therefore, such option would not be insurable. Other states recognize only options tied to specific real property interests, such as the lease-option. It is important to know how the laws in your jurisdiction treat options. Consult with your Westcor underwriting counsel before agreeing to insure an option to purchase in any form.

In order to provide constructive notice, an option must be recorded and must not violate the rule against perpetuities in your state. In addition, the option instrument must clearly establish the purchase price for the option.

## Underwriting Instructions

When insuring a stand-alone option, the regular ATLA owner"s policy may be used, showing the estate or interest being insured as an *"option to purchase a [specified] estate as granted in _____ recorded in_____."* When insuring a lease-option (a lease in which an option to purchase is granted to the lessee), a leasehold policy may be used to insure both the leasehold estate and the option to purchase. Alternately, a leasehold policy, insuring the leasehold estate, may be issued in conjunction with an owner"s policy insuring the option to purchase. When insuring under two policies, you must take exception in Schedule B of the owner"s policy as to the option provision of the recorded lease.

In addition to the above, when insuring a stand-alone option or leasehold option, an exception should be made as to any loss or damage resulting from the bankruptcy of the optionor; and another exception made regarding the optionee"s responsibility to comply with the terms and conditions of the option agreement and, in the case of a lease-option, to comply with the terms and conditions of the lease.

The policy insuring the option would have to be issued for the option price or the full value of the property, whichever is greater.

The following exceptions should be used:

1. Loss or damage resulting from the rejection of the option referred to in Schedule A hereof in any proceedings in or related to the Bankruptcy Act of the United States subsequent to the date hereof or resulting from loss of title by the optionor by sale for taxes and/or assessments herein excepted or hereafter accruing.

2. (for an option to purchase contained within a lease) Terms and provisions of the lease described under Schedule A above creating the estates or interests insured hereunder. **Note:** By insuring the interest of the insured as optionee under the option contained in said lease, the company insures

**WESTCOR 000750**

that by virtue of the option, the insured has the prior right to a conveyance of the fee simple title, subject to the exceptions herein contained, the Exclusions from Coverage and the Conditions and Stipulations of this policy, upon legally exercising the option and fulfilling its terms and conditions; and that such right may be successfully maintained against any other parties claiming through or under the lessor. At the time of exercising the option and taking title pursuant thereto, the optionee must determine in whom title is then vested through or under the lessor, and the liens and encumbrances on said title attaching subsequent to the recording of said option, and the company assumes no liability hereunder for cost or expense incurred by the insured in making such determinations or, there being no question of the validity or priority of the option involved, in prosecuting such suit or suits as may be necessary to procure the necessary deed from the party or parties in whom title is then vested or the necessary discharge of the liens and encumbrances then on the property.

3.   (for a stand-alone option to purchase) Terms, provisions, conditions, limitations, and restrictions contained in the Option to Purchase described on Schedule A hereof, and the instrument which grants or contains the said Option to Purchase.

4.   This Policy insures the status of title to the land described on Schedule A hereof only as of the Date of Policy stated on Schedule A. This Policy does not insure against rights, liens, encumbrances, or interests attaching to the land subsequent to the Date of Policy or status of title at the time the Option to Purchase is exercised.

5.   This Policy does not insure the enforceability of the Option to Purchase described in Schedule A, and no obligation is assumed herein to enforce the performance or terms of said Option to Purchase.


NOTE:  Approval by Westcor underwriting counsel is required for an option to be insured.  Counsel must be provided with sufficient information from which to analyze the nature and insurability of the option and the requirements and exceptions which must be listed.

# Parties In Possession

## Overview

It is common practice to take exception for rights or claims of parties in possession not shown by the public records. This standard exception is designed to protect the Company from claims of adverse possessors, claims of non-record interests, and from tenants under unrecorded leases. This exception relates to both actual occupancy of the property or any other possessory interests such as easements or driveways. Such standard exception does not alleviate the responsibility of the issuing agent to examine the public records and to make specific exception for outstanding possessory rights which are of record.

In cases where the purchaser or mortgagee knows of or should have knowledge of the possessory interest of a third party, such purchaser/mortgagee is no longer considered to be a "bona fide purchaser for value *without notice*" and will not, therefore, be afforded protection against such possessory interests under the policy. Generally, an affidavit obtained from the seller or mortgagor, stating that they are the sole parties in possession, is sufficient to delete the standard exception for parties in possession.

## Underwriting Instructions

Upon determination that the seller or mortgagor is in sole possession of the property, this exception can be deleted routinely from owner″s policies on owner-occupied residential property, if the proposed insured so requests, by having them execute an affidavit stating that they are the sole party(ies) in possession. This affidavit should be retained in the agent″s files. It can be deleted from rural or farm property upon presentation of a recent survey. This survey must not show the potential for boundary line disputes or other evidence of potential adverse possessors.

The parties in possession exception may be deleted on commercial property or residential investment property transactions with an affidavit from the seller that there are no tenants holding unrecorded leases. Otherwise, the following exception should be taken in Schedule B:

> *"Rights of tenants, under unrecorded leases or tenancies."*

Commercial properties present a particular problem because tenants must be presumed to occupy all or part of the property. It is customary to require a certified rent roll before insuring such property. With the certified rent roll, the general exception can be deleted and a special exception noted for rights of tenants according to the rent roll.

NOTE:  The rights of parties in possession not shown by the public records exception certainly addresses non-record leases, but it applies equally to non-record contract purchases, optionees in possession, trails, driveways and other possible easement claims, encroachments from adjoining property and fences which do not follow the property boundaries.  Care must be taken any time this exception is deleted to inquire as to any and all of these possible non-record interests to be sure they do not affect the land being insured.

See also: **Affirmative Coverage**, **Deletion of Standard Exceptions (Extended Coverage)**.

WESTCOR 000752

# Partnerships

## Overview

Generally, most states recognize partnerships as legal entities that can acquire, convey, and encumber real property in the partnership name; however, the partners of the partnership may also acquire title individually, if desired. For instance, a deed to Perennial Partnership, a [state] general partnership vests title in the partnership name while a deed to John Doe, Richard Roe, and Sam Snow doing business as Perennial Partnership, a [state] general partnership would serve to vest title in the names of the partners. If, however, title is held in the name(s) of less than all partners, any subsequent conveyance or encumbrance would require execution by all named partners and the authority to act on behalf of the partnership must be verified.

For normal conveyance purposes, title held in the partnership name must be conveyed in the partnership name, and the deed must be executed by one or more of the general partners, in accordance with the partnership agreement of the general or limited partnership. If the transaction being insured is considered to be in the usual course of partnership business, it is generally not necessary to review the partnership agreement. However, transactions not in the usual course of business require that the partnership agreement be reviewed to ascertain that the transaction is authorized by the partnership and that the appropriate partners execute the requisite instruments. Transactions considered not to be in the usual or ordinary course of business would be a conveyance of partnership property to one or more general partners; conveyances made for nominal consideration; mortgages to secure debts of third parties; and conveyances or encumbrances of all or substantially all partnership assets.

### Joint Ventures

A joint venture is a temporary form of business structure, normally used when two or more persons or parties combine efforts to complete one or more business transactions. No written agreements are required for the formation of a joint venture. Joint ventures are often used in real estate development as a means of raising capital and spreading risk. The rights, duties, and obligations are similar to those of partners in a general partnership except that they are restricted to the transaction or transactions for which the joint venture was formed. Once the purpose of the joint venture has been accomplished, the entity ceases to exist without need of formal dissolution proceedings.

In states where a joint venture is not viewed as an entity legally able to hold title to real property, those involved in the joint venture may acquire property in their names, individually, with or without reference being made to the joint venture. If the individuals of the joint venture are married, their spouses" interests must also be accounted for. Upon subsequent conveyance or encumbrance of such property, those holding an interest in the property would be required to execute the requisite deed or mortgage in the manner in which they took title. In states which recognize joint ventures as holding the same powers as partnerships, such entities may acquire, convey, and encumber title to real property in the joint venture name, subject to applicable laws.

## Underwriting Instructions

In most instances, the Company requires the signatures of all partners on a deed or mortgage. Only if the authority is specifically given to less than all partners to sell or mortgage, or if the partnership is in the business of buying and selling real estate, can title be insured based on a deed or mortgage without the signatures of all partners.

Generally, joint ventures should be treated just as partnerships are treated. If less than all joint venturers are executing the documents, written authorization to act on behalf of the joint venture is required. Title under joint ventures must be vested in the individuals names, *(e.g., Tom Jones and Jane Johnson d/b/a/ J & J Company, a joint venture)*. The deeds must be executed individually and the acknowledgment also made as to the individual. If married, their spouses" interests must also be accounted for.

See also: **Deeds**.

# Party Walls

## Overview

Party walls are those common walls located on or along the boundary line between adjoining properties for the benefit and use of the owners of both properties. Each owner has an easement in that portion of the wall owned by the other and an easement over as much of the adjoining property as is necessary for the lateral support of the wall and the attached building.

An exception must be taken for a recorded party wall agreement that defines the rights and obligations of the parties. In townhouse developments where each owner owns fee simple title to the land under his specific unit and holds a common interest with adjacent property owners in the party walls, there must be a recorded agreement, declaration, or covenant containing a provision covering party walls. That agreement, covenant, or declaration must also be raised as an exception. If there is no recorded party wall agreement, but a party wall is common to exist, an exception should be raised for the party walls and the rights of the adjoining neighbors according to these guidelines:

- If there is no agreement of record and the party wall is located on the property line, an exception must be made for the rights of the adjoining property owner as to the party wall and as much of the insured land as is necessary for lateral support of the wall and the attached building.

- If there is no agreement of record and the party wall is completely located on the insured land, an exception must be made as to the rights of the adjoining property owner as to the wall and as to the encroachment.

- If there is no agreement of record and the wall is completely located on the adjoining property, exception must be made as to the existence of the party wall, the rights of the adjoining owner in and to the party wall, and the encroachment unto the adjoining property, unless the parties record a party wall agreement containing the requisite easement.

Where walls are adjacent and self-supporting such as in zero lot line developments, provided the walls are independent, self-supporting, and do not cross the property line, no exception need be made for the wall. If there is an encroachment by the wall then the encroachment must be raised as an exception unless there is an agreement allowing the maintenance of the wall on the adjoining property.

## Underwriting Instructions

In general, the following exceptions should be used when insuring property with a party wall:

1. Where survey shows party wall, but there is no recorded agreement:

   *"Party wall and rights of others in and to the party walls, as shown by survey by _____, dated _____."*

2. Where deed indicates existence of party wall:

   *"Party wall as set out in deed recorded in Book _____, Page_____."*

3. Where many deeds refer to party wall:

   *"Party wall as set out in deed recorded in Book _____, Page _____ and various other deeds of record."*

4. Where agreement recorded setting forth the interests and liabilities of Parties thereto:

   *"Party wall agreement relating to the party wall located on said property, recorded in Book _____, Page _____."*

WESTCOR 000754

# Planned Unit Development

## Overview

A *planned unit development (PUD)* may generally be defined as a parcel of land containing property and improvements owned and maintained by a homeowners'' association, corporation, or trust for the benefit and use of individual PUD units within such a parcel of land. There exists, through the association, corporation, or trust, an automatic non-severable membership of individual unit owners, who must pay mandatory assessments. The purpose of the common property is to enhance the enjoyment of the premises along with the value of the property securing a PUD unit mortgage. A *"de minimus PUD"* refers to common property that has little or no effect upon the value securing the PUD unit mortgage and little, if any, influence on the enjoyment of the premises.

## Underwriting Instructions

Each commitment and policy insuring a PUD must contain an exception similar to the following for the documents creating the PUD development:

> *"Terms, provisions, conditions, easements, restrictions, options, and liens created by and set forth in the declaration recorded [recording information]".*

> *"Any and all authority of the [describe] homeowner's association to regulate and/or levy assessments against the subject property and rights of others in the common areas, if any."*

The agent must also determine that any and all assessments have been paid in full; otherwise, exception must be made in the title policy.

ALTA Endorsement Form 5 applies to loans made on a planned unit development or to an owner who buys in such development.

See also: **Endorsements**, **ALTA 5**, **PUD**.

# Powers of Attorney

## Overview

In order to be considered valid, a Power of Attorney (POA):

5.   Must afford the named attorney-in-fact the power to convey and/or encumber real property;

6.   If non-durable, the Principal named in the POA must be alive and mentally competent at time of execution and delivery of the requisite deed or mortgage;

7.   The POA must not have been revoked; AND

8.   The POA must be properly recorded.

While most states recognize durable Powers of Attorney that reference the disposition of "all my property" – for insuring purposes a specific POA, setting forth the legal description of the property to be conveyed or encumbered, is preferable.

The signature line should reference the names of the principal and the attorney-in-fact – e.g., *"Paula Principal by Angela Agent, her Attorney-in-Fact."* Likewise, the notary acknowledgment section should reference both – e.g*., "Angela Agent, as Attorney-in-Fact on behalf of Paula Principal."* When recording, the POA should precede the instrument executed by the attorney-in-fact.

## Underwriting Instructions

Use of powers of attorney is not encouraged, but documents based on their use can be insured. The examiner must make sure that:

1.   The power of attorney provides the attorney-in-fact full power to "convey" or "mortgage" the subject property;

2.   The principals were living and mentally competent at the time of execution and delivery of such conveyance or mortgage, or the POA must be durable in form;

3.   The POA had not been revoked. In some states, death of the principal, his/her insanity or incompetency, bankruptcy or insolvency, and/or subsequent marriage can revoke a POA; and

4.   The POA was/is properly recorded.

5.   Must be a recent POA with limitations as to time periods.

Additionally, in some jurisdictions, a POA must be in recordable form, which would include compliance with statutory requirements for witnessing and/or acknowledgments.

Westcor recommends that the POA be *specific* as to the property (contains an adequate legal description) and also have the operative language setting forth the powers of the attorney-in-fact to convey or execute documents on behalf of the Principal. In some jurisdictions, the language "to perform any and all acts" is not sufficient.

NOTE:  A common tactic used in fraud claims is for the perpetrator of the fraud to present, **at closing**, a power of attorney.  Supposedly signed and acknowledged outside of closing which authorizes the attorney in fact to sign deeds, mortgages, etc. for the present closing.  When this occurs, the power of attorney (just

like a deed signed outside of closing) must be carefully scrutinized and questioned.  Verification of its authenticity is absolutely required.

# Probate Proceedings

## Overview

Traditionally, the term "probate" included the procedural acts necessary to establish the legal validity of a will and governed the procedural administration of a decedent's estate involving a will. However, in more modern terminology, "probate" contemplates the procedures for administering a decedent's estate, whether with or without a will. In most states such procedures are handled by the Probate Court. States assign jurisdiction for probate matters to different courts, some to a special court only for this purpose, others to the courts which hold general jurisdiction over all civil matters. An individual dies intestate when he or she dies without leaving a valid will. An individual dies testate when he or she dies leaving a properly executed will. Both intestate and testate estates are normally administered by the Probate Court.

When an individual dies he or she continues to hold ownership of property. Title remains vested in the deceased person until such time as it is conveyed by sale by the executor, administrator, or personal representative doing estate administration or transferred by court order or judicial determination. When notified that the record title holder is deceased, you should show title in _(name)_____ deceased" (the name of deceased title holder). However, this may vary depending on the laws of your state.

Whenever you are asked to insure property which is part of a decedent's estate, you should confirm that probate proceedings have been instituted to properly dispose of the property, and that all applicable estate taxes have been paid. If the inheritance and federal estate taxes have not been paid, they should be shown as exceptions on the title policy.

## Underwriting Instructions

Seek your local Westcor counsel's opinion on probate laws. However, generally, the following should be reviewed for conformity by the examiner:

Testate Estate:

1. Will

2. Order admitting the will to probate

3. Letters of Testamentary

4. Proof of publication of notice to creditors

5. Federal and state tax clearances or non-taxable certificate from the Internal Revenue Service and the Commissioner of Revenue of the State

6. Order of Distribution, if any

7. Final Order.

Intestate Estate:

1. Petition for Letters of Administration and the Letters

2. Letters of Administration or letters appointing personal representative

3. Final Decree of Heirship

4. Proof of publication of the notice to creditors

WESTCOR 000758

5.  Federal and state tax clearances or non-taxable certificate from the Internal Revenue Service and the Commissioner of Revenue of the State

6.  Order of Distribution, if any

7.  Final Order.

If you are insuring a sale transaction which requires that a personal representative convey the subject property, you must obtain the necessary documentation appointing the individual as personal representative and verify that the individual has the authority to sign the deed. In addition, the authority should be filed of record.

See also: **Heirs at Law, Inheritance**.

# Purchase Money Mortgages

## Overview

Generally, to qualify as a true purchase money mortgage, the following must occur:

- A buyer must secure a loan made by a third party lender. A mortgage taken back by a seller for all or a portion of the purchase price is also considered a purchase money mortgage;

- All of the loan proceeds must be applied to the purchase price of the property;

- The loan must be secured by the purchased property;

- The mortgage must be dated and recorded concurrently with the deed transferring the property to the mortgagor.

Provided the purchase money mortgage complies with the above, in most states it will enjoy priority over any prior or subsequent claims or liens attaching to the property through the mortgagor, except prior Federal Abstracts of Judgment.

The Internal Revenue Service has ruled that a purchase money security interest or mortgage, valid under local law, is entitled to priority even though it may arise after a notice of federal tax lien has been filed against the purchaser/borrower. (In the state of Louisiana, however, the forgoing does not apply. Federal tax liens (FTLs) filed against purchasers in that state will take priority over the purchase money mortgage. For this reason, it is mandatory that the purchasers" names are searched for federal tax liens in Louisiana and all discovered FTLs either paid or listed as exceptions.)

If secondary financing is being insured, the purchase money doctrine will not protect the secondary lender, and an exception for a federal tax lien or any other intervening liens must be taken.

## Underwriting Instructions

Although the insured mortgage will generally have priority over Federal Abstracts of Judgment against purchasers, Westcor agents must diligently search the records for Federal Abstracts of Judgment filed against the purchasers. If detected, these liens should be listed as exceptions in both the title commitment and under Schedule B of the final title policy.

If the agent has been given constructive notice that a judgment creditor is actively pursuing the enforcement of its lien, an exception to the lien must be made in the commitment and final policy.

When insuring a mortgage which secures purchase money and additional sums, such as payment of credit cards or construction of improvements, its priority is unclear. Therefore, when insuring this type of transaction, an exception must be taken for any existing claims or liens against the mortgagor.

In some jurisdictions, to qualify as a purchase money mortgage, a mortgage must also:

1. Encumber property which is a residential dwelling with not more than four residential units (1-4 family residential property); and

2. The property must be occupied by the purchaser/borrower as a primary residence.

These additional requirements, however, are not the usual requirements in most states. Consult your Westcor underwriting counsel for applicability of these additional qualifications in your jurisdiction. Some transactions involve multiple purchase money mortgages. For example, a property acquisition may include both a new loan from a third-party lender and a seller carry-back loan for a portion of the purchase price.

WESTCOR 000760

Most institutional third-party lenders will require that the mortgage securing the third-party loan must have priority over the seller carry-back mortgage. As a result, the third-party mortgage is usually recorded in first priority position, ahead of the seller carry-back mortgage. Both of the loans are considered purchase money mortgages and are entitled to the priority of such mortgages. However, the relative priorities between the two purchase money mortgages may not be quite as defined. Law in some states gives special priority to a "vender's" purchase money mortgage (the seller carry-back) over a purchase money mortgage made by a third-party lender. Care must be taken to insured the correct and/or priority between the purchase money mortgages according to the laws of your jurisdiction. The order in which the mortgages are recorded must be documented by instructions from the lenders and the mortgage securing the junior priority loan should include a provision that it is junior and subject to the other purchase money mortgage.

# Railroads

## Overview

When insuring title to real property which is adjacent and contiguous to a railroad right-of-way, an exception should be made for potential rights of the railway for ingress and egress purposes. In order to be considered contiguous to the railroad right-of-way, the subject property may lie within 100 to 400 feet of the center line of the main track of the railroad as originally laid out, notwithstanding the intervention of streets, roads, or separate ownerships of land that may lie between the center line of the railroad and the land to be insured. The distance from the center line will depend on the provisions of the railroad act which created the right-of-way. Generally, deeds containing no specific overall width as to the railroad are to be construed as conveying at least 200 feet (but this width is determined by the railroad act which created the railroad right-of-way and must always be checked and verified.). Therefore, unless the agent can verify with certainty that the land to be insured comes no closer than 100 feet from the center line of the main track of the railroad line, an exception must also be made for any easements or claims of easements of the [named] railroad.

## Underwriting Instructions

When insuring property which is contiguous to a railroad right-of-way, the commitment and final title policy must contain the following exception:

> *"Ingress and egress, if any, of the _____ railroad in and to the right-of-way line of said railroad adjoining the ____ boundary of the property herein insured."*

The exception for easements or claims of easements on property as outlined in the overview list above may conform to the following:

> *"Any easements, or claims of easements, of the ____ Railroad."*

## Railroad as Owner in Chain of Title:

Before insuring property wherein the chain of title shows that the land was formerly owned by a railroad company, the agent must carefully review the instrument by which the railroad company acquired its interest in and to the land to determine the intention of conveyance of the parties.

Generally, a grant or conveyance of real estate to a railroad company is intended to vest title or interest as an *easement* rather than fee simple title, depending on the language used. Unless the agent has proven that the railroad company acquired fee simple title, the estate as insured on Schedule A should list "EASEMENT" rather than fee simple title and the following exception shown in the commitment and final title policy:

> *"The interest herein insured is an easement only, and not fee simple title."*

**Caution:** Land Grant railroads which received their right-of-way by grants from the federal government by congressional act are subject to reversionary interests. If the railroad abandons, sells, or ceases to use the right-of-way for a railroad, the property may revert to the federal government. It is always necessary to determine the source of a railroad's title or ownership before insuring a conveyance out from a railroad or property formerly owned by a railroad.

Any of the following situations would infer that the interest was intended as an *easement* only:

- Lack of adequate consideration.

- Deed contains a reversionary clause.

WESTCOR 000762

- The railroad company charter does not authorize the acquisition of property other than for railroad purposes.

- The property conveyed is a small strip of land.

- Phrases are found in the instrument which restrict the use of the land: e.g., conveyed as "an easement/right-of-way only" or "for railroad or depot purposes only."

- The instrument contains a right of reverter or provides conditions for its conveyance: e.g., "as long as used for railroad purposes", "as long as the same shall be used for a railroad", or "on condition that a crossing be maintained."

- When insuring access that crosses a railroad right-of-way, it is important to determine if the access is via an easement rather than a renewable license.

For additional information, contact Westcor underwriting counsel.

# Receivers

## Overview

Often, Receivers will be appointed to hold or distribute property or funds of others during litigation. Once a Receiver has been appointed, the court has complete control over the distribution of those assets. Any sale by a Receiver must be done by court order. Therefore, an attempt to sell, mortgage, lease or convey those assets by the owner is void.

## Underwriting Instructions

The following guidelines are given when insuring property sold by a Receiver:

1. The agent should obtain and examine a certified copy of the order of sale. This order should contain a minimum of the following:
   a. Complete description of the property;
   b. Whether the sale is to be private or public;
   c. Price, terms and conditions of the sale;

2. How the sales proceeds are to be distributed. (If not stated, the proceeds are paid to the clerk of the court to be held until the rights of all claimants are determined.)

3. Expiration of the time for appeal (or an affidavit from the Receiver attesting that there has been no appeal from the Order Appointing the Receiver and the Order of Sale).

4. If the time for appeal has not run, the following exception should be made in the commitment and policy:

   a. "Subject to the rights of appeal from the order *appointing* the Receiver and/or the order of the sale, if any".

5. A Certified Copy (conformed copies are not acceptable) of the Report and Confirmation of the Sale must be obtained prior to closing.

6. Recordation of the Receiver's Deed.

Certified Copies of the Order of Sale, Report and Confirmation of Sale, and the Receiver's Deed must be recorded in the records in which the property is located.

WESTCOR 000764

# Restrictions

<u>Overview</u>

When insuring title to real property encumbered by restrictions, an exception for such restrictions must be made in both owners and loan policies along with a notation as to whether or not the restrictions are accompanied by a reverter or forfeiture clause in the event of violation. If a forfeiture or reverter clause has been modified, such modification must be noted. The forfeiture or reverter must be reviewed to determine if the interests of a mortgage holder are protected, if not, then the exception should state that the insurer accepts no liability for any past or present violation of the restrictions. If the restrictions have been violated, such violation must be shown as a separate exception. Most importantly, if the restrictions are accompanied by right of reverter or forfeiture in event of violation, and a known violation has occurred, no policy should be issued until a deed can be obtained from the party entitled to such reversionary or forfeiture rights.

Generally, lenders will require some form of affirmative coverage with respect to exceptions for restrictions – language to the effect that the restrictions contain no reversion or forfeiture clause, that the restrictions have not been violated, and that a future violation will not cause a reversion or forfeiture of title. Provided a review of the restrictions shows that no reversion or forfeiture clauses exist and that no violations of restrictions have occurred, such affirmative language may be given through the use of various endorsements.

Some lenders will also ask that affirmative coverage include the assurance that the use intended for the property will not result in a violation of the restrictions. Since violation of use restrictions is one of the most common forms of violations, it is unwise to provide affirmative coverage against such violations, especially when a potential violation will be the first of its nature in the subdivision or might become a nuisance or otherwise offend or annoy neighboring property owners.

Where building restriction lines appear on a recorded subdivision plat or on the plat of a survey, an exception should be noted to the platted restrictions. Affirmative insurance, stating that such setback lines have not been violated should not be given unless and until it can be verified, by an inspection or a recent survey, that the improvements on the property do not, in fact, violate the setbacks. Where there has been a violation, the violation must be noted as a separate exception.

Any affirmative assurance, if given, should be set out on a separate endorsement after approval by local Westcor Title underwriting counsel.

No affirmative insurance should ever be given on owners policies regarding the exception for restrictions or building line restrictions unless underwriter approval is obtained.

<u>Underwriting Instructions</u>

**General Exception for Restrictions**

> "Covenants, Conditions and Restrictions contained in instrument dated _____, filed _____, in Book _____, Page _____, _____ County/Parish Recorder's Office."

**Restrictions (No Reverter or Forfeiture Clause or Violations)**

Provided the restrictions have been reviewed and there is no reversionary clause and a current, accurate survey has been provided and the agent has checked it against the restrictions and determined there has been no violation of the restrictions, affirmative language may be provided as follows: *

> "Covenants, Conditions and Restrictions contained in instrument dated _____, filed in Book _____, Page _____, _____ County/Parish Recorder's Office. However, this policy hereby insures that, as of the date hereof said, conditions and restrictions have not been violated and that a future violation will not cause a forfeiture or reversion of title."

\* Notwithstanding this affirmative language, the preferred method for providing affirmative coverage is by appropriate endorsement and not affirmative language.

### Restrictions (With Reverter or Forfeiture Clause)

The fact that there exists a reversionary clause, no matter how designated (reverter, rights of reentry, etc.), should be set out *as an exception* in Schedule B of the commitment or policy.

### Minor Violations

If a review of the recorded plat or survey discloses a violation of restrictions, the agent must determine the risk posed by such violation. If the violation is minor and it has been determined that there is little or no possibility of the violation resulting in a loss to the Company because the statute of limitations may have run on enforcement or some other similar reason, affirmative coverage may be given after securing approval from local underwriting counsel as a separate endorsement as follows:

> *"A review of the survey dated _____ by _____ discloses that the west side of the house located on the premises encroaches 6 inches over the building restriction line along the west boundary of the property However, this policy hereby insures against loss or damage which the insured shall sustain by reason of the entry of a final court order or judgment which constitutes a final determination and requires the removal of the existing improvements as a result thereof."*

In some jurisdictions specific endorsements exist to provide affirmative coverage for minor violations of restrictions. With approval of Westcor underwriting counsel, such endorsements can be used to provide this coverage.

Major violations which may not be affirmatively insured against should be brought to the lender"s attention immediately. The loan should not be closed until amended closing instructions have been received from the lender authorizing the agent to proceed with the closing and accepting the exception in the final title policy. The agent should also disclose the matter to the purchasers/borrowers at closing and obtain a written acknowledgment of the violation(s).

As an alternative, with approval and guidance from your local Westcor counsel you may suggest that the parties seek a variance from the local governmental authority with jurisdiction of such matters if the setback that is violated is one established by local law or ordinance. Such variance will have to be granted before affirmative coverage may be granted, and even if granted, an exception will still have to be taken for the violation. If the violation is of a setback established by a recorded agreement or plat of subdivision, then all of the parties or successors to the original agreement will have to execute a modification of the agreement allowing the violation, and in the case of a setback established by subdivision plat, the owners of the properties in the subdivision will have to execute a modification allowing the violation. Once the restriction has been modified, with the approval of local underwriting counsel affirmative coverage may be granted.

It is important to stress than any affirmative coverage constitutes extra hazardous risk and as such any requests by a proposed insured for affirmative coverage for violations of use restrictions must be approved by Westcor"s underwriting counsel. The affirmative coverage must be on a separate endorsement and may require the payment of an additional hazardous risk premium. Before approving such language, it must be proved that:

1. The use restrictions are ancient;

2. The character of the neighborhood has drastically changed so as to make the violated use a reasonable use of the property in conformity with the present uses and character of the neighborhood;

3.  The properties immediately surrounding the properly to be insured have similar violations of the use restrictions;

4.  No recent attempts have been made to enforce such restrictions.

Contact your local Westcor counsel for further guidance and written authorization.

# Reversionary Clauses

## Overview

A reversionary clause serves to protect the interest of the person or entity making restrictions on property and, in the event of a violation of such restrictions, title to the property subject to such violation may revert back to the reversionary party. Whenever a reversionary clause exists it must be set out as an exception to title, unless it has been properly released through a deed expressly stating such purpose and intention.

## Underwriting Instructions

Reversionary clauses, no mater how designated (reverters, rights of reentry, etc.), preferably should be set out verbatim in Schedule B of the commitment or policy. Although it would be the Company's position that a reversionary clause has been sufficiently incorporated into the exceptions from coverage by a mere reference to the Restrictive Covenants in which it appears, the Company believes that it is a better business practice to set out such a drastic exception from coverage in detail.

See also: **Restrictions**.

WESTCOR 000768

WESTCOR

# Rights of Way

## Overview

A right of way is a privilege to pass over the land of another for a particular and expressly stated purpose. The term "right of way" is sometimes used interchangeably with "easement". However, this usage is not necessarily correct.  A right of way may be an easement or a fee ownership. It is similar to an easement. A right of way is sometimes used to describe a strip of land over which an easement passes. It may also attach to and be incidental to the use of a parcel of land, in the same manner for an appurtenant easement. When insuring the title to property which is subject to a right of way, the right of all persons entitled to use the right of way must be excepted from the policy coverage under Schedule B.

The term "right of way" does not necessarily have legal significance since it can be either a fee title interest or an easement.  The legal status of "right of way" depends on the nature of the original grant and the context of its use.  Care must always be exercised when dealing with "rights of way" and proper exceptions should be noted regardless of its status as a fee interest or an easement.

## Underwriting Instructions

All rights of way should be listed as exceptions, with appropriate recording information as well as the type and location of the right of way.

The rights of all persons entitle to use the right of way should be excepted from the policy coverage in Schedule B.

The following are suggested ways to set out exceptions regarding rights of way:

- "Rights of the public in and over that portion of _____ affecting subject property."

- "Right of way running over the Southwest portion of subject property, as shown by survey of John Doe, date_____ , 19___."

- "Right of way of (NAME OF ROAD OR STREET) over that portion of _____ above property embraced therein."

See also: **Easements**, **Alleys**.

# Riparian/Littoral Rights

## Overview

Riparian rights and littoral rights refer to the rights appurtenant to the ownership of land partially covered by or bordering on a body of water. These rights are not easily defined and may be considered interchangeable for purposes of title insurance. They may include the right to ingress, egress, boating, fishing, and bathing (swimming), among others. These are the rights to use the abutting body of water. The extent of rights to use the connected body of water by the landowner, neighboring riparian landowners, and the public in general vary from state to state and within given states depending upon the nature of the body of water.

## Underwriting Instructions

Whenever land is bordered by or extends beneath a body of water, an exception as to riparian and littoral rights is always required. The nature and extent of riparian rights can never be insured without a referral to Westcor underwriting counsel. Title to submerged land or previously submerged land could be subject to a Federal Navigational Servitude based on government powers pursuant to the commerce clause of the Constitution of the United States of America. It may be impossible to release or convey such lands. Any attempts to convey such lands may be revocable if deemed contrary to the Public Trust Doctrine. The Public Trust Doctrine provides the sovereign state will hold all lands in trust for the benefit of the public. Careful analysis of the derivation of title and uses of the land must be made in every instance when affirmative coverage is sought with respect to riparian or littoral rights. The initial presumption as to any body of water is that it is a navigable body of water. Accordingly, others may have rights of use for navigation purposes in addition to rights to uninterrupted flow of the water. The terms: *accretion, reliction, erosion,* and *avulsion* are generally associated with the changes in the location of the waterlines as a result of natural causes. The definition of these terms may vary from state to state. Many of these terms are used interchangeably. A determination of which of these terms is applicable should be made only after consultation with underwriting counsel. Be careful not to rely on prior title insurance policies to determine waterfront interests. The nature, extent, or existence of riparian rights may never be insured without thorough analysis by Westcor underwriting counsel. An independent determination must be made in each instance.

Often deeds or mortgages are prepared with language such as "together with all riparian rights" included after the legal description of the land. The agent should be careful not to incorporate this or similar terms anywhere in the title policy. Although title insurance does not insure riparian rights, mistakenly including this language with the legal description in Schedule A may lead to the insured to believe the Company is providing this coverage.

Whenever the land abuts a body of water, proper exceptions must always be raised in Schedule B. These exceptions could take the following forms:

*Rights, if any, of the United States of America, State/Commonwealth of _____, the municipality or other local government and the public in and to that part of the land, if any, as may have been formed by means other than natural accretions or may be covered by the waters of Lake _____.*

*Rights of the United States of America, State/Commonwealth of _____, the municipality or other local government and the public in and to that part of the land lying within the bed of the _____River.*

*Rights of owners of land bordering on the _____ and others to the continued and uninterrupted flow of the water (without diminution or pollution).*

*Rights of the public and owners of land bordering on the _____ River/Lake to navigational and/or riparian recreational and/or other rights to use said water.*

WESTCOR 000770

WESTCOR

*Any and all rights of the United States of America, the State/Commonwealth of _____, the local government and the public, if any, in and to the use of all or any part of the land lying between the body of water abutting the subject land and the natural line of vegetation, bluff or extreme high water mark or other apparent boundary line separating the publicly used area from the upland private area.*

*This policy does not insure title to artificially filled lands, submerged lands, or land which may have been under water or which has been added to the subject land by accretion, reliction or avulsion.*

*This policy does not insure title to any portion of the land lying below the high water mark of _____.*

*This policy does not insure against any decrease of the subject land, if any, caused by erosion or changes in the shoreline or centerline or meander line of the body of water known as _____.*

*This policy does not insure against any claim of ambiguity or uncertainty in the exact location of the boundary along the body of water known as _____.*

*This policy does not insure against the rights of federal, state, or local jurisdictions to regulate usage of the shore area.*

See also: **Filled in Lands, Water Rights, Wetlands**.

# Severed Improvements

## Overview

Insuring title to the improvements in one party and title to the land upon which they are affixed in another party is often referred to as a "severed improvement", a "split fee", or a "constructive severance" transaction. The party owning title to the improvements must also own a possessory interest in the land it is affixed to by virtue of ground lease.

It is important to determine whether the severed improvements constitute real or personal property. Provided the improvements have, or will continue to be, permanently affixed to the land, and the estates or interests have been properly created, separately described land and improvements are eligible for title insurance coverage for both owners and lenders.

Depending upon the instrument creating the interest, the interest in severed improvements and title policy should show title to the severed improvements vested as a fee estate. Qualified ownership is generally created in a lease transaction where the conditions of ownership are limited by its terms, and upon the happening of a certain event, such as the expiration of the lease, the estate will revert back to the lessor. Before insuring a fee interest, the instrument creating the separation must be unqualified as to the limitation of the term, and there may be no other conveyance by the owner of the improvements upon the happening of an event, e.g., the expiration or sooner termination of a lease. In transactions where the interest created cannot be determined, exception under Schedule A of the final policy should make reference to the estate or interest as conveyed or reserved by the instrument and its recording date. The policy must also note a Schedule B exception to the terms and provisions of the ground lease.

## Underwriting Instructions

To determine whether severed improvements constitute real or personal property, the agent must thoroughly review the instruments creating the interest to ascertain the intention of the parties involved. Documentation must not only properly describe the improvements, title to which is being or has been constructively severed from that of the land, but must also provide an assurance that the building and improvements "are and shall remain real property". The agent must also obtain written verification that it is the intention of the parties that the improvements are not to be physically removed from the land to which they are affixed, and there are no "side agreements" to the contrary.

The agent should also make an exception for any easements for access, maintenance, use, and support of such buildings and improvements which, although not necessarily constructed, may be implied by the separate estate or interests created by the severance.

Easement created by express grant or reservation:

> *"Easement for the access, maintenance, use and support of buildings and improvements situated on and excepted from the land described herein, as may be implied from the severance of the title to buildings and improvements (GRANTED TO/EXCEPTED BY)_____,in document recorded_____."*

Easement created by implication:

> *"Such easements or other rights for the access, maintenance, use and support of buildings and improvements situated on and excepted from the land described herein, as may be implied from the severance of the title to buildings and improvements (GRANTED BY/EXCEPTED BY) _____, document recorded _____."*

WESTCOR 000772

When insuring severed improvements, exception should be noted to the terms and provisions of the ground lease. With severed improvements it is always required that the improvements be supported by a ground lease. Otherwise, the improvements would encroach onto the land on which they are located.

All severed improvement transactions must be submitted to Westcor underwriting counsel along with the Company's Policy Authorization request (for unusual underwriting risks).

# Subordination Agreements

## Overview

When insuring a mortgage where there are intervening liens that prevent the lender from holding first lien priority, such other liens may be subordinated to the lien of the subject mortgage. If applicable, where lienholders voluntarily execute proper subordination agreements, such subordinated liens should be shown on Schedule B, Part II of the ALTA loan policy.

## Underwriting Instructions

When insuring transactions that rely on any subordination agreement, such instrument must be reviewed carefully and found to comply with the following requirements:

1. To be insurable, a Subordination Agreement must be specific as to the particular transaction:
    a. Instrument must be dated;
    b. Must specifically recite the names of the existing mortgagor, mortgagee, new lender, the new loan document, its amount, and the recording information of both documents;
    c. Contain a proper legal description of the land affected;
    d. Contain language to the effect that the existing mortgage holder subordinates its interest to the new loan without condition;
    e. If the new loan makes provisions for future advances or extensions, the subordination agreement must state that it is also subordinate to these matters.

2. The instrument must be properly executed, acknowledged, and recorded.

3. If there are modifications or changes in the terms of the new mortgage after the original transaction, an amended subordination may be required to reflect these changes.

4. The Company does not rely on automatic subordinations. Because many courts refuse to enforce automatic subordinations to future construction loans, Westcor does not authorize the issuance of its policies insuring a first lien position pursuant to blanket, automatic, or general subordinations.

5. The agent should obtain proof that the individual executing the subordination agreement has the authority to act on behalf of the company.

6. A mortgage which has been subordinated must be listed as an exception under Schedule B-II of the final title policy (subordinate matters) and may conform to the following language:

    *"Mortgage dated _____, executed by _____, in the original amount of $_____, in favor of _____, recorded _____, in Book ____, Page _____, Records of _____ County, State of _____; made SUBORDINATE to the insured mortgage by Subordination Agreement dated _____, and recorded on _____, Book _____, Page _____, Records of _____ County/Parish, State of _____."*

7. Check with your local Westcor underwriting counsel for any state-specific requirements.

**Caveat:** Section 1823 of the Federal Deposit Insurance Corporation Act allows the FDIC to disallow or not be bound by any document which diminishes or reduces the interest of a failed bank unless such document has been expressly approved by resolution of the bank"s Board of Directors or Loan Committee. This applies to subordination agreements which subject a mortgage to the bank to another loan. To avoid possible problems which could arise in the event of failure of the subordinating bank, Westcor requires that any subordination agreement signed by a bank, savings and loan institution, federal savings bank, or other financial institution governed by FDIC must be approved by a resolution of the bank"s Board of Directors or Loan Committee, and a copy of this resolution must be retained in the agent"s file.

WESTCOR 000774

# Survey Matters

## Overview

The standard exception regarding survey matters may be deleted provided a current acceptable survey, properly certified, is received. In order to be considered acceptable, the survey must reflect the property address (where available), city, county, and state where the property is located; the lot/block and subdivision name, along with applicable plat book and page number or accurate metes and bounds description; clearly defined boundary lines and notation of any discrepancies in the measurement of property lines; location of property in relation to the nearest discernable monument, where possible; location of all improvements in relation to property lines, notation of any encroachments between subject and adjoining properties; and any visible uses of the property which would indicate potential easements.

Any easements, encroachments, or boundary line disputes as revealed by the survey, must be specifically excepted in both the owner's and loan policies including reference to the survey reflecting such matters. The standard survey exception may be deleted, provided specific exceptions are made as to the matters above.

## Underwriting Instructions

When insuring title to a *mortgagee only* on 1-4 Family Residential properties up to $1 million in a platted subdivision, a survey is no longer required to give coverage for survey matters when utilizing an ALTA Loan Policy or Short Form Policy. *This change does not apply to owner's policies, construction loan policies, new construction, acreage tracts, vacant land, commercial loans, mixed-use properties or residential properties for more than four families*. Exceptions must still be made for recorded easements and any unrecorded easements you may discover from an old survey, a prior policy, or other reliable source. (The above guideline does not apply to the State of Florida.)

When insuring property not within a platted subdivision, where the lender requires title insurance be given without exception to survey matters, but is not requiring that a new survey be ordered, Westcor will accept prior surveys issued to the current owner within 6 years provided the property is a *refinance only of residential property* and an affidavit has been obtained from the current owner stating that there have been no improvements to the insured property since the date of that prior survey. The survey cannot be used to delete the survey exception when issuing a policy for a resale.

The following pages contain surveys that show examples of encroachments or other survey matters that require specific types of underwriting treatment. Examples number 1 and 2 are acceptable for affirmative coverage, and examples number 3 and 4 must be listed as exceptions.



Example 1

The encroachment of the shed onto the public utilities and drainage easement and the minor fence encroachment may be insured for mortgage purposes only utilizing the following wording:

> *"Encroachment of a shed into the 20' public utilities and drainage easement and the encroachments of the fence along the southerly lot line of Lot #48. The company hereby insures for mortgage purposes only against loss or damage which the insured shall sustain by reason of the entry of any court order or judgment which constitutes a final determination and requires the removal of the existing improvements because of the encroachments or encroachments thereof."*

NOTE:  The preferred method for providing affirmative coverage is by endorsement.

WESTCOR 000776



*Example 2*

The encroachment of the house onto the minimum building setback line may be affirmatively insured for mortgage purposes only using the following language:

> *"The survey dated ____ by (Surveyor), shows a two foot encroachment of the house and improvements over the 50" minimum building setback line. The company hereby insures for mortgage purposes only against loss or damage which the insured shall sustain by reason of the entry of any court order or judgment which constitutes a final determination and requires the removal of the existing improvements because of the encroachments or encroachments thereof."*

NOTE:  The preferred method for providing affirmative coverage is endorsement.

**THE WESTCOR MANUAL**



*Example 3*

The shed and concrete pad may not be insured and must be included in Schedule B as an exception. The exception may be worded as follows:

*"Nine foot encroachment of shed and concrete pad over the northerly lot line onto adjoining Lot #76."*

WESTCOR 000778



*Example 4*

The encroachment of the neighbor"s fence and subject property fence are not insurable. The following exception from coverage must be made:

> *"Encroachment of the neighbor's fence over the southerly lot line onto the subject premises and the encroachment (projection) of the fence over the northerly lot line onto the adjoining Lot #62, and any right, title or interest or claim thereof in or to the insured land by adjoining owners."*

By no means do the above examples demonstrate all of the situations that may occur when insuring title to property. However, the illustrations do show situations that occur fairly frequently and are also indicative of Westcor"s treatment of different types of encroachments and/or survey matters.

See also: **Affirmative Coverages**, **Building Setback Lines**, **Surveys**.

# Synthetic Leases

## Overview

A synthetic lease is a financing arrangement that is classified as a lease for financial accounting purposes and as a loan for tax purposes. This type of lease is sometimes referred to as a "tax ownership/operating lease or an "off balance sheet" financing. A synthetic lease involves the purchase of real estate from a third party seller by a Special Purpose Entity (SPE) that then leases the property to the lessee. The lessor provides acquisition and construction funding. The funds advanced by the lessor are repaid through the rent that the lessee pays. If the lease is properly structured, the lessee/borrower will be recognized as a lessee under the accounting rules and as an owner and borrower under applicable federal income tax code provisions.

Synthetic lease transactions usually resemble leveraged sale-leaseback transactions, so a description of the re-characterization risk encountered in sale-leasebacks is useful to understand the title industry's approach to synthetic leases. Many sale-leaseback transactions contain features that could persuade a court to determine that the transaction created a financing instead of a lease. In these cases, the court may decide to re-characterize the transaction to a financing by interpreting the interest of the lessee as a fee interest and the interest of the lessor as a mortgage lien.

### Indicators of Risk

Due to a number of title claims in the industry that have resulted from some re-characterization challenges to sale-leaseback transactions, companies have responded by taking exception to this risk in those transactions where this possibility appears too great. A typical list of the risks indicating that a sale-leaseback might be re-characterized as a financing usually includes:

1.  The purchase price for the sale is less than the property is worth.

2.  The "rent" is equal to or greater than the debt service for an equivalent loan.

3.  The purchaser has a "put option" to return the property to the seller, or the seller must repurchase it, at the end of the lease.

4.  The seller's repurchase option price reduces to a token sum over the life of the lease.

5.  The seller will build improvements on the leasehold, but the term of the lease is too short to depreciate its investment on the improvements.

6.  The lease permits substitution of properties in a multi-property transaction.

7.  The lease may indicate that it is for security only, or make reference to "the lender" or "this mortgage."

## Underwriting Instructions

Agents that are asked to insure a synthetic lease transaction should contact underwriting counsel for guidance. If underwriting counsel is uncomfortable with the structure of the transaction because it contains too many of the risks listed above, counsel will suggest the agent add a re-characterization exception to Schedule B of the commitment and title policy as follows:

> "Any assertion or determination that (a) the lease referred to at item _____
> of Schedule B is not a "true lease" or (b) the vesting of title in [the insured] is part of a loan
> transaction, including the assertion that the deed to [the insured] and the lease constitutes a
> mortgage or other security device."

WESTCOR 000780

**Note:** *Affirmative insurance should never be added to this exception.*

Underwriting counsel may even decide that it is not necessary to raise any exception in the first place because of the availability of a defense under one of the following theories:

1. *The "Act of the Insured" Defense*: the risk of re-characterization is excepted from coverage under the title policy exclusions because it is a matter "created, suffered, assumed, or agreed to" by the insured, or

2. *The "Post Policy" Defense*: the risk of re-characterization is excepted from coverage because it is a "defect, lien, encumbrance, adverse claim, or other matter…attaching to or created subsequent to Date of Policy."

If approved by underwriting counsel, the agent may issue an Owner Policy to the SPE and a Leasehold Policy to the lessee. In both policies in Schedule B, there must be an exception to the terms and conditions of the recorded synthetic lease documentation.

**Insuring a Fee Transaction after a Synthetic Lease Transaction**

Whenever an agent is requested to insure a conveyance of property which has been the subject of a Synthetic Lease Transaction, consideration must be given to the elimination of any potential interests or liens created by that transaction.

In order to vest unencumbered title, the following documents should be executed and recorded:

1. Deed from the SPE fee owner/mortgagee with the joinder of the lessee/real owner.

2. Termination of the leasehold interest created by the synthetic lease.

3. Release, discharge, or satisfaction of the fee mortgage created by the synthetic lease.

Unless these documents are executed and recorded, a future bankruptcy of either the SPE or lessee could result in a claim under the policy insuring the new owner. The trustee in bankruptcy would be in a position to assert that the absence of recorded termination documents results in either an outstanding interest in or a lien on the property.

CAVEAT:     A synthetic lease transaction is a very sophisticated, coupler arrangement that requires special care and analysis for title insurance purposes.  No such transaction may be insured without involvement of and approval by Westcor Underwriting Counsel.

# Tax Titles

## Overview

Tax titles arise out of the non-payment of taxes, assessments, or other public charges by the real property owner resulting in a forfeiture of title by all who have an interest in that property. Although this is a general description applicable to most jurisdictions, the actual laws and timing requirements of each jurisdiction will be different based upon specific state statutes and local ordinances. Guidance from local underwriting counsel must always be sought when faced with tax sales.

In a tax sale, title is most often conveyed by an administrative tax deed. Generally, when taxes on land are not paid, the tax collector may sell either the land or a tax certificate on such land at public auction. A tax sale certificate is then issued to the successful bidder who pays the unpaid taxes and requisite interest, costs, and related charges. If there is no buyer, the certificate is issued to the county. After the statutory period of time has elapsed – e.g., two years – following the year of issuance of the tax sale certificate, the owner of the certificate is entitled to apply to the tax collector for a tax deed if the owner of the land has not paid the tax certificate holder or the county the redemption amount of the taxes, interest, penalties, and charges from the tax sale.

Upon notice of sale being properly published and sent to the owner and any lienholders or mortgagees of record, the land is sold at public auction. At that time, the owner of the tax sale certificate may bid in the amount required to redeem the tax certificate plus other related costs, and a tax deed will then be issued to the purchaser. In other jurisdictions the action may actually be one to foreclose upon the tax certificate or one to foreclose the equity of redemption. In any case the result is the same and that is to divest the owner of the property. In some jurisdictions, if the owner has not redeemed the property from the original tax sale by within the prescribed time period the tax deed may be issued by the tax assessing office or clerk of court and the issuance of the tax deed will divest the former owner of all title to the land and constitute a new and independent source of title.

A tax sale will not only divest the non-paying owner of the land but all who have an interest in the property, whether they are a mortgagee, judgment creditor, remainderman, lessee, or co-tenant. Easements, rights of ways, covenants, conditions, and restrictions will typically survive a tax sale and will continue to burden the property. One must also keep in mind that an owner of a tax certificate or a tax sale purchaser may also be divested at a subsequent tax sale for failing to pay real estate taxes, assessments, or other public charges. Another matter to keep in mind is that in most jurisdictions a co-tenant will not be able to acquire exclusive title to property as against his co-tenants by virtue of successful bid at a tax sale. A payment made by one co-tenant will ordinarily be for the benefit of all co-tenants or joint owners.

## Underwriting Instructions

Because courts may be sympathetic to an owner that lost his property for pennies on the dollar, and as equity abhors a forfeiture, tax sales are often set aside. The slightest defect in the tax sale may cause it to be vacated. The procedures or the implementation of procedures for a sale of real property for non-payment of taxes and the validity of tax sales are often attacked even if a sale was held in strict compliance with all state and local laws, based upon failure to give proper notice as required under the Due Process Clause of the United States Constitution. For these reasons it is the policy of the Company not to insure property where the title search reveals that the title is derived from a tax sale that occurred less than twenty years before the effective date of the search.

The company will consider exceptions to this policy on a case-by-case basis. Please contact Westcor''s local counsel for guidance. In general WLTIC guidelines will be as follows:

1. The tax deed has been of record at least *20* years or the time required to gain title by adverse possession;

WESTCOR 000782

2.   A review of the tax assessments and collection records has determined that the state and local tax laws have been strictly complied with;

3.   Delinquent taxes were not paid by the dispossessed former owner prior to issuance of the tax deed;

4.   Evidence is obtained and recorded in the records verifying that the taxes are paid and current and further verifying the continuous payment of the taxes by the tax deed grantee or successors in title for at least 20 years or the time required for adverse possession;

5.   Subsequent to the tax deed there has been no possession adverse to the tax deed grantee or his successor in title;

6.   That the tax deed purchaser or his successors have held exclusive possession of the property for at least the minimum required to establish adverse possession;

7.   A review of the tax sale proceedings (which must be judicial proceedings) must reflect strict compliance with the notice requirements of the Due Process Clause of the U.S. Constitution as set out under Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), as expanded by Mennonite Board of Missions v. Adams, 462 U.S. 791 (1983), and its progeny, i.e., notice to affected individuals must be reasonably calculated, under all of the circumstances to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections; or

8.   A deed from the former dispossessed owner to the tax deed holder conveying title along with a release from all mortgagees and lienholders; or

9.   A final non-appealable order from a court of competent jurisdiction quieting title in the tax sale purchaser or his successors in a case in which the summons and complaint was personally served on an owner that lost the property at the tax sale as well as on all mortgagees and lienholders.

With items 1-7 above, the Company may also require the execution of a ratification by the original dispossessed owners. Contact Westcor underwriting counsel for written authorization before insuring any transaction which contains a tax sale in the chain of title.

# Taxes and Assessments

## Overview

Taxes and assessments which are due and payable at time of closing are to be listed on the requirements page of the title commitment and are to be paid in full in conjunction with the closing. Taxes and assessments which are not yet due and payable must be shown as an exception to title and may include the notation *"a lien but not yet due and payable."*

Special assessments, such as street improvements, sewer lines, and sidewalk repair may result in a lien against abutting properties served by such improvements. An exception must be made for special assessments which remain unpaid. Similarly, certain assessments may be set up on an installment payment plan and such installments must be current at time of closing, with an exception being made for the lien of such continuing assessments.

Deed restrictions or declarations of condominiums that contain a clause authorizing levy assessments against property owners are to be specifically excepted in the policy as to such potential assessments, unless written verification from the assessment authority is received, which states that all assessments have been paid to current date.

Liens for unpaid taxes are to be shown as exceptions to title on the commitment and final title policy unless paid in full.

## Underwriting Instructions

Always check the offices of the appropriate taxing authority for the status of taxes which are currently due and payable or delinquent. In addition, when insuring Planned United Developments ("PUDS"), condominium units, or other developments which incorporate association fees or dues, all homeowner"s fees and/or assessments must be brought current and paid at closing. Status of taxes and assessments must be obtained in writing from the assessing or levying authority. Verbal information is not acceptable and cannot be relied upon.

Always include an exception in any commitment or policy for any existing lien for taxes or assessments which are due but not paid or are not yet due and payable.

WESTCOR 000784

# Timeshare Estates

## Overview

The concept of timeshare estates varies from state to state, so it is difficult to make any general statements about their nature. However, timeshare ownership usually applies to condominium projects (usually located in resort areas) and provides multiple owners of an individual unit the right to occupy it during various and specific time periods of the year. Timeshare ownership involves an undivided interest in a specific unit according to the number of weeks purchased. For instance, a person buying a one week timeshare will own an undivided 1/52 interest in a unit in the timeshare property.

There are many types of interests created in timeshare projects ranging from actual co-ownership tenancy to "club memberships" or "vacation licenses" where no actual ownership exists. When timeshare estates are held as *tenants in common*, each owner has the undivided right to use the property for a specific time period during the year. The timeshare purchaser may own what is commonly called an *"interval estate"* (an estate for years in a specific, described parcel of real estate for a designated recurring period of time), or a *"time-span estate"* (an undivided interest in fee simple in a designated parcel of real estate with the exclusive right of occupancy in that parcel of real estate for a designated recurring period of time). There may also be a *leasehold* timeshare estate.

Under a co-tenancy, it is possible that the interests of all owners of a particular time-share unit may be sold to enforce one owner's delinquent state or federal tax liens with the balance of the proceeds from the sale being distributed pro rata.

## Underwriting Instructions

When a timeshare purchaser only obtains a contractual right-to-use the facility as owned by the club, commonly called a *vacation license or club membership*, no ownership rights are created and therefore the purchaser does not own an insurable interest in the land. *Westcor agents are not authorized to issue its commitment or final policy insuring these types of transactions*.

Under timeshare regimes that provide for individual ownership interests in real property, title insurance may be issued. Typically, Schedule A of the commitment will be unchanged, except the legal description, which must describe the timeshare estate number (or other designation), condominium unit number, and timeshare declaration recording information, and must include a clause similar to the following:

> *"Each such timeshare estate constituting a one fifty-second (1/52) undivided interest in the respective Condominium Unit described above in the Condominium established by [TITLE OF CONDOMINIUM DECLARATION], dated ____, and recorded ____."*

In addition to the usual exceptions for condominiums (e.g. Master Declarations, Declaration of Easements, etc.), the specific timeshare declaration, and other matters of record, both the commitment and any final policies must contain exceptions for the following matters (these exceptions should be modified in accordance with the language and contents of the actual project documents):

> *"Nothing contained herein shall be construed as insuring that tax assessments against the interest described in Schedule A will be made in any particular manner."*

> *"This policy does not insure against the consequences of a merger of all the timeshare estates in one parcel/unit by operation of law."*

> *"This policy does not insure against loss by reason of the hold-over or unauthorized occupancy by other owners/users of any unit or by the association, the developer, its lessees or other third parties holding over pursuant to the procedures for reserving usage as set forth in the timeshare declaration, as amended."*

*"This policy does not insure against loss or damage which may be caused as a result of the enforcement of any state, federal or judicial lien against any other party holding an interest in and to the subject unit."*

*"A right-of-entry for purposes shown and incidental purposes, during the "maintenance periods" as provided in the declaration of condominium and/or timeshare declaration, as the case may be, referred to herein for cleaning, servicing and maintenance." (If applicable.)*

Any record matter affecting the underlying fee must be excepted in both the commitment and final policy.

It is important that Westcor agents determine the nature of the interests being insured and their insurability under state law. If you are unfamiliar with the insurance of timeshare estates, please contact Westcor underwriting counsel for approval before issuing any commitment or policy.

See also: **Condominiums, Contract (Agreement) for Deed.**

WESTCOR 000786

# Trusts

## Overview

A trust may be defined as a fiduciary relationship in which one person holds interest subject to an equitable obligation to keep or use that interest for the benefit of another and generally comprised of the following elements:

1.  A settlor or "trustor"

2.  One or more trustees

3.  One or more beneficiaries

4.  The agreement giving the trustee certain powers, and

5.  Property which is the subject of the trust.

Trusts may be created in different ways: "living trusts" or "inter vivos trusts" are created by living persons conveying property to a trustee. "Testamentary trusts" are created by wills wherein a decedent's will appoints a trustee to administer the assets of the estate following his death.

At common law, a trust is not a legal entity capable of holding title or dealing with it in any way. For example, deeds conveyed to the "John Doe Trust" are generally not valid conveyances according to the common law rule. The deed should have been conveyed into the trustee in that capacity: e.g., James Doe, Trustee of the [John Doe Trust].

When insuring title to property being acquired, conveyed, or encumbered by a trust, the trust document must be reviewed to ascertain that it is a valid and active trust and that the action taken by the trustee is within the scope of authorized powers conveyed upon him by the trust.

Property conveyed to an individual, corporation, or partnership with the wording "trustee" or "as trustee" , and with no other reference made to a specific trust, beneficiary, or the granting of powers may, depending upon applicable state law, be viewed as having been conveyed to such individual, corporation, or partnership individually and not as trustee. The act of placing the wording "trustee" or "as trustee" should not be construed as automatically creating a trust, especially in those cases where any other reference to such trust is clearly absent.

In modern jurisprudence many states have now enacted statutes which allow trusts to hold title in the trust name. In those states a conveyance to "The John Doe Trust" is considered valid. In most states this authority is concurrent with the common law method so either concept is considered valid. Some states require that certification by affidavit of the trust name, the name and address of the trustee and other relevant information must be recorded for a conveyance to the trust name to be valid.

## Underwriting Instructions

When insuring property being bought, sold, or mortgaged by a trust, the agent must call for and examine the trust agreement in order to establish that the trustee is acting within the authority provided under the trust. If there is any question as to the sufficiency of the power of the trustee to act, then the agent should require deeds from all beneficiaries under the trust agreement. A copy of the trust instrument or memorandum of trust should be retained in the agent's files for future reference.

# UCC Financing Statements

## Overview

**Fixture Filings**

Certain transactions may include a transfer of personal property in addition to real property. It is important to remember that ALTA title policies insure only those improvements which, by law, have been converted to permanent fixtures and are considered part of the real property. These transactions may be subject to financing statements filed under the provisions of the Uniform Commercial Code, which may take priority over the insured instrument.

**Personal Property or Fixture?**

A "fixture" is an article that was once personal property, but that has been installed in or attached to land or a building in some more or less permanent manner, so that such article is regarded in law as part of the real estate. In most states, in the absence of an express agreement, an item is considered personal property or a fixture according to the following six criteria:

1. The nature of the items in question.

2. The manner of the annexation to the real property.

3. The purpose for which annexation is made.

4. The intention of the parties (especially the annexing party).

5. The degree of difficulty and extent of loss involved in removing the items from the realty.

6. The damage to the secured property caused by the removal.

If by a preponderance of the evidence using these factors the item is deemed to be part of the real estate, then the item is a fixture. If the tests indicate the item is personal property, it is "goods" and not a fixture.

**Financing Statements**

In most states, a security interest in personal property which is or is to become a fixture is governed by the Uniform Commercial Code (UCC). A financing statement must be filed in order to perfect a security interest in fixtures. Lenders often file UCC-1 Financing Statements (for personal property) in addition to the mortgage securing the financing of the real property.

The UCC-1 Financing Statement is generally filed in two places:

- With the Secretary of State

- In the public land records of the county in which the property is located.

Part of the search and examination process is to verify that no unexpired UCC Financing Statements exist of record. The statute of limitations for such statements varies from state to state. Prior to the expiration date (usually 6 months prior to expiration) the UCC may be extended for an additional period of time. If the financing statement has expired by its own terms or by applicable law, then it should be considered to no longer exist. Additionally, if a review of the financing statement determines that only non-fixtures are included (such as computers, copiers, or inventory), then it does not affect real property.

The problem with locating some UCC Financing Statements is that not all states require the inclusion of the legal description of the property and, in some cases, the name of the debtor reflected on the statement is not

that of the current record owner. At times, the only common link between the statement and the property being insured is the physical property address. Some states have amended the UCC requirements to include provisions for identifying such property.

## Underwriting Instructions

Any existing or newly filed financing statements covering fixtures must be excepted on the final title policy. If the financing statement has been assigned or continued, the exception should reflect the original financing statement as well as the assignment or continuation. If the agent can ascertain that the personal property secured by the financing statement or chattel mortgage has not become a fixture and thus real property according to the law of the jurisdiction, then it is permissible to omit these recorded statements for the loan policy. However, it is advisable to disclose the existence of these statements to the proposed insured for informational purposes.

An agent should never insure machinery, equipment, or fixtures as part of the insured land without prior approval of Westcor underwriting counsel.

Commitments and policies should contain an exception to any financing statement that affects the property if it has not been properly disposed of.

Contact your local Westcor counsel for any questions regarding specific provisions of your state.

# Vendor's Liens

## Overview

In some jurisdictions, a seller of real estate who has not been paid the full purchase price and does not take any lien or security beyond the personal obligation of the purchaser is recognized as having an implied equitable lien upon the land conveyed. This lien may be enforceable not only against the vendee (purchaser), but against any purchaser who may have had notice that the full consideration has not been paid.

A vendor's lien may be evidenced of record by a notice of contract or similar instrument, or the lien may be reserved in a conveyance. However, a vendor's lien may also be shown by unrecorded documentation such as escrow documentation or disclosure by the proposed insured or another party. Generally, a recorded notice of a vendor's lien has the same priority as a purchase money mortgage and is superior to any liens existing at the time the vendor's lien is created, except for Federal Abstracts of Judgment.

Before insuring title to a property where a vendor's lien exists, the lien must be properly released, quitclaimed, subordinated, waived, or determined to have expired under the statute of limitations.

## Underwriting Instructions

Where a vendor's lien has attached to property being insured, a requirement for the proper release of the interest of the vendor must be made under Schedule B of the commitment. Unless the lien is disposed of to the satisfaction of the agent, it must be excepted to in the final title policy.

See also: **Contract for Deed**.

WESTCOR 000790

# Water Rights

## Overview

Water rights refer to the right to take water from a body of water, including underground or percolating waters. Water rights can be granted for many purposes, but most commonly are granted in connection with farming, ranching, and mining. Because of the complexity of state-by-state water rights, Westcor requires that all policies except or exclude water rights from coverage, unless specifically approved by Westcor underwriting counsel.

## Underwriting Instructions

The following exception should be taken in Schedule B as follows:

> *"Water rights, claims or title to water, whether or not shown by the public records."*

In some states, water rights are included in a standard, pre-printed policy exception, so a separate exception on Schedule B is not necessary.

Where water rights are applicable, other specific exceptions for other related rights and interests may be necessary (e.g., an easement across the land to extract water from a well or pump).

See also: **Riparian/Littoral**, **Easements**, **Wetlands**.

# Waterfront Property and Wetlands

## Overview

In reviewing the title to any parcel of property, the title examiner or attorney is primarily interested in four issues:

- Who is the vested owner;

- What property do they own, i.e., what are the boundaries;

- How is their ownership defined, what rights and benefits do they enjoy;

- What burdens or encumbrances have been placed upon the land.

In examining property that borders on a body of water or contains wetlands, the answers to these questions become more difficult because of the ever-changing nature of shore lands and wetlands. The difficulty is then compounded by the complex and varied laws that affect these properties. Wetlands are defined under the Clean Water Act and various other federal and state statutes. The EPA, Army Corps of Engineers, state natural resources department, state environmental departments, and the U.S. Coast Guard, may have regulatory authority over these properties, not to mention various other local or state agencies that may have been established to regulate development along waterfront properties.

The single most difficult task faced by a title insurer is to determine the legal character of wetland property. Its legal character may be very different than its physical appearance. Wetlands include tidelands, submerged lands, swamp and overflow lands, inland lakes and rivers, marshes, bogs, and uplands which border a body of water. Wetlands, for conveyancing purposes, may also be treated as dry land or upland property. Wetlands may be defined by legislation or regulations as land which is normally dry but has a high water table or supports a certain type of vegetation. Because of these uncertainties, local underwriting counsel must be consulted.

### Water as a Boundary

A deed conveying a parcel of land bordering on a body of water may describe the conveyed land with reference to the adjoining water. The description may give a call and a distance as part of a metes and bounds description to the water's edge, bank of a river, or low or high water mark, or it may simply state that the river, bay, lake, or ocean is a boundary line. Although the deed may give an exact distance and direction, that does not answer the question of how close to the water or how much of the land is conveyed. Shore lines erode and rivers meander; the only certainty with land bordering water is that the shore line or bank will change over time. Physical features will change and the rules for determining the extent of ownership in each state are different.

The effect such change has on land ownership depends upon how the change occurs. Changes to a shoreline, which occur gradually or by "imperceptible degrees" in response to the normal and natural action of the water will, in many jurisdictions, actually shift the legal boundary. These changes occur through erosion, reliction, or accretion. Under normal circumstances, Westcor Title would not insure the ownership of this additional land. On the other hand, sudden, perceptible changes do not result in a shift in the legal boundary. Such sudden action is referred to as avulsion (i.e., the effects of a violent storm) or the artificial filling of wet areas.

To confuse matters further, different bodies of water are also subject to different rules. Any inquiry into the extent of the ownership interest should start with a determination of whether the land under the water or even the land adjacent to the water is subject to private ownership. The answers to such inquiries, although academically stimulating and educational, are difficult and fraught with peril for the title insurer. These inquiries must, nonetheless, be made on those occasions when we encounter the waterfront property with a

WESTCOR 000792

WESTCOR

dock or a marine condominium providing ownership of a boat slip or even a condominium built on piers or filled lands.

Even if private ownership of shore lands or subaqueous land can be proven and is allowed, it will typically be subject to stringent federal, state, and local regulation, as well as be burdened by rights vested in the public. When insuring lands bordering a body of water, several exceptions for these rights must be taken, as set out in the Underwriting Instructions section below. These would include the right of the public to use the shore, the navigational servitude imposed on navigable waters, and others.

**The Public Trust**

Generally, with a few exceptions, a state owns tidelands, submerged lands, and lands lying below navigable lakes and rivers within its borders by reason of its sovereignty. Sovereign ownership by the states has two distinct elements. The first is the proprietary ownership of the land, which, under certain limited circumstances, may be sold by the state to others. The second is the interest held by the state in trust for the public, which, except for very limited circumstances may not be sold by the state. Sovereign ownership and the difficulties encountered in attempting to determine the character of the property which is the subject of a title order make wetlands an extra-hazardous title risk.

The law in this area has primarily evolved from the English common law where those waters that were affected by tides and the abutting shores of those waters were deemed to be in the public domain and the King held title to those waters in trust for the benefit of the public. The concept of the land held by the sovereign for the benefit of the public goes back to the time of the Magna Charta. Royal ownership of these lands became the law of the colonies. After the revolution, the original states succeeded to the interests of the crown in the tidelands and large flowing waters. New states entering the union enjoyed the same rights of sovereignty and ownership under the equal footing doctrine. The leading case on this point is Illinois Central R.R. v. Illinois, 146 U.S. 387 (1892) where the court held that the state″s ownership of the Lake Michigan shore in Chicago was impressed with a trust for the benefit of the public. Put simply, generally, a state owns tidelands, submerged lands, and lands lying below navigable lakes and rivers within its borders by reason of its sovereignty.

While this public interest is referred to in various ways in different jurisdictions, it will be referred to here as "the public trust." This public trust encompasses the public″s right to use tidelands and other navigable waters for commerce, navigation, and fishing.

In a more recent case, Phillips Petroleum Co. v. Mississippi, 108 S. Ct. 791 (1988), the Supreme Court reaffirmed that the state was vested with title to all lands under all waters affected by tide, whether navigable or not. The recent trend has been to expand the effect of the public trust by designating such activities as recreational use and even the preservation of tidelands in their natural state as a valid exercise of the public trust power. The public trust continues to exist even if the property is conveyed by the state into private ownership. These public rights may, as a practical matter, render the property worthless to its private owner.

**Navigable Waters**

The term navigable has been used to identify those waters that are reserved for public use and, hence, title to the bed and the water would lie with the state or federal government. Navigable waters are essentially waters not subject to meaningful private ownership and are either tidal or non-tidal.

The federal law and the laws of the states have continued to develop and change to fit the changing circumstances since the colonial times. In England all waters of importance to commerce were affected by tides. On the American Continent, rivers and large inland lakes were not affected by tides but yet were important to commerce and used for navigation. The concept of navigable waters was expanded by court decisions and gave the federal government jurisdiction and ownership of these non-tidal waters under the Commerce Clause of the U.S. Constitution. When states entered the Union they were then given title to the navigable waters within their borders. State ownership of the lands under these waters was expanded and codified under the Submerged Lands Act of 1953.

Under a federal definition of navigability, if the water in question at one time belonged to the federal government and the federal government transferred it to the state when the state joined the Union, then the water is deemed navigable, if, when it was transferred, the water was used or could have been used in its ordinary condition for commerce. For the 31 states that acquired their navigable waters from the federal government, public ownership of these waters and lands is then determined by this federal definition by examining the water′s natural condition at the time of statehood. The balance of the states include the 13 original states, which preceded the existence of the federal government, and the five states formed from the original states, as well as Texas, which was a republic before joining the union. In those 19 states the federal definition may not be dispositive on the issue.

## Federal Navigational Servitude

The Commerce Clause of the U.S. Constitution gives the federal government the exclusive power to regulate interstate and foreign commerce, which gives the federal government the authority over all navigable waters of the United States. This right is paramount to all other interests, including the rights a state or individual may have in the land. This federal navigational servitude exists over all lands presently or formerly flowed by the navigable waters of the United States. The exercise of this paramount right may result in a taking of property without compensation being paid.

The navigational servitude would affect filled-in lands that may now be dry but were previously under the waters of a navigable waterway. This places such land at the risk of some day being cleared, having the fill removed, and being returned to its former wet state. It also affects all piers and bulkheads on navigable waters.

## Piers, Bulkheads, Man-made Fill

Although private ownership of shoreline improvements may be possible, its existence may be by revocable license subject to termination and forced removal. The construction or even repair of any improvements is subject to scrutiny at various levels and regulation by many different states, local, and federal agencies. Shore improvements would most likely be subject to navigational servitude and other easement rights. No affirmative coverage should ever be given covering any such improvements, and any policy insuring property with any such improvements should contain appropriate exceptions as shown in the Underwriting Instructions. As with any complex issue, local underwriting counsel must be consulted before issuing policies on waterfront properties.

## Rights of the Public

Because wetlands are, in fact, attractive to the public, adjoining private lands may be subject to claims that the public has the right to cross the private lands to get to the wetlands or navigable waters. Such claims have been based upon custom, prescriptive easement, or the doctrine of implied dedication. Wetlands may also be classified as a wasteland and be impressed with the rights of the public as a commons and subject to the public′s right to fish, fowl, or hunt.

## Surface Runoff

Under common law, surface water was viewed as a common enemy and each landowner had the right to fight off or drain surface water as best he could. These rights were tempered in that good faith was to be used in the efforts to remove surface water and one was and is typically prohibited from collecting water on one′s land and then discharging it in volume upon the land of another with injurious results.

A landowner is able to take steps to drive off surface waters from the land if such acts are reasonably necessary to protect the land. Liability to another landowner may result if his efforts are unreasonable and an adjoining property owner is injured.

WESTCOR 000794

**Rivers and Streams**

Properties located on or having flowing waters run through them raise additional concerns. Downstream owners have the right to expect the continued uninterrupted flow of the waters past the subject property without unreasonable diminution or pollution. In the western part of the country, water rights are a highly specialized area of the law and the right to make use of the flowing waters on the property may be severed by agreement or forfeited by lack of use.

Upstream owners also have the right to the continued flowage of the waters, and the owner would in most cases be prevented from blocking off the flow of the water so as to dam up the river and stream and cause flooding on the neighboring property. The owner would, in most cases, be prevented from altering the course of the stream or river as that would impede the flow of waters and could cause injury to the adjoining neighbors.

The river may qualify as a navigable body of water and be subject to a navigational servitude, and the public may have rights to fish, navigate, or carry on commerce.

**Underwriting Instructions**

We must remember that we can only insure matters as reflected in the public land records and only to the extent allowed to by the laws controlling ownership of land bordering water. A survey may not be able to track a legal description along a water boundary as it may have changed. The description along the water may have been inaccurate to begin with. Ownership issues and easements as they pertain to bulkheads, piers, fill, and dry land created by accretion or reliction may not be reflected in the land records and may not be insurable interests.

The following Schedule B exceptions are used when insuring different types of waterfront or wetlands property. Their purpose is to avoid insuring risks. This list is not exhaustive, but covers basic situations only. Situations can be encountered which require modification of these exceptions or different exceptions altogether. Some states use promulgated forms that already exclude the rights or interests that may arise because of water-related issues.

Since wetlands present extra-hazardous title risks, Westcor underwriting counsel must approve reports, commitments, or policies covering wetlands before they are issued.

**Property abutting any body of water:**

1. Any and all rights of the United States of America, the State/Commonwealth of _____, the local government and the public, if any, in and to so much of the land lying below the high water mark of the _____, unaffected by fill, man-made jetties and bulkheads.

2. Title to that portion of the property lying below the high water mark of _____.

3. Subject to any wetland regulation by the local, state or federal authorities and the rights of the public, if any.

4. Riparian or littoral rights are not insured.

5. Title to artificially filled lands, submerged lands, or land which may have been under water or which has been added to the subject property by accretion, reliction, or avulsion is not insured.

6. Any claim alleging that the actual acreage or square footage of the insured parcel is less than the amount in the parcel described in Schedule A.

7. Any claim based upon ambiguity or uncertainty in the exact location of the boundary along the high water line of _____.

8. Rights of the public to use the lands below the high water line for fishing, fowling, navigating, or conducting commerce.

9. Title to or the right to use or maintain any docks, piers, bulkheads, jetties, or artificially filled lands are not insured.

10. Navigational servitude over that portion of the property that is or may have been under water.

**Property abutting an ocean, gulf, bay, tidal river, swamp, or estuary:**

Any adverse claim based upon the assertion that some portion of said land is tidal or submerged lands.

**Property on or containing a stream or river:**

1. Rights of others entitled to the continued uninterrupted flow of the _____ without diminution or pollution.

2. Rights of others in and to the use of the waters of _____ and the natural flow thereof.

**Beaches and shore areas:**

1. Rights, if any, of the public to use any part of the land lying below the high water mark or below the natural line of vegetation, bluff, or other apparent boundary line separating the publicly used area from the upland private area.

2. Rights of the state, local, or federal government to regulate usage of the shore area.

**Swamps, bogs, and marshes:**

Rights of the state, local, or federal government to regulate usage of any wetlands on the subject property and the rights of the public, if any, thereto.

See also: **Beaches**, **Riparian/Littoral Rights**, **Waters and Filled-in Lands**.

WESTCOR 000796

# Zoning

## Overview

ALTA owner's and loan policies specifically exclude zoning matters from coverage. While some states do permit such coverage to be made via endorsement, other states expressly forbid it. Since the ALTA policies themselves – through the Exclusions from Coverage – specifically exclude such matters, it is not necessary to make further exception regarding zoning laws and ordinances. However, any zoning violations noted of record should be specifically excepted in such policies.

Zoning matters contained within the body of restrictions or other agreements, designed to limit or regulate the use of specific property, should be treated as restrictive covenants and not as express zoning matters. If restrictions contain, or a notation is made on the recorded plat as to, a requirement that the subject lands comply with local zoning laws, specific exception must be made re same.

Affirmative insurance for the status of zoning may be requested by lenders in certain commercial transactions. For guidelines on its issuance, see **Endorsements**, **Zoning**.

## Underwriting Instructions

Any zoning violations noted of record must be listed in Schedule B of the title policy as follows:

> *"Violations of Zoning Regulations as disclosed by [describe instrument], dated _____, recorded _____ in Book _____, Page _____, Records of _____ County/Parish, State of _____."*

If restrictions or other agreements contain or make notation as to a requirement of the land to comply with zoning laws, exception must be shown on Schedule B of the title policy as follows:

> *"Compliance with that certain requirement that the property comply with local zoning laws disclosed in [describe instrument], dated _____, recorded _____ in Book _____, Page _____, Records of _____ County/Parish, State of _____."*

# Index

abandoned property ....................................18, 20
*access* ................................ 6, 14, 24, 65, 91, 136
Access...........................................................67
   Wetlands...........24, 28, 76, 135, 155, 156, 158
accretion .........................76, 134, 135, 156, 159
acknowledgment......7, 8, 36, 52, 55, 63, 64, 117, 120, 130
acknowledgments ...................................7, 120
   mail-away closings ...................................*See*
acreage.................................9, 47, 72, 139, 159
adjustable rate ...............................................112
adverse possession....................10, 65, 146, 147
Adverse possession...........................................10
affirmative coverage 11, 27, 68, 69, 89, 103, 107, 129, 130, 134, 139, 158
Affirmative coverage...............................69, 107
Affirmative Coverages ...................................143
after-acquired title ...........................................13
After-acquired title .........................................13
After-Acquired Title.........................................13
agreement for deed ..........................................45
Airspace ..........................................................14
Alleys ...........................................................133
ALTA 5 ..........................................................119
ALTA 7 ...................................................90, 103
ALTA 8.1 .........................................................70
appeals......................................................20, 94
assessments..39, 40, 79, 114, 119, 146, 147, 148, 149
Assessments...................................................148
   Condominiums .........................15, 39, 79, 150
assignment ...............................16, 98, 153
Assignment .....................................................98
attorney-in-fact .....................................8, 71, 120
Attorney-in-fact
   Acknowledgment........................................7, 8
attorneys-in-fact...........................................7, 71
automatic stay...................................................19
balloon mortgage...................................112, 113
Balloon mortgage
   Endorsement..............................103, 108, 119
bankruptcy . 17, 18, 19, 20, 21, 22, 23, 49, 51, 53, 57, 73, 80, 87, 96, 114, 120, 145
Bankruptcy 17, 19, 20, 21, 23, 51, 57, 73, 80, 87, 96, 114
bona fide purchaser...........25, 57, 61, 94, 95, 116
boundaries ..............................9, 26, 27, 28, 39, 156
building setback..................................27, 68, 141
capacity............................7, 8, 29, 34, 36, 77, 151
cash reporting ............................................30, 32
cash transaction ...............................................30
cemeteries.......................................................33

CERCLA .........................................................70
certificate of authority ................................37, 47
chain of title.....13, 14, 55, 56, 63, 64, 65, 82, 86, 88, 126, 147
Chapter 11 .....................................18, 20, 21, 22
Chapter 12 ......................................................22
Chapter 13 ...........................................20, 22, 23
Chapter 7 ................................18, 19, 20, 21, 22
churches............................................34, 35, 36
civil forfeiture ..................................................61
closings ..........................................................71
commercial construction.................................105
condemnation ...........................................28, 38
condominium......6, 14, 39, 40, 79, 149, 150, 157
condominiums .....................39, 40, 58, 148, 149
consideration....23, 25, 42, 44, 51, 55, 56, 57, 82, 98, 117, 126, 145, 154
construction loan.....41, 42, 43, 72, 112, 138, 139
construction loans ..........................................138
constructive severance .............................89, 136
contemplated improvements.....................42, 43
contract for deed ........................................44, 45
contract for sale ........................................25, 45
contract purchaser.....................................44, 45
conversion....................................................20, 21
Conversion.......................................................20
corporate deed .................................................52
corporations ..................20, 21, 46, 47, 49, 71, 77
creditor″s rights....................................51, 56, 57
current party proceedings ................................17
Current party proceedings................................17
debt restructuring............................................22
debtor-in-possession .................18, 20, 21, 22
deceased.................48, 78, 86, 94, 100, 111, 122
deed in lieu of foreclosure ....................51, 56, 57
deed of trust ....................16, 41, 74, 75, 80, 112
deficiency judgment .........................................79
divorce .................................................22, 49, 60
drainage ..................................................76, 140
easement ......6, 14, 24, 28, 33, 38, 39, 65, 66, 68, 118, 126, 127, 133, 140, 155, 158
easements.......15, 27, 40, 65, 66, 68, 72, 91, 116, 119, 126, 136, 139, 159, See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See , See
eminent domain ...............................................38
encroachment 11, 27, 68, 118, 140, 141, 142, 143
Encroachment...................................140, 143
endorsement. 11, 16, 27, 41, 51, 68, 69, 107, 129, 130, 161

endorsements ............ 11, 12, 16, 69, 97, 113, 130
Endorsements .. 12, 16, 69, 70, 90, 103, 108, 119, 161
entireties ........................................ 49, 50, 84
environmental protection ................................. 70
estate 7, 11, 14, 16, 17, 18, 19, 20, 22, 39, 44, 45, 48, 49, 51, 54, 63, 64, 65, 71, 77, 89, 90, 91, 94, 95, 97, 98, 100, 101, 107, 111, 114, 117, 122, 126, 136, 144, 146, 149, 151, 152, 154
estate for years ........................................ 100, 149
estate property ............................................. 19, 22
estates .... 14, 38, 39, 40, 44, 49, 77, 90, 100, 101, 114, 122, 136, 149, 150
exceptions to title ............... 18, 87, 101, 112, 148
farm ....................................................... 72, 116
federal funds .................................................. 88
federal tax lien 44, 49, 73, 74, 75, 79, 80, 95, 124, 149
federal tax liens .............. 44, 49, 73, 95, 124, 149
filled-in land ........................................... 76, 158
FIRPTA ..................................................... 77, 99
foreclosure . 19, 39, 51, 56, 57, 59, 74, 75, 78, 79, 80, 83, 93, 112
Foreclosure ............................... 56, 74, 78, 79, 80
foreclosures .......................................... 19, 79, 80
forfeiture ................. 40, 61, 62, 63, 64, 129, 146
forfeitures ............................................... 61, 62
general partnership ................................... 52, 117
general warranty ....................................... 54, 56
general warranty deed ...................................... 54
gift deed ............................................ 25, 55, 82
government ...... 7, 38, 61, 62, 71, 76, 79, 88, 126, 134, 135, 157, 158, 159, 160
guardian ......................................... 84, 85, 92, 109
guardianship ......................................... 84, 109
guardianship of property .................................. 84
hazardous material .......................................... 70
heirs at law ............................................. 86, 94
homeowners" association ................................ 119
homestead ......................... 49, 71, 73, 87, 95, 100
hospitals .................................................... 88
improvements .. 11, 27, 41, 42, 43, 48, 68, 72, 88, 89, 90, 91, 105, 119, 124, 129, 130, 136, 137, 139, 140, 141, 144, 148, 152, 158
Indian lands ................................................. 93
inheritance ....................................... 25, 94, 122
insuring around .............................................. 11
insuring over ............................................ 11, 12
inter vivos trusts .......................................... 151
Internal Revenue Service ... 30, 49, 73, 74, 75, 80, 95, 122, 123, 124
interval .................................................... 149
interval estate ............................................. 149
intestate ............................................... 86, 122
IRS ........................ 30, 31, 32, 73, 74, 77, 79, 80
joint tenancy .............................................. 48, 49

joint tenant .............................................. 48, 49
joint tenants .............................................. 48, 49
joint venture ............................................... 117
judgment lien ....................................... 23, 95, 96
judgment liens ........................................ 95, 96
judicial foreclosure .................. 74, 78, 79, 80, 93
lease-option ............................................... 114
legal description . 9, 14, 39, 44, 58, 59, 63, 66, 85, 89, 97, 120, 134, 149, 152, 159
legal descriptions ...................................... 58, 59
life estate ............................................ 100, 101
life tenant ............................................ 100, 101
limited partnership .......................... 53, 71, 117
lis pendens ............................................ 61, 80, 102
littoral rights ....................................... 134, 159
living trust ................................................ 151
mail-away .................................................. 71
manufactured housing ..................................... 103
marital rights ............................................... 49
matters of record ........................................ 149
mechanic"s lien ..................... 41, 104, 105, 106
mechanic"s liens .............................. 16, 104, 105
mechanics" liens ............................................ 41
metes and bounds ........................ 9, 58, 139, 156
military service ............................................ 79
mineral rights ............................................. 107
minerals ............................................. 107, 108
minors ...................................................... 92
missing persons ........................................... 111
mobile home ................................................ 90
mortgage .... 13, 16, 17, 18, 19, 26, 29, 35, 39, 40, 41, 42, 44, 45, 46, 49, 51, 52, 56, 57, 58, 71, 74, 75, 78, 79, 80, 82, 84, 85, 92, 95, 96, 97, 98, 100, 104, 105, 107, 109, 110, 111, 112, 113, 117, 119, 120, 124, 125, 128, 129, 134, 138, 144, 145, 152, 153, 154
mortgage" .................................................. 41
mortgages .. 17, 18, 19, 26, 40, 46, 52, 71, 79, 96, 112, 113, 117, 124, 134
navigation ............................................ 134, 157
navigational servitude .................... 157, 158, 159
non-judicial ..................... 74, 78, 79, 80, 93, 112
option to purchase ................................. 114, 115
options to purchase ...................................... 114
overlapping conveyances .................................... 9
parties in possession ................... 16, 33, 72, 116
partnership .............. 7, 52, 53, 71, 117, 151
party walls ................................................. 118
pending disbursement ......................... 41, 42, 112
perfected lien ......................................... 18, 73
personal property 20, 62, 84, 89, 90, 91, 103, 109, 114, 136, 152, 153
plat recording ............................................. 58
policies ... 6, 24, 25, 27, 38, 43, 49, 50, 58, 68, 69, 72, 74, 89, 95, 97, 102, 103, 104, 105, 106,

114, 116, 129, 134, 138, 139, 145, 149, 152, 153, 155, 158, 159, 161
powers of attorney ...........................................120
prescriptive easement ....................6, 24, 65, 158
prior lien ..................................12, 74, 80, 112
prior liens..................................................12, 112
prior party ......................................................17
Prior party proceedings....................................17
prior taking .....................................................38
probate..........................53, 71, 78, 94, 111, 122
property settlement agreement..................22, 60
public trust....................................................157
PUD ...............................................................119
purchase money doctrine .........................75, 124
purchase money mortgages .............96, 113, 125
qualified ownership .........................................90
quitclaim...................................13, 26, 54, 59, 82
railroad .............................................66, 126, 127
relation back ...............................61, 62, 74, 104
remainderman...............................100, 101, 146
reorganization ...............................19, 20, 21, 22
restriction...................................27, 33, 129, 130
restructuring....................................................21, 22
reversion ......................................100, 101, 129
reversionary clause ..........40, 126, 129, 130, 132
RICO ...............................................................61
right of redemption ..............................74, 75, 80
right of way ................................27, 65, 66, 133
rights of redemption .........................................78
rights of way ................................66, 133, 146
riparian rights ...........................................76, 134
scheduled debts..........................................18, 21
secondary financing................................75, 124
secured creditors.........................................18, 22
severed improvement............89, 90, 91, 136, 137
special warranty................................................54

stand-alone.........................................55, 114, 115
statute of limitations ...........73, 95, 130, 152, 154
submerged land.76, 134, 135, 156, 157, 159, 160
submerged lands .......76, 135, 156, 157, 159, 160
subordination agreement ........................79, 138
subsidence....................................................108
super-lien ........................................................70
surface rights .................................................107
survey matters........................9, 16, 72, 139, 143
survivorship ....................................................48
tax deed............................................10, 54, 146, 147
tax title ...........................................................54
taxes.......10, 25, 40, 46, 73, 82, 87, 94, 103, 114, 122, 146, 147, 148
tenants by the entirety..........................49, 50, 95
tenants in common ..............................39, 48, 149
testate estate .................................................122
timeshare.............................................149, 150
townhouse......................................................118
trust ....2, 7, 16, 18, 19, 20, 21, 22, 29, 34, 41, 46, 71, 74, 75, 78, 79, 80, 100, 111, 112, 113, 119, 134, 145, 151, 157
trustee ... 7, 18, 20, 21, 22, 71, 111, 112, 145, 151
UCC .............................................89, 99, 103, 152
unscheduled debts.......................................18, 19
upland owner ..................................................76
variable rate ..................................................113
variable rate mortgage .....................................113
vendor's lien .................................................154
waiver agreement..............................................73
water rights ............................................155, 159
wetland ................................................156, 159
wills ....................................................71, 151
zero lot line ...................................................118
zoning ...................................................27, 161

WESTCOR 000800

# EXHIBIT 4

# EXHIBIT 4



# Endorsements

*Generally, endorsements will provide additional coverage for matters which would ordinarily be excluded by the Exclusions from Coverage, or excepted from coverage either by the pre-printed exceptions, if any, or by the specific exceptions shown in Schedule B of the policy.*

*Because of this, most endorsements are not general in nature, but are specific as to items for which the insured desires coverage. Some are specifically designed for owner's policies and others for lender's policies.*

*The issuance of any endorsement is conditioned upon the circumstances surrounding the property involved, and upon the fulfillment of the underwriting criteria established by the Company.*

*The following descriptions do not define the coverage of the endorsement, which can only be determined by reading the same. This list is provided as a convenience in locating the endorsement which may fit a particular set of facts. CLTA Endorsement (with ALTA Equivalent) Numbers Available*

## Common Endorsements requested by Residential Lenders

FORM DESCRIPTION
CLTA

**100** Provides comprehensive coverage for insured ALTA lender against loss by reason of present or future CC&Rs violations, the encroachment of improvements, or by reason of surface entry for mineral development.

Endorsement provides insurance that:

1. There are no CC&Rs under which the lien of the insured mortgage can be cut off, subordinated or impaired;

2. There are no present CC&R violations on the land; and

3. Except as shown in Schedule B, there are no encroachments of improvements on the land onto adjoining land, and no encroachments of improvements on adjoining land onto the land. Endorsement insures against loss by reason of:

I . Future violations of CC&Rs which result in loss of the insured mortgage lien or title to the land if the insured lender has acquired same by foreclosure or conveyance in lieu thereof;

2. Unmarketability of title by reason of CC&R violations occurring prior to acquisition of title by the insured lender;

3. Damage to improvements which encroach on any portion of the land subject to an easement excepted in Schedule B;

4. Damage to improvements resulting from the exercise of any right to use the surface of the land

for the extraction or development of excepted minerals; and

5. Final court order or judgment requiring removal from any land adjoining the land of any encroachment shown in Schedule B.

**100.12** Provides insured lender with insurance concerning the enforceability of reverter rights found in CC&Rs.

**100.13** Provides insured ALTA lender with insurance concerning the priority of a mortgage lien over maintenance or upkeep assessment liens.

**100.18** Provides insured lender with coverage against loss by reason of the exercise or attempted exercise of reverter rights in CC&Rs.

**100.23** Provides insured ALTA lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals leased under oil lease.

**100.24** Provides insured ALTA lender with insurance that lessee under mineral lease does not have any right to enter on or use the surface of the land.

# FIDELITY NATIONAL TITLE

Template Copyright © 2009 EffectiveSolutions,LLC for HelpMyTitleRep.com members only

# Endorsements

100.26 Provides insured ALTA lender with coverage against loss by reason of damage to proposed or completed improvements under FHA project, resulting from the exercise of surface or subsurface rights for the extraction or development of minerals excepted from the description of the land.

100.29 Provides insured owner or lender with coverage against loss by reason of the exercise of surface rights for the extraction or development of minerals excepted from the description of the land or shown as a reservation in Schedule B.

101.2 Provides insured construction lender with coverage against loss by reason of a lack of priority of the insured mortgage over statutory liens for services, labor or material arising out of a work of improvement referred to in a recorded notice of completion.

102.4 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land and that their location docs not violate referenced CC&Rs.

102.5 Provides insured construction lender with insurance that the foundations of the structure under construction are within the boundaries of the land, that their location does not violate referenced CC&Rs and that they do not encroach upon referenced easements. (Broader coverage than Form 102.4).

103.1 Provides insured lender with coverage against loss by reason of the exercise of the right of use or maintenance of a particular easement by the easement holder.

103.1a  Provides insured lender with against loss resulting from (1) damage to the existing improvements, including lawns, shrubbery and trees, on the land, and (2) interference with the continuing use, as presently

utilized, of the existing improvements on the land, arising from a particular easement described in Schedule B.

103.3 Provides insured lender with coverage against loss by reason of the forced removal of improvements which encroach upon a particular easement which easement right is presently being exercised

103.4 Provides insured owner or lender with insurance that an insured easement affords ingress and egress to and from a specified public street.

103.7 Provides insured owner or lender with assurance that the land described in Schedule A abuts upon a specific, physically- open public street.

104.1 Provides assignee of the insured mortgage with assurance concerning (a) validity of a recorded assignment to evidence transfer of the entire beneficial interest to the named assured assignee and (b) full or partial reconveyances, modification or subordination of the insured mortgage.

108.7 Provides insured CLTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance.

108.8 Provides insured ALTA lender with coverage against loss concerning vesting of title, subsistence and priority of insured mortgage lien insofar as same secures an additional (optional) advance and increases policy liability by the amount of the advance

110.5 Provides insured ALTA lender insurance concerning proper modification of the insured mortgage, including express

priority coverage.

110.9 (ALTA form 8.1) Provides insured ALTA residential lender with coverage against loss by reason of lack of priority over (a) any federal or state environmental protection lien which is recorded in the public records, except as set forth in Schedule B, and (b) any state environmental protection lien provided for by any state statute in effect at Date of Policy, except as provided for by state statutes specified in the endorsement.

111.5 (ALTA Form 6) Provides insured ALTA variable rate mortgage lender with coverage against loss by reason of (1) invalidity or unenforceability of the insured mortgage resulting from terms therein providing for changes in the rate of interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest.

111.8 (ALTA Form 6.2) Provides insured ALTA variable rate mortgage lender with coverage against changes in the rate of interest, the addition of unpaid interest to principal and/or interest on interest, or (2) loss of priority of the insured mortgage lien caused by the changes in the rate of interest, unpaid interest added to principal and/or interest on interest.

111.9 Provides insured ALTA lender with insurance concerning the priority of a mortgage lien relating to FNMA Balloon mortgage, conditional right to refinance, extension of the loan term and change in the interest rate.

111.10 (Optional Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in

# Endorsements

accordance with the terms of a specified loan agreement. Except as to intervening matters of which the insured has actual knowledge.

111.11 (Obligatory Advance) Provides insured lender with coverage against (1) loss by reason of invalidity or unenforceability of the insured mortgage or of (2) loss of priority of said mortgage for the unpaid balance together with interest caused by changes in the rate of interest in accordance with the terms of a specified loan agreement.

115 Provides insured lender with insurance that the estate or interest covered by the policy is a condominium, in fee, and is entitled to be assessed and taxed as a separate parcel.

115.1 Provides coverage for an insured ALTA lender against loss concerning statutory compliance. Violations of CC&Rs, homeowners association charges and assessments, the separate assessment of real property taxes , encroachments and the exercise of a right of first refusal to purchase, all with respect to a condominium unit within a condominium project.

115.2 Provides coverage for an insured ALTA lender against loss concerning violations of CC&Rs, homeowners association charges and assessments, encroachments and the exercise of a right of first refusal to purchase, all with respect to a parcel of land in a planned development.

116 Provides insured ALTA lender with insurance concerning the street address of designated improvements on the land; and, with respect to the sufficiency of the policy plat to show the record location and dimensions of that land.

116.1 Provides insured lender with insurance that the land described in the policy is the same as that delineated on plat of a survey

attached to and made a part of the policy.

116.2 Provides insured ALTA lender with insurance concerning the street address of designated separately-owned elements comprising pan of the insured condominium and with respect to the sufficiency of the referenced map or plan to show the exterior boundary of the condominium project as a whole.

116.7 Provides insured with insurance that the land described is a lawfully created parcel according to the California Subdivision Map Act and local ordinances adopted pursuant thereto.

122 Provides insured ALTA lender with insurance concerning obligatory advance made under the insured mortgage; liability limited to face amount of policy.

123.1 (ALTA form 3) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land and the broad, allowable use or uses under that classification.

123.2 (ALTA Form 3.I) Provides insured ALTA owner or lender with insurance concerning the zoning classification of the land, the allowable use or uses under that classification and with respect to the existing structure on the land, limited coverage concerning compliance with applicable provisions of the zoning ordinance.

124.1 Provides insured owner or lender with insurance concerning affirmative and/or negative covenants contained in a deed or agreement between landowners.

124.2 Provides insured owner or lender with insurance concerning affirmative covenants contained in a lease.

124.3 Provides insured owner or lender with insurance concerning negative covenants contained in a

lease.

125 Provides coverage for the insured ALTA lender against loss by reason of a judicial determination that (a) the insured mortgage lien (or the lender's title after foreclosure) has been defeated by a valid exercise of the right of rescission conferred by the Federal Truth in Lending Act, and that (b) such right of rescission existed because neither the loan transaction nor the right of rescission there of was exempted or excepted by the provision of Regulation Z.

126.1 Provides coverage for insured CLTA owner of a one-to-four family residence against defined loss by reason of lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

126.2 Provides coverage for insured CLTA fee owner of a residential condominium against defined loss concerning the separate assessment of taxes, lack of a right of access, rights to liens for services, labor or material, encroachments, zoning and restrictions violations and surface entry for mineral development.

# EXHIBIT 5

# EXHIBIT 5

# Bulletin : MU000003

**Date:** December 12, 1991

**From:** Stewart Title Guaranty Company
P. O. Box 2029
Houston, Texas 77252-2029
(800) 729-1902

**To:** All Issuing Offices in Alabama, Alaska, Colorado, Connecticut, Florida, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, West Virginia

**RE:** Condominium Assessment Lien Priority

_____

Dear Associates:

All offices issuing policies in any of the above states should be aware that relevant state laws provide that condominium assessment liens have limited priority over first mortgages. The amount of assessment having priority ranges from six months to five years. Paragraph 4 of ALTA Form 4 Endorsement, the condominium endorsement, insures a lender against loss or damage by reason of the priority of any assessment lien over the lien to be issued. Because of the priority of the assessment liens, Company policy requires that any ALTA Form 4 Endorsement issued in any of the above states have paragraph 4 of the endorsement deleted. You may accomplish this by x-ing through the paragraph with a typewriter.

Within the next few weeks, a supply of ALTA Form 4 Endorsements will be printed with paragraph 4 deleted. Thereafter, any orders for ALTA Form 4 originating in the above states will receive ALTA Form 4 with paragraph 4 deleted.

You should also note that ALTA Form 9 Endorsement, the so-called Comprehensive Endorsement, contains paragraph 2 which provides insurance against loss due to the existence of provisions in covenants and restrictions which would create a loss of priority of the insured lien. Because assessment lien priority would affect the priority of the insured lien, if you are asked to issue an ALTA 9 on a condominium unit, you must delete all of paragraph 2 from the Form 9. The Company does not plan on printing ALTA Form 9 Endorsements with paragraph 2 deleted.

In addition, if you issue any master policy or short form policy in which the Form 4 or Form 9 is incorporated into the coverage by marking a box, it will be necessary for you to include (with the

certificate or short form policy) an addendum deleting the appropriate paragraph(s) from the incorporated endorsement(s) if you have included the coverage in the policy. Blank addendums are available from the Forms Department in Houston.

In addition to filing this Bulletin in your Bulletin binder, you should place a copy in your Underwriting Manual, Volume I, under "Condominiums" Section 3.40.

**THIS BULLETIN IS FURNISHED TO INFORM YOU OF CURRENT DEVELOPMENTS. AS A REMINDER, YOU ARE CHARGED WITH KNOWLEDGE OF ALL CONTENT ON VIRTUAL UNDERWRITER AS IT EXISTS FROM TIME TO TIME AND ANY OTHER INSTRUCTIONS. OUR UNDERWRITING AGREEMENTS DO NOT AUTHORIZE OUR ISSUING AGENTS TO ENGAGE IN SETTLEMENTS OR CLOSINGS ON BEHALF OF STEWART TITLE GUARANTY COMPANY. THIS BULLETIN IS NOT INTENDED TO DIRECT YOUR ESCROW OR SETTLEMENT PRACTICES OR TO CHANGE PROVISIONS OF APPLICABLE UNDERWRITING AGREEMENTS. CONFIDENTIAL, PROPRIETARY, OR NONPUBLIC PERSONAL INFORMATION SHOULD NEVER BE SHARED, OR DISSEMINATED EXCEPT AS ALLOWED BY LAW. IF APPLICABLE STATE LAW OR REGULATION IMPOSES ADDITIONAL REQUIREMENTS, YOU SHOULD CONTINUE TO COMPLY WITH THOSE REQUIREMENTS.**

# References

**Bulletins Replaced :** None
**Related Bulletins :** None
**Underwriting Manual :** 3.40 Condominiums

**Exceptions Manual :** CON Condominiums
**Forms :** ALTA Endorsement 4 (Condominium)
ALTA Endorsement 4.1 (Condominium)
ALTA Restrictions, Encroachments, Minerals Endorsement 9

# EXHIBIT 6

# EXHIBIT 6

# Bulletin : MU000008

**Date:** July 16, 1993

**From:** Stewart Title Guaranty Company
P. O. Box 2029
Houston, Texas 77252-2029
(800) 729-1902

**To:** All Issuing Offices in Alabama, Alaska, Colorado, Connecticut, District of Columbia, Massachusetts, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, West Virginia

**RE:** ALTA Condominium Endorsement 4.1

_____

Dear Associates:

Paragraph 4 of the ALTA Endorsement 4 (Condominium) insures against loss because of priority of maintenance liens over the insured mortgage. The ALTA Master Policy, Short Form Policy, CLTA Comprehensive Endorsement, and ALTA Endorsement 9 provide similar coverage.

The ALTA adopted ALTA Endorsement 4.1 on October 17, 1992. At paragraph 4, it insures against loss because of any charges or assessments that are due and unpaid at date of policy. It does not insure that the mortgage has priority over future condominium assessment liens.

Some states (such as Alaska and Pennsylvania) have a modified condominium endorsement like the ALTA Form 4.1.

In your states, future assessments (usually six months) have priority over a prior mortgage.

Company Policy:

Issue the ALTA Endorsement 4.1 or your modified condominium endorsement (in Alaska and Pennsylvania) to the Policy or Master Policy Certificate on condominiums. Do not issue the ALTA Endorsement Form 4 on condominiums without underwriter approval.

If you issue an ALTA Endorsement Form 9, CLTA Comprehensive Endorsement, Master Policy Certificate or Short Form Loan Policy on condominiums, add the following exception:

"The Policy and any endorsements to the Policy do not insure against loss because of condominium assessments not yet due and payable."

You also should comply with our Underwriting Manual Guidelines on condominiums (Condominiums 3.40.17).

Attached is the rate filing for your state where applicable.

Alta 4.1 Form - Condominium Endorsement

State                Rate

| Alabama | $15 |
| Colorado, | 10%$25 min. |
| District of | $15 |
| Columbia | $50 |
| Oregon | $50 |
| Pennsylvania | $15 |
| West Virginia | |

**THIS BULLETIN IS FURNISHED TO INFORM YOU OF CURRENT DEVELOPMENTS. AS A REMINDER, YOU ARE CHARGED WITH KNOWLEDGE OF ALL CONTENT ON VIRTUAL UNDERWRITER AS IT EXISTS FROM TIME TO TIME AND ANY OTHER INSTRUCTIONS. OUR UNDERWRITING AGREEMENTS DO NOT AUTHORIZE OUR ISSUING AGENTS TO ENGAGE IN SETTLEMENTS OR CLOSINGS ON BEHALF OF STEWART TITLE GUARANTY COMPANY. THIS BULLETIN IS NOT INTENDED TO DIRECT YOUR ESCROW OR SETTLEMENT PRACTICES OR TO CHANGE PROVISIONS OF APPLICABLE UNDERWRITING AGREEMENTS. CONFIDENTIAL, PROPRIETARY, OR NONPUBLIC PERSONAL INFORMATION SHOULD NEVER BE SHARED, OR DISSEMINATED EXCEPT AS ALLOWED BY LAW. IF APPLICABLE STATE LAW OR REGULATION IMPOSES ADDITIONAL REQUIREMENTS, YOU SHOULD CONTINUE TO COMPLY WITH THOSE REQUIREMENTS.**

# References

**Bulletins Replaced :** None
**Related Bulletins :** None
**Underwriting Manual :** 3.40 Condominiums


**Exceptions Manual :** CON Condominiums
**Forms :** ALTA Endorsement 4.1 (Condominium)

# EXHIBIT 7

# EXHIBIT 7

# Bulletin : NV2014002

**Date:** November 06, 2014

**To:** All Nevada Issuing Offices

**RE:** RATES AND/OR FORMS UPDATE - Use of the ALTA 9.10, the ALTA 4.1, and the ALTA 5.1

_____

Dear Associates:

Due to the recent decision by the Nevada Supreme Court in the case of SFR Investments Pool 1 LLC vs. US Bank, questions have arisen regarding the issuance of loan policies and endorsements to lenders making loans secured by condominiums, planned unit developments, or other common interest developments with a homeowners association. At this time, the only changes to our underwriting procedures are that 1) in lieu of issuing an ALTA 9 (or a CLTA 100) for a lender's policy, issue the ALTA 9.10; 2) in lieu of issuing an ALTA 4 for a lender's policy, issue the ALTA 4.1, and; 3) in lieu of issuing an ALTA 5 for a lender's policy, issue the ALTA 5.1.

If you have any questions relating to this or other bulletins, please contact a Stewart Title Guaranty Company underwriter.

For on-line viewing of this and other bulletins, please log onto www.vuwriter.com.

# References

**Bulletins Replaced :** None

**Related Bulletins :** None

**Underwriting Manual :** None

**Exceptions Manual :** None

**Forms :** None

# EXHIBIT 8

# EXHIBIT 8

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:
Jane Stern
AMERICAN WEST HOMES, INC.
2700 E. Sunset Road, Suite 5
Las Vegas, NV  89129



_____

(Space above this line for Recorders Use)

**DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
AND GRANT AND RESERVATION OF
EASEMENTS FOR
TIMBERLAKE STREET AND LANDSCAPE
MAINTENANCE ASSOCIATION**

## TABLE OF CONTENTS
### FOR
### DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
### AND GRANT AND RESERVATION OF EASEMENTS FOR
### TIMBERLAKE STREET AND LANDSCAPE MAINTENANCE ASSOCIATION

**ARTICLE 1  Definitions**...........................................................................2
1.1   Annexable Territory.............................................................2
1.2   Articles.............................................................................3
1.3   Assessment, Annual...........................................................3
1.4   Assessment, Special...........................................................3
1.5   Association.......................................................................3
1.6   Association Maintenance Funds ..........................................3
1.7   Beneficiary........................................................................3
1.8   Board ..............................................................................3
1.9   Budget.............................................................................3
1.10  Bylaws.............................................................................3
1.11  City..................................................................................3
1.12  CPI Increase .....................................................................4
1.13  Close of Escrow ................................................................4
1.14  Common Elements.............................................................4
1.15  Common Expenses.............................................................4
1.16  Declarant..........................................................................5
1.17  Declaration.......................................................................5
1.18  Deed of Trust....................................................................5
1.19  Family..............................................................................5
1.20  FHA..................................................................................5
1.21  FHLMC.............................................................................5
1.22  Fiscal Year .......................................................................5
1.23  FNMA...............................................................................5
1.24  GNMA ..............................................................................5
1.25  Guest...............................................................................6
1.26  Improvements ...................................................................6
1.27  Landscape Easements.........................................................6
1.28  Lot...................................................................................6
1.29  Manager...........................................................................6
1.30  Map..................................................................................6
1.31  Member, Membership .........................................................6
1.32  Mortgage..........................................................................6
1.33  Mortgagee, Mortgagor........................................................7
1.34  Notice and Hearing ...........................................................7
1.35  Notice of Addition..............................................................7
1.36  Owner ..............................................................................7
1.37  Party Wall.........................................................................7

i

1.38   Person ...............................................................................................7
1.39   Phase 1 ............................................................................................7
1.40   Phases of Development ...................................................................7
1.41   Private Streets...................................................................................7
1.42   Property .............................................................................................7
1.43   Record, File, Recordation ................................................................7
1.44   Residence ..........................................................................................8
1.45   Resident.............................................................................................8
1.46   Restrictions .......................................................................................8
1.47   Sewer and Drainage .........................................................................8
1.48   VA ......................................................................................................8

ARTICLE 2   The Association ...................................................................................8
2.1   Organization of Association ...............................................................8
2.2   Duties and Powers .............................................................................8
2.3   Membership ........................................................................................9
2.4   Transfer...............................................................................................9
2.5   Board of Directors ............................................................................10
2.6   Voting Rights.....................................................................................10
       2.6.1  Declarant's Control; Termination of Declarant's Control............11
       2.6.2  Proxies ...................................................................................12
       2.6.3  Actions....................................................................................12
2.7   Repair and Maintenance by the Association ....................................12
       2.7.1  Maintenance Standards .........................................................12
       2.7.2  Charges to Owners ................................................................12
2.8   Repair and Maintenance by Owners .................................................13
       2.8.1  Common Element Lighting and Photoelectric Cells ..................14
2.9   Use of Agent .....................................................................................14

ARTICLE 3   Owners' Property Rights....................................................................14
3.1   Legal Description of Lot ....................................................................14
3.2   Association Easement .......................................................................15
3.3   Partition .............................................................................................15
3.4   Member's Easement in Common Elements .......................................15
3.5   Extent of Member's Easements ........................................................15
3.6   Waiver of Use....................................................................................16
3.7   Damage by Member...........................................................................16
3.8   Landscape Easement ........................................................................16
3.9   Sewer and Drainage Easement ........................................................16

ARTICLE 4   Architectural Review Committee .......................................................16

ARTICLE 5   Association Maintenance Funds and Assessments ...........................17
5.1   Personal Obligation of Assessments ...............................................17
5.2   Maintenance Funds of Association ...................................................17
5.3   Purpose of Assessments ..................................................................17

ii

5.4    Adoption of Budget ............................................................18
       5.4.1  Initial Year of Operations..............................................18
       5.4.2  Subsequent Fiscal Years .............................................18
5.5    Annual Assessments.........................................................18
5.6    First Annual Assessment And Maximum Annual Increases...................20
       5.6.1  First Annual Assessment.............................................20
       5.6.2  Maximum Annual Assessment ........................................20
       5.6.3  Maximum Annual Increase............................................20
5.7    Special Assessments ........................................................20
5.8    Time for Payments ...........................................................20
5.9    Delinquency ...................................................................21
5.10   Creation and Release of Lien...............................................21
5.11   Enforcement of Liens ........................................................22
5.12   Capital Contributions to the Association .................................22

ARTICLE 6  Property Easements and Rights of Entry ............................23
6.1    Easements ....................................................................23
6.2    Rights of Entry................................................................24

ARTICLE 7  Declarant's Rights and Reservations ...............................24

ARTICLE 8  Residence and Use Restrictions ....................................25

ARTICLE 9  Insurance................................................................25
9.1    Duty to Obtain Insurance; Types..........................................25
9.2    Waiver of Claim Against Association.....................................26
9.3    Right and Duty of Owners to Insure .....................................26
9.4    Notice of Expiration Requirements .......................................27
9.5    Insurance Premiums ........................................................27
9.6    Trustee for Policies .........................................................27
9.7    Actions as Trustee ..........................................................27
9.8    Annual Insurance Review ..................................................28
9.9    Required Waiver .............................................................28

ARTICLE 10  Destruction of Improvements........................................29
10.1   Restoration of the Property ...............................................29
10.2   Partition........................................................................29
10.3   Residence Damage..........................................................29
10.4   Notice to Owners and Listed Mortgagees ..............................29

ARTICLE 11  Eminent Domain.......................................................30
11.1   Condemnation of  Association Common Elements......................30
11.2   Condemnation of Lots.......................................................30
11.3   Condemnation of Annexable Territory ...................................30
11.4   Notice to Owners and Mortgagees........................................30

iii

ARTICLE 12 Rights of Mortgagees ........................................................................ 31

ARTICLE 13 Duration and Amendment .................................................................. 34
    13.1   Duration .................................................................................................. 34
    13.2   Termination and Amendment ................................................................ 34
    13.3   Protection of Declarant ......................................................................... 36

ARTICLE 14 Annexable Territory .......................................................................... 37
    14.1   Additions by Declarant ......................................................................... 37
    14.2   Other Additions ..................................................................................... 37
    14.3   Rights and Obligations of Added Territory ......................................... 37
    14.4   Notice of Addition................................................................................. 38
    14.5   Deannexation and Amendment ............................................................ 38

ARTICLE 15 General Provisions ........................................................................... 39
    15.1   Enforcement of Restrictions ................................................................ 39
    15.2   Severability............................................................................................ 39
    15.3   Interpretation......................................................................................... 39
    15.4   Mergers or Consolidations ................................................................... 39
    15.5   No Public Right or Dedication ............................................................. 40
    15.6   No representations or Warranties ......................................................... 40
    15.7   Nonliability and Indemnification.......................................................... 40
    15.8   Notices .................................................................................................. 40
    15.9   Priorities and Inconsistencies............................................................... 41
    15.10 Constructive Notice and Acceptance .................................................. 41

EXHIBIT "A"   LEGAL DESCRIPTION (PHASE 1)
EXHIBIT "B"   ANNEXABLE TERRITORY
EXHIBIT "C"   LANDSCAPE EASEMENTS
EXHIBIT "D"   SITE PLAN
EXHIBIT "E"   SEWER AND DRAINAGE EASEMENTS

## DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
## AND GRANT AND RESERVATION OF EASEMENTS
## FOR TIMBERLAKE STREET AND LANDSCAPE MAINTENANCE ASSOCIATION

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND GRANT AND RESERVATION OF EASEMENTS is dated for purposes of reference only as of this 28ᵗʰ day of February, 1997, and is made by AMERICAN WEST HOMES, INC., a Nevada corporation ("Declarant").

PREAMBLE:

WHEREAS, Declarant is the owner of certain real property ("Phase 1") all of which is located in Las Vegas, Clark County, Nevada, as is more fully described in Exhibit "A" attached hereto and incorporated herein by this reference; and

WHEREAS, it is the desire and intention of Declarant to create a limited expense liability planned community, as defined in Section 116.1203(b) of the Nevada Revised Statutes ("NRS"), and to impose mutually beneficial restrictions and obligations under a general plan of improvement for the benefit of all the Lots in the planned community; and

WHEREAS, Phase 1 consists of 192 Lots and Declarant reserves the right, but is not obligated and does not warrant, to annex into the development an additional 152 Lots; and

WHEREAS, the Common Elements, the maintenance expense of which is to be shared by the Owners, includes, but is not limited to, entry and exit gates, lighting, private drives and sidewalks, clustered mailboxes, Landscape Easements, Sewer and Drainage Easements, entry monument(s) and Common Element Lots A, B, C and D, as set forth in the recorded Map for Unit 1 - Deer Springs Ranch, and any Improvements thereon; and

WHEREAS, THE Maximum Annual Assessments for any Common Expenses, exclusive of any insurance premiums paid by the Association, shall not exceed Five Hundred Dollars ($500.00) per Lot, in any Fiscal Year, as adjusted from time to time by the CPI Increase defined herein;

WHEREAS, on 3 7 , 1997 Declarant recorded Protective Covenants, Conditions and Restrictions for Timberlake ("Protective Covenants") with the Clark County Recorder's office, in Book No. 97030, as Instrument No. 715 , which instrument sets forth, among other things, the use restrictions, architectural control provisions and enforcement rights related thereto of the Declarant and the Owners;

1

NOW, THEREFORE, Declarant hereby records this Declaration for the limited purpose of identifying and establishing each Owner's maintenance responsibilities, as well as the assessment obligation for the Common Elements and the maintenance and repair thereof. This Declaration is not an amendment of the Protective Covenants previously recorded against the Property. All provisions of this Declaration are hereby imposed as equitable servitudes upon the Property.

DECLARANT FURTHER DECLARES that inasmuch as the amount of the Maximum Annual Assessments are expressly restricted by this Declaration, the Uniform Ownership Act, which is codified at NRS 116, does not apply to this development, except for NRS 116.1105, 116.1106 and 116.1107 and the provisions mandated by NRS 116.1203(2).

DECLARANT FURTHER DECLARES that all of the Property is to be held, conveyed, hypothecated, encumbered, leased, rented, used, occupied and improved subject to the limitations, restrictions, reservations, rights, easements, conditions and covenants contained in the Protective Covenants, as well as the obligations, rights and duties set forth in this Declaration, all of which are declared and agreed to be in furtherance of a plan for the protection, maintenance, improvement and sale of the Property for the purpose of enhancing the value, desirability and attractiveness of the Property. Each of the provisions of this Declaration shall run with and burden the Property and shall be binding on and for the benefit of all of the Property and all Persons having or acquiring any right, title or interest in the Property, or any part thereof, and their successive owners and assigns. The development plan of the Property shall be consistent with the overall development plan, if any, submitted to the VA and/or FHA.

DECLARANT FURTHER DECLARES that Declarant, its successors, assigns and grantees, covenant and agree that the Membership in the Association, any easements conveyed therewith and the fee title to each respective Lot conveyed therewith shall not be separated or separately conveyed, and each such, Membership and/or easements shall be deemed to be conveyed or encumbered with its respective Lot even though the description in the instrument of conveyance or encumbrance may refer only to the Lot. Any conveyance by an Owner of a Lot, or any portion thereof, shall be presumed to convey the entire Lot, together with a Membership in the Association and any easements.

## ARTICLE 1
### Definitions

Unless otherwise expressly provided, the following words and phrases when used herein shall have the following specified meanings.

1.1   Annexable Territory. "Annexable Territory" shall mean the real property described in Exhibit "B" attached hereto and incorporated herein by this reference, all or

2

or a portion of which may from time to time be made subject to this Declaration pursuant to Article 14 hereof; provided that the maximum number of Lots that may be added to the property pursuant to Article 14 shall be one hundred fifty-two (152) Lots, exclusive of the Lots contained in Phase 1.

  1.2 <u>Articles</u>. "Articles" shall mean the Articles of Incorporation of the Association, as such Articles may be amended from time to time.

  1.3 <u>Assessment, Annual</u>. "Annual Assessment" shall mean a charge against a particular Owner and his Lot, representing a portion of the Common Expenses which are to be levied among all Owners and their Lots in the Property in the manner and proportions provided herein.

  1.4 <u>Assessment, Special</u>. "Special Assessment" shall mean a charge:  (a) against a particular Owner, levied by the Board after Notice and Hearing, which is directly attributable to, or reimbursable by, that Owner, equal to the cost incurred by the Association for damages to the Common Elements; (b) which the Board may from time to time levy against a particular Owner and his Lot, representing a portion of the cost to the Association for reconstruction, maintenance or repair of any Improvements on any of the Common Areas.  The assessment levied pursuant to 1.4(b) shall be levied among all the Owners and their Lots in the Property in the same proportions as Annual Assessments.

  1.5 <u>Association</u>. "Association" shall mean TIMBERLAKE STREET AND LANDSCAPE MAINTENANCE ASSOCIATION, a Nevada nonprofit corporation, its successors and assigns.

  1.6 <u>Association Maintenance Funds</u>. "Association Maintenance Funds" shall mean the accounts created for receipts and disbursements of the Association, pursuant to Article 5 hereof.

  1.7 <u>Beneficiary</u>. "Beneficiary" shall mean a Mortgagee under a Mortgage or a Beneficiary under a Deed of Trust, as the case may be, and the assignees of such Mortgagee or Beneficiary.

  1.8 <u>Board</u>. "Board" shall mean the Board of Directors of the Association, elected in accordance with the Bylaws of the Association and this Declaration.

  1.9 <u>Budget</u>. "Budget" shall mean a written, itemized estimate of the income and Common Expenses of the Association in performing its functions under this Declaration.

  1.10 <u>Bylaws</u>. "Bylaws" shall mean the Bylaws of the Association, as such Bylaws may be amended from time to time.

  1.11 <u>City</u>. "City" shall mean the City of Las Vegas (CLV), State of Nevada, and

3

its various departments, divisions, employees and representatives.

1.12    CPI Increase. "CPI Increase" shall mean the adjustment in the dollar amount of the maximum assessment, according to the extent of changes in the Consumer Price Index for Urban Wage Earners and Clerical Workers: U.S. City Average,  All Items 1982-1984 = 100 , compiled by the Bureau of Labor Statistics, United States Department of Labor.  The Index for December 1990 is the Reference Base Index (the "Index").

The dollar amounts must change on July 1 of each year if the percentage of change, calculated to the nearest whole percentage point, between the Index at the end of the preceding year and the Reference Base Index is 10 percent or more, but:

(a)    The portion of the percentage change in the Index in excess of the multiple of 10 percent must be disregarded and the dollar amounts must change only in the multiples of 10 percent.

(b)    In no event may the dollar amounts be reduced below the amounts appearing in this Declaration.

If the Index is revised after December 1990 then the percentage of change pursuant to this section must be calculated on the basis of the revised Index.  If the revision of the Index changes the Reference Base Index, a revised Reference Base Index must be determined by multiplying the Reference Base Index then applicable by the rebasing factor furnished by the Bureau of Labor Statistics.  If the Index is superseded, the index referred to in this section is the one represented by the Bureau of Labor Statistics after reflecting most accurately changes in the purchasing power of the dollar for consumers.

1.13    Close of Escrow.  "Close of Escrow" shall mean the date on which a deed or other such instrument conveying a Lot in the Property is Recorded, conveying said Lot from Declarant to a member of the home-buying public or other party.

1.14    Common Elements.  "Common Elements" shall include but not be limited to, the entry and exit gates, common element lighting, Private Streets and sidewalks, clustered mailboxes, entry monuments, Landscape Easements, and Sewer and Drainage Easements, Common Element Lots A, B, C and D, as set forth in the recorded Map for Unit 1 - Deer Springs Ranch, and any Improvements thereon that the Association has a duty to repair and maintain under this Declaration.

1.15    Common Expenses.  "Common Expenses" shall mean those expenses for which the Association is responsible under this Declaration, including the actual and estimated costs of maintenance, management, operation, repair and replacement of the Common Elements as defined in Section 1.15 above, and any Improvements thereon, or unpaid Special Assessments; the costs of any commonly metered charges for the Property; the costs of management and administration of the Association including, but

4

not limited to, compensation paid by the Association to managers, accountants, attorneys and other employees; the costs of all other services benefiting the Common Elements; the costs of fire, casualty and liability insurance, workers' compensation insurance, errors and omissions and directors, officer's and agent liability insurance, and other insurance covering the Common Elements and the directors, officers and agents of the Association; the costs of bonding of the members of the Board; taxes paid by the Association; amounts paid by the Association for discharge of any lien or encumbrance levied against the Property, or portion thereof; and the costs of any other item or items incurred by the Association, for any reason whatsoever in connection with the Property, for the common benefit of the Owners.

1.16   Declarant.  "Declarant" shall mean American West Homes, Inc., a Nevada corporation, its successor in any merger, consolidation or liquidation, to the extent, but only to the extent, provided in any written assignment of rights by Declarant and assumption of obligations by the assignee.

1.17   Declaration.  "Declaration" shall mean this Declaration of Covenants, Conditions and Restrictions and Grant and Reservation of Easements for Timberlake Street and Landscape Maintenance Association, as it may be amended from time to time.

1.18   Deed of Trust.  "Deed of Trust" shall mean a Mortgage as further defined herein.

1.19   Family.  "Family" shall mean one or more natural persons related to each other by blood, marriage or adoption, or one or more natural persons not all so related, but who maintain a common household in a Residence.

1.20   FHA.  "FHA" shall mean the Federal Housing Administration of the United States Department of Housing and Urban Development and any department or agency of the United States government which succeeds to the FHA's function of insuring notes secured by Mortgages on residential real estate.

1.21   FHLMC.  "FHLMC" shall mean the Federal Home Loan Mortgage Corporation (also known as The Mortgage Corporation) created by Title II of the Emergency Home Finance Act of 1970, and any successors to such corporation.

1.22   Fiscal Year.  "Fiscal Year" shall mean the fiscal accounting and reporting period of the Association selected by the Board from time to time.

1.23   FNMA.  "FNMA" shall mean the Federal National Mortgage Association, a government-sponsored private corporation established pursuant to Title VIII of the Housing and Urban Development Act of 1968, and any successors to such corporation.

1.24   GNMA.  "GNMA" shall mean the Government National Mortgage Association administered by the United States Department of Housing and Urban

5

Development, and any successor to such association.

1.25   Guest. "Guest" shall mean any visitor of an Owner or Resident, including any employee, tenant, guest (whether or not for hire), licensee, agent or invitee of such Owner or Resident, including any transient guest, or any family member of the Owner or Resident.

1.26   Improvements. "Improvements" shall mean all structures and appurtenances thereto of every type and kind, located on the Common Elements, including but not limited to, sprinkler pipes, walkways, block walls, retaining walls, and the paint on such surfaces, landscaping, hedges, windbreaks, planted trees, ground cover and shrubs.

1.27   Landscape Easements. "Landscape Easements" shall mean all portions of the Property in Phase 1 designated as Landscape Easements on the Map, and as shown on Exhibit "C" attached hereto.  The Landscape Easements, as well as any other easements reserved by the Declarant, or required by any governmental agency, are part of the Lots and an easement is given to the Association, as well as all other Owners, Families, and Guests over the Landscape Easements.

1.28   Lot. "Lot" shall mean each and every individual, physical portion of the Property designated for separate Ownership, and which is an intended or proposed site for one Residence and may include portions of the Property designated as Landscape Easements and CLV Sewer and Drainage Easements as set forth on the Map or on the Exhibits attached to this Declaration.

1.29   Manager. "Manager" shall mean the Person employed by the Association pursuant to and limited by the provisions of this Declaration, and delegated the duties, power or functions of the Association as limited by this Declaration, the Bylaws and the terms of the agreement between the Association and said Person.

1.30   Map. "Map" shall mean a Recorded map or plat covering all or any portion of the Property, as may be amended from time to time, including, but not limited to, the Map(s) recorded with the Clark County Recorder's Office.  Attached hereto as Exhibit "D" for reference purposes only, is a site plan for the Lots within the Association.

1.31   Member, Membership. "Member" shall mean any Person holding a membership in the Association, as provided in this Declaration. "Membership" shall mean the property, voting and other rights and privileges of Members as provided herein, together with the correlative duties and obligations contained in the Restrictions.

1.32   Mortgage. "Mortgage" shall mean any Recorded Mortgage or Deed of Trust relating to one or more Lots or other portion of the Property to secure the performance of an obligation, which conveyance will be reconveyed upon the completion of such performance.

6

1.33   Mortgagee, Mortgagor.  "Mortgagee" shall mean a Person to whom a Mortgage is made and shall include the Beneficiary of a Deed of Trust.  "Mortgagor" shall mean a Person who mortgages his or its property to another (i.e., the maker of a Mortgage), and shall include the Trustor of a Deed of Trust.  The term "Trustor" shall be synonymous with the term "Mortgagor" and the term "Beneficiary" shall be synonymous with the term "Mortgagee".

1.34   Notice and Hearing. "Notice and Hearing" shall mean written notice and a hearing before the Board, at which the Owner concerned shall have an opportunity to be heard in person, or by counsel at the Owner's expense, in the manner further provided in the Bylaws, Rules and Regulations or this Declaration, and consistent with Section 116.3102(1)(k) of the Nevada Revised Statutes.

1.35   Notice of Addition. "Notice of Addition" shall mean a Notice of Addition of Territory Recorded pursuant to Article 14 hereof for the purpose of annexing all or any portion of the Annexable Territory to the Property.

1.36   Owner.  "Owner" shall mean the Person or Persons, including Declarant, holding fee simple interest to all or any interest in a Lot, excluding those having such interest merely as security for the performance of an obligation.  The term "Owner" shall include a seller under an executory contract of sale but shall exclude Mortgagees.

1.37   Party Wall.  "Party Wall" shall mean any portion of a wall which is constructed and placed approximately on the common boundary of two (2) or more Lots.

1.38   Person.   "Person" shall mean a natural individual or any other entity the legal right to hold title to real property.

1.39   Phase 1.  "Phase 1" shall mean all of the real  property described in Exhibit "A" attached to this Declaration.

1.40   Phases of Development . "Phase of Development" shall mean:    (a) Phase 1 or (b) any portion of the real property covered by a Notice of Addition recorded pursuant to Article 14 hereof, unless otherwise defined in such Notice of Addition.

1.41   Private Streets.  "Private Streets" shall mean all portions of the Property designated a Private Drives, and shall include P.U.E. (public utility easements) and CLV Sewer Easements, as set forth on the Map.

1.42   Property.  "Property" shall mean: (a) Phase 1, and (b) each Phase of Development described in a Notice of Addition and recorded pursuant to Article 14 hereof.

1.43   Record, File, Recordation.  "Record" , "File", or "Recordation" shall mean, with respect to any document, the recordation or filing of such document in the Office of

7

the Clark County Recorder, Clark County, Nevada.

1.44   Residence.  "Residence" shall mean the structure or physical portion of the Lot used for living quarters and held as a separate freehold estate, as separately shown, numbered and designated on the Map, and intended for use by a single Family. There may only be one Residence per Lot.  In interpreting deeds, Declarations, and Maps, the existing physical boundaries of the Residence constructed or reconstructed in substantial accordance with the applicable Map and the original plans thereof, if such plans are available, shall be conclusively presumed to be its boundaries, rather than the description expressed in the deed, Map or Declaration, regardless of settling or lateral movement of the building and regardless of minor variances between boundaries, as shown on the Map or defined in the deed and Declaration, and the boundaries of a building as constructed or reconstructed.

1.45   Resident.  "Resident" shall mean any person who is physically residing in a Residence on a Lot, for so long as said person is so residing, including, but not limited to, an Owner or a tenant.

1.46   Restrictions.  "Restrictions" shall mean this Declaration, the Articles and Bylaws as may be amended from time to time.

1.47   Sewer and Drainage Easements.  "Sewer and Drainage Easements" shall mean all portions of the Property designated as CLV Sewer and Drainage Easements or CLV Drainage Easements on the Map and as shown on Exhibit "E" attached to this Declaration.

1.48   VA.  "VA" shall mean the Department of Veterans Affairs of the United States of America and any department or agency of the United States government which succeeds to VA's function of issuing guarantees of notes secured by Mortgages on residential real estate.


ARTICLE 2
The Association

2.1   Organization of Association.  The Association is or shall be incorporated under the name of TIMBERLAKE STREET AND LANDSCAPE MAINTENANCE ASSOCIATION, as a nonprofit corporation organized under the provisions of Sections 82.006 through 82.690 of the Nevada Revised Statutes.

2.2   Duties and Powers.  The duties and powers of the Association are limited to the following:

(a)   the Association, acting through the Board, shall have the right to install or construct additional Improvements on the Common Elements;

8

(b)     the Association, acting through the Board, may at any time, and from time to time, reconstruct, repair, replace, maintain, or refinish any Improvement, or portion thereof, upon the Common Elements in accordance with the original design, finish or standard or any accepted modification thereof for construction of such Improvement;

(c)     the Association, acting through the Board, shall additionally have the power, but not the duty, to enter into contracts with Owners or other Persons to provide services or to maintain and repair Improvements within the Property and elsewhere which the Association is not otherwise required to provide or maintain pursuant to this Declaration; provided, however, that any such contract shall provide for the payment to the Association for the costs of providing such services or maintenance;

(d)     the Association, acting through the Board, shall have all other powers necessary to fulfill its obligations under this Declaration.

(e)     the Association, acting through the Board, shall have the right to service and inspect those areas of the Sewer and Drainage Easements which lay within the enclosed rear yard of a Lot whenever it deems necessary.

(f)     the Association, acting through the Board, shall have the right to establish uniform Rules and Regulations for use of the Common Elements.

(g)     the Association shall have all other powers, as set forth in the Bylaws.  Notwithstanding, anything in this Declaration to the contrary, the Association shall not have the power to enforce the provisions contained in the Protective Covenants.

2.3     Membership.  Every Owner, upon becoming the Owner of a Lot, shall automatically become a Member of the Association, and shall remain a Member thereof until such time as his ownership ceases, at which time his Membership in the Association shall automatically cease.  Ownership of a Lot shall be the sole qualification for Membership in the Association.  Membership in the Association shall not be assignable except to the Person to which title to the Lot has been transferred, and every Membership in the Association shall be appurtenant to and may not be separated from the fee ownership of such Lot.  The rights, duties, privileges and obligations of all Members of the Association shall be as provided in this Declaration, as well as the Protective Covenants and Bylaws of the Association.

2.4     Transfer.  The Membership held by any Owner shall not be transferred, pledged or alienated in any way, except upon the sale or encumbrance of such Owner's Lot, and then only to the purchaser or Mortgagee of such Lot.  A prohibited transfer is void and will not be reflected upon the books and records of the Association.  A Member who has sold his Lot to a contract purchaser under an agreement to purchase shall be entitled to delegate to the contract purchaser his Membership rights in the

9

Association. The delegation shall be in writing and shall be delivered to the Board before the contract purchaser may vote. However, the contract seller shall remain liable for all charges and assessments attributable to his Lot until fee title to the Lot sold is transferred.

If the Owner of any Lot fails or refuses to transfer his Membership to the purchaser of the Lot upon transfer of fee title thereto, the Board shall have the right to record the transfer upon the books of the Association. Until satisfactory evidence of such transfer has been presented to the Board, the purchaser shall not be entitled to vote at meetings of the Association.

The Association may levy a reasonable transfer fee against a new Owner and his Lot (which fee shall be added to the Annual Assessment chargeable to such new Owner) to reimburse the Association for the administrative cost of transferring the membership to the new Owner on the records of the Association.

2.5   Board of Directors. The affairs of the Association shall be managed by and (unless otherwise provided herein) undertaken through actions of the Board, which may by resolution delegate any portion of its authority permitted by law to a committee of the Association created consistent with the Bylaws. The number and qualifications of Directors and their terms of office shall be as provided in the Articles and Bylaws of the Association.

2.6   Voting Rights. Members shall have the following voting rights in the Association:

The Association shall have one (1) class of Voting Membership. Each Owner shall be a Member. The vote for such Lot shall be exercised in accordance with this Section 2.6, but in no event shall more than one (1) vote be cast for any Lot.

When more than one (1) Person holds such interest or interests in any Lot ("co-owners"), all such co-owners shall be Members and may attend any meeting of the Association, but only one (1) such co-owner shall be entitled to exercise the single vote to which the Lot is entitled. If only one (1) of several Owners of a Lot is present at a meeting of the Association, that Owner is entitled to cast all the votes allocated to that Lot. Co-owners owning the majority interests in a Lot may from time to time designate in writing one (1) of their number to vote. Fractional votes shall not be allowed, and the vote for each Lot shall be exercised, if at all, as a unit. Where no voting co-owner is designated or if the designation has been revoked, the vote for the Lot shall be exercised as the co-owners owning the majority interests in the Lot mutually agree. There is a majority agreement if any of the Owners cast the votes allocated to that Lot without protest made promptly to the person presiding over the meeting by the other Owners of the Lot. Unless the Board receives a written objection in advance from an absent co-owner, it shall be conclusively presumed that the corresponding voting co-owner is acting with the consent of his co-owners. No vote shall be cast for any Lot if the co-owners present in person or by proxy owning the majority interests in such Lot

10

cannot agree to said vote or other action. The nonvoting co-owner or co-owners shall be jointly and severally responsible for all of the obligations imposed upon the jointly-owned Lot and shall be entitled to all other benefits of ownership. All agreements and determinations lawfully made by the Association in accordance with the voting percentages established herein, or in the Bylaws of the Association, shall be deemed to be binding on all Owners, their successors and assigns.

2.6.1  Declarant's Control; Termination of Declarant's Control.  There shall be a period of Declarant control of the Association, during which a Declarant, or persons designated by the Declarant, may appoint and remove the officers and members of the Board.  The period of Declarant control shall terminate no later than:

(a)  Sixty (60) days after conveyance of seventy-five percent (75%) of the Lots that may be created to Owners other than the Declarant; or

(b)  Five (5) years after the Declarant has ceased to offer Lots for sale in the ordinary course of business; or

(c)  Seven (7) years after the first Lot is conveyed to an Owner other than the Declarant.

The Declarant may voluntarily surrender the right to appoint and remove officers and members of the Board before termination of that period.  In that event, the Declarant may require, for the duration of the period of Declarant's control, that specified actions of the Association or Board, as described in a recorded instrument executed by the Declarant, be approved by the Declarant before they become effective.

Not later than sixty (60) days after conveyance of twenty-five percent (25%) of the Lots that shall be created to Owners other than the Declarant, at least one (1) member and not less than twenty-five percent (25%) of the members of the Board shall be elected by Owners other than the Declarant.  Not later than sixty (60) days after conveyance of fifty percent (50%) of the Lots that may be created to Owners other than a Declarant, not less than thirty-three and one-third percent (33-1/3%) of the members of the Board must be elected by Owners other than the Declarant.

Not later than ninety (90) days after the termination of any period of Declarant control, the Owners shall elect members of the Board, to fill the vacancies, if any, created by the termination of Declarant's control.  Thereafter, the Owners shall elect, at each annual meeting, members of the Board to fill any vacancies caused by the expiration of the directors term.  At least a majority of the members of the Board shall be Owners other than Declarant.  The Board shall elect the officers of the Association.  The Board members and officers shall take office upon election.  Notwithstanding any provision of this Declaration or the Bylaws to the contrary, the Owners, by a two-thirds (2/3) vote of all persons present and entitled to vote at a meeting of the Owners at which a quorum is present, may remove a member of the Board with or without cause,

11

other than a member appointed by the Declarant.

The termination of Declarant's control under this Section shall not affect the Declarant's rights as an Owner to exercise the vote allocated to Lots which Declarant owns.

2.6.2   Proxies.  Every Member entitled to vote or execute statements of consent shall have the right to do so either in person or by an agent or agents authorized by a written proxy executed by such Person or his duly authorized agent; provided, that any proxy is void if it is not dated or purports to be revocable without notice.  A proxy terminates one year after its date, unless it specifies a shorter term.  A Member's proxy shall automatically terminate upon conveyance by that Member of his fee title interest in all Lots owned by the Member.

2.6.3   Actions.  If a quorum is present, the affirmative vote on any matter of the majority of the votes represented at the meeting (or, in the case of elections in which there are more than two candidates, a plurality of the votes cast) shall be the act of the Members, unless the vote of a greater number is required by law, by the Articles of Incorporation or Bylaws of the Association, or by this Declaration.

2.7   Repair and Maintenance by the Association.

2.7.1   Maintenance Standards.  Subject to Article 10 pertaining to Destruction of Improvements, Article 11 pertaining to Eminent Domain and Article 2, Section 2.8 pertaining to Repair and Maintenance by Owners, the Association shall maintain, repair and replace the Common Elements, and any Improvements thereon, or shall contract for such maintenance, repair and replacement to assure maintenance of the Common Elements, and Improvements thereon, in a clean, sanitary and attractive condition reasonably consistent with prudent property management practices and the Budget.  The Board shall determine, in its sole discretion, the level and frequency of maintenance of the Common Elements.

2.7.2   Charges to Owners.  All such costs of maintenance, repairs and replacements for the Common Elements shall be paid for as Common Expenses out of the Association Maintenance Funds as provided in this Declaration.  The cost of any maintenance, repair or replacement by the Association which is not the responsibility of the Association or which arises out of, or is caused by, the act of an Owner, Resident, or such Owner's or Resident's Family, or Guest shall, after Notice and Hearing, be levied by the Board as a Special Assessment against such Owner.

Notwithstanding the foregoing, an Owner is responsible for any costs incurred by the Association for damages resulting from an Owner building within or placing

12

landscaping or other Improvements on the Landscape Easements and Sewer and Drainage Easements.

     2.8   Repair and Maintenance by Owners. Each Owner or Resident shall cause to be maintained, repaired, replaced and restored, at his sole expense, all portions of his Lot except any Common Element which is to be maintained by the Association pursuant to Section 2.7.1.  Each Owner is responsible to maintain, repair, replace or restore and is liable for any expense related to the utility connections within the Lot, including, but not limited to, the sewer clean out, the water meter and valves, power meter, telephone line and any other utility connections appurtenant to said Lot.

     Notwithstanding any other provision in this Declaration to the contrary, each Owner or Resident is responsible for the maintenance, repair or replacement of the light fixture located in, on, or upon his Lot or in the public utility easement adjacent to his Lot, and any appurtenances thereto, including but not limited to the utility connections. Each Owner or Resident shall keep said light fixture operational and lit from dusk to dawn.

     The Owners of a Party Wall shall be responsible for maintaining, repairing and replacing said Party Wall.  The costs of such maintenance, repair and/or replacement shall be shared equally by the respective Owners; provided, however, that all costs of any maintenance, repair or replacement necessitated by the negligent or willful action of an Owner, his Family, Guest or tenant shall be borne by that Owner. In the absence of negligent or willful conduct, any necessary maintenance, repair or replacement performed by an Owner shall entitle that Owner to a right of contribution from the other Owner of the Party Wall.  The right of contribution shall be appurtenant to the Lot and shall pass to the successor(s) in interest of the Owner entitled to contribution.

     Each portion of the wall which separates a Lot from a Common Element shall be maintained, repaired and replaced by the Owner of the Lot and the Association.  The costs of such maintenance, repair and/or replacement shall be shared equally by the Owner and the Association; provided, however, that all costs of any maintenance, repair or replacement necessitated by the negligent or willful action of any Owner, his Family, Guest or tenant, shall be borne by that Owner. In the absence of negligent or willful conduct, any necessary maintenance, repair or replacement performed by the Association shall entitle the Association to a right of contribution from the other Owners of the Party Wall. The right of contribution shall be appurtenant to the Lot and shall pass to the successor(s) in interest of the Owner entitled to contribution. All such costs of maintenance, repairs and replacements for which the Association is responsible for shall be paid for as Common Expenses out of the Association Maintenance Funds as provided in this Declaration.

     Walls along the perimeter of the Property which separate a Lot from neighboring projects shall be maintained, repaired, replaced and restored by the Owner of the Lot. Walls along the perimeter of the Property which separate Common Elements from neighboring projects shall be maintained, repaired, replaced and restored by the

13

Association.

The Owner of a Lot on which a Sewer and Drainage Easement is located is responsible for the repair, replacement, maintenance and restoration of the drainage culvert, if any, which is situated upon Lot, and any cost associated therewith.   The Association reserves the right to inspect and service said drainage culverts from time to time or whenever it may deem necessary.

If the Owner of a Lot fails to maintain, repair, replace or restore the Improvements as required by this Section 2.8 of this Declaration, then the Association reserves the right to enter upon the Owners Lot to perform such maintenance, repair, replacement or restoration and to levy a Special Assessment against such Owner as described in Section 2.7.2 of this Declaration.

2.8.1  Common Element Lighting and Photoelectric Cells.   The Association shall be responsible for maintaining and repairing any light fixtures, wiring, or conduit located in the Common Elements.

2.9    Use of Agent.  The Board, on behalf of the Association, may contract with a Manager for the performance of maintenance and repair and for conducting other activities on behalf of the Association, as may be determined by the Board.  The maximum term of any such contract ("Management Contract") shall be one (1) year, unless a longer term is approved either by vote or written assent of a majority of the voting power of the Association or by VA or FHA, in which case the maximum term of the Management Contract shall be three (3) years.  The maximum term of any contract providing for Declarant's services to the Association or the Property shall also be three (3) years.  Each such contract for Declarant's services and each Management Contract shall provide for its termination by either party thereto with cause upon no more than thirty (30) days' written notice to the other party, and without cause and without payment of a termination fee upon no more than ninety (90) days' written notice to the other party.

ARTICLE 3
Owners' Property Rights

3.1    Legal Description of Lot.  The components of each Lot shall be substantially as follows:

PARCEL NO. 1: Fee title to the applicable Lot as shown on the Map covering such Lot.  The Lots in Phase 1 are as set forth in Exhibit "A"  attached hereto. Additional Lots may be annexed into the Property consistent with Article 14 hereof.

PARCEL NO. 2: Nonexclusive easements for access, ingress, egress, use, enjoyment, and other purposes, with respect to the Common Elements, including but not limited to, the Landscape Easements and Sewer and Drainage Easements, as described in this Declaration.

14

3.2     Association Easement.  The Association shall have an easement over the Common Elements for performing its duties and exercising its powers described in this Declaration.  The Association's obligations to maintain the Common Elements shall commence on the date Annual Assessments commence on the Lots.  Until commencement of Annual Assessments on the Lots, the Common Elements in the Association shall be maintained by Declarant.

3.3     Partition.  There shall be no judicial partition of the Common Elements, or any part thereof, nor shall Declarant, any Owner or any other Person acquiring any interest in any Lot in the Property seek any such judicial partition.

3.4     Member's Easement in Common Elements.  Subject to the provisions of this Declaration, every Member of the Association shall have, for himself, his Family and Guests, a non exclusive easement of access, ingress, egress, use and enjoyment of, in and to the Common Elements, only as to those portions of the Common Elements which lay in the unenclosed portion of Lots, and such easements shall be appurtenant to and shall pass with title to every Lot in the Property.

3.5     Extent of Member's Easements.  The rights and easements of use and enjoyment of the Common Elements created by this Declaration shall be subject to the Restrictions, which include, without limitation, the following:

(a)     The right of the Board to consent to or otherwise cause the construction of additional Improvements on the Common Elements and to consent to or otherwise cause the alteration or removal of any existing Improvements on the Common Elements for the benefit of the Members of the Association.

(b)     The right of the Board, to grant easements, leases, licenses and concessions through or over the Common Elements.

(c)     The right of the Board to reasonably restrict access to easements for which the Association is responsible for maintenance.

(d)     The right of the Board, to establish uniform rules and regulations for the use of the Common Elements.

(e)     The right of the Board and pursuant to an agreement executed by Owners to whom a majority of the Association's voting power is allocated, including a majority of the voting power not allocated to Declarant, which agreement must be Recorded and which must specify a date after which the agreement will be void unless Recorded, to convey the Common Elements or to subject the Common Elements to a Mortgage.

(f)     The rights and reservations of Declarant as set forth in this

15

Declaration;

3.6    Waiver of Use.  No Owner may exempt himself from personal liability for Assessments duly levied by the Association, or effect the release of his Lot from the liens and charges thereof, by waiving use and enjoyment of the Common Elements or by abandoning his Lot.

3.7    Damage by Member.  To the extent permitted by Nevada law, each Member shall be liable to the Association for any damage to the Common Elements not fully reimbursed to the Association by insurance if the damage is sustained because of the negligence, willful misconduct or unauthorized or improper installation or maintenance of any Common Elements, or Improvement thereon, by the Member, Resident or Guest, or any other Persons deriving their right and easement of use and enjoyment of the Common Elements from the Member, or his or their respective Family and Guests, both minor and adult.  However, the Association, acting through the Board, reserves the right to determine whether any claim shall be made upon the insurance maintained by the Association, and the Association further reserves the right, after Notice and Hearing as provided in the Bylaws, to levy a Special Assessment against such Members equal to the increase, if any, in insurance premiums directly attributable to the damage caused by the Member or the Person for whom the Member may be liable as described above.  In the case of joint ownership of a Lot, the liability of the owners shall be joint and several, except to the extent that the Association shall have previously contracted in writing with the joint Owners to the contrary.  After Notice and Hearing as provided in the Bylaws, the cost of correcting the damage to the extent not reimbursed to the Association by insurance shall be a Special Assessment against such Member's Lot, and may be enforced as provided herein.

3.8    Landscape Easement.  No Owner may construct, install or place any Improvement within a Landscape Easement.

3.9    Sewer and Drainage Easement.  No Owner may construct, install or place any permanent improvement within a Sewer and Drainage Easement.  All other improvements shall be submitted for approval as more fully set forth in the Protective Covenants.

## ARTICLE 4
### Architectural Review Committee

The provisions governing architectural review for any construction on a Lot are set forth in the Protective Covenants.  The term of those serving on the Architectural Review Committee at the pleasure of the Declarant  shall automatically expire after Declarant conveys all Lots owned by Declarant in the Property.  After Declarant conveys all Lots owned by Declarant in the Property, the Members may create and empower an architectural review committee by amending this Declaration as set forth in Article 13 of this Declaration.

16

# ARTICLE 5
## Association Maintenance Funds and Assessments

5.1     Personal Obligation of Assessments.  Declarant, on behalf of itself and all future Owners, hereby covenants and agrees to pay, and each Owner by accepting title to a Lot or any interest therein, whether or not it shall be expressed in the deed or other instrument conveying title, shall be deemed to covenant and agree to pay to the Association, Annual Assessments and other amounts as required or provided for in this Declaration.  Amounts payable for Annual Assessments and Special Assessments (as generally defined in Sections 5.5 and 5.7, respectively) are generally referred to herein as Assessments.  All such Assessments, together with any and all late charges, fines, interest, attorneys fees and other costs or expenses incurred by the Association in collecting unpaid amounts shall be a charge on the Lot, against which such assessment is made, enforceable and collectible as Annual or Special Assessments.  Each such Assessment, together with late charges, interest, costs and reasonable attorneys fees, shall also be the personal obligation of the Person who was the Owner of the Lot at the time when the Assessment fell due.  The personal obligation cannot be avoided by abandonment of the Lot or by an offer to waive use of the Common Elements.  The personal obligation for delinquent Assessments shall not pass to any new Owner unless expressly assumed by said new Owner.

Subject to the provisions hereof, the Board shall have the power and authority to determine all matters in connection with Annual or Special Assessments, including, without limitation, power and authority to determine where, when and how Assessments shall be paid to the Association, and each Owner shall comply with all such determinations.

5.2     Maintenance Funds of Association.  The Board shall establish no fewer than two (2) separate Association Maintenance Funds, into which shall be deposited all funds paid to the Association, and from which disbursements shall be made, as provided herein, in the performance of functions by the Association under this Declaration.  The Association Maintenance Funds may be established as trust accounts at a federally insured banking or savings institution and shall include: (1) an Operating Fund for current Common Expenses of the Association; (2) an adequate Reserve Fund for capital Improvements, replacements, and repairs of the Common Elements (which cannot normally be expected to occur on an annual or more frequent basis), and for payment of deductible amounts for policies of insurance which the Association obtains as provided in Section 9.1 hereof, and (3) any other funds which the Board may establish to the extent necessary under the provisions of this Declaration.  Nothing contained herein shall limit, preclude or impair the establishment of additional Maintenance Funds by the Association, so long as the amounts assessed to, deposited into, and disbursed from any such Fund are earmarked for specified purposes authorized by this Declaration.

5.3     Purpose of Assessments.  The assessments levied by the Association shall be used exclusively for the operation, replacement, improvement and

17

maintenance of the Common Elements, and to discharge any other obligations of the Association under this Declaration. All amounts deposited into the Operating Fund must be used solely for the common benefit of all of the Owners for purposes authorized under this Declaration. Disbursements from the Operating Fund shall be made by the Board for such purposes as are necessary for the discharge of its responsibilities herein for the common benefit of all of the Owners, other than those purposes for which disbursements from the Reserve Fund are to be used. Disbursements from the Reserve Fund shall be made by the Board only for the purposes specified in this Article 5. Nothing in this Declaration shall be construed in such a way as to permit the use of Assessments or funds to abate any annoyance or nuisance emanating from outside the boundaries of the Property or to enforce the Protective Covenants for Timberlake. Annual Assessments shall be used to satisfy Common Expenses of the Association, as provided herein and in the Bylaws.

5.4     Adoption of Budget.

5.4.1  Initial Year of Operations.  The Annual Assessment per Lot for the first Fiscal Year of the Association shall be as set forth in the initial Budget adopted by the Board. If during the first Fiscal Year of the Association the Board determines that the Annual Assessment should be increased, the Board shall provide a summary of the increased Budget to all Owners and shall call a meeting of the Members to consider ratification of the increased Budget. The date of such meeting shall be not less than fourteen (14) nor more than thirty (30) days after the date of mailing of increased Budget summary. Unless Members controlling a majority of the voting power of the Association reject the increase, the increase shall be deemed ratified, whether or not a quorum is present at said meeting.

5.4.2  Subsequent Fiscal Years.  The Board shall annually adopt, at least sixty (60) days prior to the expiration of the current Fiscal Year, a proposed Budget for the Property for the upcoming Fiscal Year. Within thirty (30) days after such adoption, the board shall provide a summary of the Budget to all Owners and shall call a meeting of the Members to consider ratification of the Budget. The date of such meeting shall be not less than fourteen (14) nor more than thirty (30) days after the date of mailing of the Budget summary. Unless Members controlling a majority of the voting power of the Association reject the Budget, the Budget shall be deemed ratified, whether or not a quorum is present at said meeting. If the Budget is rejected, then the Budget last ratified shall be continued until such time as a new proposed Budget is ratified. If during such upcoming Fiscal Year the Board determines that the Annual Assessment should be increased above the amount reflected in the Budget then in effect for such Fiscal Year, the Board shall provide a summary of the increased Budget to all Owners and the provisions set forth above concerning a meeting of the Owners to ratify a new Budget shall be applicable to such proposed increase.

5.5     Annual Assessments.  On January 1, 1998, Annual Assessments and any

18

monthly installment related thereto, shall commence on all Lots in Phase 1, and any Phase of Development annexed into the Property prior to January 1, 1998. The Annual Assessments shall commence on all other Lots, in a Phase of Development, on the first day of the first calendar month following the Close of Escrow for the sale of the first Lot in said Phase of Development. Prior to January 1, 1998, the Declarant will maintain the Common Elements within the Property at its sole expense.

The amount to be raised by Annual Assessments during a Fiscal Year shall be equal to (i) the Operating Fund necessary to satisfy the Budget for such period, plus (ii) the Reserve Fund to be set aside for said period, less the amount attributable to the Operating Budget collected but not disbursed in the immediately preceding Fiscal Year or partial Fiscal Year; provided, however, that in lieu of such subtraction the Board may elect to refund said surplus to the Owners or to place the surplus in the Reserve Fund.

All Annual Assessments shall be assessed equally against the Members and their Lots based upon the number of Lots owned by each Member. Annual Assessments for any assessment period shall be prorated. Declarant shall pay its full share of Annual Assessments on all unsold Lots for which Annual Assessments have commenced. From time to time, and consistent with NRS 116.3114 and Section 5.2 hereof, the Board may determine that all excess funds in the Operating Fund be retained by the Association and used to reduce the following year's Annual Assessments. Upon dissolution of the Association incident to the abandonment or termination of the Property, any amounts remaining in any of the Maintenance Funds shall be distributed to or for the benefit of the Members in the same proportions as such monies were collected from the Members, subject to the right of any creditors of the Association.

Each Installment of Annual Assessments may be paid by the Member to the Association in one check or in separate checks as payments attributable to deposits into specified Association Maintenance Funds. If any installment of an Annual Assessment payment is less than the amount assessed and the payment does not specify the Association Maintenance Fund or Funds into which it should be deposited, the receipt by the Association from that Member shall be credited in order of priority first to the Operating Fund, until that portion of the Annual Assessment has been satisfied, and second to the Reserve Fund.

If the Board fails to determine or cause to be determined the total amount to be raised by Annual Assessments in any Fiscal Year and/or fails to notify the Owners of the amount of such Annual Assessments for any Fiscal Year, then the amounts of Annual Assessments shall be deemed to be the amounts assessed in the previous Fiscal Year.

Except as emergencies may require, the Association shall make no commitments or expenditures in excess of the funds reasonably expected to be available to the Association.

19

5.6     First Annual Assessment And Maximum Annual Increases.

    5.6.1   First Annual Assessment.  The initial Annual Assessment for the Fiscal Year in which Assessments first commence shall be calculated as determined from the Budget.  The Board shall estimate and prepare a Budget for the costs and expenses to be incurred by the Association, as is more fully set forth in Section 5.4 of this Declaration.  All costs and expenses incurred in fulfilling the financial obligations of the Association prior to the commencement of Annual Assessments shall be the responsibility of Declarant. and Declarant hereby covenants to bear and to pay or otherwise satisfy such financial obligations.

    5.6.2   Maximum Annual Assessment.  Notwithstanding anything in this Declaration to the contrary, the Maximum Annual Assessment for a Fiscal Year for Common Expenses, exclusive of any insurance premiums paid by the Association, shall not exceed Five Hundred Dollars ($500.00) per Lot, as adjusted from time to time pursuant to the CPI Increase.

    5.6.3   Maximum Annual Increase.  Subject to Section 5.6.2 above, the Annual Assessments for the Association following the first Fiscal Year may be increased as provided herein.  However, the Annual Assessment for a particular Fiscal Year shall not, without approval of the Members, be increased by an amount which is more than 115% of the last installment of Annual Assessments levied in the last quarter (or other installment period) of the immediately preceding Fiscal Year, annualized over an entire year, without approval of the Members.  An Annual Assessment may be increased above such maximum if, but only if, such increase is approved at a meeting of Members by the vote of Members holding two-thirds (2/3) of the votes cast at said meeting in each class of voting rights then in existence, with the quorum at such meeting to be as set forth in the Bylaws.

5.7     Special Assessments.  In addition to Annual Assessments, the Association may levy Special Assessments, payable over the period of the Association's Fiscal Year (i) for the purpose of defraying, in whole or in part, the costs of any acquisition, construction, reconstruction, maintenance, repair or replacement provided for or required pursuant to Article 2 of this Declaration; (ii) for the purpose of defraying any other expense incurred or to be incurred by the Association as provided in this Declaration; or (iii) to cover any deficiency in the event that, for whatever reasons, the amount received by the Association from Annual Assessments is less than the amount determined to be necessary and assessed by the Board.  Special Assessments for these purposes may not be levied unless approved by Members holding a majority of the votes held by all Members.

5.8     Time for Payments.  The amount of any Assessment, charge, or other amount payable by an Owner or Resident with respect to such Owner's or Resident's Lot shall become due and payable as specified herein and if said payment is not

20

received, then said owner or Resident shall also be responsible for any late charges, interest, or attorneys fees related thereto. Unless paid, when due, any such amount shall bear interest as set forth in Section 5.9 below, from its original due date until date of payment. Annual Assessments shall be paid and collected on a semi-annual basis, unless the Board agrees otherwise. Special Assessments shall be paid and collected as determined by the Board.

5.9   Delinquency. Any installment of an Assessment provided for in this Declaration shall be delinquent if not paid within fifteen (15) days of the due date as established by the Board of the Association. Upon such delinquency, the full amount of the Assessment (i.e., not simply the delinquent installment) shall immediately become due and payable. The Board shall be authorized to adopt a system pursuant to which the full amount of any Annual Assessments or Special Assessments not paid within thirty (30) days after the due date, plus all reasonable charges, or other costs of collection (including attorneys' fees) and late charges, shall bear interest commencing thirty (30) days from the due date until paid at the rate of up to eighteen percent (18%) per annum, but in no event more than the maximum rate permitted by law. The Association need not accept any tender of a partial payment of an installment of an Assessment and all costs and attorneys fees attributable thereto, and any acceptance of any such tender shall not be deemed to be a waiver of the Association's right to demand and receive full payments thereafter.

5.10   Creation and Release of Lien. All sums assessed in accordance with the provisions of this Declaration shall constitute a lien on the respective Lot from the time such sums become due prior and superior to all other liens and encumbrances thereon except (a) liens and encumbrances Recorded before Recordation of this Declaration; (b) a first Mortgage on the Lot Recorded before the date on which the assessment sought to be enforced became delinquent, except the Association lien shall have priority for six (6) months Annual Assessments and related charges including late charges, interest, and attorneys fees, pursuant to Section 116.3116.(2) of the Nevada Revised Statutes; and (c) liens for real estate taxes and other governmental assessments or charges against the Lot. The Association may enforce the lien after (aa) Recordation by the Board or its authorized agent of a Notice of Assessment ("Notice of Lien") which states (i) the amount of the Assessment and other authorized charges and interest, including the cost of preparing and Recording the Notice of Lien, (ii) a sufficient description of the Lot against which the same has been assessed, and (iii) the name of the owner thereof; (bb) the Association or other Person enforcing the lien has executed and caused to be Recorded a Notice of Default and Election to Sell ("Notice of Default") the Lot to satisfy the lien, which contains the same information as the Notice of Default plus a description of the deficiency in payment and the name and address of the person authorized to enforce the lien by sale; and (cc) the Owner or his successor in interest has failed to pay the amount of the lien (including costs, fees and expenses incident to its enforcement) for sixty (60) days following Recordation of the Notice of Default. The Notice of Default shall be signed by any authorized officer or agent of the Association.

The Association or other Person conducting the sale shall also, after the

expiration of said sixty (60) day period and before selling the Lot, give notice of the time and place of the sale in the manner and for a time not less than that required by law for the sale of real property by execution, except that a copy of the notice of sale must be mailed, on or before the date of first publication or posting, by certified or registered mail, return receipt requested, to the Lot Owner or his successor-in-interest at his address if known, otherwise to the address of the Lot. The lien shall relate only to the individual Lot against which the assessment was levied and not to the Property as a whole. Upon payment to the Association of the full amount claimed in the Notice of Lien, or other satisfaction thereof, the Board shall cause to be Recorded a Notice of Satisfaction and Release of Lien ("Notice of Release") stating the satisfaction and release of the amount claimed. The Board may demand and receive from the applicable owner a reasonable charge, to be determined by the Board, for the preparation and Recordation of the Notice of Release before Recording it. Any purchaser or encumbrance who has acted in good faith and extended value may rely upon the Notice of Release as conclusive evidence of the full satisfaction of the sums stated in the Notice of Lien. A lien for unpaid assessments is extinguished unless proceedings to enforce the lien are instituted within three (3) years after the full amount of the assessment becomes due.

     5.11   Enforcement of Liens. It shall be the duty of the Board to enforce the collection of any amounts due under this Declaration by one (1) or more of the alternative means of relief afforded by this Declaration or in any other manner permitted by law. The lien on a Lot may be enforced by sale of the Lot by the Association, the Associations attorneys, any title insurance company authorized to do business in Nevada, or other persons authorized to conduct the sale as a trustee, or in any other manner permitted by law, after failure of the owner to pay any Annual or Special Assessment, or installments thereof, as well as any charges, late charges, interest or attorneys fees as provided herein. The sale shall be conducted in accordance with the relevant provisions of Nevada Law, as may be amended from time to time. The Association, through its agents, shall have the power to enter a credit bid on the Lot at the foreclosure sale, and to acquire and hold, lease, mortgage and convey the same. Upon completion of the foreclosure sale, an action may be brought by the Association or the purchaser at the sale in order to secure occupancy of the defaulting Owner's Residence, and the defaulting Owner shall be required to pay the reasonable rental value for such Residence during any period of continued occupancy by the defaulting Owner or any persons claiming under the defaulting Owner. Suit to recover a money judgment for unpaid assessments, charges, penalties, fines, late charges, interest or attorneys fees, shall be maintainable without foreclosing or waiving any lien securing the same, but this provision or any institution of suit to recover a money judgment shall not constitute an affirmation of the adequacy of money damages. Any recovery resulting from a suit at law or in equity initiated pursuant to this Section may include reasonable attorneys' fees as fixed by the court.

     5.12   Capital Contributions to the Association. Upon acquisition of record title to a Lot from Declarant, each Owner of a Lot shall contribute to the capital of the Association the amount of Two Hundred Dollars ($200.00). This amount shall be

deposited by the buyer into the purchase and sale escrow and disbursed therefrom to the Association or to Declarant if Declarant has previously advanced such funds to the Association. If disbursed to the Association, the Association shall deposit One Hundred Dollars ($100.00) into the Operating Account and One Hundred Dollars ($100.00) into the Reserve Account.

## ARTICLE 6
## Property Easements and Rights of Entry

6.1    Easements.

(a)    Access. Subject to Section 3.4 and 3.5 of this Declaration, Declarant expressly reserves for the benefit of the Owners reciprocal, nonexclusive easements for access, ingress and egress over all of the Common Elements as defined in this Declaration. Subject to the provisions of this Declaration governing use and enjoyment thereof, the easements may be used by all Owners or Residents and their Families or Guests residing on or temporarily visiting the Property.

(b)    Maintenance and Repair. Declarant expressly reserves for the benefit of the Board and all agents, officers and employees of the Association, nonexclusive easements over the Common Elements as necessary to maintain and repair the Common Elements, and to perform all other tasks in accordance with the provisions of this Declaration. Such easements over the Common Element shall be appurtenant to, binding upon, and shall pass with the title to, every Lot conveyed.

(c)    Utility Easements. Declarant expressly reserves, grants and conveys to all utility companies, as well as their successors and assigns, easements over, on and above the Property as is more fully set forth on the Map. Declarant expressly reserves for the benefit of the Association the right of Declarant to grant additional easements and rights-of-way over the Property to utility companies and public agencies, as necessary, for the property development and disposal of the Property. Such right of Declarant shall expire upon Close of Escrow for the sale of all Lots in the Association by Declarant.

(d)    Encroachments. Declarant, the Association and Owners of contiguous Residences shall have a reciprocal easement appurtenant to each of the Lots over the Lots and the Common Elements for the purpose of (1) accommodating any existing encroachment of any wall of any Improvement, and (2) maintaining the same and accommodating authorized construction, reconstruction, repair, shifting, movement or natural settling of the Improvements or any other portion of the Property housing their respective residences. Declarant expressly reserves for the benefit of the Common Elements, and for the benefit of the Owners and the Association, a reciprocal nonexclusive easements for drainage of water, over, across and upon the Common Elements. The foregoing easements shall not unreasonably interfere with each Owner's use and enjoyment of his Residences or Lots. No portion of the Common Elements, including any amenities contemplated as a part of the Property, are

23

proposed to be leased by Declarant to the Owners or to the Association.

(e)     Completion of Improvements.  Declarant expressly reserves for its benefit the right and easement to enter the Property to complete any Improvement which Declarant deems desirable to implement Declarant's development plan.

6.2     Rights of Entry.  The Association shall have a limited right of entry in and upon the Lots for the purpose of inspecting the Property, and taking whatever corrective action may be deemed necessary or proper by the Board, consistent with the provisions of this Declaration.  Nothing herein shall be construed to impose any obligation upon the Association to maintain or repair any portion of the Property or Improvements, required to be maintained or repaired by the Owners.  Nothing in this Article 6 shall in any manner limit the right of an Owner to exclusive occupancy and control over his Residence.  Any damage caused to a Lot by such entry by the Association or by and person authorized by the Association shall be repaired by the Association as a Common Expense of the Association.

ARTICLE 7
Declarant's Rights and Reservations

Nothing in this Declaration shall limit, and no Owner or the Association shall do anything to interfere with, the right of Declarant to complete Improvements to and on the Common Elements or any portion of the Property owned solely or partially by Declarant.  The rights of Declarant hereunder shall include, but shall not be limited to, the right to install and maintain such structures, displays, signs, billboards, flags and sales offices as may be reasonably necessary for the conduct of its business of completing the work and disposing of the Lots by sale, resale, lease or otherwise.

Each Owner by accepting a deed to a Lot hereby acknowledges that the activities of Declarant may temporarily or permanently impair the view of such Owner and may constitute an inconvenience or nuisance to the Owners, and hereby consents to such impairment, inconvenience or nuisance.  This Declaration shall not limit the right of Declarant at any time prior to acquisition of title to a Lot in the Property by a purchaser from Declarant to establish on that Lot additional licenses, easements, reservations and rights-of-way to itself, to utility companies, or to others as may from time to time be reasonably necessary to the proper development and disposal of the Property.  Declarant may use any Lots owned or leased by Declarant in the Property as model home complexes or real estate sales or leasing offices.  Declarant need not seek or obtain Board approval of any Improvement constructed or placed on any portion of the Property by Declarant.  The rights of Declarant hereunder and elsewhere in this Declaration may be assigned by Declarant to any successor in interest to any portion of Declarant's interest in any portion of the Property by a written assignment. Notwithstanding any other provision of this Declaration, the prior written approval of Declarant, as developer of the Property, will be required before any amendment to this Article shall be effective. Each Owner, with the exception of the Secretary, Department of Veterans Affairs, an officer of the United States of America, hereby grants, upon

24

acceptance of his deed to his Lot, an irrevocable, special power of attorney to Declarant to execute and Record all documents and maps necessary to allow Declarant to exercise its rights under this Article.  Declarant and its prospective purchasers of Lots shall be entitled to the nonexclusive use of the Common Elements without further cost for access, ingress, egress, use or enjoyment, in order to show the Property to its prospective purchasers, to dispose of the Property as provided herein, and to develop and sell the Property. Declarant, its successors and tenants, shall also be entitled to the nonexclusive use of any portions of the Property for the purpose of ingress, egress and accommodating vehicular and pedestrian traffic to and from the Property. The use of the Common Elements by Declarant shall not unreasonably interfere with the use thereof by the other Members. The Association shall provide Declarant with all notices and other documents to which a Beneficiary is entitled pursuant to this Declaration, provided that Declarant shall be provided such notices and other documents without making written request therefor. The rights and reservations of Declarant set forth in this Article 7 shall terminate on the seventh (7th) anniversary of the first Close of Escrow for the sale of a Lot in the Property.

## ARTICLE 8
### Residence and Use Restrictions

All of the Property shall be held, used and enjoyed subject to the limitations and restrictions set forth in the Protective Covenants.  However, as set forth in Section 2.2(g) of this Declaration, the Association shall not have the power to enforce the provisions contained in the Protective Covenants.

## ARTICLE 9
### Insurance

9.1     Duty to Obtain Insurance; Types.

(a)  Public Liability. The Board shall cause to be obtained and maintained adequate blanket public liability insurance (including medical payments), with such limits as may be considered acceptable to FNMA, insuring against liability for bodily injury, death and property damage arising out of or in connection with the use, ownership or maintenance of the Common Elements.

(b)  Fire and Casualty Insurance. The Board shall also cause to be obtained and maintained fire and casualty insurance with extended coverage without deduction for depreciation, in an amount as near as possible to the full replacement value of the Common Elements.

(c)  Fidelity Bonds. Fidelity bond coverage which names the Association as an obligee must be obtained by or on behalf of the Association for any person or entity handling funds of the Association, including, but not limited to, officers, directors, trustees, employees and agents of the Association and employees of the Manager of the Association, whether or not such Persons are compensated

25

for their services, in an amount not less than the estimated maximum of funds, including reserve funds, in the custody of the Association or the Manager, as the case may be, at any given time during the term of each bond. However, in no event may the aggregate amount of such bonds be less than the sum equal to one-fourth (1/4) of the Annual Assessments on all Lots in the Property, plus reserve funds.

(d)  Insurance Required by FNMA, GNMA and FHLMC. The Association shall continuously maintain in effect such casualty, flood and liability insurance and fidelity bond coverage meeting the insurance and fidelity bond requirements established by FNMA, GNMA and FHLMC, so long as any of which is a Mortgagee or Owner of a Lot within the Property, except to the extent such coverage is not available or has been waived in writing by FNMA, GNMA and FHLMC, as applicable.

(e)  Other Insurance. The Board shall purchase such other insurance, as the Board may deem necessary, including but not limited to, errors and omissions, directors, officers and agents liability insurance, medical payments, malicious mischief, liquor liability and vandalism insurance, fidelity bonds and worker's compensation, and such other risks as shall customarily be covered with respect to projects similar in construction, location and use.

(f)  Beneficiaries. Such insurance shall be maintained for the benefit of the Association, the Owners, and the Mortgagees, as their interests may appear as named insured, subject, however, to loss payment requirements as set forth herein.

9.2  Waiver of Claim Against Association.  As to all policies of insurance maintained by or for the benefit of the Association and the Owners, the Association and the Owners hereby waive and release all claims against one another, the Board and Declarant, to the extent of the insurance proceeds available, whether or not the insurable damage or injury is caused by the negligence of or breach of any agreement by any of said Persons.

9.3  Right and Duty of Owners to Insure. It is the responsibility of each Owner or Resident to provide  insurance on his Residence and personal property. Nothing herein shall preclude any Owner or Resident from carrying any public liability insurance as he deems desirable to cover his individual liability for damage to person or property occurring inside his Residence or elsewhere upon his Lot. Such policies shall not adversely affect or diminish any liability under any insurance obtained by or on behalf of the Association. If any loss intended to be covered by insurance carried by or on behalf of the Association shall occur and the proceeds payable thereunder shall be reduced by reason of insurance carried by any Owner, such Owner shall assign the proceeds of such insurance carried by him to the Association, to the extent of such reduction, for application by the Board to the same purposes as the reduced proceeds are to be applied.

26

9.4   Notice of Expiration Requirements. If available, each of the policies of insurance maintained by the Association shall contain a provision that said policy shall not be canceled, terminated, materially modified or allowed to expire by its term, without ten (10) days prior written notice to the Board and Declarant, and to each Owner and Beneficiary, insurer and guarantor of a first Mortgage who has filed a written request with the carrier for such notice and every other Person in interest who requests such notice of the insurer. In addition, fidelity bonds shall provide that they may not be canceled or substantially modified without ten (10) days prior written notice to any insurance trustee named pursuant to Section 9.6 and to each FNMA service who has filed a written request with the carrier for such notice.

9.5   Insurance Premiums. Insurance premiums for any blanket insurance coverage obtained by the Association and any other insurance deemed necessary by the Board shall be a Common Expense to be included in the Annual Assessments levied by the Association and collected from the Owners.

9.6   Trustee for Policies. The Association, acting through its Board, is hereby appointed and shall be deemed trustee of the interests of all named insured under policies of insurance purchased and maintained by the Association. All insurance proceeds under any such policies as provided for in Section 9.1 of this Article shall be paid to the Board as trustees. The Board shall have full power to receive and to receipt for the proceeds and to deal therewith as provided herein. Insurance proceeds shall be used by the Association for the repair or replacement of the property for which the insurance was carried or otherwise disposed of as provided in Article 10 of this Declaration. The Board is hereby granted the authority to negotiate loss settlements with the appropriate insurance carriers, with participation, to the extent they desire, of first Mortgagees who have filed written requests within ten (10) days of receipt of notice of any damage or destruction as provided in Section 10.4 of this Declaration. Any two (2) officers of the Association may sign a loss claim form and release form in connection with the settlement of a loss claim, and such signatures shall be binding on all the named insured. A representative chosen by the Board may be named as an insured, including a trustee with whom the Association may enter into an insurance trust agreement or any successor to such trustee, who shall have exclusive authority to negotiate losses under any policy providing property or liability insurance and to perform such other functions necessary to accomplish this purpose.

9.7   Actions as Trustee. Except as otherwise specifically provided in this Declaration, the Board, acting on behalf of the Association and all Owners, shall have the exclusive right to bind such parties in respect to all matters affecting insurance carried by the Association, the settlement of a loss claim, and the surrender, cancellation, and modification of all such insurance, in a manner satisfactory to Beneficiaries of seventy-five percent (75%) of the first Mortgages held by first Mortgagees who have filed requests under Section 9.4. Duplicate originals or certificates of all policies of fire and casualty insurance maintained by the Association and of all renewals thereof, together with proof of payment of premiums, shall be

27

delivered by the Association to all Owners and Mortgagees who have requested the same in writing.

9.8    Annual Insurance Review. The Board shall review the insurance carried by or on behalf of the Association at least annually, for the purpose of determining the amount of the casualty and fire insurance referred to in Section 9.1 above. If economically feasible, the Board shall obtain a current appraisal of the full replacement value of the Improvements on the Property except for foundations and footings, without deduction for depreciation, from a qualified independent insurance appraiser, prior to each such annual review.

9.9    Required Waiver. All policies of physical damage and liability insurance shall provide, if reasonably possible, for waiver of the following rights, to the extent that the respective insurers would have the rights without such waivers:

(a)    subrogation of claims against the Owners and tenants of the Owners;

(b)    any defense based upon co-insurance;

(c)    any right of setoff, counterclaim, apportionment, proration or contribution by reason of other insurance not carried by the Association;

(d)    any invalidity, other adverse effect or defense on account of any breach of warranty or condition caused by the Association, any Owner or any tenant of any Owner, or arising from any act, neglect, or omission of any named insured or the respective agents, contractors and employees of any insured;

(e)    any right of the insurer to repair, rebuild or replace, and, if the Improvement is not repaired, rebuilt or replaced following loss, any right to pay under the insurance an amount less than the replacement value of the Improvements insured;

(f)    notice of the assignment of any Owner of his interest in the insurance by virtue of a conveyance of any Lot; and

(g)    any right to require any assignment of any Mortgage to the insurer.

Each such policy shall also provide that each Owner is an insured person under the policy with respect to liability arising out of the Owner's interest in the Common Element or Membership in the Association.

28

## ARTICLE 10
### Destruction of Improvements.

10.1   Restoration of the Property. Except as otherwise provided in this Declaration, in the event of any destruction of any portion of the Common Element, the repair or replacement of which is the responsibility of the Association, it shall be the duty of the Association to restore and repair the same to its former condition, as promptly as practical. The proceeds of any insurance maintained pursuant to Article 9 hereof for reconstruction or repair of the Common Element shall be used for such purpose, unless (a) the Association is terminated, in which case Section 13.2 (c) of this Declaration shall apply; (b) repair or restoration would be illegal under any state or local statute or ordinance governing health or safety; or (c) eighty percent (80%) of the Owners' vote not to rebuild. The Board shall be authorized to have prepared the necessary documents to effect such reconstruction as promptly as practical. The Common Element shall be reconstructed or rebuilt substantially in accordance with the applicable Map and the original construction plans if they are available, unless changes have been approved in writing by sixty-seven percent (67%) of the Owners and by the Beneficiaries of fifty-one percent (51%) of first Mortgages upon the Lots. A Special Assessment shall be levied by the Board to provide the necessary funds for such reconstruction, over and above the amount of any insurance proceeds available for such purpose. If the entire Property is not repaired or replaced, then the proceeds attributable to the damaged Common Element must be used to restore the damaged Element to a condition compatible with the remainder of the Property.

10.2   Partition. No Owner shall have the right to partition of his interest in the Lot and there shall be no judicial partition of the Property, or any part thereof. Nothing herein shall be deemed to prevent partition of a co-tenancy in any Lot. Except as provided above, each Owner and the successors of each Owner, whether by deed, gift, devise, or by operation of law, for their own benefit and for the Lot and for the benefit of all other Owners, specifically waive and abandon all rights, interests and causes of action for a judicial partition of the tenancy in common Ownership of the Property and do further covenant that no action for such judicial partition shall be instituted, prosecuted or reduced to judgment.

10.3   Residence Damage.  Restoration and repair of any damage to any individual Residence shall be made by and at the individual expense of the Owner of the Residence so damaged.  In the event of a determination to rebuild the Property after partial or total destruction, as provided in this Article 10, such repair and restoration shall be completed as promptly as practical and in a lawful and workmanlike manner, in accordance with plans approved by the Board as provided herein.

10.4   Notice to Owners and Listed Mortgagees. The Board, immediately upon having knowledge of any damage or destruction affecting a material portion of the Common Element, shall promptly notify all Owners and Beneficiaries, insurers and guarantors of first Mortgages on Lots in the Property, who have filed a written request for such notice with the Board. The Board, immediately upon having knowledge of any

29

damage or destruction affecting a Lot, shall promptly notify any Beneficiary, insurer or guarantor of any Mortgage encumbering such Lot who has filed a written request for such notice with the Board.

## ARTICLE 11
### Eminent Domain.

The term "taking" as used in this Article shall mean condemnation by exercise of the power of eminent domain or by sale under threat of the exercise of the power of eminent domain. The Board shall represent the Association, with the exception of the Secretary, Department of Veterans Affairs, an officer of the United States of America, in any proceedings, negotiations, settlements, or agreements regarding takings. Except as otherwise set forth herein, all takings proceeds shall be payable to the Association for the benefit of the Lot Owners and their Mortgagees, and shall be distributed to such Owners and Mortgagees as provided in this Article 11.

11.1   Condemnation of Association Common Elements. If there is a taking of all or any portion of the Common Elements, or any interest therein, other than the taking of an undivided interest therein taken as a result of the taking of a Lot, then the award in condemnation shall be paid to the Association, and shall be deposited in the Operating Fund. No Member shall be entitled to participate as a party, or otherwise, in any proceedings relating to such condemnation.

11.2   Condemnation of Lots. If there is a taking of a Lot, the award in condemnation shall be paid to the Owner of the Lot; provided, however, that such award shall first be applied to the balance then due on any Mortgages encumbering such Owner's Lot, in order of priority.

11.3   Condemnation of Annexable Territory. If there is a taking of any or all of the Annexable Territory, regardless whether said Annexable Territory was designated as Common Elements or Lots on the Map, or any interest Declarant may have therein, then the award in condemnation shall be paid to Declarant. No Member of the Association shall be entitled to participate as a party, or otherwise, in any proceedings relating to such condemnation.

11.4   Notice to Owners and Mortgagees. The Board, upon learning of any taking affecting a material portion of the Common Elements, or any threat thereof, shall promptly notify all Owners and those Beneficiaries, insurers and guarantors of Mortgages on Lots in the Property who have filed a written request for such notice with the Association. The Board, upon learning of any taking affecting a Lot, or any threat thereof, shall promptly notify any Beneficiary, insurer or guarantor of a Mortgage encumbering such Lot who has filed a written request for such notice with the Association.

The Nevada Department of Transportation (NDOT) in connection with

30

various other state and local agencies, has identified several corridors within which to create a beltway (freeway) in northwest Las Vegas. One of these corridors, if chosen by NDOT, may affect the southerly portion of the Deer Springs Ranch Subdivision. In this case, certain portions of the subdivision may not be utilized for housing. Therefore, the alignment of the beltway may result in a redesign and/or reduction in the size of the Association.

### ARTICLE 12
### Rights of Mortgagees.

Notwithstanding any other provision of this Declaration, no amendment or violation of this Declaration shall operate to defeat or render invalid the rights of the Beneficiary under any Deed of Trust upon one (1) or more Lots made in good faith and for value, provided that after the foreclosure of any such Deed of Trust such Lot(s) shall remain subject to this Declaration, as amended. For purpose of this Declaration, "first Mortgage" shall mean a Mortgage with first priority over other Mortgages or Deeds of Trust on a Lot, and "first Mortgagee" shall mean the Beneficiary of a first Mortgage. For purposes of any provision of this Declaration which requires the vote or approval of a specified percentage of first Mortgagees, such vote or approval shall be determined based upon one (1) vote for each Lot encumbered by each such first Mortgage. In order to induce VA, FHA, FHLMC, GNMA and FNMA to participate in the financing of the sale of Lots within the Property, the following provisions are added hereto (and to the extent these added provisions conflict with any other provisions of this Declaration, these added provisions shall control):

(a)     Each Beneficiary, insurer and guarantor of a first Mortgage encumbering one (1) or more Lots, upon filing a written request for notification with the Board, is entitled to written notification from the Association of: (1) any condemnation or casualty loss which affects either a material portion of the Property or the Lot(s) securing the respective first Mortgage; and (2) any delinquency of sixty (60) days or more in the performance of any obligation under this Declaration, including without limitation the payment of assessments or charges owed by the Owner(s) of the Lot(s) securing the respective first Mortgage, which notice each Owner hereby consents to and authorizes; and (3) a lapse, cancellation, or material modification of any policy of insurance or fidelity bond maintained by the Association; and (4) any proposed action of the Association which requires consent by a specified percentage of first Mortgagees.

(b)     Each Owner, including each first Mortgagee of a Mortgage encumbering any Lot who obtains title to such Lot pursuant to the remedies provided in such Mortgage, or by foreclosure of the Mortgage, or by deed or assignment in lieu of foreclosure, shall be exempt from any right of first refusal" created or purported to be created by this Declaration.

(c)     Each first Mortgagee of a Mortgage encumbering any Lot which obtains title to such Lot, pursuant to the remedies provided in such Mortgage or by foreclosure of such Mortgage, shall take title to such Lot free and clear of any claims for unpaid

31

assessments or charges against such Lot which accrued prior to the time such Mortgagee acquires title to such Lot.

(d)     Unless at least sixty-seven percent (67%) of the first Mortgagees and sixty-seven percent (67%) of the Owners (other than Declarant) have given their prior written approval, neither the Association nor the Owners shall:

(1)     by act or omission seek to abandon or terminate the Property; or

(2)     change the method of determining the obligations, assessments, dues or other charges which may be levied against any Owner; or

(3)     partition or subdivide any Lot or Residence; or

(4)     by act or omission, seek to abandon, partition, subdivide, encumber, sell or transfer the Common Element. (The granting of easements for public utilities or for other purposes consistent with the intended use of the Common Element shall not be deemed a transfer within the meaning of this clause); or

(5)     by act or omission change, waive or abandon any scheme of regulations, or enforcement thereof, pertaining to the architectural design, the exterior appearance or the maintenance of the Residences or the Common Element; or

(6)     fail to maintain or cause to be maintained Fire and Extended Coverage insurance on insurable Common Element as provided in Article 0 of this Declaration; or

(7)     use hazard insurance proceeds for losses to any Association Property (i.e., Improvements to the Common Element) for other than the repair, replacement or reconstruction of such Association Property, subject to the provisions of Article 10 of this Declaration; or

(8)     change the pro rata interest or obligations of any Lot in order to levy assessments or charges, allocate distributions of hazard insurance proceeds or condemnation awards or determine the pro rata share of Ownership of each Lot in the Common Element.

(e)     All Beneficiaries, insurers and guarantors of first Mortgages, upon written request to the Association, shall have the right to:

(1)     examine current copies of the Association's books, records and financial statements during normal business hours; and

(2)     require the Association to submit an annual audited financial

32

statement without expense to the entity requesting the statement; and

        (3)     receive written notice of all meetings of Owners; and

        (4)     designate in writing a representative who shall be authorized to attend all meetings of Owners.

    (f)     All Beneficiaries, insurers and guarantors of first Mortgages, upon written request, shall be given thirty (30) days' written notice prior to the effective date of (1) any proposed material amendment to the Declaration or Maps; (2) any termination of an agreement for professional management of the Property following any decision of the Owners to assume self management of the Property; and (3) any proposed termination of the Property as a limited expense liability planned community.

    (g)     The Reserve Fund described in Article 5 of this Declaration must be funded by regular scheduled monthly, quarterly, semiannual or annual payments rather than by large special assessments.

    (h)     The Board shall secure and cause to be maintained in force at all times a fidelity bond for any Person handling funds of the Association, including, but not limited to, employees of the professional Manager.

    (i)     The Board may enter into such contracts or agreements on behalf of the Association as are required in order to satisfy the guidelines of VA, FHA, FHLMC, FNMA or GNMA or any similar entity, so as to allow for the purchase, guaranty or insurance, as the case may be, by such entities of first Mortgages encumbering Lots. Each Owner hereby agrees that it will benefit the Association and the membership of the Association, as a class of potential Mortgage borrowers and potential sellers of their residential Lots, if such agencies approve the Property a. a qualifying subdivision under their respective policies, rules and regulations, as adopted from time to time. Each Owner hereby authorizes his Mortgagees to furnish information to the Board concerning the status of any Mortgage encumbering a Lot.

    (j)     When professional management has been previously required by a Beneficiary, insurer, or guarantor of a first Mortgage, any decision to establish self-management by the Association shall require the approval of sixty-seven percent (67%) of the voting power of the Association and the Beneficiaries of fifty-one percent (51%) of the first Mortgages of Lots in the Property.

## ARTICLE 13
### Duration and Amendment

13.1    Duration.  This Declaration shall continue in full force for a term of fifty (50) years from the date of Recordation hereof, after which the term shall be automatically extended for successive periods of ten (10) years, unless a Declaration of Termination satisfying the requirements of an amendment to this Declaration as set forth in Section 13.2 is Recorded.  There shall be no severance by sale, conveyance, encumbrance or hypothecation of an interest in any Lot from the concomitant Membership in the association, as long as this Declaration shall continue in full force and effect. The provisions of this Article are subject to the provisions of Articles 10 and 11 of this Declaration.

13.2    Termination and Amendment.

(a)    Notice of the subject matter of a proposed amendment to this Declaration in reasonably detailed form shall be included in the notice of any meeting or election of the Association at which a proposed amendment is to be considered.  The resolution shall be adopted by the vote, in person or by proxy, or written consent of Members representing not less than sixty-seven percent (67%) of the voting power of the Association, provided that the specified percentage of the voting power of the Association necessary to amend a specified Section or provision of this Declaration shall not be less than the percentage of affirmative votes prescribed for action to be taken under that Section or provision. In the event VA or FHA is a First Mortgagee or insurer of a First Mortgagee, a draft of the proposed amendment shall be submitted to VA and FHA for approval prior to its approval by the Membership of the Association. The Member approval described above shall not be required for amendments that may be executed by the Association under NRS 116.1107.

(b)    In addition to the required notice and consent of VA, FHA, Members and Declarant provided above, the Beneficiaries of fifty-one percent (51%) of the first Mortgages on all the Lots in the Property who have requested the Association to notify them of proposed action requiring the consent of a specified percentage of first Mortgagees must approve any amendment to this Declaration which is of a material nature, as follows:

(1)  Any amendment which affects or purports to affect the validity or priority of Mortgages or the rights or protection granted to Beneficiaries, insurers or guarantors of first Mortgages as provided in Articles 5, 9, 10, 11, 12 and 13 hereof.

(2)  Any amendment which would necessitate a Mortgagee after it has acquired a Lot through foreclosure, to pay more than its proportionate share of any unpaid assessment or assessments accruing after such foreclosure.

(3)  Any amendment which would or could result in a Mortgage being

34



canceled by forfeiture, or in a Lot not being separately assessed for tax purposes.

(4)  Any amendment relating to the insurance provisions as set forth in Article 9 hereof, or to the application of insurance proceeds as set forth in Article 10 hereof, or to the disposition of any money received in any taking under condemnation proceedings as set forth in Article 11 hereof.

(5)  Any amendment which would or could result in partition or subdivision of a Lot or Residence in any manner inconsistent with the provisions of this Declaration.

(6)  Any amendment which would subject any Owner to a right of first refusal or other such restriction, if such Lot is proposed to be sold, transferred, or otherwise conveyed.

(7)  Any amendment concerning:

(a) Voting rights;

(b) Rights to use the Common Elements;

(c) Reserves and responsibility for maintenance, repair and replacement of the Common Elements;

(d) Boundaries of any Lot;

(e) Owner's interests in the Common Elements;

(f) Leasing of Residences;

(g) Establishment of self-management by the Association where professional  management has been required by any Beneficiary, insurer or guarantor of a first Mortgage;

(h) Assessments, assessment liens, or the subordination of such lien.

(c)    Termination of this Declaration shall require approval by Members representing at least sixty-seven percent (67%) of the Association's voting power. No such termination shall be effective unless it is also approved in advance either by fifty-one percent (51%) of the Beneficiaries of the first Mortgages on all of the Lots in the Property (if said termination is proposed by reason of the substantial destruction or condemnation of the Property) or by sixty-seven percent (67%) of such Beneficiaries (if said termination is for reasons other than such substantial destruction or condemnation).

35

     (d)    Each Beneficiary of a first Mortgage on a Lot in the Property which receives proper written notice of a proposed amendment or termination of this Declaration by certified or registered mail with a return receipt requested shall be deemed to have approved the amendment or termination if the Beneficiary fails to submit a response to the notice within thirty (30) days after the Beneficiary receives the notice.

     (e)    A copy of each amendment shall be certified by at least two (2) officers of the Association, and the amendment shall be effective when a Certificate of Amendment is Recorded. The Certificate, signed and sworn to by two (2) officers of the Association that the requisite number of Owners and mortgagees have either voted for or consented in writing to any amendment adopted as provided above, when Recorded, shall be conclusive evidence of that fact. The Association shall maintain in its files the record of all such votes or written consents for a period of at least four (4) years. The certificate reflecting any termination or amendment which requires the written consent of any of the Beneficiaries of first Mortgages shall include a certification that the requisite approval of such first Mortgagees has been obtained.

     (f)    Notwithstanding any other provisions of this Section 13.2, at any time prior to the first Close of Escrow for the sale of a Lot, Declarant may unilaterally amend or terminate this Declaration by Recording a written instrument which effects the amendment or termination and is signed and acknowledged by Declarant

     (g)    Notwithstanding any other provisions of this Section 13.2, for so long as Declarant owns any portion of the Property, Declarant may unilaterally amend this Declaration by Recording a written instrument signed by Declarant in order to conform this Declaration to the requirements of the City, County, VA, FHA, FNMA, GNMA or FHLMC then in effect.

     13.3   Protection of Declarant.  Until the seventh (7th) anniversary of the first Close of Escrow for the sale of a Lot in the Property, the prior written approval of Declarant, as developer of the Property, will be required before any amendment which would impair or diminish the rights of Declarant to complete the Property or sell or lease Lots therein in accordance with this Declaration shall become effective. Notwithstanding any other provisions of this Declaration, until such time as Declarant no longer owns any Lots in the Property, the following actions, before being undertaken by the Association, shall first be approved in writing by Declarant:

     (a)    Any amendment or action requiring the approval of first Mortgagees pursuant to this Declaration, including without limitation all amendments and actions specified in Sections 13.2; or

     (b)    Any significant reduction of Association maintenance or other services.

36

## ARTICLE 14
### Annexable Territory.

Additional real property may be annexed to the Property and such additional real property may become subject to this Declaration by any of the methods set forth hereinafter.

14.1  Additions by Declarant.  Declarant shall have the right from time to time to add the Annexable Territory, or any portion or portions thereof, to the Property and to bring such added territory within the general plan and scheme of this Declaration without the approval of the Association, its Board, or Members; provided that such a right of Declarant shall terminate on the seventh (7th) anniversary of the date of Recordation of this Declaration.  As each Phase of Development is developed, Declarant may, with respect thereto, record a supplemental declaration ("Supplemental Declaration") which may supplement this Declaration with such additional covenants, conditions, restrictions, reservations and easements as Declarant may deem appropriate for that Phase of Development. Prior to any annexation under this Section 14.1, detailed plans for the development of the additional property must be submitted to VA and VA must determine that such plans are in accordance with the development plan and so advise Declarant. Declarant makes no assurances regarding the order in which the Annexable Territory will be annexed to the coverage of the Declaration or whether the Annexable Territory will be annexed into the Property.

14.2  Other Additions. In addition to the provision for annexation specified in Section 14.1 above, additional real property may be annexed to the Property and brought within the general plan and scheme of this Declaration upon the approval by vote or written consent of Members entitled to exercise no less than two-thirds (2/3) of the voting power of the Association. Notwithstanding the foregoing, any additional real property annexed to the Property after the seventh (7th) anniversary of the Recordation of this Declaration shall not effect a change in the percentage interests of Owners in the Common Elements which existed prior to the date of annexation.

14.3  Rights and Obligations of Added Territory. Subject to the provisions of Section 14.4, upon the Recording of a Notice of Addition containing the provisions as set forth in Section 14.4, all provisions contained in this Declaration shall apply to the real property described in such Notice of Addition (the "Added Territory") in the same manner as if it were originally covered by this Declaration. Thereafter, the rights, powers and responsibilities of the parties to this Declaration with respect to the Added Territory shall be the same as with respect to the Property originally covered hereby, and the rights, powers and responsibilities of the Owners, lessees and occupants of Lots within the Added Territory, as well as within the Property, originally subject to this Declaration, shall be the same as if the Added Territory was originally covered by this Declaration.  Subject to Declarant's obligation to maintain the Common Elements, and as more fully set forth in Section 5.5 of this Declaration, Annual Assessments for Lots in the Phase of Developments described in the Notice of Added Territory shall commence on: (a) January 1, 1998; or (b) the first day of the month following the first close of escrow of a Lot in the Added Territory.  Voting rights attributable to the Lots in the

37

Added Territory shall not vest until Annual Assessments have commenced as to such Lots.

14.4  Notice of Addition. The additions authorized under Sections 14.1 and 14.2 shall be made by Recording a Notice of Addition, or other similar instrument (which notice or instrument may contain the Supplemental Declaration, if any, affecting each such Phase of Development), with respect to the Added Territory, which shall extend the general plan and scheme of this Declaration to such Added Territory. Any such Notice of Addition shall constitute an amendment to this Declaration. The Notice of Addition for any addition under Section 14.1 shall be signed by Declarant. The Notice of Addition for any addition under Section 14.2 shall be signed by at least two (2) officers of the Association to certify that the requisite approval of the Members under Section 14.2 was obtained.

The Recordation of said Notice of Addition shall constitute and effectuate the annexation of the Added Territory described therein, and thereupon said Added Territory shall become and constitute a part of the Property, become subject to this Declaration and encompassed within the general plan and scheme of covenants, conditions, restrictions, reservation of easements and equitable servitudes contained herein, and become subject to the function, powers and jurisdiction of the Association; and the Owners of Lots in said Added Territory shall automatically become Members of the Association. Such Notice of Addition may contain a Supplemental Declaration with such additions and modifications of the covenants, conditions, restrictions, reservation of easements and equitable servitudes contained in this Declaration as may be necessary to reflect the different character, if any, of the Added Territory, or as Declarant may deem appropriate in the development of the Added Territory, and as are not inconsistent with the general plan and scheme of this Declaration.

14.5  Deannexation and Amendment. Declarant may amend a Notice of Addition or delete all or a portion of a Phase of Development from coverage of this Declaration and the jurisdiction of the Association, so long as Declarant is the Owner of all of such Phase of Development, and provided that (1) an amending instrument or a Notice of Deletion of Territory, as applicable, is Recorded in the same manner as the applicable Notice of Addition was Recorded, (2) Declarant has not exercised any Association vote with respect to any portion of such Phase of Development, (3) assessments have not yet commenced with respect to any portion of such Phase of Development, (4) Close of Escrow has not occurred for the sale of any Lot in such Phase of Development, (5) the Association has not made any expenditures or incurred any obligations with respect to any portion of such Phase of Development, and (6) a draft of the Notice of Deletion of Territory has been submitted to VA and VA has determined that the deannexation is acceptable and in accordance with the revised general plan and has so advised Declarant.

38

## ARTICLE 15
### General Provisions

15.1   Enforcement of Restrictions.

(a) Legal Proceedings. Failure to comply with any of the terms of this Declaration by an Owner, Resident, or his or their Family or Guests, shall be grounds for relief which may include, without limitation, an action to recover sums due for damages, injunctive relief, foreclosure of any lien, or any combination thereof.

(b) No Waiver. Failure to enforce any provision hereof shall not constitute a waiver of the right to enforce that provision, or any other provision hereof.

(c) Attorney. Any judgment rendered in any action or proceeding pursuant to this Declaration shall include a sum for attorneys' fees in such amount as the court may deem reasonable, in favor of the prevailing party, as well as the amount of any delinquent payment, interest thereon, costs of collection and costs of court.

15.2   Severability. The provisions hereof shall be deemed independent and several, and a determination of invalidity or partial invalidity or unenforceability of any one provision or portion hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provisions hereof.

15.3   Interpretation. The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the creation and operation of a residential limited expense liability planned community and for the maintenance of Common Elements, and any violation of this Declaration shall be deemed to be a nuisance. The Article and Section headings have been inserted for convenience only, and shall not be considered or referred to in resolving questions of interpretation or construction. As used herein, the singular shall include the plural and the plural the singular; and the masculine, feminine and neuter shall each include the other, unless the context dictates otherwise.

15.4   Mergers or Consolidations. Upon a merger or consolidation of the Association with another association, its properties, rights and obligations may, by operation of law, be transferred to another surviving or consolidated association or, alternatively, the properties, rights and obligations of another association may, by operation of law, be added to the properties rights and obligations of the Association as a surviving corporation pursuant to a merger. The surviving or consolidated association may administer and enforce the covenants, conditions and restrictions established by this Declaration governing the Property, together with the covenants and restrictions established upon any other property, as one (1) plan. Any such merger or consolidation shall be evidenced by an agreement prepared, executed, recorded and certified by the president of the Association following approval by the percentage of Owners needed to terminate the Association as set forth in Section 13.2 of the Declaration.

39

15.5   No Public Right or Dedication. Nothing contained in this Declaration shall be deemed to be a gift or dedication of all or any part of the Property to the public, or for any public use.

15.6   No representations or Warranties. No representations or warranties of any kind, express or implied, other than the standard warranty required by VA and FHA, have been given or made by Declarant or its agents or employees in connection with the Property or any portion thereof, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance, taxes or regulation thereof as a limited expense liability planned community, except as specifically and expressly set forth in this Declaration and except as may be filed by Declarant from time to time with any governmental authority.

15.7   Nonliability and Indemnification.

(a)   General Limitation. Except as specifically provided in the Declaration or as required by law, no right, power, or responsibility conferred on the Board by this Declaration, the Articles or the Bylaws shall be construed as a duty, obligation or disability charged upon the Board, or any member of the Board , or any other officer, employee or agent of the Association. Such Persons are subject to the insulation from liability provided for directors of corporations by the laws of the State of Nevada. Members of the Board are not personally liable to the victims of crimes occurring on the Property.

(b)   Indemnification. When liability is sought to be imposed on a member of the Board for actions undertaken in such Person's role as a member of the Board, the Association shall indemnify him for his losses or claims, and undertake all costs of defense, unless and until it is proven that he acted with willful or wanton misfeasance or with gross negligence. After such proof the Association is no longer liable for the cost of defense, and may recover costs already expended from the member of the Board who so acted. Punitive damages may not be recovered against the Association, but may be recovered from Persons whose activity gave rise to the damages. This Section 15.7(b) shall be construed to authorize payments and indemnification to the fullest extent now or hereafter permitted by applicable law. The entitlement to indemnification hereunder shall inure to the benefit of the estate, executor, administrator, heirs, legatees, or devisees of any person entitled to such indemnification.

15.8   Notices. Except as otherwise provided in this Declaration, notice to be given to an Owner shall be in writing and may be delivered personally to the Owner. Personal delivery of such notice to one (1) or more co-Owners of a Lot or to any general partner of a partnership owning a Lot shall be deemed delivery to all co-Owners or to the partnership, as the case may be. Personal delivery of such notice to any officer or agent for the service of process on a corporation shall be deemed delivery to the corporation. In lieu of the foregoing, such notice may be delivered by regular United

40

States mail, postage prepaid, addressed to the Owner at the most recent address furnished by such Owner to the Association or, if no such address shall have been furnished, to the street address of such Owner's Residence. Such notice shall be deemed delivered three (3) business days after the time of such mailing, except for notice of a meeting of Members or of the Board in which case the notice provisions of the Bylaws shall control. Any notice to be given to the Association may be delivered personally to any member of the Board, or sent by United States mail, postage prepaid, addressed to the Association at such address as shall be fixed from time to time and circulated to all Owners.

15.9   Priorities and Inconsistencies. If there are conflicts or inconsistencies between this Declaration and either the Articles of Incorporation or the Bylaws of the Association, the terms and provisions of this Declaration shall prevail. If there are any conflicts or inconsistencies between this Declaration and the Protective Covenants, the terms and provisions of the Protective Covenants shall prevail.

15.10   Constructive Notice and Acceptance. Every person who owns, occupies or acquires any right, title, estate or interest in or to any Lot or other portion of the Property does hereby consent and agree, and shall be conclusively deemed to have consented and agreed, to every limitation, restriction, easement, reservation, condition and covenant contained herein, whether or not any reference to these restrictions is contained in the instrument by which such person acquired an interest in the Property, or any portion thereof.

This Declaration is dated for identification purposes 28th February 1997.

Declarant:   **AMERICAN WEST HOMES, INC.**

By: _____
Lawrence D. Canarelli
President

41

**STATE OF NEVADA )**
                     **:ss**
**COUNTY OF CLARK )**

On this day 28th of February, 1997, personally appeared before me, a notary public, Lawrence D. Canarelli, personally known (or proved) to me to be the person whose name is subscribed to the above instrument and acknowledged to me that he executed the above instrument.

WITNESS my hand and official seal.

_____
Notary Public in and for said State

 

42



CONSULTING ENGINEERS • PLANNING • SURVEYING
PROVIDING QUALITY PROFESSIONAL
SERVICES SINCE 1960

# EXHIBIT "A" (PAGE 1)
# LEGAL DESCRIPTION

## EXHIBIT "A"



W.O. 4884
FEBRUARY 05, 1997
BY: ARR
P.R. BY: TZ
(PAGE 1 OF 2)

**EXPLANATION:**
THIS LEGAL DESCRIBES A PARCEL OF LAND GENERALLY LOCATED ON THE
NORTHEAST CORNER OF CENTENNIAL PARKWAY AND DURANGO DRIVE.

### LEGAL DESCRIPTION
### PHASE 1

BEING A PORTION OF THE WEST HALF (W 1/2) OF THE SOUTHWEST QUARTER
(SW 1/4) OF SECTION 21, TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.M.,
CITY OF LAS VEGAS, CLARK COUNTY, NEVADA, MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEING ALL OF THE AREA WITHIN THE BOUNDARIES OF THAT SUBDIVISION
KNOWN AS "DEER SPRINGS RANCH - UNIT 1" ON FILE IN THE OFFICE OF
THE CLARK COUNTY RECORDER IN BOOK 76 OF FINAL MAPS, AT PAGE 58,
CONTAINING 8.435 ACRES, MORE OR LESS.

TOGETHER WITH THE FOLLOWING DESCRIBED PARCEL:

BEGINNING AT THE MOST EASTERLY SOUTHEAST CORNER OF SAID "DEER
SPRINGS RANCH - UNIT 1", SAME BEING ON THE EAST LINE OF THE WEST
HALF (W 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION
21; THENCE SOUTH 00°48'11" WEST, ALONG SAID EAST LINE, 1196.82
FEET; THENCE SOUTH 88°55'31" WEST, DEPARTING SAID EAST LINE,
1289.66 FEET TO THE EASTERLY RIGHT-OF-WAY OF DURANGO DRIVE;
THENCE NORTH 00°28'05" EAST, ALONG SAID EASTERLY RIGHT-OF-WAY,
1268.43 FEET TO THE SOUTHERLY BOUNDARY LINE OF SAID "DEER SPRINGS
RANCH - UNIT 1"; THENCE DEPARTING SAID EASTERLY RIGHT-OF-WAY AND
ALONG THE SOUTHERLY BOUNDARY LINE OF SAID "DEER SPRINGS RANCH -
UNIT 1" THROUGH ITS VARIOUS CURVES AND COURSES AS FOLLOWS: SOUTH
69°20'02" EAST, 392.86 FEET; THENCE SOUTH 88°21'56" EAST, 304.00
FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE

# EXHIBIT "A" (PAGE 2)
# LEGAL DESCRIPTION

W.O. 4884
FEBRUARY 05, 1997
(PAGE 2 OF 2)

SOUTHEASTERLY HAVING A RADIUS OF 402.00 FEET, A RADIAL LINE TO
SAID BEGINNING BEARS NORTH 89°04'42" WEST; THENCE NORTHEASTERLY,
5.00 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 00°42'46";
THENCE NORTH 01°38'04" EAST, 3.00 FEET; THENCE SOUTH 88°21'56"
EAST, 396.42 FEET; THENCE NORTH 68°33'33" EAST, 81.25 FEET;
THENCE NORTH 62°36'47" EAST, 80.81 FEET; THENCE NORTH 65°35'40"
EAST, 87.78 FEET TO THE POINT OF BEGINNING, AS SHOWN ON THE
"EXHIBIT TO ACCOMPANY LEGAL DESCRIPTION" ATTACHED HERETO AND MADE
A PART HEREOF.

CONTAINING 33.857 ACRES, MORE OR LESS, AS DETERMINED BY COMPUTER
METHODS.

AREA TOTAL FOR PHASE 1 = 38.292 ACRES, MORE OR LESS.


BASIS OF BEARINGS
SOUTH 88°55'31" WEST, BEING THE SOUTH LINE OF THE SOUTHWEST
QUARTER (SW 1/4) OF SECTION 21, TOWNSHIP 19 SOUTH, RANGE 60 EAST,
M.D.M., CLARK COUNTY, NEVADA, SAME BEING THE CENTERLINE OF
CENTENNIAL PARKWAY, AS SHOWN ON THAT MAP ON FILE IN THE OFFICE OF
THE CLARK COUNTY RECORDER IN FILE 81 OF PARCEL MAPS, AT PAGE 28.

NOTE: THIS LEGAL DESCRIPTION IS PROVIDED AS A CONVENIENCE AND IS
NOT INTENDED FOR THE PURPOSE OF SUBDIVIDING LAND NOT IN
CONFORMANCE WITH NEVADA REVISED STATUTES.

END OF DESCRIPTION.

**EXHIBIT "A" (PAGE 3)**
**LEGAL DESCRIPTION**
**(PHASE 1)**



EXHIBIT TO ACCOMPANY LEGAL DESCRIPTION
DEER SPRINGS RANCH

ANNEXABLE
TERRITORY

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

## LEGAL DESCRIPTION
## (PHASE 1)



EXHIBIT TO ACCOMPANY LEGAL DESCRIPTION
DEER SPRINGS RANCH

DEER SPRINGS WAY

BOOK 76 PAGE "56"

P.O.B.

PHASE 1

UNIT 2

N.I.S.

DURANGO DRIVE

ANNEXABLE
TERRITORY

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

CENTENNIAL   PARKWAY



# EXHIBIT "B"  (PAGE 1)
# ANNEXABLE TERRITORY

CONSULTING ENGINEERS • PLANNERS • SURVEYORS
PROVIDING QUALITY PROFESSIONAL
SERVICES SINCE 1960

## EXHIBIT "B"



W.O. 4884
FEBRUARY 05, 1997
BY: ARR
P.R. BY: TZ
(PAGE 1 OF 2)

**EXPLANATION:**
THIS LEGAL DESCRIBES A PARCEL OF LAND GENERALLY LOCATED ON THE
NORTHEAST CORNER OF CENTENNIAL PARKWAY AND DURANGO DRIVE.

**LEGAL DESCRIPTION**
**ANNEXABLE TERRITORY**

BEING A PORTION OF THE WEST HALF (W 1/2) OF THE SOUTHWEST QUARTER
(SW 1/4) OF SECTION 21, TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.M.,
CITY OF LAS VEGAS, CLARK COUNTY, NEVADA, MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST EASTERLY SOUTHEAST CORNER OF SAID "DEER
SPRINGS RANCH - UNIT 1", SAME BEING ON THE EAST LINE OF THE WEST
HALF (W 1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SAID SECTION
21; THENCE SOUTH 00°48'11" WEST, ALONG SAID EAST LINE, 1196.82
FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 00°48'11" WEST, ALONG SAID EAST LINE,
1111.60 FEET TO THE NORTHERLY RIGHT-OF-WAY OF CENTENNIAL PARKWAY;
THENCE SOUTH 88°55'31" WEST, DEPARTING SAID EAST LINE AND ALONG
SAID NORTHERLY RIGHT-OF-WAY, 1227.69 FEET TO THE BEGINNING OF A
CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 54.00 FEET;
THENCE NORTHWESTERLY, 86.28 FEET ALONG SAID CURVE THROUGH A
CENTRAL ANGLE OF 91°32'34" TO THE EASTERLY RIGHT-OF-WAY OF
DURANGO DRIVE; THENCE NORTH 00°28'05" EAST, ALONG SAID EASTERLY
RIGHT-OF-WAY, 1055.93 FEET; THENCE NORTH 88°55'31" EAST,
DEPARTING SAID EASTERLY RIGHT-OF-WAY, 1289.66 FEET TO THE POINT
OF BEGINNING, AS SHOWN ON THE "EXHIBIT TO ACCOMPANY LEGAL
DESCRIPTION" ATTACHED HERETO AND MADE A PART HEREOF.

2727 SOUTH RAINBOW BOULEVARD   LAS VEGAS, NEVADA 89102-5148
TEL (702) 873-7550  FAX 362-2597

**EXHIBIT "B" (PAGE 2)**
**ANNEXABLE TERRITORY**

W.O. 4884
FEBRUARY 05, 1997
(PAGE 2 OF 2)

CONTAINING 32.79 ACRES, MORE OR LESS, AS DETERMINED BY COMPUTER METHODS.

**BASIS OF BEARINGS**
SOUTH 88°55'31" WEST, BEING THE SOUTH LINE OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 21, TOWNSHIP 19 SOUTH, RANGE 60 EAST, M.D.M., CLARK COUNTY, NEVADA, SAME BEING THE CENTERLINE OF CENTENNIAL PARKWAY, AS SHOWN ON THAT MAP ON FILE IN THE OFFICE OF THE CLARK COUNTY RECORDER IN FILE 81 OF PARCEL MAPS, AT PAGE 28.

NOTE: THIS LEGAL DESCRIPTION IS PROVIDED AS A CONVENIENCE AND IS NOT INTENDED FOR THE PURPOSE OF SUBDIVIDING LAND NOT IN CONFORMANCE WITH NEVADA REVISED STATUTES.

END OF DESCRIPTION.





EXHIBIT "B" (PAGE 3)

ANNEXABLE TERRITORY



DEER SPRINGS WAY

BOOK 76 PAGE 56

PHASE 1

UNIT 2

P.O.C.

P.O.B.

DURANGO DRIVE

DEER SPRINGS RANCH

N.T.S.

ANNEXABLE
TERRITORY

RECORDER'S MEMO
POSSIBLE POOR RECORD DUE TO
QUALITY OF ORIGINAL DOCUMENT

CENTENNIAL     PARKWAY

# EXHIBIT "C" (PAGE 1)
## LANDSCAPE EASEMENT
## DEER SPRINGS RANCH - UNIT NO. 1



CONSULTING ENGINEERS   PLANNERS   LAND SURVEYORS
2727 SOUTH RAINBOW BOULEVARD
LAS VEGAS, NEVADA 89102-5148 PHONE (702) 873-7550 FAX (702) 362-2597

VTN nevada